## CASE NO. 22-4562(L), 22-4734

### IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

TERRELL DARNELL WALTON,

*Defendant - Appellant.*

---

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### AT BALTIMORE

---

### JOINT APPENDIX - VOLUME I OF III
### (Pages 1 - 511)

---

Allen H. Orenberg
ORENBERG LAW FIRM, PC
12505 Park Potomac Avenue
6th Floor
Potomac, MD 20854
301-984-8005
aorenberg@orenberglaw.com

Gary E. Proctor
LAW OFFICES OF
GARY E. PROCTOR, LLC
8 East Mulberry Street
Baltimore, MD 21202
410-444-1500
garyeproctor@gmail.com

Jason D. Medinger
OFFICE OF THE
U. S. ATTORNEY
36 South Charles Street
4th Floor
Baltimore, MD 21201
410-209-4800
jason.medinger@usdoj.gov

*Counsel for Appellant*
  *Terrell D. Walton (22-4652)*

*Counsel for Appellant*
  *Che J. Durbin (22-4734)*

*Counsel for Appellee*

LANTAGNE LEGAL PRINTING
801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477

# TABLE OF CONTENTS

## VOLUME I OF III

JA Page

District Court Docket Sheet [1:20-cr-00210-GLR All Defendants] ........................1

Indictment
    Filed October 27, 2020 [ECF38] ...................................................................... 31

Excerpt of Proposed Jury Instructions (Both Defendants)
    Filed February 17, 2022 [ECF138].................................................................... 40

Excerpt of Transcript of Jury Trial Vol. III
Before the Honorable George Levi Russell, III
    On March 3, 2022 ............................................................................................. 46

    JAMEKA THOMPSON
        Direct Examination by Mr. Romano ...................................................... 48

Excerpt of Transcript of Jury Trial Vol. IV
Before the Honorable George Levi Russell, III
    On March 7, 2022 ............................................................................................. 96

    JAMEKA THOMPSON *(Continued)*
        Cross Examination by Ms. Flynn ......................................................... 100
        Cross Examination by Mr. Mann .......................................................... 126

    BRIAN BATTEE
        Direct Examination by Mr. Romano .................................................... 127
        Cross Examination by Ms. Flynn ......................................................... 163
        Redirect Examination by Mr. Romano................................................. 178

    STEPHANIE LAUFERT
        Direct Examination by Mr. Hamilton.................................................... 180
        Cross Examination by Ms. Flynn ......................................................... 189
        Cross Examination by Mr. Mann .......................................................... 197

Excerpts of Transcript of Jury Trial Vol. V
Before the Honorable George Levi Russell, III
On March 8, 2022 ................................................................ 200

    CHE DURBIN
        Direct Examination by Ms. Flynn ...................................... 230
        Cross Examination by Mr. Romano ................................... 264
        Redirect Examination by Ms. Flynn.................................. 267
        Recross Examination by Mr. Romano ................................ 275

Excerpt of Transcript of Jury Trial Vol. VI (Closing Arguments)
Before the Honorable George Levi Russell, III
On March 9, 2022 ................................................................ 329

Verdict Form (Both Defendant's)
On March 10, 2022 [ECF166] ............................................ 378

Sentencing Memorandum (Walton)
Filed August 28, 2022 [ECF197]........................................ 381

Sentencing Memorandum (Durbin)
Filed September 2, 2022 [ECF199] ..................................... 388

Defendant's Pro Se Supplemental Sentencing Memorandum (Durbin)
Filed September 7, 2022 [ECF200] ..................................... 396

Transcript of Sentencing Hearing (Walton)
Before the Honorable George Levi Russell, III
On September 22, 2022 [ECF220] ...................................... 403

Judgment in a Criminal Case (Walton)
Entered September 23, 2022 [ECF202]................................ 452

Notice of Appeal (Walton)
Filed September 30, 2022 [ECF204] ................................... 458

Transcript of Sentencing Hearing (Durbin)
Before the Honorable George Levi Russell, III
On December 19, 2022 [ECF248] ...................................... 459

Judgment in a Criminal Case (Durbin)
    Entered December 20, 2022 [ECF225] ........................................................505

Notice of Appeal (Durbin)
    Filed December 21, 2022 [ECF227]................................................................ 511

## **VOLUME II OF III - SEALED** *(Terrell D. Walton)*

Presentence Investigation Report (Walton)
    Filed April 19, 2022 .................................................................................... 512

Government's Sentencing Memorandum and Motion for
Upward Departure and Variance with Exhibits (Walton)
    Filed August 10, 2022 [ECF192]................................................................. 532

      Ex. 1:   Defendant's History [ECF192-1] ................................. 540

      Ex. 2:   Defendant's History [ECF192-2] ................................. 552

Statement of Reasons (Walton)
    Filed September 23, 2022 [ECF203] ............................................................ 593

## **VOLUME III OF III - SEALED** *(Che J. Durbin)*

Government's Sentencing Memorandum and
Exceptions to the Presentence Report (Durbin)
    Filed August 10, 2022 [ECF194]................................................................. 597

      Ex. 1:   DOJ Document (Durbin) [ECF194-1] ........................ 607

Presentence Investigation Report (Durbin)
    Filed August 30, 2022................................................................................. 621

Motion to Seal (Durbin)
    Filed November 17, 2022 [ECF216] ............................................................ 649

Government's Supplemental Sentencing Memorandum
Regarding Forfeiture of Drug Proceeds with Exhibits (Durbin)
    Filed November 17, 2022 [ECF217] ................................................ 650

    Ex. 1:    Application for a Search Warrant [ECF217-1] .......................... 654

    Ex. 2:    Search and Seizure Warrant [ECF217-2] ................................. 666

    Ex. 3:    Photos of Package and its Contents [ECF217-3] ...................... 671

Statement of Reasons (Durbin)
    Filed December 20, 2022 [ECF226] ................................................ 681

Query   Reports   Utilities   Help   Log Out

APPEAL,CLOSED

# U.S. District Court
## District of Maryland (Baltimore)
## CRIMINAL DOCKET FOR CASE #: 1:20-cr-00210-GLR All Defendants

Case title: USA v. Anderson, IV, et al.

Date Filed: 07/21/2020

Date Terminated: 12/20/2022

---

Assigned to: Judge George Levi Russell, III

**Defendant (1)**

**Jack Anderson, IV**
*TERMINATED: 12/17/2021*

represented by **Elizabeth Genevieve Oyer**
Office of the Federal Public Defender
100 S Charles St Ste 900 Tower II
Baltimore, MD 21201
14109623962
Fax: 14109623976
Email: liz_oyer@fd.org
*TERMINATED: 12/03/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William B Purpura , Jr**
Law Office of William B Purpura
Eight E Mulberry St
Baltimore, MD 21202
14107278550
Fax: 14105769351
Email: wpurp@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Pending Counts**

21:846 CONSPIRACY TO DISTRIBUTE
AND POSSESS WITH INTENT TO
DISTRIBUTE C0NTROLLED
SUBSTANCES
(1s)

**Disposition**

IMPRISONMENT for a total term of 126
months w/credit for time served since
07/29/2020; SUPERVISED RELEASE for
a term of 5 years; ASSESSMENT $100.00

**JA1**

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 21:846 CONSPIRACY TO DISTRIBUTE AND POSSESS WITH INTENT TO DISTRIBUTE COCAINE (1) | DISMISSED |
| 21:841(b)(1)(B) POSSESSION WITH INTENT TO DISTRIBUTE COCAINE; 18:2 AIDING AND ABETTING (2-3) | DISMISSED |
| 21:841(b)(1)(B) POSSESSION WITH INTENT TO DISTRIBUTE COCAINE; 18:2 AIDING AND ABETTING (2s-3s) | DISMISSED |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

---

Assigned to: Judge George Levi Russell, III

Appeals court case number: 22-4734 USCA

**Defendant (2)**

| **Che Jaron Durbin**<br>*TERMINATED: 12/20/2022* | represented by | **Catherine Flynn**<br>Law Office of Catherine Flynn<br>217 North Charles Street<br>2nd Floor<br>Baltimore, MD 21201<br>14102861440<br>Fax: 18442222460<br>Email: cflynn@catflynnlaw.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Retained* |
| --- | --- | --- |

| **Pending Counts** | **Disposition** |
| --- | --- |

| | |
|---|---|
| 21:846 CONSPIRACY TO DISTRIBUTE AND POSSESS WITH INTENT TO DISTRIBUTE COCAINE (1) | DISMISSED |
| 21:846 CONSPIRACY TO DISTRIBUTE AND POSSESS WITH INTENT TO DISTRIBUTE C0NTROLLED SUBSTANCES (1s) | IMPRISONMENT for 240 months as to count 1, 240 months as to count 2 to run concurrent to cont 1 , 240 months as to count 3 to run concurrent to count 2 for a total term of 240 months w/credit for time served since 05/12/2020; SUPERVISED RELEASE for a term of 5 years as to count 1 , 5 years as to count 2 to run concurrent to count 1, 5 years as to count 3 to run concurrent to count 2 for a total term of 5 years; ASSESSMENT $300.00 |
| 21:841(b)(1)(B) POSSESSION WITH INTENT TO DISTRIBUTE COCAINE; 18:2 AIDING AND ABETTING (2-3) | DISMISSED |
| 21:841(b)(1)(B) POSSESSION WITH INTENT TO DISTRIBUTE COCAINE; 18:2 AIDING AND ABETTING (2s-3s) | IMPRISONMENT for 240 months as to count 1, 240 months as to count 2 to run concurrent to cont 1 , 240 months as to count 3 to run concurrent to count 2 for a total term of 240 months w/credit for time served since 05/12/2020; SUPERVISED RELEASE for a term of 5 years as to count 1 , 5 years as to count 2 to run concurrent to count 1, 5 years as to count 3 to run concurrent to count 2 for a total term of 5 years; ASSESSMENT $300.00 |

**Highest Offense Level (Opening)**
Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**
None

| **Complaints** | **Disposition** |
|---|---|
| None | |

Assigned to: Judge George Levi Russell, III

**JA3**

**Defendant (3)**

**Jameka Cara Thompson**
*TERMINATED: 06/24/2022*

represented by **Joseph Murtha**
Rice, Murtha & Psoras, LLC
STE 200
1301 YORK RD
Ste. 200
Lutherville, MD 21093
14105836969
Fax: 14105834706
Email: jmurtha@ricelawmd.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 21:846 CONSPIRACY TO DISTRIBUTE AND POSSESS WITH INTENT TO DISTRIBUTE C0NTROLLED SUBSTANCES (1s) | IMPRISONMENT for a total term of 33 months w/credit for time served since 05/20/2020; SUPERVISED RELEASE for a term of 5 years; ASSESSMENT $100.00. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 21:846 CONSPIRACY TO DISTRIBUTE AND POSSESS WITH INTENT TO DISTRIBUTE COCAINE (1) | DISMISSED |
| 21:841(b)(1)(B) POSSESSION WITH INTENT TO DISTRIBUTE COCAINE; 18:2 AIDING AND ABETTING (2-3) | DISMISSED |
| 21:841(b)(1)(B) POSSESSION WITH INTENT TO DISTRIBUTE COCAINE; 18:2 AIDING AND ABETTING (2s-3s) | DISMISSED |
| 18:924(c) POSSESSION OF A FIREARM IN FURTHERANCE OF A DRUG TRAFFICKING CRIME (4) | DISMISSED |
| 18:924(c) POSSESSION OF A FIREARM IN FURTHERANCE OF A DRUG TRAFFICKING CRIME (4s) | DISMISSED |

**JA4**

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

Assigned to: Judge George Levi Russell, III

Appeals court case number: 22-4562 US Court of Appeals for the 4th Cicuit

**Defendant (4)**

**Terrell Darnell Walton**
*TERMINATED: 09/23/2022*

represented by **Tyler L Mann**
Law Offices of Mann and Risch
101 E Chesapeake Ave
Ste. 100
Towson, MD 21286
14109295145
Fax: 14106255809
Email: tyler@mannrisch.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 21:846 CONSPIRACY TO DISTRIBUTE AND POSSESS WITH INTENT TO DISTRIBUTE C0NTROLLED SUBSTANCES (1) | IMPRISONMENT for a total term of 156 months; SUPERVISED RELEASE for a term of 5 years; ASSESSMENT $100.00 |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

**JA5**

Assigned to: Judge George Levi Russell, III

### Defendant (5)

**Michael Ronnell Wells**
*TERMINATED: 09/02/2021*

represented by **Jonathan Paul Van Hoven**
Jonathan P. Van Hoven, P.A.
36 South Charles Street
Suite 901
Baltimore, MD 21201
410-576-0689
Fax: 410-576-9391
Email: jon@vanhovenlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

### Pending Counts

21:846 CONSPIRACY TO DISTRIBUTE
AND POSSESS WITH INTENT TO
DISTRIBUTE C0NTROLLED
SUBSTANCES
(1)

### Disposition

IMPRISONMENT for a total term of 71
months; SUPERVISED RELEASE for a
term of 4 years; ASSESSMENT $100.00.

### Highest Offense Level (Opening)

Felony

### Terminated Counts

None

### Disposition

### Highest Offense Level (Terminated)

None

### Complaints

None

### Disposition

---

Assigned to: Judge George Levi Russell, III

### Defendant (6)

**Gerrick Delvon Jackson**
*TERMINATED: 06/07/2022*

represented by **Ryan L Burke**
Law Offices of Ryan Burke
812 N. Calvert St.
Suite: I
Baltimore, MD 21202
443-873-7536

**JA6**

Fax: 1-844-447-4507
Email: ryan@ryanburkelaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 21:846 CONSPIRACY TO DISTRIBUTE AND POSSESS WITH INTENT TO DISTRIBUTE C0NTROLLED SUBSTANCES<br>(1) | IMPRISONMENT for a term of 72 months as to count 1 and 72 months as to count 5 , each to run concurrently to one another for a total term of 72 months; SUPERVISED RELEASE for a term of 5 years as to count 1 and 3 years as to count 5 , each to run concurrently to one another, for a total term of 5 years; ASSESSMENT $200.00. |
| 18:922(g)(1) POSSESSION OF A FIREARM AND AMMUNUTION BY A PROHIBITED PERSON<br>(5) | IMPRISONMENT for a term of 72 months as to count 1 and 72 months as to count 5 , each to run concurrently to one another for a total term of 72 months; SUPERVISED RELEASE for a term of 5 years as to count 1 and 3 years as to count 5 , each to run concurrently to one another, for a total term of 5 years; ASSESSMENT $200.00. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

| **Plaintiff** | | |
|---|---|---|
| **USA** | represented by | **Christopher J Romano**<br>Office of the United States Attorney<br>36 S Charles St Fourth Fl<br>Baltimore, MD 21201<br>4102094907<br>Fax: 4109623124<br>Email: Christopher.Romano@usdoj.gov<br>*LEAD ATTORNEY* |

*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Jason Xavier Hamilton**
Office of the United States Attorney
36 S. Charles St.
Baltimore, MD 21201
4435093617
Email: jason.hamilton@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/21/2020 | 1 | SEALED INDICTMENT as to Jack Anderson, IV (1) count(s) 1, 2-3, Che Jaron Durbin (2) count(s) 1, 2-3, Jameka Cara Thompson (3) count(s) 1, 2-3, 4. (bas, Deputy Clerk) (Entered: 07/21/2020) |
| 07/21/2020 | 3 | MOTION to Seal Indictment and Arrest Warrants by USA as to Jack Anderson, IV, Che Jaron Durbin, Jameka Cara Thompson. (bas, Deputy Clerk) (Entered: 07/21/2020) |
| 07/21/2020 | 4 | ORDER Granting 3 Motion to Seal Indictment as to Jack Anderson IV (1), Che Jaron Durbin (2), Jameka Cara Thompson (3). Signed by Magistrate Judge A. David Copperthite on 7/21/2020. (bas, Deputy Clerk) (Entered: 07/21/2020) |
| 07/30/2020 | 8 | MOTION to Unseal Indictment by USA as to Jack Anderson, IV, Che Jaron Durbin, Jameka Cara Thompson. (bas, Deputy Clerk) (Entered: 07/30/2020) |
| 07/30/2020 | 9 | ORDER Granting 8 Motion to Unseal Indictment as to Jack Anderson IV (1), Che Jaron Durbin (2), Jameka Cara Thompson (3). Signed by Judge George Levi Russell, III on 7/30/2020. (bas, Deputy Clerk) (Entered: 07/30/2020) |
| 07/30/2020 | | INDICTMENT UNSEALED as to Jack Anderson, IV, Che Jaron Durbin, Jameka Cara Thompson (bas, Deputy Clerk) (Entered: 07/30/2020) |
| 08/06/2020 | 10 | NOTICE OF ATTORNEY APPEARANCE: Joseph Murtha as Retained Counsel appearing for Jameka Cara Thompson(Murtha, Joseph) (Entered: 08/06/2020) |
| 08/06/2020 | 11 | NOTICE OF ATTORNEY APPEARANCE: Joseph Murtha as CJA Appointment appearing for Jameka Cara Thompson(Murtha, Joseph) (Entered: 08/06/2020) |
| 08/07/2020 | 12 | NOTICE OF ATTORNEY APPEARANCE: Catherine Flynn as Retained Counsel appearing for Che Jaron Durbin(Flynn, Catherine) (Entered: 08/07/2020) |
| 08/07/2020 | 13 | Initial Appearance as to Jameka Cara Thompson (Defendant informed of Rights.) held on 8/7/2020 before Magistrate Judge Thomas M. DiGirolamo.(FTR - J Klein 7B.) (jks, Deputy Clerk) (Entered: 08/07/2020) |
| 08/07/2020 | 14 | Initial Appearance as to Che Jaron Durbin (Defendant informed of Rights.) held on 8/7/2020 before Magistrate Judge Thomas M. DiGirolamo.(FTR J Klein -7B.) (jks, Deputy Clerk) (Entered: 08/07/2020) |
| 08/07/2020 | 15 | Sealed Document (Attachments: # 1 Sealed Document, # 2 Sealed Document)(bas, Deputy Clerk) (Entered: 08/10/2020) |

| 08/07/2020 | 16 | ORDER OF TEMPORARY DETENTION as to Che Jaron Durbin Detention Hearing set for 8/14/2020 02:00 PM in Courtroom 7B, 101 West Lombard Street, Baltimore, Maryland 21201, before Magistrate Judge Thomas M. Mag. DiGirolamo.. Signed by Magistrate Judge Thomas M. DiGirolamo on 8/7/2020. (jks, Deputy Clerk) (Entered: 08/10/2020) |
| --- | --- | --- |
| 08/07/2020 | 17 | ORDER OF TEMPORARY DETENTION as to Jameka Cara Thompson Detention Hearing set for 8/14/2020 11:30 AM in Courtroom 7B, 101 West Lombard Street, Baltimore, Maryland 21201, before Magistrate Judge Thomas M. Mag. DiGirolamo.. Signed by Magistrate Judge Thomas M. DiGirolamo on 8/7/2020. (jks, Deputy Clerk) (Entered: 08/10/2020) |
| 08/10/2020 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Che Jaron Durbin. *Virtual Hearing* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 8/10/2020. An interpreter will not be needed. Detention Hearing set for 8/14/2020 02:00 PM in Courtroom 7B, 101 West Lombard Street, Baltimore, Maryland 21201, before Magistrate Judge Deborah L. Boardman. (Romano, Christopher) (Entered: 08/10/2020) |
| 08/10/2020 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Jameka Cara Thompson. *Virtual hearing* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 8/10/2020. An interpreter will not be needed. Detention Hearing set for 8/14/2020 11:30 AM in Courtroom 7B, 101 West Lombard Street, Baltimore, Maryland 21201, before Magistrate Judge Deborah L. Boardman.(Romano, Christopher) (Entered: 08/10/2020) |
| 08/10/2020 | | Amended PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Che Jaron Durbin. *Amended to reflect correct Magistrate. Virtual Hearing* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 8/10/2020. An interpreter will not be needed. Detention Hearing set for 8/14/2020 02:00 PM in Courtroom 7B, 101 West Lombard Street, Baltimore, Maryland 21201, before Magistrate Judge Thomas M. Mag. DiGirolamo.(Romano, Christopher) (Entered: 08/10/2020) |
| 08/10/2020 | | Amended PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Jameka Cara Thompson. *Amended to reflect correct Magistrate Judge. Virtual Hearing* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 8/10/2020. An interpreter will not be needed. Detention Hearing set for 8/14/2020 11:30 AM in Courtroom 7B, 101 West Lombard Street, Baltimore, Maryland 21201, before Magistrate Judge Thomas M. Mag. DiGirolamo. (Romano, Christopher) (Entered: 08/10/2020) |
| 08/11/2020 | 19 | Bench Warrant Returned Executed on 08-07-2020 in case as to Jameka Cara Thompson(bas, Deputy Clerk) (Entered: 08/11/2020) |
| 08/11/2020 | 20 | Bench Warrant Returned Executed on 08-07-2020 in case as to Che Jaron Durbin(bas, Deputy Clerk) (Entered: 08/11/2020) |
| 08/14/2020 | 21 | Detention Hearing as to Jameka Cara Thompson held on 8/14/2020 before Magistrate Judge Thomas M. DiGirolamo.(FTR L.Purnell) (lps, Deputy Clerk) (Entered: 08/14/2020) |
| 08/14/2020 | 23 | Detention Hearing as to Che Jaron Durbin held on 8/14/2020 before Magistrate Judge Thomas M. DiGirolamo.(FTR L.Purnell) (lps, Deputy Clerk) (Entered: 08/17/2020) |

| 08/17/2020 | 22 | ORDER OF DETENTION as to Jameka Cara Thompson. Signed by Magistrate Judge Thomas M. DiGirolamo on 8/14/2020. (bas, Deputy Clerk) (Entered: 08/17/2020) |
|---|---|---|
| 08/17/2020 | 24 | ORDER OF DETENTION as to Che Jaron Durbin. Signed by Magistrate Judge Thomas M. DiGirolamo on 8/14/2020. (bas, Deputy Clerk) (Entered: 08/17/2020) |
| 08/17/2020 | 25 | ORDER OF DETENTION as to Jameka Cara Thompson. Signed by Magistrate Judge Thomas M. DiGirolamo on 8/14/2020. (bas, Deputy Clerk) (Entered: 08/17/2020) |
| 08/26/2020 | 27 | Initial Appearance as to Jack Anderson, IV (Defendant informed of Rights.) held on 8/26/2020 before Magistrate Judge J. Mark Coulson.(FTR- Purnell 7B) (jws, Deputy Clerk) (Entered: 08/27/2020) |
| 08/27/2020 | 26 | NOTICE OF ATTORNEY APPEARANCE: Elizabeth Genevieve Oyer as Public Defender appearing for Jack Anderson, IV(Oyer, Elizabeth) (Entered: 08/27/2020) |
| 08/27/2020 | 28 | CJA 23 Financial Affidavit by Jack Anderson, IV (bas, Deputy Clerk) (Entered: 08/28/2020) |
| 08/27/2020 | 29 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Jack Anderson, IV. Signed by Magistrate Judge J. Mark Coulson on 8/26/2020. (bas, Deputy Clerk) (Entered: 08/28/2020) |
| 09/01/2020 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Jack Anderson, IV. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 9/1/2020. An interpreter will not be needed. Appeal of Detention Hearing set for 10/7/2020 09:30 AM in Courtroom 7A, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge George Levi Russell III.(Romano, Christopher) (Entered: 09/01/2020) |
| 09/02/2020 | | Amended PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Jack Anderson, IV. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 9/2/2020. An interpreter will not be needed. Appeal of Detention Hearing set for 9/11/2020 09:30 AM in Courtroom 7A, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge George Levi Russell III.(Romano, Christopher) (Entered: 09/02/2020) |
| 09/02/2020 | 31 | PAPERLESS NOTICE Joint Initial Status Report due on or before 10/19/2020. Status report should address if plea negotiations in progress; if counsel believe case will resolve short of trial; or if trial schedule should be set. (dafs, Chambers) (Entered: 09/02/2020) |
| 09/09/2020 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Jack Anderson, IV. PLEASE NOTE: THE FOLLOWING HEARING HAS BEEN CANCELLED: Appeal of Detention Hearing scheduled for 9/11/2020 at 09:30 located at Courtroom 7A, 101 West Lombard Street, Baltimore, Maryland 21201. An interpreter was not previously requested for this hearing. (Romano, Christopher) (Entered: 09/09/2020) |
| 09/10/2020 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Jack Anderson, IV. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 9/10/2020. An interpreter will not be needed. Appeal of Detention Hearing set for 10/1/2020 11:00 AM in Courtroom 7A, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge George Levi Russell III.(Romano, Christopher) (Entered: 09/10/2020) |

**JA10**

| 10/01/2020 | 33 | Detention Hearing as to Jack Anderson, IV held on 10/1/2020 before Judge George Levi Russell, III.(Court Reporter: Nadine Gazic) (nrms, Deputy Clerk) (Entered: 10/02/2020) |
|---|---|---|
| 10/01/2020 | 34 | Arraignment as to Jack Anderson IV (1) on Counts 1,2-3 held on 10/1/2020. Plea entered by Jack Anderson, IV of NOT GUILTY as to counts 1, 2 and 3 before Judge George Levi Russell, III.(Court Reporter: Nadine Gazic) (nrms, Deputy Clerk) (Entered: 10/02/2020) |
| 10/02/2020 | 32 | ORDER OF DETENTION as to Jack Anderson, IV.. Signed by Judge George Levi Russell, III on 10/1/2020. (bas, Deputy Clerk) (Entered: 10/02/2020) |
| 10/19/2020 | 35 | Correspondence re: Status Update (Romano, Christopher) (Entered: 10/19/2020) |
| 10/20/2020 | 36 | MARGINAL ORDER Approving 35 Correspondence re: Status Update as to Jack Anderson, IV, Che Jaron Durbin, Jameka Cara Thompson. Signed by Judge George Levi Russell, III on 10/20/2020. (bas, Deputy Clerk) (Entered: 10/20/2020) |
| 10/20/2020 | 37 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Jack Anderson, IV held on 10-01-2020, before Judge Russell. Court Reporter N. Gazic, Telephone number 4109624753. Total number of pages filed: 46. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 11/10/2020. Redacted Transcript Deadline set for 11/20/2020. Release of Transcript Restriction set for 1/19/2021. (ng, Court Reporter) (Entered: 10/20/2020) |
| 10/27/2020 | 38 | SEALED SUPERSEDING INDICTMENT as to Jack Anderson, IV (1) count(s) 1s, 2s-3s, Che Jaron Durbin (2) count(s) 1s, 2s-3s, Jameka Cara Thompson (3) count(s) 1s, 2s-3s, 4s, Terrell Darnell Walton (4) count(s) 1, Michael Ronnell Wells (5) count(s) 1, Gerrick Delvon Jackson (6) count(s) 1, 5. (bas, Deputy Clerk) (Entered: 10/28/2020) |
| 10/27/2020 | 40 | MOTION to Seal Superseding Indictment by USA as to Jack Anderson, IV, Che Jaron Durbin, Jameka Cara Thompson, Terrell Darnell Walton, Michael Ronnell Wells, Gerrick Delvon Jackson. (bas, Deputy Clerk) (Entered: 10/28/2020) |
| 10/27/2020 | 41 | ORDER Granting 40 Motion to Seal Document as to Jack Anderson IV (1), Che Jaron Durbin (2), Jameka Cara Thompson (3), Terrell Darnell Walton (4), Michael Ronnell Wells (5), Gerrick Delvon Jackson (6). Signed by Magistrate Judge Thomas M. DiGirolamo on 10/27/20. (bas, Deputy Clerk) (Entered: 10/28/2020) |
| 11/23/2020 | 45 | MOTION for Reconsideration of Detention Status by Che Jaron Durbin. (bas, Deputy Clerk) (Entered: 11/23/2020) |
| 12/03/2020 | 46 | MOTION to Withdraw as Attorney by Elizabeth Genevieve Oyer by Jack Anderson, IV. (bas, Deputy Clerk) (Entered: 12/04/2020) |
| 12/03/2020 | 47 | ORDER Granting 46 Motion to Withdraw as Attorney. Elizabeth Genevieve Oyer withdrawn from case. as to Jack Anderson IV (1). Signed by Judge George Levi Russell, III on 12/3/2020. (bas, Deputy Clerk) (Entered: 12/04/2020) |
| 12/22/2020 | 48 | Motion Hearing as to Che Jaron Durbin held on 12/22/2020 re 45 MOTION for Reconsideration filed by Che Jaron Durbin before Judge George Levi Russell, III.(Court Reporter: Nadine Gazic) (kams, Deputy Clerk) (Entered: 12/22/2020) |

**JA11**

| 12/22/2020 | 49 | ORDER denying 45 Motion for Reconsideration of Detention Status as to Che Jaron Durbin (2). Signed by Judge George Levi Russell, III on 12/22/2020. (bmhs, Deputy Clerk) (Entered: 12/22/2020) |
| 12/22/2020 | 50 | ORDER pursuant to Fed R Crim P 5(f) and the Due Process Protections Act as to Che Jaron Durbin. Signed by Judge George Levi Russell, III on 12/22/2020. (bmhs, Deputy Clerk) (Entered: 12/22/2020) |
| 12/22/2020 | 51 | MOTION to Unseal Indictment by USA as to Che Jaron Durbin. (bas, Deputy Clerk) (Entered: 12/23/2020) |
| 12/22/2020 | 52 | ORDER Granting 51 Motion to Unseal Indictment as to Che Jaron Durbin (2). Signed by Judge George Levi Russell, III on 12/22/2020. (bas, Deputy Clerk) (Entered: 12/23/2020) |
| 12/22/2020 | | INDICTMENT UNSEALED as to Che Jaron Durbin (bas, Deputy Clerk) (Entered: 12/23/2020) |
| 12/22/2020 | | INDICTMENT UNSEALED as to Che Jaron Durbin (bas, Deputy Clerk) (Entered: 12/23/2020) |
| 12/30/2020 | 53 | Sealed Document (bas, Deputy Clerk) (Entered: 12/30/2020) |
| 12/30/2020 | 54 | Sealed Document (bas, Deputy Clerk) (Entered: 12/30/2020) |
| 01/13/2021 | 55 | CJA 23 Financial Affidavit by Michael Ronnell Wells (bas, Deputy Clerk) (Entered: 01/13/2021) |
| 01/21/2021 | 56 | CJA 20 as to Michael Ronnell Wells: Appointment of Attorney Jonathan Paul Van Hoven for Michael Ronnell Wells. Signed by Judge George Levi Russell, III on 1/19/2021. (bas, Deputy Clerk) (Entered: 01/22/2021) |
| 02/05/2021 | 57 | Sealed Document (Attachments: # 1 SEALED Document)(bas, Deputy Clerk) (Entered: 02/05/2021) |
| 02/05/2021 | 58 | Sealed Document (bas, Deputy Clerk) (Entered: 02/05/2021) |
| 02/05/2021 | | Attorney update in case as to Jack Anderson, IV. Attorney William B Purpura, Jr for Jack Anderson, IV added. (bas, Deputy Clerk) (Entered: 02/05/2021) |
| 02/09/2021 | 59 | Sealed Document (bas, Deputy Clerk) (Entered: 02/09/2021) |
| 02/09/2021 | 60 | Sealed Document (bas, Deputy Clerk) (Entered: 02/09/2021) |
| 03/05/2021 | 61 | MOTION for Reconsideration by Che Jaron Durbin. (bas, Deputy Clerk) (Entered: 03/05/2021) |
| 03/17/2021 | 62 | Sealed Document (bas, Deputy Clerk) (Entered: 03/18/2021) |
| 03/22/2021 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Che Jaron Durbin. *Virtual Reconsideration of Detention Hearing* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 3/22/2021. An interpreter will not be needed. Hearing set for 4/22/2021 11:30 AM before Judge George Levi Russell III.(Romano, Christopher) (Entered: 03/22/2021) |
| 03/22/2021 | 63 | Sealed Document (Attachments: # 1 SEALED Document, # 2 SEALED Document, # 3 SEALED Document, # 4 SEALED Document, # 5 SEALED Document, # 6 SEALED Document, # 7 SEALED Document)(bas, Deputy Clerk) (Entered: |

| | | 03/22/2021) |
|---|---|---|
| 04/04/2021 | 66 | MOTION unseal superseding indictment by USA as to Che Jaron Durbin. (Attachments: # 1 Text of Proposed Order)(Romano, Christopher) (Entered: 04/04/2021) |
| 04/04/2021 | 67 | MOTION to Unseal Superseding Indictment by USA as to Jack Anderson, IV, Jameka Cara Thompson, Terrell Darnell Walton, Michael Ronnell Wells. (bas, Deputy Clerk) (Entered: 04/05/2021) |
| 04/05/2021 | 68 | ORDER Granting 67 Motion to Unseal Indictment as to Jack Anderson IV (1), Jameka Cara Thompson (3), Terrell Darnell Walton (4), Michael Ronnell Wells (5); granting 66 Motion as to Che Jaron Durbin (2). Signed by Magistrate Judge Thomas M. DiGirolamo on 4/5/2021. (bas, Deputy Clerk) (Entered: 04/05/2021) |
| 04/05/2021 | | INDICTMENT UNSEALED as to Jack Anderson, IV, Che Jaron Durbin, Jameka Cara Thompson, Terrell Darnell Walton, Michael Ronnell Wells (bas, Deputy Clerk) (Entered: 04/05/2021) |
| 04/05/2021 | 69 | MOTION to Withdraw Hearing on Reconsideration of Detention Order by Jack Anderson, IV. (bas, Deputy Clerk) (Entered: 04/05/2021) |
| 04/05/2021 | 70 | MARGINAL ORDER Granting 69 Motion to Withdraw Hearing on Reconsideration of Detention Order as to Jack Anderson IV (1). Signed by Judge George Levi Russell, III on 4/5/2021. (bas, Deputy Clerk) (Entered: 04/05/2021) |
| 04/07/2021 | 71 | Initial Appearance as to Michael Ronnell Wells (Defendant informed of Rights.) held on 4/7/2021 before Magistrate Judge Thomas M. DiGirolamo.(FTR - Klein -7B.) (jks, Deputy Clerk) (Entered: 04/08/2021) |
| 04/07/2021 | 72 | Arraignment as to Michael Ronnell Wells (5) Count 1 held on 4/7/2021, Plea entered by Michael Ronnell Wells of Not Guilty as to count 1 before Magistrate Judge Thomas M. DiGirolamo.(FTR - Klein -7B.) (jks, Deputy Clerk) (Entered: 04/08/2021) |
| 04/08/2021 | 73 | ORDER OF DETENTION as to Michael Ronnell Wells. Signed by Magistrate Judge Thomas M. DiGirolamo on 4/7/2021. (bas, Deputy Clerk) (Entered: 04/09/2021) |
| 04/22/2021 | 74 | Detention Hearing as to Che Jaron Durbin held on 4/22/2021 before Judge George Levi Russell, III.(Court Reporter: Nadine Gazic and Susan Watts) (nrms, Deputy Clerk) (Entered: 04/22/2021) |
| 04/23/2021 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Terrell Darnell Walton. *This hearing will take place via VTC* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 4/23/2021. An interpreter will not be needed. Arraignment set for 5/5/2021 02:00 PM before Judge George Levi Russell III. Initial Appearance set for 5/5/2021 02:00 PM before Judge George Levi Russell III.(Romano, Christopher) (Entered: 04/23/2021) |
| 04/23/2021 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Terrell Darnell Walton. *This hearing will take place via VTC* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 4/23/2021. An interpreter will not be needed. Arraignment set for 5/5/2021 02:00 PM before Magistrate Judge Beth P. Gesner. Initial Appearance set for 5/5/2021 02:00 PM before Magistrate Judge Beth P. Gesner.(Romano, Christopher) (Entered: 04/23/2021) |

| 04/27/2021 | 75 | SCHEDULING ORDER as to Jack Anderson, IV, Che Jaron Durbin, Jameka Cara Thompson, Terrell Darnell Walton, Michael Ronnell Wells, Gerrick Delvon Jackson. Signed by Judge George Levi Russell, III on 4/27/2021. (bas, Deputy Clerk) (Entered: 04/27/2021) |
|---|---|---|
| 04/28/2021 | 76 | Initial Appearance as to Gerrick Delvon Jackson (Defendant informed of Rights.) held on 4/28/2021 before Magistrate Judge A. David Copperthite.(FTR L. Purnell) (lps, Deputy Clerk) (Entered: 04/29/2021) |
| 04/29/2021 | 77 | ORDER OF TEMPORARY DETENTION as to Gerrick Delvon Jackson.. Signed by Magistrate Judge A. David Copperthite on 4/28/2021. (bas, Deputy Clerk) (Entered: 04/29/2021) |
| 04/29/2021 | 78 | ORDER pursuant to Fed R Crim P 5(f) and the Due Process Protections Act. as to Gerrick Delvon Jackson. Signed by Magistrate Judge A. David Copperthite on 4/28/2021. (bas, Deputy Clerk) (Entered: 04/29/2021) |
| 04/30/2021 | 79 | Detention Hearing as to Gerrick Delvon Jackson held on 4/30/2021 before Magistrate Judge A. David Copperthite.(FTR - Klein -7B.) (jks, Deputy Clerk) (Entered: 04/30/2021) |
| 04/30/2021 | 80 | ORDER OF DETENTION as to Gerrick Delvon Jackson.. Signed by Magistrate Judge A. David Copperthite on 4/30/2021. (bas, Deputy Clerk) (Entered: 04/30/2021) |
| 05/05/2021 | 81 | Initial Appearance as to Terrell Darnell Walton (Defendant informed of Rights.) held on 5/5/2021 before Magistrate Judge Beth P. Gesner.(FTR-Waryu 7B) (jws, Deputy Clerk) (Entered: 05/06/2021) |
| 05/05/2021 | 82 | Arraignment as to Terrell Darnell Walton (4) Count 1 held on 5/5/2021. Plea entered by Terrell Darnell Walton Not Guilty as to Count 1 before Magistrate Judge Beth P. Gesner.(FTR-Waryu 7B) (jws, Deputy Clerk) (Entered: 05/06/2021) |
| 05/06/2021 | 83 | CJA 23 Financial Affidavit by Terrell Darnell Walton (bas, Deputy Clerk) (Entered: 05/06/2021) |
| 05/06/2021 | 84 | ORDER OF DETENTION as to Terrell Darnell Walton.. Signed by Magistrate Judge Beth P. Gesner on 5/5/2021. (bas, Deputy Clerk) (Entered: 05/06/2021) |
| 05/06/2021 | 85 | ORDER pursuant to Fed R Crim P 5(f) and the Due Process Protections Act. as to Terrell Darnell Walton. Signed by Magistrate Judge Beth P. Gesner on 5/5/2021. (bas, Deputy Clerk) (Entered: 05/06/2021) |
| 05/14/2021 | 87 | Bench Warrant Returned Executed on 4/07/2021 in case as to Michael Ronnell Wells(bas, Deputy Clerk) (Entered: 05/17/2021) |
| 05/14/2021 | 88 | Bench Warrant Returned Executed on 04/28/2021 in case as to Gerrick Delvon Jackson(bas, Deputy Clerk) (Entered: 05/17/2021) |
| 06/29/2021 | 89 | MOTION for Medical Treatment , MOTION for Medical Exam by Che Jaron Durbin. (Flynn, Catherine) (Entered: 06/29/2021) |
| 07/06/2021 | 90 | Correspondence re: Pole Camera (Romano, Christopher) (Entered: 07/06/2021) |
| 07/23/2021 | 93 | MOTION to Unseal Superseding Indictment by USA as to Jack Anderson, IV, Che Jaron Durbin, Jameka Cara Thompson, Terrell Darnell Walton, Michael Ronnell Wells, Gerrick Delvon Jackson. (bas, Deputy Clerk) (Entered: 07/23/2021) |

| 07/23/2021 | 94 | ORDER Granting 93 Motion to Unseal Indictment as to Jack Anderson IV (1), Che Jaron Durbin (2), Jameka Cara Thompson (3), Terrell Darnell Walton (4), Michael Ronnell Wells (5), Gerrick Delvon Jackson (6). Signed by Magistrate Judge Thomas M. DiGirolamo on 7/23/2021. (bas, Deputy Clerk) (Entered: 07/23/2021) |
| --- | --- | --- |
| 07/23/2021 | | INDICTMENT UNSEALED as to Jack Anderson, IV, Che Jaron Durbin, Jameka Cara Thompson, Terrell Darnell Walton, Michael Ronnell Wells, Gerrick Delvon Jackson (bas, Deputy Clerk) (Entered: 07/23/2021) |
| 08/05/2021 | 95 | ORDER GRANTING 89 Motion for Medical Treatment as to Che Jaron Durbin (2); GRANTING 89 Motion for Medical Exam as to Che Jaron Durbin (2). Signed by Magistrate Judge Thomas M. DiGirolamo on 8/5/2021. (jrs, Chambers) (Entered: 08/05/2021) |
| 08/30/2021 | 98 | SENTENCING MEMORANDUM by USA as to Michael Ronnell Wells (Romano, Christopher) (Entered: 08/30/2021) |
| 08/30/2021 | 99 | SENTENCING MEMORANDUM by Michael Ronnell Wells (Van Hoven, Jonathan) (Entered: 08/30/2021) |
| 08/31/2021 | 100 | Re-Arraignment as to Michael Ronnell Wells (5) Count 1 held on 8/31/2021, Plea entered by Michael Ronnell Wells (5) of Guilty as to Count 1 before Judge George Levi Russell, III.(Court Reporter: Nadine Gazic) (jks, Deputy Clerk) (Entered: 08/31/2021) |
| 08/31/2021 | 101 | Sentencing as to Michael Ronnell Wells held on 8/31/2021 before Judge George Levi Russell, III.(Court Reporter: Nadine Gazic) (jks, Deputy Clerk) (Entered: 08/31/2021) |
| 08/31/2021 | 102 | PLEA AGREEMENT as to Michael Ronnell Wells (bas, Deputy Clerk) (Entered: 08/31/2021) |
| 08/31/2021 | 103 | -SEALED- PLEA SUPPLEMENT as to Michael Ronnell Wells (bas, Deputy Clerk) (bas, Deputy Clerk). (Entered: 08/31/2021) |
| 09/02/2021 | 104 | JUDGMENT as to Michael Ronnell Wells (5), Count(s) 1, IMPRISONMENT for a total term of 71 months; SUPERVISED RELEASE for a term of 4 years; ASSESSMENT $100.00.. Signed by Judge George Levi Russell, III on 8/31/2021. (bas, Deputy Clerk) (Entered: 09/02/2021) |
| 09/29/2021 | 106 | NOTICE OF ATTORNEY APPEARANCE: Tyler L Mann as CJA Appointment appearing for Terrell Darnell Walton(Mann, Tyler) (Entered: 09/29/2021) |
| 11/09/2021 | 107 | NOTICE OF ATTORNEY APPEARANCE: Ryan L Burke as CJA Appointment appearing for Gerrick Delvon Jackson(Burke, Ryan) (Entered: 11/09/2021) |
| 11/12/2021 | 108 | MOTION for Medical Treatment by Che Jaron Durbin. (Flynn, Catherine) (Entered: 11/12/2021) |
| 11/18/2021 | 109 | ORDER Granting 108 Motion for Medical Treatment as to Che Jaron Durbin (2). Signed by Magistrate Judge J. Mark Coulson on 11/18/2021. (c/m USM 11/18/2021bas, Deputy Clerk) (Entered: 11/18/2021) |

| 11/29/2021 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Jack Anderson, IV. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 11/29/2021. An interpreter will not be needed. Rearraignment set for 12/17/2021 09:30 AM before Judge George Levi Russell III.(Romano, Christopher) (Entered: 11/29/2021) |
|---|---|---|
| 11/29/2021 | | Corrected PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Jack Anderson, IV. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 11/29/2021. An interpreter will not be needed. Guilty Plea - Arraignment Hearing set for 12/17/2021 09:30 AM before Judge George Levi Russell III.(Romano, Christopher) (Entered: 11/29/2021) |
| 11/30/2021 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Jameka Cara Thompson. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 11/30/2021. An interpreter will not be needed. Guilty Plea - Arraignment Hearing set for 1/21/2022 09:30 AM before Judge George Levi Russell III.(Romano, Christopher) (Entered: 11/30/2021) |
| 12/08/2021 | 110 | MOTION to Seal by Jack Anderson, IV. (Attachments: # 1 Text of Proposed Order) (Purpura, William) (Entered: 12/08/2021) |
| 12/08/2021 | 111 | SEALED DOCUMENT (Purpura, William) Modified on 12/9/2021 (bas, Deputy Clerk). (Entered: 12/08/2021) |
| 12/09/2021 | 112 | -SEALED- MOTION to Seal by USA as to Jack Anderson, IV. (Romano, Christopher) (Entered: 12/09/2021) |
| 12/09/2021 | 113 | SEALED DOCUMENT (Romano, Christopher) Modified on 12/9/2021 (bas, Deputy Clerk). (Entered: 12/09/2021) |
| 12/09/2021 | 114 | -SEALED- MARGINAL ORDER Granting 112 Motion to Seal as to Jack Anderson IV (1). Signed by Judge George Levi Russell, III on 12/9/2021. (bas, Deputy Clerk) (Entered: 12/09/2021) |
| 12/09/2021 | 115 | ORDER Granting 110 Motion to Seal as to Jack Anderson IV (1). Signed by Judge George Levi Russell, III on 12/9/2021. (bas, Deputy Clerk) (Entered: 12/09/2021) |
| 12/17/2021 | 116 | Initial Appearance as to Jack Anderson, IV (Defendant informed of Rights.) held on 12/17/2021 before Judge George Levi Russell, III.(Court Reporter: Melissa Clark) (dg4s, Deputy Clerk) (Entered: 12/17/2021) |
| 12/17/2021 | 117 | Arraignment as to Jack Anderson IV (1) held on 12/17/2021, Guilty Plea entered as to Count 1s of the Superseding Indictment and Not Guilty on counts 2s, 3s of the Superseding Indictment. before Judge George Levi Russell, III.(Court Reporter: Melissa Clark) (dg4s, Deputy Clerk) (Entered: 12/17/2021) |
| 12/17/2021 | 118 | Sentencing as to Jack Anderson, IV held on 12/17/2021 before Judge George Levi Russell, III.(Court Reporter: Melissa Clark) (dg4s, Deputy Clerk) (Entered: 12/17/2021) |
| 12/17/2021 | 119 | ORDER pursuant to Fed R Crim P 5(f) and the Due Process Protections Act as to Jack Anderson, IV. Signed by Judge George Levi Russell, III on 12/17/2021. (bas, Deputy Clerk) (Entered: 12/17/2021) |
| 12/17/2021 | 120 | PLEA AGREEMENT as to Jack Anderson, IV (dg4s, Deputy Clerk) (Entered: 12/17/2021) |

| 12/17/2021 | 121 | -SEALED- PLEA SUPPLEMENT as to Jack Anderson, IV (dg4s, Deputy Clerk) (Entered: 12/17/2021) |
|---|---|---|
| 12/17/2021 | 122 | JUDGMENT as to Jack Anderson, IV (1), Count(s) 1, 2-3, 2s-3s, DISMISSED; Count(s) 1s, IMPRISONMENT for a total term of 126 months w/credit for time served since 07/29/2020; SUPERVISED RELEASE for a term of 5 years; ASSESSMENT $100.00. Signed by Judge George Levi Russell, III on 12/17/2021. (bas, Deputy Clerk) (Entered: 12/17/2021) |
| 12/18/2021 | 124 | Consent Correspondence re: Forfeiture Order (Romano, Christopher) (Entered: 12/18/2021) |
| 12/21/2021 | 125 | ORDER DIRECTING FORFEITURE to Jack Anderson, IV.. Signed by Judge George Levi Russell, III on 12/21/2021. (bas, Deputy Clerk) (Entered: 12/21/2021) |
| 12/22/2021 | 126 | Second MOTION for Review of Detention Order by Che Jaron Durbin. (Flynn, Catherine) (Entered: 12/22/2021) |
| 01/03/2022 | 127 | -SEALED- MOTION to Seal by USA as to Che Jaron Durbin. (Romano, Christopher) (Entered: 01/03/2022) |
| 01/03/2022 | 128 | SEALED DOCUMENT (Romano, Christopher) Modified on 1/3/2022 (bas, Deputy Clerk). (Entered: 01/03/2022) |
| 01/03/2022 | 129 | -SEALED- ORDER granting 127 Motion to Seal as to Che Jaron Durbin (2). Signed by Judge George Levi Russell, III on 1/3/2022. (bas, Deputy Clerk) (Entered: 01/03/2022) |
| 01/14/2022 | 130 | NOTICE *Intent to Use Expert Testimony* (Hamilton, Jason) (Entered: 01/14/2022) |
| 01/14/2022 | 131 | NOTICE OF ATTORNEY APPEARANCE Jason Xavier Hamilton appearing for USA.(Hamilton, Jason) (Entered: 01/14/2022) |
| 01/21/2022 | 132 | Arraignment as to Jameka Cara Thompson (3) Counts 1s,2s-3s,4s held on 1/21/2022, Plea entered by Jameka Cara Thompson (3)of Guilty as to Count 1s, and Not Guilty as to counts 2s-3s, 4s, before Judge George Levi Russell, III.(Court Reporter: Nadine Bachmann) (jks, Deputy Clerk) (Entered: 01/21/2022) |
| 01/21/2022 | 133 | PLEA AGREEMENT as to Jameka Cara Thompson (bas, Deputy Clerk) (Entered: 01/21/2022) |
| 01/21/2022 | 134 | -SEALED- PLEA SUPPLEMENT as to Jameka Cara Thompson (bas, Deputy Clerk) (Entered: 01/21/2022) |
| 01/21/2022 | 135 | ORDER pursuant to Fed R Crim P 5(f) and the Due Process Protections Act as to Jameka Cara Thompson. Signed by Judge George Levi Russell, III on 1/21/2022. (bas, Deputy Clerk) (Entered: 01/21/2022) |
| 01/21/2022 | 136 | Regular Sentencing Order as to Jameka Cara Thompson. Signed by Judge George Levi Russell, III on 1/21/2022. (bas, Deputy Clerk) (Entered: 01/21/2022) |
| 01/25/2022 | 137 | Correspondence re: coded drug language (Romano, Christopher) (Entered: 01/25/2022) |
| 01/25/2022 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Gerrick Delvon Jackson. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 1/25/2022. An interpreter will not be needed. Guilty Plea - |

| | | |
|---|---|---|
| | | Arraignment Hearing set for 2/11/2022 02:00 PM in Courtroom 7A, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge George Levi Russell III. Sentencing set for 2/11/2022 02:00 PM in Courtroom 7A, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge George Levi Russell III.(Romano, Christopher) (Entered: 01/25/2022) |
| 02/01/2022 | | Amended PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Gerrick Delvon Jackson. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 2/1/2022. An interpreter will not be needed. Plea and Sentence set for 2/22/2022 02:00 PM before Judge George Levi Russell III.(Romano, Christopher) (Entered: 02/01/2022) |
| 02/09/2022 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Gerrick Delvon Jackson. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 2/9/2022. An interpreter will not be needed. Guilty Plea - Arraignment Hearing set for 2/17/2022 10:30 AM before Judge George Levi Russell III.(Romano, Christopher) (Entered: 02/09/2022) |
| 02/10/2022 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Che Jaron Durbin, Terrell Darnell Walton, Gerrick Delvon Jackson. *Pre Trial Conference* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 2/10/2022. An interpreter will not be needed. Hearing set for 2/18/2022 09:30 AM before Judge George Levi Russell III.(Romano, Christopher) (Entered: 02/10/2022) |
| 02/10/2022 | | Corrected PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Che Jaron Durbin, Terrell Darnell Walton. *Pre Trial Conference* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 2/10/2022. An interpreter will not be needed. Hearing set for 2/18/2022 09:30 AM before Judge George Levi Russell III.(Romano, Christopher) (Entered: 02/10/2022) |
| 02/17/2022 | 138 | Proposed Jury Instructions by USA as to Che Jaron Durbin, Terrell Darnell Walton (Hamilton, Jason) (Entered: 02/17/2022) |
| 02/17/2022 | 139 | Proposed Voir Dire by USA as to Che Jaron Durbin, Terrell Darnell Walton (Hamilton, Jason) (Entered: 02/17/2022) |
| 02/17/2022 | 140 | Re-Arraignment as to Gerrick Delvon Jackson (6) Count 1,5 held on 2/17/2022.Plea entered by Gerrick Delvon Jackson (6) Guilty on Counts 1 & 5 before Judge George Levi Russell, III.(Court Reporter: Nadine Bachman) (jh2s, Deputy Clerk) (Entered: 02/17/2022) |
| 02/17/2022 | 141 | PLEA AGREEMENT as to Gerrick Delvon Jackson (jh2s, Deputy Clerk) (Entered: 02/18/2022) |
| 02/17/2022 | 142 | -SEALED- PLEA SUPPLEMENT as to Gerrick Delvon Jackson (jh2s, Deputy Clerk) (Entered: 02/18/2022) |
| 02/17/2022 | 143 | Sentencing Order as to Gerrick Delvon Jackson. Signed by Judge George Levi Russell, III on 2/17/2022. (jh2s, Deputy Clerk) (Entered: 02/18/2022) |
| 02/18/2022 | 144 | Pretrial Conference as to Che Jaron Durbin, Terrell Darnell Walton held on 2/18/2022 before Judge George Levi Russell, III.(Court Reporter: Nadine Bachman) (jh2s, Deputy Clerk) (Entered: 02/18/2022) |

**JA18**

| | | |
|---|---|---|
| 02/24/2022 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Che Jaron Durbin, Terrell Darnell Walton. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 2/23/2022. An interpreter will not be needed. Jury Trial set for 2/28/2022 09:00 AM before Judge George Levi Russell III.(Romano, Christopher) (Entered: 02/24/2022) |
| 02/25/2022 | 145 | -SEALED- MOTION to Seal by USA as to Che Jaron Durbin, Terrell Darnell Walton. (Romano, Christopher) (Entered: 02/25/2022) |
| 02/25/2022 | 146 | SEALED DOCUMENT (Attachments: # 1 Text of Proposed Order, # 2 Exhibit 1)(Romano, Christopher) Modified on 2/25/2022 (bas, Deputy Clerk). (Entered: 02/25/2022) |
| 02/25/2022 | 147 | -SEALED- ORDER Granting 145 Motion to Seal as to 145 Motion to Seal as to Che Jaron Durbin (2), Terrell Darnell Walton (4). Signed by Judge George Levi Russell, III on 2/25/2022. (c/m 2/25/2022 bas, Deputy Clerk) (Entered: 02/25/2022) |
| 02/28/2022 | 148 | Jury Trial Day 1 as to Che Jaron Durbin, Terrell Darnell Walton held on 2/28/2022 before Judge George Levi Russell, III.(Court Reporter: Nadine Bachman) (jh2s, Deputy Clerk) (Entered: 02/28/2022) |
| 02/28/2022 | 149 | Sealed Document (bas, Deputy Clerk) (Entered: 03/01/2022) |
| 03/02/2022 | 150 | Jury Trial Day 2 as to Che Jaron Durbin, Terrell Darnell Walton held on 3/2/2022 before Judge George Levi Russell, III.(Court Reporter: Nadine Bachman) (jh2s, Deputy Clerk) (Entered: 03/02/2022) |
| 03/03/2022 | 151 | Jury Trial Day 3 as to Che Jaron Durbin, Terrell Darnell Walton held on 3/3/2022 before Judge George Levi Russell, III.(Court Reporter: Nadine Bachman) (jh2s, Deputy Clerk) (Entered: 03/03/2022) |
| 03/07/2022 | 152 | Jury Trial Day 4 as to Che Jaron Durbin, Terrell Darnell Walton held on 3/7/2022 before Judge George Levi Russell, III.(Court Reporter: Nadine Bachman) (jh2s, Deputy Clerk) (Entered: 03/07/2022) |
| 03/08/2022 | 153 | Jury Trial Day 5 as to Che Jaron Durbin, Terrell Darnell Walton held on 3/8/2022 before Judge George Levi Russell, III.(Court Reporter: Nadine Bachman) (jh2s, Deputy Clerk) (Entered: 03/08/2022) |
| 03/09/2022 | 154 | Jury Trial Day 6 as to Che Jaron Durbin, Terrell Darnell Walton held on 3/9/2022 before Judge George Levi Russell, III.(Court Reporter: Nadine Bachman) (jh2s, Deputy Clerk) (Entered: 03/09/2022) |
| 03/10/2022 | 155 | Jury Trial Day 7 VERDICT RECORDED as to Che Jaron Durbin, Terrell Darnell Walton held on 3/10/2022 before Judge George Levi Russell, III.(Court Reporter: Nadine Bachman) (jh2s, Deputy Clerk) (Entered: 03/10/2022) |
| 03/10/2022 | 156 | Regular Sentencing Order as to Che Jaron Durbin. Signed by Judge George Levi Russell, III on 3/10/2022. (bas, Deputy Clerk) (Entered: 03/10/2022) |
| 03/10/2022 | 157 | Regular Sentencing Order as to Terrell Darnell Walton. Signed by Judge George Levi Russell, III on 3/10/2022. (bas, Deputy Clerk) (Entered: 03/10/2022) |
| 03/10/2022 | 158 | WITNESS LIST by USA as to Che Jaron Durbin (bas, Deputy Clerk) (Entered: 03/10/2022) |

**JA19**

| | | |
|---|---|---|
| 03/10/2022 | 159 | EXHIBIT LIST by USA as to Che Jaron Durbin, Terrell Darnell Walton (bas, Deputy Clerk) (Entered: 03/10/2022) |
| 03/10/2022 | 160 | EXHIBIT LIST by Che Jaron Durbin, Terrell Darnell Walton (bas, Deputy Clerk) (Entered: 03/10/2022) |
| 03/10/2022 | 161 | Stipulation re: Certification of Exhibits Submitted to the Jury (bas, Deputy Clerk) (Entered: 03/10/2022) |
| 03/10/2022 | 162 | Stipulation re: Return of Exhibits to Counsel (bas, Deputy Clerk) (Entered: 03/10/2022) |
| 03/10/2022 | 163 | WITNESS LIST by USA as to Terrell Darnell Walton (bas, Deputy Clerk) (Entered: 03/10/2022) |
| 03/10/2022 | 164 | COURT'S EXHIBIT LIST as to Che Jaron Durbin, Terrell Darnell Walton (bas, Deputy Clerk) (Entered: 03/10/2022) |
| 03/10/2022 | 165 | Jury Notes (Attachments: # 1 Jury Note 3, # 2 Jury Note4, # 3 Jury Note5, # 4 Jury Note 6)(bas, Deputy Clerk) (Entered: 03/10/2022) |
| 03/10/2022 | 166 | JURY VERDICT as to Che Jaron Durbin (2) Guilty on Count 1s,2s-3s and Terrell Darnell Walton (4) Guilty on Count 1. (bas, Deputy Clerk) (Entered: 03/10/2022) |
| 03/10/2022 | 167 | -SEALED- JURY VERDICT Signed (bas, Deputy Clerk) (Entered: 03/10/2022) |
| 03/15/2022 | 168 | AMENDED REGULAR Sentencing Order as to Che Jaron Durbin. Signed by Judge George Levi Russell, III on 3/15/2022. (bas, Deputy Clerk) (Entered: 03/15/2022) |
| 03/15/2022 | 169 | AMENDED REGULAR Sentencing Order as to Terrell Darnell Walton. Signed by Judge George Levi Russell, III on 3/15/2022. (bas, Deputy Clerk) (Entered: 03/15/2022) |
| 03/16/2022 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Gerrick Delvon Jackson. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 3/16/2022. An interpreter will not be needed. Sentencing set for 6/7/2022 09:30 AM in Courtroom 7A, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge George Levi Russell III.(Hamilton, Jason) (Entered: 03/16/2022) |
| 03/23/2022 | | Amended PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Che Jaron Durbin. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 3/23/2022. An interpreter will not be needed. Sentencing set for 9/16/2022 02:00 PM in Courtroom 7A, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge George Levi Russell III.(Romano, Christopher) (Entered: 03/23/2022) |
| 04/14/2022 | 173 | Request for Scheduling (Flynn, Catherine) (Entered: 04/14/2022) |
| 04/14/2022 | 174 | MARGINAL ORDER Approving re 173 Request for Scheduling filed by Che Jaron Durbin. Signed by Judge George Levi Russell, III on 4/14/2022. (bas, Deputy Clerk) (Entered: 04/14/2022) |
| 06/03/2022 | 176 | Second MOTION for Medical Treatment by Che Jaron Durbin. (Attachments: # 1 Exhibit Summary, # 2 Exhibit Medical Report)(Flynn, Catherine) (Entered: 06/03/2022) |

| | | |
|---|---|---|
| 06/03/2022 | 177 | ORDER Granting 176 Request for Hospital Visitation as to Che Jaron Durbin (2). Signed by Judge George Levi Russell, III on 6/3/2022. (bas, Deputy Clerk) (Entered: 06/03/2022) |
| 06/07/2022 | 178 | Sentencing as to Gerrick Delvon Jackson held on 6/7/2022 before Judge George Levi Russell, III. (Court Reporter: Nadine Bachmann) (rm2s, Deputy Clerk) (Entered: 06/07/2022) |
| 06/07/2022 | 180 | JUDGMENT as to Gerrick Delvon Jackson (6), Count(s) 1, 5, IMPRISONMENT for a term of 72 months as to count 1 and 72 months as to count 5, each to run concurrently to one another for a total term of 72 months; SUPERVISED RELEASE for a term of 5 years as to count 1 and 3 years as to count 5, each to run concurrently to one another, for a total term of 5 years; ASSESSMENT $200.00.. Signed by Judge George Levi Russell, III on 6/7/2022. (bas, Deputy Clerk) (Entered: 06/07/2022) |
| 06/17/2022 | 182 | Correspondence re: Defendants statement in aid of sentencing (Attachments: # 1 Exhibit Exhibit, # 2 Exhibit Exhibit, # 3 Exhibit Exhibt)(Murtha, Joseph) (Entered: 06/17/2022) |
| 06/21/2022 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Jameka Cara Thompson. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 6/21/2022. An interpreter will not be needed. Sentencing set for 6/23/2022 09:30 AM before Judge George Levi Russell III.(Romano, Christopher) (Entered: 06/21/2022) |
| 06/23/2022 | 183 | Sentencing as to Jameka Cara Thompson held on 6/23/2022 before Judge George Levi Russell, III.(Court Reporter: Nadine Bachmann) (dg4s, Deputy Clerk) (Entered: 06/23/2022) |
| 06/23/2022 | 184 | ORDER DIRECTING FORFEITURE OF PROPERTY as to Jameka Cara Thompson.. Signed by Judge George Levi Russell, III on 6/23/2022. (bas, Deputy Clerk) (Entered: 06/23/2022) |
| 06/24/2022 | 185 | JUDGMENT as to Jameka Cara Thompson (3), Count(s) 1, 2-3, 2s-3s, 4, 4s, DISMISSED; Count(s) 1s, IMPRISONMENT for a total term of 33 months w/credit for time served since 05/20/2020; SUPERVISED RELEASE for a term of 5 years; ASSESSMENT $100.00.. Signed by Judge George Levi Russell, III on 6/24/2022. (bas, Deputy Clerk) (Entered: 06/24/2022) |
| 07/21/2022 | 187 | ORDER: The parties are directed to submit a joint status report as to Che Jaron Durbin by noon on Friday July 22, 2022. Signed by Judge George Levi Russell, III on 7/21/2022. (ats, Chambers) (Entered: 07/21/2022) |
| 07/22/2022 | 188 | Correspondence re: status update (Romano, Christopher) (Entered: 07/22/2022) |
| 07/22/2022 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Terrell Darnell Walton. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 7/22/2022. An interpreter will not be needed. Sentencing set for 9/9/2022 02:00 PM before Judge George Levi Russell III.(Romano, Christopher) (Entered: 07/22/2022) |
| 07/25/2022 | 189 | Correspondence received as to Che Jaron Durbin re: Status of Prisoner. (bas, Deputy Clerk) (Entered: 07/25/2022) |

**JA21**

| 07/25/2022 | 190 | ORDER Vacating 177 Order on Motion for Medical Treatment as to Che Jaron Durbin. Signed by Judge George Levi Russell, III on 7/25/2022. (bas, Deputy Clerk) (Entered: 07/25/2022) |
| 08/10/2022 | 191 | -SEALED- MOTION to Seal by USA as to Terrell Darnell Walton. (Romano, Christopher) (Entered: 08/10/2022) |
| 08/10/2022 | 192 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Romano, Christopher) (Entered: 08/10/2022) |
| 08/10/2022 | 193 | -SEALED- MOTION to Seal by USA as to Che Jaron Durbin. (Romano, Christopher) (Entered: 08/10/2022) |
| 08/10/2022 | 194 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit 1)(Romano, Christopher) (Entered: 08/10/2022) |
| 08/15/2022 | 195 | PAPERLESS ORDER GRANTING 191 Motion to Seal as to 192 Proposed Sealed Document as to Terrell Darnell Walton (4). Signed by Judge George Levi Russell, III on 8/15/2022. (ats, Chambers) (Entered: 08/15/2022) |
| 08/15/2022 | 196 | PAPERLESS ORDER GRANTING 193 Motion to Seal as to 194 Proposed Sealed Document as to Che Jaron Durbin (2). Signed by Judge George Levi Russell, III on 8/15/2022. (ats, Chambers) (Entered: 08/15/2022) |
| 08/28/2022 | 197 | SENTENCING MEMORANDUM by Terrell Darnell Walton (Mann, Tyler) (Entered: 08/28/2022) |
| 09/02/2022 | 199 | SENTENCING MEMORANDUM by Che Jaron Durbin (Flynn, Catherine) (Entered: 09/02/2022) |
| 09/07/2022 | 200 | Supplement to 199 Sentencing Memorandum (Attachments: # 1 Envelope)(bas, Deputy Clerk) (Entered: 09/07/2022) |
| 09/14/2022 | | Amended PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Che Jaron Durbin. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 9/14/2022. An interpreter will not be needed. Sentencing set for 9/30/2022 09:30 AM before Judge George Levi Russell III.(Romano, Christopher) (Entered: 09/14/2022) |
| 09/21/2022 | | Amended PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Terrell Darnell Walton. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 9/21/2022. An interpreter will not be needed. Sentencing set for 9/22/2022 02:00 PM in Courtroom 7A, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge George Levi Russell III.(Romano, Christopher) (Entered: 09/21/2022) |
| 09/22/2022 | 201 | Sentencing as to Terrell Darnell Walton held on 9/22/2022 before Judge George Levi Russell, III.(Court Reporter: Ronda Thomas) (jh2s, Deputy Clerk) (Entered: 09/22/2022) |
| 09/23/2022 | 202 | JUDGMENT as to Terrell Darnell Walton (4), Count(s) 1, IMPRISONMENT for a total term of 156 months; SUPERVISED RELEASE for a term of 5 years; ASSESSMENT $100.00. Signed by Judge George Levi Russell, III on 9/22/2022. (bas, Deputy Clerk) (Entered: 09/23/2022) |

**JA22**

| 09/30/2022 | 204 | NOTICE OF APPEAL by Terrell Darnell Walton Fee Status: CJA. (Mann, Tyler) (Entered: 09/30/2022) |
|---|---|---|
| 10/03/2022 | 205 | Transmission of Notice of Appeal and Docket Sheet as to Terrell Darnell Walton to US Court of Appeals re 204 Notice of Appeal - Final Judgment. (slss, Deputy Clerk) (Entered: 10/03/2022) |
| 10/05/2022 | 206 | USCA Case Number 22-4562 as to Terrell Darnell Walton for 204 Notice of Appeal - Final Judgment filed by Terrell Darnell Walton. Case Manager - Rachel Phillips. (jb5s, Deputy Clerk) (Entered: 10/05/2022) |
| 10/05/2022 | 207 | ORDER appointing Tyler Mann as court appointed CJA Counsel of USCA (certified copy) as to Terrell Darnell Walton re 204 Notice of Appeal - Final Judgment (jb5s, Deputy Clerk) (Entered: 10/05/2022) |
| 10/05/2022 | 208 | MOTION to Withdraw as Attorney by Tyler Mann by Terrell Darnell Walton. (Mann, Tyler) (Entered: 10/05/2022) |
| 10/11/2022 | 209 | PAPERLESS ORDER GRANTING 208 Motion to Withdraw as Attorney. Tyler L Mann withdrawn from case. as to Terrell Darnell Walton (4). Signed by Judge George Levi Russell, III on 10/11/2022. (ats, Chambers) (Entered: 10/11/2022) |
| 10/12/2022 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Che Jaron Durbin. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 10/12/2022. An interpreter will not be needed. Sentencing set for 12/19/2022 09:30 AM in Courtroom 7A, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge George Levi Russell III.(Romano, Christopher) (Entered: 10/12/2022) |
| 10/24/2022 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Che Jaron Durbin. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 10/24/2022. An interpreter will not be needed. Sentencing set for 12/19/2022 09:30 AM before Judge George Levi Russell III.(Romano, Christopher) (Entered: 10/24/2022) |
| 10/25/2022 | 210 | ORDER of USCA (certified copy) "Granting" motion to withdraw as counsel on appeal and "Appointing" Allen Howard Orenberg as counsel as to Terrell Darnell Walton re 204 Notice of Appeal - Final Judgment. (slss, Deputy Clerk) (Entered: 10/25/2022) |
| 10/27/2022 | 211 | CJA 20 as to Terrell Darnell Walton: Appointment of Attorney Tyler L Mann for Terrell Darnell Walton. Signed by Judge George Levi Russell, III on 5/4/2021. (bas, Deputy Clerk) (Entered: 10/27/2022) |
| 10/31/2022 | 212 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Terrell Darnell Walton for proceedings held on Initial Appearance and Arraignment on 05/05/2021 before Judge Russell, re 204 Notice of Appeal - Final Judgment - Transcript due by 12/7/2022. (Court Reporter: Er'd)(slss, Deputy Clerk) (Entered: 10/31/2022) |
| 10/31/2022 | 213 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Terrell Darnell Walton for proceedings held on Sentencing Hearing on 09/22/2022 before Judge Russell, re 204 Notice of Appeal - Final Judgment - Transcript due by 12/7/2022. (Court Reporter: Ronda Thomas)(slss, Deputy Clerk) (Entered: 10/31/2022) |

**JA23**

| | | |
|---|---|---|
| 11/01/2022 | 214 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Terrell Darnell Walton for proceedings held on 2/18/22, 2/28/22 - 3/10/22 before Judge George L. Russell, III, Transcript due by 12/8/2022. (Court Reporter: Nadine Bachmann)(kos, Deputy Clerk) (Entered: 11/01/2022) |
| 11/03/2022 | 215 | STATUS REPORT on offender under supervision - No Action as to Jameka Cara Thompson (Crystal Mercer, Probation Supervisor) (Entered: 11/03/2022) |
| 11/17/2022 | 216 | -SEALED- MOTION to Seal by USA as to Che Jaron Durbin. (Romano, Christopher) (Entered: 11/17/2022) |
| 11/17/2022 | 217 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Romano, Christopher) (Entered: 11/17/2022) |
| 11/18/2022 | 218 | PAPERLESS ORDER GRANTING 216 Motion to Seal as to 217 Proposed Sealed Document as to Che Jaron Durbin (2). Signed by Judge George Levi Russell, III on 11/18/2022. (ats, Chambers) (Entered: 11/18/2022) |
| 12/09/2022 | 219 | Sealed Document (rt, Court Reporter) (Entered: 12/09/2022) |
| 12/09/2022 | 220 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Terrell Darnell Walton for dates of 9/22/2022 before Judge George Levi Russell, III, re 204 Notice of Appeal - Final Judgment Court Reporter Ronda Thomas, Telephone number 410-962-4504, ronda_thomas@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 12/30/2022. Redacted Transcript Deadline set for 1/9/2023. Release of Transcript Restriction set for 3/9/2023. Redaction Request due 12/30/2022. Redacted Transcript Deadline set for 1/9/2023. Release of Transcript Restriction set for 3/9/2023. (rt, Court Reporter) (Entered: 12/09/2022) |
| 12/12/2022 | 221 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Terrell Darnell Walton for dates of 5/5/2021 before Judge Beth P. Gesner, re 204 Notice of Appeal - Final Judgment Court Reporter/Transcriber CompuScribe, Telephone number 301-577-5882. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 1/3/2023. Redacted Transcript Deadline set for 1/12/2023. Release of Transcript Restriction set for 3/13/2023. (kos, Deputy Clerk) (Entered: 12/12/2022) |
| 12/16/2022 | 222 | MOTION for Forfeiture of Property by USA as to Che Jaron Durbin. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(Romano, Christopher) (Entered: 12/16/2022) |
| 12/19/2022 | 223 | Sentencing as to Che Jaron Durbin held on 12/19/2022 before Judge George Levi Russell, III.(Court Reporter: Trish Mitchell) (dg4s, Deputy Clerk) (Entered: 12/19/2022) |
| 12/19/2022 | 224 | PRELIMINARY ORDER OF FORFEITURE as to Che Jaron Durbin., Motions terminated as to Che Jaron Durbin: 222 MOTION for Forfeiture of Property filed by USA.. Signed by Judge George Levi Russell, III on 12/19/2022. (bas, Deputy Clerk) (Entered: 12/19/2022) |

| 12/20/2022 | 225 | JUDGMENT as to Che Jaron Durbin (2), Count(s) 1, 2-3, DISMISSED; Count(s) 1s, 2s-3s, IMPRISONMENT for 240 months as to count 1, 240 months as to count 2 to run concurrent to cont 1, 240 months as to count 3 to run concurrent to count 2 for a total term of 240 months w/credit for time served since 05/12/2020; SUPERVISED RELEASE for a term of 5 years as to count 1, 5 years as to count 2 to run concurrent to count 1, 5 years as to count 3 to run concurrent to count 2 for a total term of 5 years; ASSESSMENT $300.00. Signed by Judge George Levi Russell, III on 12/19/2022. (bas, Deputy Clerk) (Entered: 12/20/2022) |
|---|---|---|
| 12/21/2022 | 227 | NOTICE OF APPEAL by Che Jaron Durbin Fee Status: Filing Fee Not Paid. (Flynn, Catherine) (Entered: 12/21/2022) |
| 12/22/2022 | 228 | Transmission of Notice of Appeal and Docket Sheet as to Che Jaron Durbin to US Court of Appeals re 227 Notice of Appeal - Final Judgment. (slss, Deputy Clerk) (Entered: 12/22/2022) |
| 12/22/2022 | 229 | ORDER of USCA (certified copy) "Extending" the deadline for filing transcript by Nadine Gazic to 1/17/2023 without sanctions as to Terrell Darnell Walton re 204 Notice of Appeal - Final Judgment. (slss, Deputy Clerk) (Entered: 12/22/2022) |
| 12/27/2022 | 230 | USCA Case Number 22-4734 as to Che Jaron Durbin for 227 Notice of Appeal - Final Judgment filed by Che Jaron Durbin. Case Manager - Rachel Phillips. (kos, Deputy Clerk) (Entered: 12/28/2022) |
| 01/17/2023 | 231 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Terrell Darnell Walton for dates of 02-28-2022 before Judge Russell, re 204 Notice of Appeal - Final Judgment Court Reporter N. Bachmann, Telephone number 410-962-4753/nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 2/7/2023. Redacted Transcript Deadline set for 2/17/2023. Release of Transcript Restriction set for 4/17/2023. (ng, Court Reporter) (Entered: 01/17/2023) |
| 01/17/2023 | 232 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Terrell Darnell Walton for dates of 03-02-2022 before Judge Russell, re 204 Notice of Appeal - Final Judgment Court Reporter N. Bachmann, Telephone number 410-962-4753/nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 2/7/2023. Redacted Transcript Deadline set for 2/17/2023. Release of Transcript Restriction set for 4/17/2023. (ng, Court Reporter) (Entered: 01/17/2023) |
| 01/17/2023 | 233 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Terrell Darnell Walton for dates of 03-03-2022 before Judge Russell, re 204 Notice of Appeal - Final Judgment Court Reporter N. Bachmann, Telephone number 410-962-4753 nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 2/7/2023. Redacted Transcript Deadline set for 2/17/2023. Release of |

| | | Transcript Restriction set for 4/17/2023. (ng, Court Reporter) (Entered: 01/17/2023) |
|---|---|---|
| 01/17/2023 | 234 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Terrell Darnell Walton for dates of 03-07-2022 before Judge Russell, re 204 Notice of Appeal - Final Judgment Court Reporter N. Bachmann, Telephone number 410-962-4753/nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 2/7/2023. Redacted Transcript Deadline set for 2/17/2023. Release of Transcript Restriction set for 4/17/2023. (ng, Court Reporter) (Entered: 01/17/2023) |
| 01/17/2023 | 235 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Terrell Darnell Walton for dates of 03-08-2022 before Judge Russell, re 204 Notice of Appeal - Final Judgment Court Reporter N. Bachmann, Telephone number 410-962-4753/nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 2/7/2023. Redacted Transcript Deadline set for 2/17/2023. Release of Transcript Restriction set for 4/17/2023. (ng, Court Reporter) (Entered: 01/17/2023) |
| 01/17/2023 | 236 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Terrell Darnell Walton for dates of 03-09-2022 before Judge Russell, re 204 Notice of Appeal - Final Judgment Court Reporter N. Bachmann, Telephone number 410-962-4753/nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 2/7/2023. Redacted Transcript Deadline set for 2/17/2023. Release of Transcript Restriction set for 4/17/2023. (ng, Court Reporter) (Entered: 01/17/2023) |
| 01/17/2023 | 237 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Terrell Darnell Walton for dates of 03-10-2022 before Judge Russell, re 204 Notice of Appeal - Final Judgment Court Reporter N. Bachmann, Telephone number 410-962-4753/nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 2/7/2023. Redacted Transcript Deadline set for 2/17/2023. Release of Transcript Restriction set for 4/17/2023. (ng, Court Reporter) (Entered: 01/17/2023) |
| 01/17/2023 | 238 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Terrell Darnell Walton for dates of 02-18-2022 before Judge Russell, re 204 Notice of Appeal - Final Judgment Court Reporter N. Bachmann, Telephone number 410-962-4753/nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - |

| | | |
|---|---|---|
| | | Y. Redaction Request due 2/7/2023. Redacted Transcript Deadline set for 2/17/2023. Release of Transcript Restriction set for 4/17/2023. (ng, Court Reporter) (Entered: 01/17/2023) |
| 01/25/2023 | 239 | ORDER of USCA consolidating USCA no. 22-4562 and USCA no. 22-4734 as to Che Jaron Durbin, Terrell Darnell Walton re 227 Notice of Appeal and 204 Notice of Appeal (kos, Deputy Clerk) (Entered: 01/25/2023) |
| 01/26/2023 | 240 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Che Jaron Durbin for proceedings held on 12/19/22 before Judge George L. Russell, III, Transcript due by 3/6/2023. (Court Reporter: Trish Mitchell)(kos, Deputy Clerk) (Entered: 01/27/2023) |
| 01/26/2023 | 241 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Che Jaron Durbin for proceedings held on 12/22/20, 4/22/21, 2/18/22, 2/28/22, 3/2/22 -3/10/22 before Judge George L. Russell, III, Transcript due by 3/13/2023. (Court Reporter: Nadine Gazic)(kos, Deputy Clerk) (Entered: 01/27/2023) |
| 01/26/2023 | 242 | ORDER of USCA appointing Gary Proctor, CJA as counsel to Che Jaron Durbin re 227 Notice of Appeal - Final Judgment (kos, Deputy Clerk) (Entered: 01/27/2023) |
| 02/21/2023 | 243 | Correspondence received from Jack Anderson, IV re: Request for Copy Work. (Attachments: # 1 Envelope)(bas, Deputy Clerk) (Entered: 02/22/2023) |
| 02/23/2023 | 244 | Correspondence sent to Jack Anderson, IV re: Request for Copy Work. (c/m 2/23/2023 bas, Deputy Clerk) (Entered: 02/23/2023) |
| 02/23/2023 | 245 | Correspondence sent to Warden as to Jack Anderson, IV re: Request for Copy Work. (c/m 2/23/2023 bas, Deputy Clerk) (Entered: 02/23/2023) |
| 02/23/2023 | 246 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Jack Anderson, IV held on 12/17/2023, before Judge George Levi Russell, III. Court Reporter/Transcriber Melissa L. Clark, Telephone number greencastlereporter@gmail.com. Total number of pages filed: 47. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 3/16/2023. Redacted Transcript Deadline set for 3/27/2023. Release of Transcript Restriction set for 5/24/2023. Redaction Request due 3/16/2023. Redacted Transcript Deadline set for 3/27/2023. Release of Transcript Restriction set for 5/24/2023. (Clark, Melissa) (Entered: 02/23/2023) |
| 02/23/2023 | 247 | Sealed Document (Clark, Melissa) (Entered: 02/23/2023) |
| 03/13/2023 | 248 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Che Jaron Durbin for dates of 12-19-22 before Judge George L. Russell III, re 227 Notice of Appeal - Final Judgment Court Reporter Patricia G. Mitchell, 410-962-3858; trish_mitchell@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 4/3/2023. Redacted Transcript Deadline set for 4/13/2023. Release of Transcript Restriction set for 6/12/2023. (pms, Court Reporter) (Entered: 03/13/2023) |
| 03/13/2023 | 249 | Sealed Document (pms, Court Reporter) (Entered: 03/13/2023) |

| 03/16/2023 | 250 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Che Jaron Durbin for dates of 12-22-2020 before Judge Russell, re 227 Notice of Appeal - Final Judgment Court Reporter Nadine Bachmann, Telephone number 410-962-4753/nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 4/6/2023. Redacted Transcript Deadline set for 4/17/2023. Release of Transcript Restriction set for 6/14/2023. Redaction Request due 4/6/2023. Redacted Transcript Deadline set for 4/17/2023. Release of Transcript Restriction set for 6/14/2023. (ng, Court Reporter) (Entered: 03/16/2023) |
| 03/16/2023 | 251 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Che Jaron Durbin for dates of 04/22/2021 before Judge Russell, re 227 Notice of Appeal - Final Judgment Court Reporter Nadine Bachmann, Telephone number 410-962-4753/nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 4/6/2023. Redacted Transcript Deadline set for 4/17/2023. Release of Transcript Restriction set for 6/14/2023. Redaction Request due 4/6/2023. Redacted Transcript Deadline set for 4/17/2023. Release of Transcript Restriction set for 6/14/2023. (ng, Court Reporter) (Entered: 03/16/2023) |
| 03/16/2023 | 252 | Transcript of Voir Dire Proceedings as to Che Jaron Durbin held on 02/28/2022, before Judge Russell. Court Reporter Nadine Bachmann, Telephone number 410-962-4753/nadine_bachmann@mdd.uscourts.gov. Total number of pages filed: 145. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 4/3/2023. Redacted Transcript Deadline set for 4/13/2023. Release of Transcript Restriction set for 6/12/2023. (nb, Court Reporter) (Entered: 03/16/2023) |
| 03/16/2023 | 253 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Che Jaron Durbin for dates of 02/18/2022 before Judge Russell, re 227 Notice of Appeal - Final Judgment Court Reporter Nadine Bachmann, Telephone number 410-962-4753/nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 4/6/2023. Redacted Transcript Deadline set for 4/17/2023. Release of Transcript Restriction set for 6/14/2023. (ng, Court Reporter) (Entered: 03/16/2023) |
| 03/16/2023 | 254 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Che Jaron Durbin for dates of 02/28/2022 before Judge Russell, re 227 Notice of Appeal - Final Judgment Court Reporter Nadine Bachmann, Telephone number 410-962-4753/nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 4/6/2023. Redacted Transcript Deadline set for 4/17/2023. |

| | | Release of Transcript Restriction set for 6/14/2023. (ng, Court Reporter) (Entered: 03/16/2023) |
|---|---|---|
| 03/16/2023 | 255 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Che Jaron Durbin for dates of 03/02/2022 before Judge Russell, re 227 Notice of Appeal - Final Judgment Court Reporter Nadine Bachmann, Telephone number 410-962-4753/nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 4/6/2023. Redacted Transcript Deadline set for 4/17/2023. Release of Transcript Restriction set for 6/14/2023. (ng, Court Reporter) (Entered: 03/16/2023) |
| 03/16/2023 | 256 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Che Jaron Durbin for dates of 03/03/2022 before Judge Russell, re 227 Notice of Appeal - Final Judgment Court Reporter/Transcriber Nadine Bachmann, Telephone number 410-962-4753/nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 4/6/2023. Redacted Transcript Deadline set for 4/17/2023. Release of Transcript Restriction set for 6/14/2023. (ng, Court Reporter) (Entered: 03/16/2023) |
| 03/16/2023 | 257 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Che Jaron Durbin for dates of 03/07/2022 before Judge Russell, re 227 Notice of Appeal - Final Judgment Court Reporter Nadine Bachmann, Telephone number 410-962-4753/nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/ before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 4/6/2023. Redacted Transcript Deadline set for 4/17/2023. Release of Transcript Restriction set for 6/14/2023. (ng, Court Reporter) (Entered: 03/16/2023) |
| 03/16/2023 | 258 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Che Jaron Durbin for dates of 03/08/2022 before Judge Russell, re 227 Notice of Appeal - Final Judgment Court Reporter Nadine Bachmann, Telephone number 410-962-4753/nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 4/6/2023. Redacted Transcript Deadline set for 4/17/2023. Release of Transcript Restriction set for 6/14/2023. (ng, Court Reporter) (Entered: 03/16/2023) |
| 03/16/2023 | 259 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Che Jaron Durbin for dates of 03/09/2022 before Judge Russell, re 227 Notice of Appeal - Final Judgment Court Reporter Nadine Bachmann, Telephone number 410-962-4753/nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court |

**JA29**

| | | Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 4/6/2023. Redacted Transcript Deadline set for 4/17/2023. Release of Transcript Restriction set for 6/14/2023. (ng, Court Reporter) (Entered: 03/16/2023) |
|---|---|---|
| 03/16/2023 | 260 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Che Jaron Durbin for dates of 03/10/2022 before Judge Russell, re 227 Notice of Appeal - Final Judgment Court Reporter Nadine Bachmann, Telephone number 410-962-4753/nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 4/6/2023. Redacted Transcript Deadline set for 4/17/2023. Release of Transcript Restriction set for 6/14/2023. (ng, Court Reporter) (Entered: 03/16/2023) |
| 04/04/2023 | 261 | Correspondence received as to Gerrick Delvon Jackson. (Attachments: # 1 Attachment, # 2 Envelope)(bas, Deputy Clerk) (Entered: 04/05/2023) |
| 05/23/2023 | 262 | STATUS REPORT on offender under supervision - No Action as to Jameka Cara Thompson (Dollie Sturgis, Location Monitoring Specialist) (Entered: 05/23/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/28/2023 10:59:33 | | |
| **PACER Login:** | Lantagne92 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cr-00210-GLR |
| **Billable Pages:** | 26 | **Cost:** | 2.60 |

*KSC/09.30.20*
CJR: USAO#2020R00531

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * CRIMINAL NO. GLR-20-0210 |
| | * |
| JACK ANDERSON IV, | * (Conspiracy to Distribute and Possess |
| | * with Intent to Distribute Controlled |
| CHE JARON DURBIN, | * Substances, 21 U.S.C. § 846; |
| | * Distribution and Possession with Intent |
| JAMEKA CARA THOMPSON, | * to Distribute Controlled Substances, 21 |
| | * U.S.C. § 841; Attempted Possession with |
| TERRELL DARNELL WALTON, | * Intent to Distribute Controlled |
| | * Substances, 21 U.S.C. § 846; Possession |
| MICHAEL RONNELL WELLS, | * of a Firearm by a Prohibited Person, 18 |
| | * U.S.C. § 922; Possession of a Firearm in |
| GERRICK DEVLON JACKSON, | * Furtherance of a Drug Trafficking |
| | * Crime, 18 U.S.C. § 924(c); Forfeiture, |
| Defendants. | * 18 U.S.C. § 924(d), 21 U.S.C. § 853, 28 |
| | * U.S.C. § 2461) |
| | * |
| | * |
| | * |
| | * |

## SUPERSEDING INDICTMENT

### COUNT ONE
**(Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances)**

The Grand Jury for the District of Maryland charges that:

From in or about May, 2019, through in or about May, 2020, in the District of Maryland,

the District of Arizona, and elsewhere,

**JACK ANDERSON IV,**
**CHE JARON DURBIN,**
**JAMEKA CARA THOMPSON,**
**TERRELL DARNELL WALTON,**
**MICHAEL RONNELL WELLS,**
**and**

**GERRICK DEVLON JACKSON,**

the defendants herein, did knowingly, willfully and unlawfully combine, conspire, confederate,

and agree with each other and with others known and unknown to the Grand Jury to knowingly,

intentionally, and unlawfully distribute and possess with intent to distribute a quantity of a mixture

or substance containing a detectable amount of cocaine and cocaine base, commonly known as

"crack cocaine," Schedule II controlled substances, in violation of Title 21, United States Code

Section 841(a)(1).

### Quantity of Controlled Substances Involved in the Conspiracy

1.    With respect to, **JACK ANDERSON, IV, CHE JARON DURBIN and

JAMEKA CARA THOMPSON,** the amount involved in the conspiracy attributable to each of

them as a result of their own conduct, and the conduct of other conspirators reasonably foreseeable

to them, is 5 kilograms or more of a mixture or substance containing a detectable amount of

cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(b)(1)(A).

2.    With respect to **TERRELL DARNELL WALTON, MICHAEL RONNELL

WELLS, and GERRICK DEVLON JACKSON,** the amount involved in the conspiracy

attributable to each of them as a result of their own conduct, and the conduct of other conspirators

reasonably foreseeable to them, is 28 grams or more of a mixture or substance containing a

detectible amount of cocaine base, "crack" cocaine, a Schedule II controlled substance, and a

quantity of a mixture or substance containing a detectible amount of cocaine, a Schedule II

controlled substance, in violation of 21 U.S.C. § 841(b)(1)(B) and 21 U.S.C. § 841(b)(1)(C).


21 U.S.C. § 846.

**JA32**

**COUNT TWO**
**(Possession with Intent to Distribute Cocaine)**

The Grand Jury for the District of Maryland further charges that:

On or about May 17, 2019, in the District of Maryland, the defendants,

**JACK ANDERSON IV,**
**CHE JARON DURBIN,**
**and**
**JAMEKA CARA THOMPSON,**

did knowingly and intentionally possess with the intent to distribute 500 grams or more of a

mixture or substance containing a detectable amount of cocaine, a Schedule II controlled

substance.

21 U.S.C. § 841(b)(1)(B).
18 U.S.C. § 2.

3

**JA33**

## COUNT THREE
### (Possession with Intent to Distribute Cocaine)

The Grand Jury for the District of Maryland further charges that:

On or about May 12, 2020, in the District of Maryland, the defendants,

**JACK ANDERSON IV,**
**CHE JARON DURBIN,**
**and**
**JAMEKA CARA THOMPSON,**

did knowingly and intentionally possess with the intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance.

21 U.S.C. § 841(b)(1)(B).
18 U.S.C. § 2.

4

**JA34**

**COUNT FOUR**
**(Possession of a Firearm in Furtherance**
**of a Drug Trafficking Crime)**

The Grand Jury for the District of Maryland further charges that:

On or about May 12, 2020, in the District of Maryland, the defendant,

**JAMEKA CARA THOMPSON,**

did knowingly and intentionally and unlawfully possess the following firearm, to wit: a loaded

.45 caliber silver "Roughneck" handgun, serial number 193398, in furtherance of drug

trafficking crimes for which she may be prosecuted in a court of the United States, as set forth in

Counts One, and Three of this Indictment, which are incorporated herein by reference.

18 U.S.C. § 924(c).

5

**JA35**

## COUNT FIVE

### (Possession of a Firearm and Ammunition by a Prohibited Person)

The Grand Jury for the District of Maryland further charges that:

On or about May 20, 2020 in the District of Maryland, the defendant,

### GERRICK DEVLON JACKSON,

knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed firearms and ammunition, to wit:

- a loaded Ruger SP101 357 handgun, serial number 57372899;
- a Phoenix arms 25 caliber handgun, serial number 3190456;
- a FN 9C handgun with magazine. serial number CSU0026339;
- a Glock 21 handgun with two magazines, serial number SHD902;
- a Remington 870 shotgun;
- 2 boxes of Gold Dot 45 cal. ammunition;
- 1 box of Gold Dot 25 cal. ammunition;
- Several rounds of Elite Sig 38 Special ammunition;
- Kent 12 gauge shotgun shells;
- 1 box Handgun Line 25 cal. auto ammunition;
- Several rounds of Blazer 9mm ammunition;

and the firearms and ammunition were in and affecting commerce.

18 U.S.C. § 922(g)(1)

6

**JA36**

## FORFEITURE

The Grand Jury for the District of Maryland further finds that:

1.      Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the Defendant(s) that the United States will seek forfeiture as part of any sentence in accordance with 21 U.S.C. § 853, and 28 U.S.C. § 2461(c), in the event of the Defendant(s)' convictions.

### Narcotics Forfeiture

2.      Pursuant to 21 U.S.C. § 853(a), upon conviction of an offense in violation of the Controlled Substances Act, as alleged in the Narcotics Count(s), the Defendant(s) convicted of such offense(s),    shall forfeit to the United States of America:

     a.   any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of such offense(s); and

     b.   any property used, or intended to be used, in any manner or part, to commit, or facilitate the commission of, such offense(s).

### Firearms and Ammunition Forfeiture

3.      Pursuant to 18 U.S.C. § 924(d), upon conviction of an offense(s) alleged in Firearms Count(s), the Defendant(s) convicted of such offense(s) shall forfeit to the United States, pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c), any firearms and ammunition involved in those offense(s).

### Substitute Assets

4.      Pursuant to 21 U.S.C. § 853(p), if any of the property described above as being subject to forfeiture, as a result of any act or omission by the Defendant(s):

     a.   cannot be located upon the exercise of due diligence;

**JA37**

b.  has been transferred or sold to, or deposited with, a third person;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been comingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the Defendant(s) up to the value of the property charged with forfeiture in the paragraphs above.

**Property Subject to Forfeiture**

5.        The property to be forfeited includes, but is not limited to, the following:

a.  One Rolex watch seized during the execution of a search warrant on Wellspring Drive in Aberdeen, Maryland;

b.  A loaded .45 caliber silver "Roughneck" handgun, bearing serial number 193398, seized during the execution of a search warrant at Palustris Lane in Abingdon, Maryland on or about May 12, 2020;

c.  Approximately two rounds of .45 caliber ammunition seized during the execution of a search warrant at Palustris Lane in Abingdon, Maryland on or about May 12, 2020;

d.  Approximately $82,300 seized from the U.S. mail on January 23, 2020;

e.  All of the following items seized from 122 Bloomsbury Avenue, Havre de Grace, Maryland on or about May 20, 2020:

- a loaded Ruger SP101 357 handgun, serial number 57372899;

- a Phoenix arms 25 caliber handgun, serial number 3190456;

- a FN 9C handgun with magazine, serial number CSU0026339;

8

**JA38**

- a Glock 21 handgun with two magazines, serial number SHD902;

- a Remington 870 shotgun;

- 2 Boxes of Gold Dot 45 cal. ammunition;

- 1 Box of Gold Dot 25 cal. ammunition;

- Several rounds of Elite Sig 38 special ammunition;

- Kent 12 gauge shotgun shells;

- 1 Box Handgun Line 25 auto ammunition;

- Several rounds of Blazer 9mm ammunition;

- Approximately $1,936 in U.S. currency

21 U.S.C. § 853; 18 U.S.C. § 924(d); 28 U.S.C. § 2461(c); Fed. R. Crim. Pro. 32.2(a)

Robert K. Hur
United States Attorney

Foreperson

Date: 10-27-20

9

**JA39**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. GLR-20-0210** |
| | * | |
| **v.** | * | |
| | * | |
| **CHE JARON DURBIN,** | * | |
| | * | |
| **and** | * | |
| | * | |
| **TERRELL DARNELL WALTON,** | * | |
| | * | |
| **Defendants.** | * | |
| | ******* | |

## **PROPOSED JURY INSTRUCTIONS**

The United States of America, through its attorneys, Erek L. Barron, United States Attorney for the District of Maryland and Christopher Romano and Jason X. Hamilton, Special Assistant United States Attorneys for said District, requests this Honorable Court to instruct the jury in the above-captioned matter in accordance with the proposed instructions annexed hereto, in addition to, but not limited to, its usual instructions in a criminal case. Counsel for the Government consulted with counsel for the Defendants regarding proposed jury instructions and without objection forward the proposal to the Court.

The Government further requests this Honorable Court, in accordance with Rule 30 of the

Federal Rules of Criminal Procedure, to inform counsel of its proposed action upon the requested

instructions prior to counsels' arguments to the jury.

 

                              Respectfully submitted,

                              Erek L. Barron
                              United States Attorney

By:     _____/s/_____
                              Christopher Romano
                              Jason X. Hamilton
                              Special Assistant United States Attorneys
                              36 South Charles Street
                              Fourth Floor
                              Baltimore, Maryland 21201
                              (410) 209-4800

**JA41**

## <u>TABLE OF CONTENTS</u>

**Court's Instructions**

1. Instruction 1 – Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

2. Instruction 2 – Instructions as a Whole . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

3. Instruction 3 – Duty to Follow Instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4. Instruction 4 – Jury Determines Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

5. Instruction 5 – Consideration of the Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . 10

6. Instruction 2-5 – The Government as a Party. . . . . . . . . . . . . . . . . . . . . . . . . . . 11

7. Instruction 2-11 – Improper Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . .12

8. Instruction 2-12 – Sympathy. . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . 13

9. Instruction 9 – Punishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

10. Instruction 2-18 – Jury to Consider Only These Defendants . . . .. . . . . . . . . . . 15

11. Instruction 3-1 – Indictment is not Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . .16

12. Instruction 3-3 – Consider Only the Charges. . . . . . . . . . . . . . . . . . . . . . . . .. .17

13. Instruction 3-12 – Variance – Dates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

14. Instruction 4-1 – Presumption of Innocence – Burden of Proof . . . . . . . . . . . . . 19

15. Instruction 15 – Direct and Circumstantial Evidence. . . . . . . . . . . . . . . . . . . . . 20

16. Instruction 4-4 – Specific Investigation Techniques not Required . . . . . . . . . . . .21

17. Instruction 74-4 – Stipulation of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18. Instruction 6-1 – Inference Defined. . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . .23

19. Instruction 6-3 – Impermissible to Infer Participation from Mere Presence. . . . . . . . . . . .24

20. Instruction 6-4 – Impermissible to Infer Participation from Association . . . . . . . . . . . . 25

21. Instruction 6-17 – Knowledge, Willfulness, Intent . . . . . . . . . . . . . . . . . . . . . . 26

**JA42**

22. Instruction 22 – Credibility of Witness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

23. Instruction 23 – Party Not Bound by Witness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

24. Instruction 24 – Number of Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

25. Instruction 5-12 – Improper Consideration of Defendant's Right Not to Testify . . . . . . . 30

26. Instruction 7-2 – Bias and Hostility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

27. Instruction 7-12 – All Available Evidence Need Not Be Produced . . . . . . . . . . . . . . . . . 32

28. Instruction 28 – Court Rulings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**Government's Requested Instructions**

1. Instruction 5-9 – Transcripts of Recordings . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . .34

2. Instruction 5-11 – Wiretaps. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

3. Instruction 5-12 – Charts and Summaries as Evidence. . . . . . . . . . . . . . . . . . . . . . . . . 36

4. Instruction 7-1 – Witness Credibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

5. Instruction 7-5 – Accomplices Called by the Government . . . . . . . . . . . . . . . . . . . . . . .39

6. Instruction 7-11 – Co-Defendant's Plea Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . .41

7. Instruction 7-21 – Expert Witness - Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

8. Instruction 3-6 – Multiple Counts – One Defendant . . . . . . . . . . . . . . . . . . . . . .. . . . . .43

**Court's Instruction**

9. Instruction 9 – Introduction to the Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**Government's Requested Instructions**

10. Instruction 10 – Count One. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45

11. Instruction 19-2 – Conspiracy – Purpose of Statue . . . . . . .. . . . . . . . . . . . . . . . .. . . 46

12. Instruction 56 3 – Count One: Relevant Statue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .47

13. Instructions 19-3, 19-8 – Elements of Conspiracy: Count One . . . . . . . . . . . . . . . . . . . 49

**JA43**

14. Instruction 19-4 – Existence of Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

15. Instruction 19-6 – Membership of the Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

16. Instruction 16 – Membership in a Conspiracy d. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54

17. Instruction 19-9 – Acts and Declarations of Co-Conspirators . . . . . . . . . . . . . . . . . . . . 55

18. Instruction 56-12 – Definition of Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

19. Instruction 56-4 – Definition of Possession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

20. Instruction 56-5 – Inference From Control Over Place Where Found. . . . . . . . . . . . . . . 60

21. Instruction 14.13 – Proof of Intent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .61

22. Instruction 22 – Amount of Controlled Substance. . . . . . . . . . . . . . . . . . . . . . . . . . . . .62

23. Instruction 23 – Counts Two and Three. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

24. Instruction 56-2 – Counts Two and Three – Elements of Offense. . . . . . . . . . . . . . . . . 65

25. Instruction 56-8 – Counts Two and Three – Knowldege that the Drugs Were Narcotics . . 66

26. Instruction 56-9 – Counts Two and Three – Method of Proving Knowledge . . . . . . . . . . 67

27. Instruction 56-7 – Counts Two and Three: Joint Possession. . . . . . . . . . . . . . . . . . . . . 68

28. Instruction 56-11 and 56-12 – Counts Two and Three – Intent to Distribute. . . . . . . . . . .69

29. Instruction 11-2 – Aiding and Abetting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .71

30. Instruction 30 – Type and Amount of Controlled Substance – Counts Two and Three . . . .72

**Court's Instruction**

31. Instruction 31 – Duty to Deliberate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .75

32. Instruction 32 – Communications with Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .76

33. Instruction 33 – Verdict Forms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

34. Instruction 31 – Reaching Verdict. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .78

**JA44**

## COURT'S INSTRUCTION NO. 26

(Bias and Hostility)

This is an instruction I give in all criminal cases.  In connection with your evaluation of the credibility of the witnesses, you should specifically consider evidence of resentment or anger which some government witnesses may have towards a defendant.  Likewise, you should consider evidence of resentment or anger which some witnesses may have towards the government.

In any trial, evidence that a witness is biased, prejudiced or hostile toward a defendant requires the jury to view that witness's testimony with caution, to weigh it with care, and subject it to close and searching scrutiny.

Sand, Modern Federal Jury Instructions, 7-2 (modified).

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                     NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,    )
                                  )
 4        vs.                     )   CRIMINAL CASE NO. GLR-20-0210
                                  )
 5   CHE DURBIN and TERRELL       )            VOLUME III
     WALTON,                      )
 6                                )
          Defendants.             )
 7   _____)

 8                     Thursday, March 3, 2022
                           Courtroom 7A
 9                       Baltimore, Maryland
                       JURY TRIAL - VOLUME 3
10

     BEFORE:  THE HONORABLE GEORGE LEVI RUSSELL, III, Judge
11
     For the Plaintiff:
12   Christopher Romano, Esquire
     Jason Hamilton, Esquire
13   Special Assistant United States Attorneys
     36 S. Charles Street, 4th Floor
14   Baltimore, Maryland  21201

15   For the Defendants:
          For Che Jaron Durbin:
16             Catherine Flynn, Esquire
               Law Office of Catherine Flynn
17             217 North Charles Street, Second Floor
               Baltimore, Maryland  21201
18        For Terrell Darnell Walton:
               Tyler Mann, Esquire
19
     Also Present:
20        Brian Battee, Harford County Sheriff's Office
          Damon Gasque, Paralegal, U.S. Attorney's Office
21   ==========================================================
                        Reported by:
22                Nadine M. Bachmann, RMR, CRR
                 Federal Official Court Reporter
23               101 W. Lombard Street, 4th Floor
                   Baltimore, Maryland  21201
24                      410-962-4753

25
```

```
 1                 T A B L E   O F   C O N T E N T S

 2      WITNESS              DIRECT     CROSS     REDIRECT        RECROSS

 3      Brian Battee (continued)

 4          By Mr. Romano:   11                     93

 5          By Ms. Flynn:               60

 6          By Mr. Mann:                72                          95

 7      AARON SANDRUCK

 8          By Mr. Romano:   98

 9          By Ms. Flynn:               111

10      BRANDON PHIPPS

11          By Mr. Romano:   119

12          By Ms. Flynn:               124

13      TIMOTHY HELF

14          By Mr. Hamilton: 128

15          By Ms. Flynn:               135

16      JAMEKA THOMPSON

17          By Mr. Romano    143

18

19

20

21

22

23

24

25
```

*****

```
 1              MR. ROMANO:  Yes, certainly, Your Honor, thank you.
 2     Your Honor, the Government's next witness is Jameka Thompson.
 3              THE COURT:  Ms. Thompson, as I told you before the
 4     jury came out, you may remove your mask if you'd like if
 5     you've been fully vaccinated. All right, and why don't you
 6     stand up to direct your attention to the courtroom deputy to
 7     get sworn in.
 8              (Witness, sworn.)
 9              THE CLERK: Thank you.  You can have a seat.  Please
10     state and spell your first and last name for the record.
11              THE COURT:  You can speak into the microphone.  It's
12     right there.  You can bend it down to make it more clear.
13              THE WITNESS:  Jameka Thompson, J-a-m-e-k-a,
14     Thompson, common spelling. T-h-o-m-p-s-o-n.
15              THE CLERK: Thank you.
16              THE COURT:  Mr. Romano, at your pleasure, sir.
17              MR. ROMANO:  Thank you.
18              D I R E C T   E X A M I N A T I O N
19     BY MR. ROMANO:
20     Q.   Good afternoon, ma'am.  Can you tell me how old you are?
21     A.   41.
22     Q.   What is your present marital status?
23     A.   Divorced.
24     Q.   With regard to your prior marriage, was your ex-husband
25     named Donald Trump?
```

```
1     A.    Yes.

2     Q.    Okay. He was not the 45th president of the United States

3     though, was he?

4     A.    No.

5     Q.    Okay.  Do you have any children?

6     A.    Yes.

7     Q.    How many?

8     A.    Four.

9     Q.    And could you just tell us not their names, but their

10    ages?

11    A.    21, 18, 15 and 11.

12    Q.    And how far did you go in school, Ms. Thompson?

13    A.    I have a master's degree.

14    Q.    And what is your master's degree in?

15    A.    Business administration.

16    Q.    And I take it then that you can read and write the

17    English language; is that fair to say?

18    A.    Yes.

19          MR. ROMANO: Your Honor, I'm going to approach the

20    witness for a moment.

21          THE COURT:  Yes, please.  Thank you.

22    BY MR. ROMANO:

23    Q.    Ms. Thompson, I'm going to hand you a document for the

24    record which is Government's Exhibit 9. And it's a multipage

25    document. But if you would, please, just kind of go through it
```

**JA49**

```
 1   quickly and I'm going to ask you with regard to whether you
 2   recognize that or not.
 3   A.   Oh, this is the plea agreement.
 4   Q.   It's your plea agreement?
 5   A.   Yes.
 6   Q.   Okay. Can you turn to see if there's a page that you
 7   signed?
 8   A.   On page 19.
 9   Q.   All right. So you recognize that as your plea agreement;
10   is that correct, ma'am?
11   A.   Yes.
12   Q.   Thank you.
13   A.   You're welcome.
14          THE COURT:  What exhibit was that, Mr. Romano?
15          MR. ROMANO:  I'm sorry, Your Honor, it's
16   Government's Exhibit 9.
17   BY MR. ROMANO:
18   Q.   All right, I'm not going to go through this page-by-page,
19   I don't believe that's necessary, but there are some parts of
20   the plea agreement that I want to review with you. First is
21   page 1 for Government's Exhibit 9. It's addressed to Joseph
22   Murtha, Esq. Who is Joseph Murtha?
23   A.   My lawyer.
24   Q.   Okay.  And in paragraph one you see it there on your
25   screen, it indicates that you agree to plead guilty to Count
```

1    One of the superseding indictment which charges you with

2    Conspiracy to Possess and Distribute and Possess with the

3    Intent to Distribute 5 kilograms or more of cocaine. Did you,

4    in fact, plead guilty to that charge before Judge Russell on

5    January 21st of this year?

6    A.   Yes.

7    Q.   According to page 2, the plea agreement provides what the

8    maximum penalties are that are provided by statute. It doesn't

9    mean that you're necessarily going to get the maximum penalty,

10   but you see where it says the maximum minimum mandatory

11   penalty is ten years and the maximum is life.  Do you

12   understand that?

13   A.   Yes.

14   Q.   And you are scheduled to be sentenced before Judge

15   Russell on January 23rd of this year, are you not?

16   A.   June 23rd.

17   Q.   I'm sorry, June 23rd.  I misspoke, thank you.

18   A.   Yes.

19   Q.   All right. Now under the terms of your plea agreement,

20   there's something called a sealed supplement and I'm going to

21   get to that in just a moment, and that's at page 15. And

22   incidentally, Counsel, can we agree that there have been

23   certain pages removed from the entirety of the plea agreement

24   by consent?

25            **MS. FLYNN:**  Yes.

 1   BY MR. ROMANO:

 2   Q.   Okay. Page 15 of the plea agreement is something called a

 3   sealed supplement.  And under the terms of the sealed

 4   supplement it indicates that you agree to cooperate with this

 5   office, meaning the U.S. Attorney's Office, correct?  Do you

 6   see that?

 7   A.   Yes.

 8   Q.   Okay. And then it says that you shall fully and

 9   truthfully respond to any questions put to you by law

10   enforcement.  And continuing down in terms of the cooperation

11   there are a number of paragraphs, including continuing on to

12   page 16, top of the page it says, "The defendant" being you,

13   Ms. Thompson, "shall testify fully and truthfully before any

14   grand jury or at any trial or any other court proceeding with

15   respect to matters that the U.S. Attorney's Office may require

16   your testimony."

17        Did you agree to do that, ma'am?

18   A.   Yes.

19   Q.   Okay. And at page 17 under paragraph 6 there's a

20   provision that says, if you were to give false testimony,

21   incomplete or misleading testimony or information, or falsely

22   implicate an innocent person in the commission of a crime or

23   you exaggerate the involvement of any person in the commission

24   of a crime in order to appear cooperative, or falsely minimize

25   the involvement of any person, including the defendant in the

```
 1    commission of the crime or the defendant engaged in conduct
 2    after this date, then this agreement that you've entered into
 3    is and null and void. Do you understand that?
 4    A.   Yes.
 5    Q.   Now Ms. Thompson, do you know an individual by the name
 6    of Che Durbin?
 7    A.   Yes.
 8    Q.   Do you see Mr. Durbin in the courtroom here today?
 9    A.   Yes.
10    Q.   Could you identify an article of clothing or point him
11    out for the record?
12    A.   He has on a white shirt.
13    Q.   All right, thank you. How about an individual by the name
14    of Terrell Walton?  Do you know Terrell Walton?
15    A.   No.
16    Q.   Okay. Can you tell us when you first met Mr. Durbin?
17    A.   Um, it was August of 2018.
18    Q.   And how is it that you came to meet Mr. Durbin in 2018?
19    A.   My sister is married to his cousin.
20    Q.   After you met Mr. Durbin in 2018, did you and Mr. Durbin
21    have a personal relationship?
22    A.   Yes.
23    Q.   How would you describe or characterize that relationship?
24    A.   Um, we were boyfriend and girlfriend.
25    Q.   At one point did you consider or was there a discussion
```

```
 1   about marriage between you and Mr. Durbin?
 2   A.    Um, like not -- I mean, he would say things here and
 3   there like he wanted to marry me and the other person he was
 4   with because he was messing with us both, but he never, like,
 5   really fed me a dream of being married.
 6   Q.    Well, at one point did you contact --
 7   A.    Oh, yes.  And when we were in jail, yes, we tried to ask
 8   for the U.S. Marshals' consent to get married around they
 9   disapproved it.
10   Q.    And as far as the discussion about getting married and
11   asking the U.S. Marshal for that, whose idea was that?
12               MS. FLYNN:  Objection.
13               THE COURT:  I'm going to sustain it. Rephrase, Mr.
14   Romano.
15               MR. ROMANO:  All right.
16   BY MR. ROMANO:
17   Q.    The conversation that occurred or the idea that occurred
18   when you and Mr. Durbin were in jail, housed together but in
19   separate locations, how did the conversation come up about
20   getting married?
21   A.    I seen it in the handbook of the Chesapeake Detention
22   Center and then I mentioned it to him.  And then he was like
23   -- well, I told him we had to get the U.S. Marshal consent and
24   he said he would write a letter and then I said I would write
25   one too.
```

```
1    Q.   And did you, in fact, write a letter, ma'am?

2    A.   Yes.

3    Q.   And it's your understanding that it was disapproved,

4    correct?

5    A.   Yes.

6    Q.   Now you've been in custody since you were arrested in May

7    of 2020, correct?

8    A.   Yes.

9    Q.   What was the first detention facility that you were in?

10   A.   Harford County Detention Center.

11   Q.   And was Mr. Durbin in that same facility?

12   A.   Yes.

13   Q.   Okay. And initially you were not placed in the Harford

14   County Detention Center, were you?

15   A.   Yes.

16   Q.   Okay. Well, did there come a time when you were to be

17   released --

18   A.   Oh, yes.  They had released me on home monitoring, the

19   ankle bracelet.

20   Q.   Okay.  So after you were first arrested, you were

21   released on home monitoring, correct?

22   A.   Yes.

23   Q.   But there were certain conditions along with that, right?

24   A.   Yes.

25   Q.   And one of those conditions was that you not have contact
```

```
 1    with Mr. Durbin, correct?
 2    A.   Yes.
 3    Q.   And did you have contact with him?
 4    A.   Yes.
 5    Q.   Okay. And as a result that was a violation of the Court's
 6    order, right?
 7    A.   Yes, so they rearrested me.
 8    Q.   And that's how you wound up in the Harford County
 9    Detention Center?
10    A.   Yes.
11    Q.   And while you were in the Harford County Detention Center
12    and Mr. Durbin was in the Harford County Detention Center, did
13    you continue to have contact with Mr. Durbin?
14    A.   Yes.
15    Q.   And how did that come about or how were you able to do
16    that?
17    A.   Just a three-way call.
18    Q.   And by three-way call, how does that work?
19    A.   Um, I would call my daughter and he would call her and
20    she would connect the call.
21    Q.   Okay. So you would call your daughter, Mr. Durbin would
22    call your daughter, and then somehow she was able to merge
23    those two so that the two of you could speak?
24    A.   Yes.
25    Q.   All right. And did officials at the detention center find
```

1    out about that?

2    A.    Yes.

3    Q.    And was there a disciplinary hearing held as a result of

4    your violation?

5    A.    Yes.

6    Q.    Okay. And did you admit or deny that you had violated the

7    Court's order and had contact with him?

8    A.    I admitted.

9          MR. ROMANO:  Can I have Government's Exhibit 39?

10         THE CLERK: Mr. Romano, do you want this on the

11   screen?

12         MR. ROMANO:  Not at the moment. I want her to

13   identify it first.

14   BY MR. ROMANO:

15   Q.    I want to hand you what's been marked, Ms. Thompson, as

16   Government's Exhibit 39 and ask you if you can just kind of go

17   through that document and see if you recognize it.

18   A.    Yes, I recognize it.

19   Q.    Look through the whole document if you would, please.

20   A.    Yes.

21   Q.    Thank you. So now Government's 39, we can put the first

22   page up please at this point, Mr. Gasque. It's captioned as a

23   disciplinary hearing and advisement of rights. Do you see

24   that?

25   A.    Yes.

1    Q.   All right. And there's a line at the bottom that says

2    "inmate signature." Is that your signature?

3    A.   Yes.

4    Q.   And if we could go to the next page it says for the

5    alleged rule violation that you -- Rule 16, it was

6    unauthorized use of mail or phone. In this case it was the

7    phone, right?  You were doing three-way calls?

8    A.   Yes.

9    Q.   And it also indicates that you failed to comply or

10   disobeyed lawful orders of the staff and that was you weren't

11   supposed to be in contact with Mr. Durbin, correct?

12   A.   Yes.

13   Q.   And let's go to the next page.  It might be a little out

14   of order this page here. All right, we can blow this up. Under

15   the part where it says "Presentation of evidence," if we could

16   go to that section, Mr. Gasque. And there's a block that's

17   checked that says, "The inmate has been advised of his or her

18   right to present a statement or remain silent, to present

19   documents and for relevant and material witnesses to appear on

20   his or her behalf."

21       And then number two says, "The inmate admits or denies

22   the charges" and the block is checked that says "admits." Did

23   you admit to those charges?

24   A.   Yes.

25   Q.   And then there's below that it says, "summary of inmate's

```
 1    statement" and it says, "Has an obsessive mental health issue
 2    which makes her dependent on Mr. Durbin."
 3         Is that something that you told the correctional
 4    facility?
 5    A.   Yes.
 6    Q.   All right. Thank you, ma'am. And then if we could go to
 7    the next page. And we see at the bottom those two rule
 8    numbers, 8 and 16. And it indicates that as a result of your
 9    not contesting it, in fact, saying you were guilty, there was
10    some form of administrative sanction or punishment, right?
11    A.   Yes.  They suspended my phone for 30 days.
12    Q.   When you say they suspended your phone for 30 days,
13    meaning you couldn't contact anybody including your daughter
14    or any other family members, right?
15    A.   Yes.
16    Q.   Okay. Now after you were arrested and in custody, were
17    you prescribed any type of medication?
18    A.   Wait, in Harford County?
19    Q.   Well, in Harford County or here.
20    A.   Yes.
21    Q.   Okay, and are you presently on medication?
22    A.   Yes.
23    Q.   Well, let's talk about what you were prescribed first.
24    A.   When I was in Harford County I was getting Zoloft,
25    Vistaril and Trazodone and Prazosin.
```

```
 1    Q.   Okay. And now you're not in the Harford County Detention
 2    Center, you're actually at what's known as the Chesapeake
 3    Detention Facility which is where federal defendants are
 4    housed, correct?
 5    A.   Yes.
 6    Q.   And that's here in Baltimore City?
 7    A.   Yes.
 8    Q.   And were you prescribed any medication there?
 9    A.   Yes.  They don't give Trazodone because the side effect
10    is sleeplessness, so they don't give that, but I get Vistaril
11    and Zoloft and Prazosin.
12    Q.   And are you on those medications presently?
13    A.   Yes.
14    Q.   Do any of those medications or the combination of those
15    medications affect your ability to understand these
16    proceedings here?
17    A.   No.
18    Q.   You understand you're under oath and you have to tell the
19    truth, correct?
20    A.   Yes.
21    Q.   All right. Now prior to being arrested, Ms. Thompson, in
22    May of 2020, were you taking or prescribed any of these
23    medications that you just talked about?
24    A.   No.
25    Q.   So only after you were arrested and incarcerated that --
```

```
 1    A.    Yes. Once I talked to the psychologist, that's what she

 2    recommended.

 3    Q.    She recommended the medication?

 4    A.    Yes.

 5    Q.    Okay, thank you, ma'am. How about prior to being

 6    arrested, did you use any type of controlled substance?

 7    A.    Yes, marijuana.

 8    Q.    Just marijuana?

 9    A.    Yes.

10    Q.    And how often were you using marijuana?

11    A.    Maybe like five or six times a day.

12    Q.    Now a minute ago I asked you you were transferred from

13    the Harford County Detention Center to the Chesapeake

14    Detention Facility, correct?

15    A.    Yes.

16    Q.    Okay. And while you were at the Chesapeake Detention

17    Facility, did there come a time, Ms. Thompson, when you

18    engaged in a sexual act with a male inmate?

19    A.    Yes.

20    Q.    And to be clear, Ms. Thompson, that individual was not

21    Mr. Durbin, was it?

22    A.    No.

23    Q.    And when you were asked or confronted by correctional

24    facility -- or correctional officers at the Chesapeake

25    Detention Facility and they asked you if, in fact, you had
```

```
 1    engaged in a sexual act you told them nothing happened, didn't
 2    you?
 3    A.    Yes.
 4    Q.    And that wasn't true, was it?
 5    A.    No.
 6    Q.    Why did you lie, Ms. Thompson?
 7    A.    Because when I initially told them about it they put me
 8    on admin segregation and they locked me in the cell.  So I
 9    wrote a statement saying it wasn't true, so they would let me
10    out.
11    Q.    And did they let you out?
12    A.    Yes.
13    Q.    And subsequently when you were interviewed in the
14    presence of your attorney by Detective Battee and others, you
15    admitted that you had lied, didn't you?
16    A.    Yes.
17    Q.    Can you tell us, Ms. Thompson, when you first met the
18    defendant, Mr. Durbin in I think you said in 2018?
19    A.    Yes.
20    Q.    Were you working at that time?
21    A.    Yes.
22    Q.    Where were you working, ma'am?
23    A.    I was a supply chain manager at Aberdeen Proving Ground
24    for the Department of the Army.
25    Q.    And where were you living?
```

```
1    A.    On Aberdeen Proving Grounds.

2    Q.    Sometimes that's referred to as --

3    A.    APG. Yes, I was living on base.

4    Q.    And that's because of your employment?

5    A.    Yes.

6    Q.    Okay. I want to show you some documents now and ask you

7    some questions. Do you recognize -- there's a document here

8    that says "from Jameka Thompson."

9    A.    Yes.

10   Q.    1003 Warwick Drive, Apartment 1B, Aberdeen, Maryland. Do

11   you recognize that address?

12   A.    Yes.

13   Q.    Were you living at that address?

14   A.    No.

15   Q.    Do you know who was living at that address, if anyone?

16   A.    Che's mom.

17   Q.    By "Che" you mean the defendant, Che Durbin?

18   A.    Yes.

19   Q.    And this package was addressed to Jack Anderson in

20   Tucson, Arizona. Do you see that?

21   A.    Yes.

22   Q.    And it says "Jack Anderson, the VI."  Actually, it looks

23   like it's inverted.  It looks like VI or the sixth, and it has

24   an address of 7661 East Dogwood Street, Tucson, Arizona. Whose

25   handwriting is that?
```

```
 1    A.    Mine.
 2    Q.    Okay. And this package that was mailed in your name from
 3    Che Durbin's mother's address to Jack Anderson, did you know
 4    what was in this package?
 5    A.    Yes.
 6    Q.    What was in this package?
 7    A.    Money.
 8    Q.    Do you know how much?
 9    A.    No, I didn't know how much until after it got seized and
10    then they said the amount. I didn't know how much it was.
11    Q.    Well, do you know whether this package was seized or was
12    it another package that was seized?
13    A.    Isn't this the package with the money?
14    Q.    Well, I can't answer your question, you have to --
15    A.    Well --
16    Q.    The date on this one is -- it may be a little difficult
17    to see, but I believe it's in May of 2019.
18    A.    Then it was money. But it didn't get seized and I don't
19    know how much it was.
20    Q.    Who told you to mail that package?
21    A.    Che.
22    Q.    Okay. Let's talk about another package. Let's talk about
23    -- Court's indulgence. I need to refer to an exhibit.
24              THE COURT:  Yes.
25              MR. ROMANO:  All right, can we pull up 45-B?
```

1    **BY MR. ROMANO:**

2    Q.   Let's talk about this package for a moment. Do you

3    recognize the handwriting on this package for the address

4    where it says "Jack Anderson, IV"?

5    A.   It's not mine. I don't -- honestly, I don't know whose

6    handwriting that is.

7    Q.   Okay. Do you know who Doris Durbin is?

8    A.   Yes.

9    Q.   And who is that?

10   A.   His grandmother.

11   Q.   Did you mail this package?

12   A.   No.

13   Q.   Okay. All right, let's talk about 45-A. So I take it you

14   didn't know what was in that package that we just looked at?

15   A.   No, no.

16   Q.   Okay, fair enough. All right, now here's a package that's

17   labeled -- the sender is Donald Trump who I believe you

18   testified earlier was your ex-husband, right?

19   A.   No, that's my son.

20   Q.   Oh, that's your son. Okay, I'm sorry. 6113 B, that's

21   Jessen Court, Aberdeen Proving Ground. Was that your address

22   on post?

23   A.   Yes.

24   Q.   Okay. And again, it's addressed to Jack Anderson, 7661

25   East Dogwood Street, Tucson, Arizona.  Whose handwriting is

1    that?

2    A.    Mine.

3    Q.    Who told you to mail this package, if anyone?

4    A.    I don't think I mailed it. I think I just filled it out.

5    He might have took it to the post office, because I don't

6    remember.

7    Q.    Okay, did you know what was in it?

8    A.    No.

9    Q.    Okay. So that's your handwriting?

10   A.    Yes.

11   Q.    But it's not a package that you, yourself, mailed?

12   A.    Yes.

13   Q.    Okay. With regard to that package that said the sender

14   was Donald Trump and you corrected me and said it wasn't your

15   ex-husband, it had your son's name on it --

16   A.    Yes.

17   Q.    Did your son take that package to be mailed or did

18   someone else take that package to be mailed?

19   A.    Someone else.

20   Q.    And do you know who that was?

21   A.    No.

22   Q.    But it wasn't you and it wasn't your son?

23   A.    No.

24   Q.    All right.  Now I'm going to show you another package and

25   we'll put this up on the Elmo. Or actually, Mr. Gasque, you

```
1    can display 41-I, I'm sorry, 4-I.  Okay. So this package, can

2    you see the date?  It says January 21st of '20?

3    A.   Yes.

4    Q.   Okay. And there's handwriting, it says Che Durbin, 1003

5    Warwick Drive, Apartment 1B, Aberdeen, Maryland and then it

6    was addressed to Jack Anderson at 7661 East Dogwood Street in

7    Tucson. Whose handwriting is on this?

8    A.   Mine.

9    Q.   Okay. And with regard to this, first off the address at

10   1003 Warwick Drive, Apartment 1B, you indicated that you did

11   not live there, correct?

12   A.   Yes, I did not live there.

13   Q.   Did Mr. Durbin live there or just another family member

14   of Mr. Durbin?

15   A.   No, he didn't live there.

16   Q.   Okay. And who took this package to be mailed?

17   A.   I did.

18   Q.   Okay. Did you know what was in this package?

19   A.   I knew it was money, I just didn't know how much.

20   Q.   Was there more than one occasion where you mailed money

21   at the direction of Mr. Durbin?

22   A.   I don't think so.

23   Q.   Just this one time?

24   A.   Yes.

25   Q.   Okay, thank you, ma'am. Ms. Thompson, I'm going to show
```

```
 1    you another package here in a minute. Mr. Gasque, if you
 2    would, please, Government's Exhibit 1-F. This was a package
 3    that was mailed to 1003 Warwick Drive, Apartment 1B from
 4    someone named Samuel Johnson at 7601 East Dogwood Street in
 5    Tucson, Arizona. Again, it's addressed to an entity called
 6    True Homes, LLC at this apartment, 1B. Do you know what True
 7    Homes, LLC is?
 8    A.    Yes.
 9    Q.    What is it?
10    A.    It was an LLC that Che and I had together.
11    Q.    Okay. For what reason did you have it together?
12    A.    Um, he wanted to start his own trucking company and I was
13    in the process of doing it.
14    Q.    Okay. Did it actually get started?
15    A.    Um, no, because when we got arrested, I had to dis --
16    dissolve it, is that the word?  Or revoke it and I didn't want
17    to use the name anymore, so he went down to the state and
18    dissolved it.
19    Q.    And this person named Samuel Johnson, did you know who
20    that person was?
21    A.    No.
22    Q.    Now there came a time in May of 2019 when you had this
23    package and you put it in your car. Do you remember that?
24    A.    Yes.
25    Q.    Exhibit 35. I'm going to ask you to look at your screen
```

```
 1   in just a minute and Mr. Gasque, if we could go to number 12,
 2   MV-12.
 3                  (The videotape was played.)
 4   BY MR. ROMANO:
 5   Q.   Now Ms. Thompson, in that video did you recognize who
 6   that person is?
 7   A.   Yes.
 8   Q.   Who was it, ma'am?
 9   A.   Me.
10   Q.   And you placed a package in a vehicle. Was that your
11   vehicle or somebody else's vehicle?
12   A.   It was mine.
13   Q.   And this is back in May of 2019. This package that you
14   placed in the back of the vehicle, who did you get that
15   package from?
16   A.   The mailman delivered it.
17   Q.   Okay. And he delivered it to Apartment 1B?
18   A.   Yes.
19   Q.   Were you in the apartment at the time?
20   A.   Yes.
21   Q.   Was Mr. Durbin there?
22   A.   Yes.
23   Q.   Okay. And when you got the package once it was delivered
24   to Apartment 1B you put it in the back of your car, where were
25   you going to take it to?
```

```
 1    A.    To the apartment.
 2    Q.    Which apartment?
 3    A.    Hillside Terrace.
 4    Q.    Did you live at Hillside Terrace at that time?
 5    A.    No.
 6    Q.    Did Mr. Durbin?
 7    A.    No.
 8    Q.    Okay. Do you know who did?
 9    A.    We would just stay there, but nobody actually lived
10    there.
11    Q.    Who told you, if anyone, to take that package to the
12    Hillside location?
13    A.    Che.
14    Q.    Okay. And it never got there, correct?  Because you got
15    stopped by the police?
16    A.    Yes.
17    Q.    Did you know what was in that package when you placed it
18    in the back of your car?
19    A.    Yes.
20    Q.    And how did you know that?
21    A.    Because he told me. Oh, Che told me, but I already knew
22    what was going on.
23    Q.    What did he tell you was in there?
24    A.    A kilo of cocaine.
25    Q.    A kilo of cocaine?
```

```
 1   A.   Yes.
 2   Q.   Okay. Now I asked you a couple minutes ago about some
 3   packages that were addressed to not Samuel Johnson, but Jack
 4   Anderson. Did you actually meet Jack Anderson?
 5   A.   Yes.
 6   Q.   And did you travel to -- well, did you know where Jack
 7   Anderson lived?
 8   A.   Yes.
 9   Q.   Where did he live?
10   A.   In Arizona, Tucson.
11   Q.   And had you ever traveled to Tucson, Arizona?
12   A.   Yes.
13   Q.   Do you recall the first time you traveled to Tucson,
14   Arizona?
15   A.   I'm thinking it was January, 2019.
16   Q.   And how did you get there, did you drive or fly?
17   A.   I flew there.
18   Q.   And when you got there, who did you meet with?
19   A.   Um, the first time I went there I didn't meet anybody.
20   Somebody put it in the rental car while I was in the hotel. I
21   didn't meet anybody that time, the first time.
22   Q.   Okay. So in January '19 you fly from where to where?  You
23   fly from --
24   A.   Maryland to Tucson.
25   Q.   Okay. And you say you put it in a car. I mean, was it
```

```
 1    your personal vehicle or rental vehicle?
 2    A.    It was a rental.
 3    Q.    Okay. Incidentally, when you flew from Maryland to
 4    Tucson, Arizona, who paid for your airfare?
 5    A.    Che.
 6    Q.    And with regard to the rental car, who paid for the
 7    rental car?
 8    A.    Che.
 9    Q.    All right. So you have a rental car and you're at a hotel
10    in Tucson?
11    A.    Yes.
12    Q.    Okay. And you say at some point there's a package put in
13    your car?
14    A.    Yes.
15    Q.    Okay. And did you understand or know what was in that
16    package?
17    A.    Yes.
18    Q.    What was in that package?
19    A.    Cocaine.
20    Q.    And what were you supposed to do with it?
21    A.    Drive it back to Maryland.
22    Q.    Did you do that?
23    A.    Yes.
24    Q.    Okay. Do you know how much it was, the package?
25    A.    No, not the first time.
```

```
1   Q.   Okay. And when you brought that package back to Maryland,
2   what did you do with it?
3   A.   I met -- I either met Che at my house or at his mom's or
4   somewhere and then he took it and then we would take the
5   rental car back and he would pay me the rest.
6   Q.   Now you indicated that there was a point in time not this
7   initial trip, but there were other trips that you made to
8   Tucson?
9   A.   Yes.
10  Q.   Okay. And on any of those trips did you meet someone
11  named Jack Anderson?
12  A.   Yes.
13  Q.   Government's 13, please. Do you recognize who that is?
14  A.   Yes.
15  Q.   Who is that, Ms. Thompson?
16  A.   Mr. Anderson.
17  Q.   Jack Anderson?
18  A.   Yes.
19  Q.   Okay. And for what reason or purpose did you meet with
20  Jack Anderson?
21  A.   To get the kilos of cocaine.
22  Q.   And did you do that on more than one occasion?
23  A.   Yes.
24  Q.   And typically how did you get to Tucson?
25  A.   I would fly there, get a rental at the airport and then
```

```
1   drive to Jack's house or meet him at a hotel.  Just depended.
2   Q.   Okay. And then once you met him, did he give you
3   anything?
4   A.   Yes.
5   Q.   What did he give you?
6   A.   Kilos of cocaine.
7   Q.   More than one?
8   A.   Yes.
9   Q.   And when you got these kilos of cocaine, what did you do
10  with them?
11  A.   I put them in my suitcase and I put it in the trunk of
12  the car.
13  Q.   And then you're talking about the rental car?
14  A.   Yes.
15  Q.   And then what happened?
16  A.   Then I would leave the next morning to go back to
17  Maryland.
18  Q.   You would drive back?
19  A.   Yes.
20  Q.   Incidentally, how long would it take you to drive from
21  Tucson, Arizona to Maryland?
22  A.   It normally only took me two days.
23  Q.   Two days?
24  A.   Yes.
25  Q.   And on each of these trips when you flew out to Tucson,
```

```
 1   who paid for the airline tickets?

 2   A.   Che.

 3   Q.   Meaning the defendant, Che Durbin, right?

 4   A.   Yes.

 5   Q.   Okay. And the rental cars?

 6   A.   Che.

 7   Q.   Okay. Do you recall how many times you flew out and

 8   brought cocaine back?

 9   A.   Maybe eight.

10   Q.   Eight times all together?

11   A.   Yes.

12   Q.   And do you know how many kilos of cocaine you brought

13   back all together?

14   A.   Maybe 40.

15   Q.   Can I have Government's Exhibit 7?  Now I've got up on

16   the Elmo, Government's Exhibit 7. Mr. Gasque, if we could at

17   the top where it says "flight information," if we could just

18   kind of blow that up. Well, before that where it has the name

19   of the passenger, do you see that, ma'am?  It says Jameka

20   Thompson?

21   A.   Yes.

22   Q.   And it says August 6th of 2019. Philadelphia to Dallas,

23   Fort Worth and Dallas, Fort Worth to Tucson, Arizona. Did you

24   make a trip on that day?

25   A.   Yes.
```

1    Q.    And for what reason or purpose?

2    A.    To drive back the kilos.

3    Q.    Okay. And again, Mr. Durbin paid for that airfare?

4    A.    Yes.

5    Q.    And the rental car to bring it back?

6    A.    Yes.

7    Q.    Now I want to ask you about what amounted to your last

8    trip which was in May of 2020. Did you, in fact, travel to

9    Arizona, to Tucson, Arizona in May of 2020?

10   A.    Yes.

11   Q.    Who requested you to go to Arizona?

12   A.    Che.

13   Q.    Was that the case on each of these times that you had

14   traveled out there?

15   A.    Yes.

16   Q.    And did you drive or did you fly out there?

17   A.    I always flew.

18   Q.    Okay. And then drove back?

19   A.    Yes.

20   Q.    In a minute I'm going to show you a video and ask you if

21   you recognize anyone in that video. Government's 21. Let's

22   just go all the way to -- well, let's start -- let's go to the

23   last segment. Let's go to the snip on 21.

24         **(The videotape was played.)**

25   BY MR. ROMANO:

```
 1    Q.   Do you see that?  All right, this is part of Government's
 2    21. Do you recognize the person that's depicted in that?
 3    A.   Yes.
 4    Q.   And who is that person?
 5    A.   Myself.
 6    Q.   Okay. And we can see that there's a rental car that has
 7    an Arizona tag. Had you rented that vehicle?
 8    A.   Yes.
 9    Q.   All right. Now there were other vehicles that you rented
10    while you were out there as well, correct?
11    A.   Just one other one, yes.
12    Q.   On this trip, right?
13    A.   Yes.
14    Q.   All right. Mr. Gasque, if we can, why don't we go back to
15    the videos and start them from the beginning.
16              (The videotape was played.)
17    BY MR. ROMANO:
18    Q.   Stop it right there for a second. Stop it right there,
19    please. Do you recognize that person?
20    A.   Yes.
21    Q.   And if we back it up for just a minute -- stop right
22    there. It looks like there's some type of a hotel facility
23    called Staybridge. Do you see that?
24    A.   Yes.
25    Q.   Are you familiar with that establishment?
```

```
 1    A.    Yes, I stayed there.

 2    Q.    Okay. Incidentally, when you stayed in a hotel there, who

 3    paid for the hotel?

 4    A.    Che.

 5    Q.    Did he pay for them each time or did Mr. Anderson pick up

 6    the tab so-to-speak on any occasion?

 7    A.    Maybe once.

 8    Q.    All right. So now this is in May of 2020, it shows you

 9    leaving the Staybridge. And Mr. Gasque, if we could continue.

10            (The videotape was played.)

11            MR. ROMANO:  Stop right there for a second.

12    BY MR. ROMANO:

13    Q.    This white vehicle here, do you recognize that?

14    A.    Yes.

15    Q.    What do you recognize that to be?

16    A.    That's Che's Suburban.

17    Q.    Do you know how that got out to Arizona?

18    A.    He drove it.

19    Q.    Okay. So you didn't drive that out there, correct?

20    A.    No, I flew.

21    Q.    You flew?

22    A.    Yes.

23    Q.    All right. Okay, Mr. Gasque, if we can --

24            (The videotape was played.)

25    BY MR. ROMANO:
```

```
1    Q.   So while we're watching this, Ms. Thompson, when you were

2    out there leaving the Staybridge as we just saw in this white

3    Chevy Suburban which you identified as Mr. Durbin's vehicle,

4    was he out there at the same time?

5    A.   No, he had already left.

6    Q.   And when you say he already left, where had he gone?

7    A.   Back to Maryland.

8    Q.   Okay. How did he get back to Maryland?

9    A.   He flew.

10   Q.   Okay. So you flew out?

11   A.   Yes.

12   Q.   And he drove out?

13   A.   Yes.

14   Q.   And you were to drive back?

15   A.   Yes.

16   Q.   Okay. And he flew back?

17   A.   Yes.

18              (The videotape was played.)

19   BY MR. ROMANO:

20   Q.   Again, while we're watching this, you indicated that Mr.

21   Durbin paid for the rental cars. How was that accomplished?

22   A.   Um, with his credit card.

23   Q.   Did you have his credit card or did he leave the credit

24   card number?  How is it you were able to rent the cars?

25   A.   Well, this last trip I had the credit card.
```

```
 1              (The videotape was played.)

 2    BY MR. ROMANO:

 3    Q.   And on this and the other trips when you flew out and

 4    rented the car, did you know beforehand what the purpose of

 5    the trip was and what you were supposed to do?

 6    A.   Yes.

 7    Q.   Which was what?

 8    A.   To get the kilos he paid for and drive them back to

 9    Maryland.

10              (The videotape was played.)

11              MR. ROMANO:  If we can go to the next segment,

12    please.

13              (The videotape was played.)

14    BY MR. ROMANO:

15    Q.   Again, that's you, correct?

16    A.   Yes.

17              (The videotape was played.)

18              MR. ROMANO:  Can you stop it right there, please?

19    BY MR. ROMANO:

20    Q.   Do you recognize this individual that just got out of the

21    car?

22    A.   Yes, it's Mr. Anderson.

23    Q.   For the record, when I say "got out of the car," which of

24    these two gentlemen is Mr. Anderson?

25    A.   The one in the green shirt that says "Jack."
```

```
 1    Q.   You can see his name "Jack" and he's got a baseball cap
 2    on backwards?
 3    A.   Yeah.
 4    Q.   Okay.  Continue, please.
 5              (The videotape was played.)
 6    BY MR. ROMANO:
 7    Q.   Did you know why you were supposed to meet Mr. Anderson
 8    where you were at this point?
 9    A.   He was supposed to give me the package with the kilo, but
10    he didn't have it.
11    Q.   At that point in time?
12    A.   Yes.
13    Q.   Okay.
14    A.   That's what he was telling me about.
15              (The videotape was played.)
16    BY MR. ROMANO:
17    Q.   Now that vehicle that just backed up, do you recognize
18    that?
19    A.   Yes, it was the rental car that I originally rented when
20    I got there.
21    Q.   When you say "originally rented," there came a time when
22    there was a second vehicle that you rented, right?
23    A.   Yes, yes.
24    Q.   Okay.
25              (The videotape was played.)
```

1    BY MR. ROMANO:

2    Q.   So stop it right there for a second. Who is driving that

3    Chevy Suburban, can you see?

4    A.   Yes, Mr. Anderson.

5           **MR. ROMANO:**  Okay, continue please, Mr. Gasque.

6           **(The videotape was played.)**

7    BY MR. ROMANO:

8    Q.   And that's you following behind?

9    A.   Yes.

10   Q.   Where were you all going at this point in time, do you

11   remember?

12   A.   To the airport to take back the rental.

13   Q.   The first rental car that you had?

14   A.   Yes.

15   Q.   Okay. And you got a second rental car?

16   A.   Yes.

17   Q.   Why did you get a second rental car?

18   A.   Because I was going to drive the Suburban back, but then

19   Jack got the kilo that Che wanted, so I had to get another

20   rental car and leave the Suburban with Jack.

21   Q.   And did you do that, Ms. Thompson?

22   A.   Yes.

23   Q.   And so you rented a second vehicle, correct?

24   A.   Yes.

25   Q.   And was this the vehicle that you were ultimately stopped

1    in?

2    A.   Yes.

3    Q.   Okay. And when you started back, incidentally, when you

4    would travel back would you take the same route every time?

5    A.   No. It just depended on as long as I felt like I was far

6    enough to be away from border patrol, I would go to MapQuest

7    or whatever, GPS and just put in my address, but it never was

8    the same route.

9    Q.   Okay. When you say "border patrol," what are you talking

10   about there?

11   A.   Well, like if you just drive straight from Arizona back

12   to Maryland you go through Texas and Oklahoma and there's just

13   a lot of -- because it's I guess a drug carrier route, they

14   usually pull a lot of people over. So I didn't want to go that

15   way so I went a roundabout way.

16   Q.   So you were trying to avoid checkpoints, is that what

17   you're saying?

18   A.   Yes.

19   Q.   Okay. Now after you got the initial amount from Jack and

20   you started back, how far did you get before you decided to

21   turn around?

22   A.   New Mexico.

23   Q.   So you made it from Tucson, Arizona to someplace in New

24   Mexico?

25   A.   Yes.

```
 1    Q.   What made you turn around?
 2    A.   Because Jack told Che that he had the kilo that he
 3    wanted.
 4    Q.   And how do you know that?
 5    A.   Because he told me on the phone.
 6    Q.   Who told you on the phone?
 7    A.   Che.
 8    Q.   Okay. What kind of phone did you have?
 9    A.   An iPhone.
10    Q.   All right. Do you know what kind of phone Che had?
11    A.   An iPhone.
12    Q.   All right. And so you got as far as Arizona, I mean, New
13    Mexico and you turned around and went back to Arizona because
14    you had a conversation with Mr. Durbin where he told you to
15    turn around because there was -- as you said there was a kilo?
16    A.   Yes.
17    Q.   Okay. Had you had any drugs at all at that point in your
18    rental car?
19    A.   Um, yes.
20    Q.   Okay.  Was it --
21    A.   It wasn't a kilo.
22    Q.   It was less?
23    A.   Yes, like a half, maybe less than that.
24    Q.   And you drove back to Maryland?
25    A.   Yes.
```

Thompson - direct                                                III-180

```
1    Q.   Okay. And you got stopped?

2    A.   Yes.

3    Q.   And they took you into custody, right?

4    A.   Yes.

5    Q.   And they also searched you, your car?

6    A.   Yes.

7    Q.   And they also searched your residence, right?

8    A.   Yes.

9    Q.   Were your kids there?

10   A.   Yes.

11   Q.   Were you concerned about your kids?

12   A.   Yes.

13   Q.   Did you have custody of your children at that point?

14   A.   Yes.

15   Q.   Were you still living on post?

16   A.   No.

17   Q.   Why not?

18   A.   Because I had lost my job.

19   Q.   Why did you lose your job?

20   A.   Because I got suspended when I got arrested in May of

21   2020.

22   Q.   May of 2020 or May of 2019 for the first kilo?

23   A.   The first kilo -- yes, I got arrested and I had a

24   security clearance and so --

25   Q.   So you lost your job?
```

```
 1    A.   Yes.

 2    Q.   On post?

 3    A.   Yes.

 4    Q.   You lost your residence on post?

 5    A.   Yes.

 6    Q.   Is that right?

 7    A.   Yes.

 8    Q.   There was a search done at your house?

 9    A.   Yes.

10    Q.   And all four of your kids were there?

11    A.   Two of them were there.

12    Q.   Two of them. The younger two, the older two?

13    A.   My 20-year-old and my 15-year-old daughter.

14    Q.   All right. Ms. Thompson, I'm going to show you in a

15    moment here, Government's Exhibit 23.  Your Honor, for the

16    record, Government 23 is a firearm, but it has been checked by

17    the marshal.  It's been made safe so I'm going to ask the

18    witness if she can identify it.

19              THE COURT:  Okay.

20              MR. ROMANO:  But there is a plastic sleeve through

21    the firearm so it's not capable of being fired.

22              THE COURT:  Let me see.  Oh, yes. Okay.  That's

23    fine.

24    BY MR. ROMANO:

25    Q.   This is Government's 23, Ms. Thompson. Do you recognize
```

1    this?

2    A.    Yes.

3    Q.    What do you recognize it to be?

4    A.    The weapon I had in the safe in my house in the closet.

5    Q.    Okay. How did you come by to get this?

6    A.    Che gave it to me.

7    Q.    And why did Che give you this?

8    A.    Because I asked him for it.

9    Q.    You asked him for it?

10   A.    Yes.

11   Q.    Okay.  And you say it was in a safe in your closet?

12   A.    Yes.

13   Q.    Did you have a combination to the safe?

14   A.    It was a key.

15   Q.    A key?

16   A.    Yes.

17   Q.    Did you have a key?

18   A.    Yes.

19   Q.    What about Mr. Durbin, did he have a key?

20   A.    Yes.

21   Q.    Why did you ask Mr. Durbin for the gun?

22   A.    No particular reason.

23   Q.    Do you remember telling the police when you were

24   interviewed that you asked for protection?

25   A.    Yes.

```
1    Q.   Was that true, you asked for it for protection?

2    A.   No.

3    Q.   You just wanted it?

4    A.   Yes.

5    Q.   Now when you were stopped by Harford County Sheriff's

6    detectives, it was pretty much the middle of night, right?

7    A.   Yes.

8    Q.   Pretty close to 3 in the morning?

9    A.   Yes.

10   Q.   And they interviewed you, right?

11   A.   Yes.

12   Q.   Were you advised of your rights before you were

13   interviewed?

14   A.   Yes.

15   Q.   And after you were advised of your rights you agreed to

16   speak with them; is that right?

17   A.   Yes.

18   Q.   Did the detectives give you water to drink?

19   A.   Yes.

20   Q.   Okay. Did you complain about being cold and they gave you

21   some type of blanket?

22   A.   Yes.

23   Q.   Do you remember that?

24   A.   Yes.

25   Q.   Okay. Understanding that you had just been arrested, did
```

```
 1    they treat you fairly or did they yell at you and threaten
 2    you?
 3    A.   No.
 4    Q.   Okay. And when you agreed to speak with them, did they
 5    ask you just one question or did they ask you several
 6    questions?
 7    A.   Several.
 8    Q.   Okay. And did you ask them questions?
 9    A.   Yes.
10    Q.   Okay. And did they try to answer the questions that you
11    asked them?
12    A.   Yes.
13    Q.   Now with regard to the questions that the detectives
14    asked you, did you answer all of those questions truthfully or
15    did you fail to tell them the complete truth?
16    A.   Um, I failed to tell them the complete truth.
17    Q.   And why did you do that, Ms. Thompson?
18    A.   I was trying to protect Che.
19    Q.   Ms. Thompson, for all these trips that you made from
20    Tucson, Arizona to Harford County, Maryland transporting kilos
21    of cocaine, what, if anything, did you get from Mr. Durbin in
22    the form of payment or compensation?
23    A.   Um, he never really paid me anything because he paid all
24    my bills.
25    Q.   So when you say he paid all your bills, what are we
```

```
 1   talking about?
 2   A.   My rent, my car payment, BGE, water bill. If I needed
 3   something for my kids, he would do it so it really wasn't --
 4   he didn't really -- like I say, Oh, here's $1,500 for your
 5   trip." He didn't do that.
 6   Q.   Well, given that you lost your job, you lost your
 7   residency, I take it you lost custody of your kids at this
 8   point?
 9   A.   I lost custody of my children when I got locked up in
10   May, 2021.
11   Q.   So given that you've lost your job, you lost your
12   residence, you lost your residence on post and you lost your
13   freedom, considering all that, was it worth it?
14           MS. FLYNN:  Objection.
15           THE COURT:  Sustained.
16           MR. ROMANO:  Thank you, ma'am. That's all the
17   questions I have at this point.
18           THE COURT: Counsel, why don't you approach.
19           (Counsel approached the bench.)
20           THE COURT:  Ms. Flynn, I'll defer to you.  What
21   would you like to do?
22           MS. FLYNN:  Your Honor, I will take advantage of the
23   Court's accommodation.
24           MR MANN:  I was going to say, Judge, I know it's not
25   how we've been doing things. I have one question for her and I
```

```
 1    don't mind going out of order to get it done.

 2              THE COURT:  Ms. Flynn, do you mind if Mr. Mann --

 3    it's a little awkward procedurally because here's the issue, I

 4    think it may be that based upon Ms. Flynn's examination you

 5    may have more than one.

 6              MR MANN:  That's true, that's true.

 7              THE COURT:  So Ms. Flynn would you like to -- do you

 8    believe that your examination would take more than 15 minutes?

 9              MS. FLYNN:  Yes, I'm guessing that it will.

10              THE COURT:  Okay, well here's what we'll do:  I'm

11    going to go ahead and adjourn for the day and then I'm going

12    to have them come back at 9:15 on Monday and we will proceed

13    with a cross-examination.

14              MR. ROMANO:  Your Honor, actually it just occurred

15    to me that there was one question that I meant to ask her that

16    I did not, so before we do that can I at least ask a question?

17              THE COURT:  Yeah, I'll let you reopen for that

18    single purpose.

19              (Counsel returned to their trial tables.)

20              THE COURT:  Ladies and gentlemen, the Government has

21    one or so more questions for this particular witness. We are

22    then going to adjourn for the day and have you return on

23    Monday at 9:15. So Mr. Romano?

24              MR. ROMANO:  Thank you, Your Honor.

25    BY MR. ROMANO:
```

1    Q.   Ms. Thompson, you indicated that you made several trips

2    at Mr. Durbin's direction and transported kilos of cocaine

3    back, correct?

4    A.   Yes.

5    Q.   Was there ever a time when you actually flew out to

6    Tucson and cocaine either wasn't available or for whatever

7    reason you did not transport cocaine back?

8    A.   Yes.

9    Q.   Okay. Did that happen once or more than once?

10   A.   More than once.

11   Q.   Okay.  Can you estimate the number of times that that

12   happened?

13   A.   I think -- I do believe it only was twice.

14   Q.   Twice you flew out and were unable for whatever reason to

15   get cocaine?

16   A.   Yes.

17   Q.   But on the other occasions where you made the trips I

18   believe you indicated that it was in excess of -- certainly in

19   excess of five kilos; is that correct?

20   A.   Yes.

21            MR. ROMANO:  Thank you, ma'am.  That's all the

22   questions I have. Appreciate it, Your Honor.

23            THE COURT:  Very well. Ms. Thompson, you can go

24   ahead and step down. And I will see you on Monday.

25            (Witness, excused.)

```
 1              THE COURT:  All right, ladies and gentlemen, we have
 2    concluded our afternoon session. As I've always said, please
 3    don't discuss this case among yourselves, allow anyone to
 4    discuss this case with you. Go home today and over the course
 5    of the weekend resist the temptation to talk about the case in
 6    any way. Respect the process and the parties. Talk about
 7    something else, the Major League Baseball strike, the
 8    Baltimore Ravens draft, but anything but this case. We need
 9    you to respect the process and the parties are really
10    interested in you doing so.
11              In the event anything questionable occurs, don't discuss
12    it with your fellow jurors.  Just simply write a note. Don't
13    do any independent research of this case on your own. Stay off
14    of Facebook, FaceTime, My Space, TikTok, whatever it is. Don't
15    look it up until you get this case for deliberation and you've
16    rendered a verdict.
17              So with that, I'm going to ask that you return back to
18    the jury assembly room at 9:15 on Monday and we will begin
19    with the cross-examination of the individual witness and we
20    will proceed. As I indicated, we are ahead of schedule. I'm
21    not going to tell you how far ahead of schedule we are because
22    I don't want to make any promises I can't keep, but I will
23    tell you we are ahead of schedule on this as far as the
24    original trial date is concerned.  So with that, I wish you
25    well. Have a wonderful weekend.
```

```
 1              (Jury excused at 4:17 p.m.)

 2              THE COURT:  Okay, you can go ahead and have a seat.

 3   All right, Counsel, is there anything else we can handle

 4   productively before we conclude today, Mr. Romano?

 5              MR. ROMANO:  No, Your Honor.  Thank you.

 6              THE COURT: Ms. Flynn?

 7              MS. FLYNN:  No, Your Honor.

 8              THE COURT:  Mr. Mann?

 9              MR MANN:  No, Your Honor.

10              THE COURT:  Please understand that I extend the

11   courtesy of adjourning early over the course of the weekend to

12   both the Government and defense counsel.  So any courtesy I

13   extended to Ms. Flynn would have been extended to the

14   Government, but for the placement of the cards.

15              MR. ROMANO:  Thank you, Your Honor, I guess.

16              THE COURT: Take care.  Have a good weekend.

17              (Proceeding concluded at 4:18 p.m.)

18

19

20

21

22

23

24

25
```

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4

5          I, Nadine M. Bachmann, Certified Realtime Reporter

6    and Registered Merit Reporter, in and for the United States

7    District Court for the District of Maryland, do hereby

8    certify, pursuant to 28 U.S.C. § 753, that the foregoing is a

9    true and correct transcript of the stenographically-reported

10   proceedings held in the above-entitled matter and that the

11   transcript page format is in conformance with the regulations

12   of the Judicial Conference of the United States.

13

14                    Dated this <u>16th</u> day of <u>January, 2022</u>.

15

16                    -S-

17          _____

18          NADINE M. BACHMANN, CRR, RMR
            FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25

```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
 2                        NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,    )
                                  )
 4       vs.                      )    CRIMINAL CASE NO. GLR-20-0210
                                  )
 5   CHE DURBIN and TERRELL       )           VOLUME IV
     WALTON,                      )
 6                                )
            Defendants.           )
 7   _____ )

 8                        Monday, March 7, 2022
                             Courtroom 7A
 9                        Baltimore, Maryland
                             JURY TRIAL
10

     BEFORE:  THE HONORABLE GEORGE LEVI RUSSELL, III, Judge
11

12   For the Plaintiff:
     Christopher Romano, Esquire
13   Jason Hamilton, Esquire
     Special Assistant United States Attorneys
14   36 S. Charles Street, 4th Floor
     Baltimore, Maryland  21201
15
     For the Defendants:
16       For Che Jaron Durbin:
             Catherine Flynn, Esquire
17           Law Office of Catherine Flynn
             217 North Charles Street, Second Floor
18           Baltimore, Maryland  21201
         For Terrell Darnell Walton:
19           Tyler Mann, Esquire
             Law Offices of Mann and Risch
20           101 E. Chesapeake Avenue, Suite 100
             Towson, Maryland  21286
21   Also Present:
         Brian Battee, Harford County Sheriff's Office
22       Damon Gasque, Paralegal, U.S. Attorney's Office

23                        Reported by:
                    Nadine M. Bachmann, RMR, CRR
24               Federal Official Court Reporter
                  101 W. Lombard Street, 4th Floor
25                 Baltimore, Maryland  21201
                        410-962-4753
```

```
1              T A B L E   O F   C O N T E N T S
2    WITNESS              DIRECT   CROSS    REDIRECT    RECROSS
3    JAMEKA THOMPSON
4    (Continued)
5         By Ms. Flynn:              5
6         By Mr. Mann:              31
7    BRIAN BATTEE
8         By Mr. Romano:   32                      83
9         By Ms. Flynn:             68
10
11   STEPHANIE LAUFERT
12        By Mr. Hamilton:  85
13        By Ms. Flynn:             94
14        By Mr Mann:              102
15
16   BRANDON UNDERHILL
17        By Mr. Romano:   105
18
19
20
21
22
23
24
25
```

```
 1                    P R O C E E D I N G S
 2              MR. ROMANO:  Calling the matter of United States
 3    versus Che Durbin and Terrell Walton. It's under criminal case
 4    GLR-20-0210. Representing the United States, Special Assistant
 5    U.S. Attorneys Jason Hamilton and Chris Romano and we're here
 6    for a continuation of the trial.
 7              THE COURT:  All right, good morning, everyone. Ms.
 8    Flynn.
 9              MS. FLYNN:  Good morning, Your Honor.  Catherine
10    Flynn.  I represent Mr. Durbin, who is seated to my left.
11              THE COURT:  All right, Mr. Durbin, good morning. Mr.
12    Mann.
13              MR MANN:  Judge, good morning.  My name is Tyler
14    Mann, M-a-n-n representing Mr. Walton, who is to my left.
15              THE COURT:  All right, good morning, Mr. Walton.
16              DEFENDANT WALTON:  Good morning.
17              THE COURT:  I wanted to bring Counsel up to date on
18    a juror issue. On Sunday, Ms. Herndon received an e-mail from
19    Juror No. 1 who indicated that she was ill. She said that she
20    may have caught a stomach bug from her young son and that she
21    was really under the weather. Ms. Herndon advised that she
22    should let us know how she's feeling in the morning, namely
23    this morning. She e-mailed saying I'm feeling better, but I'm
24    still sort of tired. I'm not quite sure what the diagnosis is
25    but I told her -- I conveyed to Ms. Herndon to advise Juror
```

1    No. 1 that she should stay at home, but I wasn't discharging

2    her until I spoke to Counsel first.

3        So with that, I am not certain whether or not it's COVID,

4    whether or not it's a stomach bug, but if it's a stomach bug,

5    it's been less than 24 hours since she's had it so I am

6    inclined not to have her infect the other jurors with whatever

7    it is she had. So that's why I advised her to stay at home,

8    but I would consult with counsel to determine whether or not

9    they agreed with the course of action to just simply discharge

10   her and replace her with Alternate No. 1 and then we'll

11   proceed. Had it been a more lengthy trial and/or we were in

12   the middle of COVID or something along those lines, then I

13   would be less inclined to discharge her automatically, but I

14   think that considering we will conclude the testimonial

15   portion -- we may conclude the testimonial portion maybe even

16   the case this week, I thought it prudent.

17       I see Mr. Romano nodding in the affirmative. Do you agree

18   to discharge this particular juror?

19           **MR. ROMANO:**  Yes, Your Honor.  We have no objection.

20           **THE COURT:** All right, Ms. Flynn?

21           **MS. FLYNN:**  I agree.  I have no objection.

22           **MR MANN:**  No objection, Judge.

23           **THE COURT:**  Very good. What we'll do is -- are we

24   ready for the jury?

25           **THE CLERK:** Your Honor, they're all here.

```
1              THE COURT:  So what we're going to do is Alternate
2    No. 1, we're going to direct her to come out first and she's
3    going to be seated in Juror No. 1's position.
4              THE CLERK: Okay, got it.
5              THE COURT: Okay, we're ready for the jury and --
6    actually, we can get the witness out as well.
7              (Witness took the stand.)
8              (The jury arrived at 9:30 a.m.)
9              THE COURT:  All right, everyone could be seated. Ms.
10   Thompson, you could be seated.  Good morning, everyone.  It's
11   nice to see you made it back here safe and sound. As you can
12   see the witness is in the witness box and we are ready to
13   continue with the trial.
14        Ms. Thompson, if you could, according to our masking
15   mandates, you can remove your mask if you've been fully
16   vaccinated and wish to do so. If you could, please state and
17   spell your full name for the record.
18             THE WITNESS:  Jameka, J-a-m-e-k-a Thompson,
19   T-h-o-m-p-s-o-n.
20             THE COURT:  All right, Ms. Flynn, at your pleasure.
21             MS. FLYNN:  Thank you, Your Honor. And with the
22   Court's permission I'm going to take off my mask.
23             THE COURT:  Yes.
24                C R O S S - E X A M I N A T I O N
25   BY MS. FLYNN:
```

```
 1    Q.   Good morning, Ms. Thompson.

 2    A.   Hello.

 3    Q.   Can you see me?

 4    A.   Um-hum.

 5    Q.   Can you hear me?

 6    A.   Yes.

 7    Q.   Now you're 41 years old; is that correct?

 8    A.   Yes.

 9    Q.   Where did you go to college?

10    A.   Morgan.

11    Q.   And when did you graduate?

12    A.   2001.

13    Q.   And what did you receive your degree in?

14    A.   Excuse me?

15    Q.   Did you get a bachelor's degree?

16    A.   Yes, yes.

17    Q.   All right.  And what did you study at Morgan?  What was

18    your major?

19    A.   Business administration.

20    Q.   And you testified that you have a masters's degree; is

21    that correct?

22    A.   Yes.

23    Q.   And where did you get your master's degree?

24    A.   Trident University.

25    Q.   And when did you get that degree?
```

Thompson - cross                                    IV-7

```
1    A.    2017.

2    Q.    Now how long did it take you to get that degree?

3    A.    Two years.

4    Q.    And is that an in-person or online?

5    A.    It was online.

6    Q.    And you also testified that you were working at some

7    point at Aberdeen Proving Ground, APG; is that correct?

8    A.    Yes.

9    Q.    And I believe you said that you were working for the

10   Department of the Army as a supply chain manager; is that

11   correct?

12   A.    Yes.

13   Q.    When did you get that job?

14   A.    In 2015.

15   Q.    All right. Now prior to that job, what did you do for a

16   living?

17   A.    I was a substitute for Harford County Public Schools.

18   Q.    And then before that what did you do?

19   A.    I was a stay-at-home mom because my husband was in the

20   Army.

21   Q.    Okay. And is that Mr. Trump?

22   A.    Yes.

23   Q.    Okay. And when he was in the Army, did you travel with

24   him?

25   A.    Yes.
```

**JA102**

```
 1    Q.   And did you guys live in various places?
 2    A.   Yes.
 3    Q.   Where did you live?
 4    A.   Virginia, North Carolina, and Missouri.
 5    Q.   Did you ever live overseas?
 6    A.   No.
 7    Q.   All right. And then I gather at some point you got
 8    divorced; is that correct?
 9    A.   Yes.
10    Q.   And when was that?
11    A.   The divorce was final in 2018.
12    Q.   Okay. So you two were together -- were you two together
13    when were you getting your masters's degree?
14    A.   Yes.
15    Q.   You were still married?
16    A.   Yes, still married, but he had already -- we were already
17    separated.
18    Q.   All right. And then you got the job at APG in 2015 before
19    you got your master's degree; is that correct?
20    A.   Yes.
21    Q.   Now did they help you pay for the master's degree?
22    A.   No.
23    Q.   Were you expecting sort of to move up in your job once
24    you got your degree?
25    A.   Yes.
```

```
1    Q.   I mean, I'm assuming that you went to get the degree to
2    further your career; is that correct?
3    A.   Yes.  It was an internship so once you graduated you were
4    permanent.
5    Q.   Okay.  So when you started working at APG for the
6    Department of the Army, you started as an intern?
7    A.   Yes.
8    Q.   So how did you learn how to become a supply chain
9    manager?
10   A.   On-the-job training and then yeah, just repetitiveness,
11   on-the-job-training.
12   Q.   And you had also gotten your college degree in business
13   administration; is that correct?
14   A.   Correct.
15   Q.   So I don't really know what a supply chain manager
16   does --
17   A.   Um --
18            THE COURT:  Wait, wait for her to finish her
19   question and then you can go ahead and respond.
20            THE WITNESS:  Okay.
21   BY MS. FLYNN:
22   Q.   What I was going to say is I don't know exactly what a
23   supply chain manager does, but did your education help you do
24   the job?
25   A.   Yes.
```

```
 1    Q.   And then when you went to get your master's degree, did
 2    that help you do your job?
 3    A.   Yes.
 4    Q.   And what is a supply chain manager?
 5    A.   Basically we support the Department of the Army with
 6    supply needs for like -- well, my section did encryptors for
 7    radios, phones, and computers.  So we basically managed the
 8    parts for the encryptors for those items and we did forecast
 9    demanding and things like that to see when they needed them or
10    we would do setup repairs at the depots, the Army depots and
11    things of that nature.
12    Q.   Okay.  So you were working on base at APG; is that
13    correct?
14    A.   Yes.
15    Q.   But did your job extend to parts of the Army beyond APG?
16    A.   Some people went on TDY, but only went for like the
17    Tobyhanna Depot in Pennsylvania.
18    Q.   Okay. So it was sort of localized efforts to make sure
19    that the supply chain for those items was sort of seamless; is
20    that correct?
21    A.   Yes.
22    Q.   And you were also living on base; is that correct?
23    A.   Yes.
24    Q.   Now how is it that you were able to live on base working
25    at APG when you started off as an intern?
```

```
 1    A.   As long as you work for the Department of the Army you
 2    can live on Aberdeen Proving Ground.
 3    Q.   Okay. And did you have to pay rent?
 4    A.   Yes.
 5    Q.   But is it at a reduced rate because it's on base?
 6    A.   It's just the electric and water is included with your
 7    rent.
 8    Q.   Okay. And so were there other people that you worked with
 9    that also lived on base?
10    A.   Yes.
11    Q.   And when you went to work for the Department of the Army,
12    did they do a background check?
13    A.   Yes.
14    Q.   And is that something that they did sort of on a periodic
15    basis?
16    A.   No, you have to -- they do an initial background check
17    and then it takes them like two or three years before they're
18    done. So you are in a pending status. You have a conditional
19    background for two or three years.
20    Q.   Okay. Was there a point at which you got cleared?
21    A.   Almost, but then I lost my job, so --
22    Q.   Okay, so you were in that pending status?
23    A.   Yes.
24    Q.   Okay. Now you have four children, they're 21, 18, 15 and
25    11; is that correct?
```

```
 1   A.   Yes.
 2   Q.   And so how many of them were living with you when you
 3   lived at APG?
 4   A.   All four of them.
 5   Q.   All right. And when you got arrested for this charge, how
 6   many of them were living with you?
 7   A.   All four of them.
 8   Q.   And were they all in school?
 9   A.   Um, it was like 3:00 in the morning when I got arrested.
10   Q.   No.  In general, were they all in school?
11   A.   Oh, yes, yes.  Well, it was online because of COVID.
12   Q.   Okay. But they were all enrolled?
13   A.   Yes.
14   Q.   Was your 21-year-old in school?
15   A.   Um, no.  Not yet.
16   Q.   Was the 21-year-old planning on going to college?
17   A.   Yes.  He's in college now.
18   Q.   Okay, where is he attending?
19   A.   I can't remember.  It's in Pennsylvania.  It's a private
20   Catholic college.
21   Q.   And what about the 18-year-old?
22   A.   She goes to Prairie View University in Houston.
23   Q.   And the 15-year-old?
24   A.   Lives with her father.
25   Q.   And the 11-year-old?
```

 1   A.   Lives with their father.

 2   Q.   And their father is Mr. Trump?

 3   A.   Yes.

 4   Q.   All right. But prior to your arrest they were all living

 5   with you, correct?

 6   A.   Yes.

 7   Q.   And during COVID, were you working remotely or were you

 8   going -- strike that. Once COVID hit, were you working at APG?

 9   A.   No.

10   Q.   Okay.  Now this True Homes, LLC that you testified

11   about --

12   A.   Yes.

13   Q.   You said that that was a trucking company, correct?

14   A.   Yes.

15   Q.   And you said something about you had to dissolve the

16   company?

17   A.   Yes.

18   Q.   At some point. Okay. So by definition you had to create

19   the company; is that correct?

20   A.   Yes.

21   Q.   Meaning you had to file all the proper paperwork to

22   establish an LLC, correct?

23   A.   Yes.

24   Q.   Now did you do that or did you hire someone to do that

25   for you?

```
1    A.    We had a lawyer.

2    Q.    Okay. And who was that?

3    A.    I don't recall.

4    Q.    All right.  But you hired an attorney to get the

5    paperwork straight and file it with the state, all of that

6    kind of stuff?

7    A.    Yes.

8    Q.    And who came up with the name?

9    A.    Che and I came up with it together.

10   Q.    Okay. Now what day did you get arrested?

11   A.    Which time?

12   Q.    The second time.

13   A.    I think it was on a Tuesday.

14   Q.    Do you know the date?

15   A.    No, no, no.  Maybe Monday.

16   Q.    Do you know the date?

17   A.    I can't remember, no.

18   Q.    Was it in May of 2020?

19   A.    Yes.

20   Q.    Okay. And then you also got arrested in May of 2019?

21   A.    Yes.

22   Q.    Okay. So in May of 2020 when you got arrested, you had a

23   cell phone, right?

24   A.    Yes.

25   Q.    And was that something that was taken from you when you
```

```
 1   got arrested?

 2   A.   Yes.

 3   Q.   And you've been -- you were released at some point?

 4   A.   Yes.

 5   Q.   And then you got locked up again; is that right?

 6   A.   Yes.

 7   Q.   When you got released, did the police give you back your

 8   phone?

 9   A.   No.

10   Q.   So you had to go get another phone; is that correct?

11   A.   Yes.

12   Q.   And as far as you know is the phone that you got arrested

13   with in 2020 still in police custody?

14   A.   Yes.

15   Q.   Now in May of 2019 when you got arrested, did you have a

16   phone?

17   A.   Yes.

18   Q.   And was that taken into police custody?

19   A.   Yes.

20   Q.   Was it ever returned to you?

21   A.   Yes.

22   Q.   Okay. So that one you were able to get back; is that

23   correct?

24   A.   Yes.

25   Q.   And was that the same phone?
```

```
 1   A.   No.

 2   Q.   Okay. So you had upgraded at some point?

 3   A.   Yes.

 4   Q.   Now I want to bring your attention to State's Exhibit --

 5   I mean, Government's Exhibit No. 9, your plea agreement.

 6   A.   Yes.

 7   Q.   And Mr. Romano showed that to you on Friday; is that

 8   correct?

 9   A.   Yes.

10   Q.   And you signed this document; is that correct?

11   A.   Yes.

12   Q.   And you actually came in front of Judge Russell to enter

13   the guilty plea, right?

14   A.   Yes.

15   Q.   And it's my understanding you're due to come back June

16   23rd for the sentencing; is that correct?

17   A.   Yes.

18   Q.   And Judge Russell is going to decide the sentence; is

19   that correct?

20   A.   Yes.

21   Q.   And your sentence to a certain degree is dependent on

22   your testimony Friday and today; is that correct?

23   A.   Yes.

24   Q.   Now if we could go to page 2. And do you see there where

25   it says that there's a mandatory minimum of ten years?
```

```
 1    A.   Yes.
 2    Q.   And so you understand that for the crime that you pled
 3    guilty to, you were facing at least ten years in federal
 4    prison; is that correct?
 5    A.   Yes.
 6    Q.   And is it your understanding there's no parole in federal
 7    prison; is that correct?
 8    A.   Yes.
 9    Q.   So essentially you were going to serve at least ten
10    years; is that correct?
11    A.   Yes.
12    Q.   Unless you made a decision to cooperate with the
13    Government; is that correct?
14    A.   Yes.
15    Q.   And you had an attorney, I think he was here on Friday --
16    you had an attorney during I guess the entirety of you being
17    locked up; is that correct?
18    A.   Yes.
19    Q.   And there came a point where you met with the Government;
20    is that correct?
21    A.   Yes.
22    Q.   And when is the first time you met with the Government?
23    A.   I don't remember.
24    Q.   How many times have you met with the Government?
25    A.   Twice.
```

```
1    Q.   And was your attorney present both of those times?

2    A.   Yes.

3    Q.   Okay. And when I say "the Government," I mean the Federal

4    Government, Mr. Romano and probably Detective Battee or

5    another law enforcement, right?

6    A.   Yes.

7    Q.   How many people were there the first time you met with

8    the Government?

9    A.   I don't know, five, six.

10   Q.   Okay. How many people were there the second time?

11   A.   I don't -- four, five.

12   Q.   All right. And that's including you and your attorney?

13   A.   No.

14   Q.   Or -- okay, so four or five people from the Government,

15   correct?

16   A.   Yes.

17   Q.   Now you also spoke to Detective Battee the day you got

18   arrested in May of 2020; is that correct?

19   A.   Yes.

20   Q.   And do you know if that meeting was recorded?

21   A.   It was.

22   Q.   And do you know was it video recorded?

23   A.   I'm not sure.

24   Q.   Then how do you know it was recorded?

25   A.   They record everything. They have their phones on the
```

```
 1    desk.
 2    Q.   Okay. So at the very least you believe it was recorded on
 3    a phone?
 4    A.   Yes.
 5    Q.   And it could have been recorded in a room, correct?
 6    A.   Yes.
 7    Q.   You were at a police station?
 8    A.   Yes.
 9    Q.   And did they bring you into a room alone?
10    A.   Yes.
11    Q.   Now as you said, you were facing at least ten years
12    without parole and you've got four children, correct?
13    A.   Yes.
14    Q.   And what is it that you're expecting Judge Russell is
15    going to sentence you to because you've cooperated?
16    A.   I don't have any expectations.
17    Q.   Well, you certainly have had conversations with the
18    Government about the potential of a lower sentence, isn't that
19    correct?
20    A.   No, only discussed that with my lawyer.
21    Q.   Okay. Now you were aware that the Government appears at
22    your sentencing and makes a recommendation based on your level
23    of cooperation; isn't that correct?
24    A.   Yes, my lawyer told me.
25    Q.   Okay. And so what's going to happen at your sentencing is
```

 1    Mr. Romano is going to say to Judge Russell that she was

 2    cooperative and we believe she was truthful. Correct?

 3    A.   Yes.

 4    Q.   I mean, you understand that part of your agreement is to

 5    be truthful; is that correct?

 6    A.   Yes.

 7    Q.   But you understand that it's the Government's opinion of

 8    your truthfulness that's going to be part of their

 9    recommendation; is that correct?

10    A.   Yes.

11    Q.   Okay. Now when you met with the Government the first time

12    when there were four or five people and your attorney and you,

13    do you know if that conversation was recorded?

14    A.   I'm not sure.

15    Q.   And what about the second time you met with them?

16    A.   I'm not sure.

17    Q.   And when you say you're not sure, like did they have

18    phones out?

19    A.   I don't know.

20    Q.   Well --

21    A.   I don't remember.

22    Q.   Okay. Where were you physically when you met with them

23    the first time?

24    A.   Um, in Harford County.

25    Q.   Okay, let me clarify. When you met with the federal

 1 │ authorities, was that in Harford County?
 2 │ A.   Yes.
 3 │ Q.   And might that have been -- well, was it last summer?
 4 │ A.   2021, yes.
 5 │ Q.   Okay. Where were you housed when you had that first
 6 │ conversation?
 7 │ A.   Harford County.
 8 │ Q.   Okay, now did there come a time where you were moved to
 9 │ the Chesapeake Detention Facility?
10 │ A.   Yes.
11 │ Q.   Is that where you're currently housed?
12 │ A.   Yes.
13 │ Q.   So the second time you met with the Government, where
14 │ were you housed?
15 │ A.   Chesapeake Detention Facility.
16 │ Q.   And do you recall where that meeting occurred?
17 │ A.   It was somewhere in here.
18 │ Q.   In this building?
19 │ A.   Yes.
20 │ Q.   All right. And so when you met the first time with the
21 │ Government in Harford County, like where in Harford County did
22 │ you go?
23 │ A.   Wherever the Narcotics Task Force, their office, I guess.
24 │ Q.   Okay. And did they bring you from jail to that meeting?
25 │ A.   Yes.

```
 1    Q.   Okay. So that was after you had been locked up again,
 2    right?
 3    A.   Yes.
 4    Q.   Now you have a storage unit in White Marsh, isn't that
 5    correct?
 6    A.   Yes.
 7    Q.   And where is that located?
 8    A.   White Marsh.
 9    Q.   Like generally it's in White Marsh, but where?
10    A.   Route 7.
11    Q.   And did you tell the Government you had a storage unit?
12    A.   Yes.
13    Q.   And Jack Anderson, he also had a place to live in White
14    Marsh; is that correct?
15    A.   Yes.
16    Q.   And did you tell the Government that?
17    A.   Yes.
18    Q.   And did you tell the Government his address?
19    A.   To the apartment in White Marsh?
20    Q.   Yes.
21    A.   No, I didn't know.
22    Q.   But you've been there, isn't that correct?
23    A.   Yes, once.
24    Q.   But you didn't memorize the address; is that correct?
25    A.   No.
```

```
1    Q.   But you told the Government that Jack Anderson had a

2    place in White Marsh; is that correct?

3    A.   Yes.

4    Q.   And you also told them that you had a storage unit; is

5    that correct?

6    A.   Yes.

7    Q.   And did you tell them specifically where the storage unit

8    was located?

9    A.   I told them it was on Route 7. I don't remember -- if I

10   remembered, I told them. I can't recall.

11   Q.   Okay. Now you also told the Government about the flights

12   that you took to Tucson; is that correct?

13   A.   Yes.

14   Q.   And in your opinion did you tell the Government

15   everything about your journeys to Tucson?

16   A.   Yes.

17   Q.   You were thorough when you spoke to them; is that

18   correct?

19   A.   Yes.

20   Q.   Now as far as the hotels that you stayed in, similarly,

21   you were thorough when you spoke to the Government about what

22   hotels --

23   A.   Yeah, I can't remember all of them, but the ones I knew,

24   I told them.

25   Q.   And what about the rental cars, were you thorough when
```

```
1    you discussed that with the Government?

2    A.   Yes.

3    Q.   So in your opinion you were truthful and thorough when

4    you spoke to the Government; is that correct?

5    A.   Yes.

6    Q.   Now you testified on Friday about this incident while you

7    were at CDF, correct?

8    A.   Yes.

9    Q.   Okay. And I don't want to get into it, I don't want to

10   embarrass you, I just want to clarify something, that you

11   agreed that at some point you lied to the authorities about

12   that incident; is that correct?

13   A.   Yes.

14   Q.   And that's because you didn't want to get in any trouble,

15   right?

16   A.   They had already locked me in. I didn't want to stay

17   locked in the cell.

18   Q.   So does that mean that you were in segregation or you

19   were --

20   A.   Yes.

21   Q.   Getting punished in some way?

22   A.   Yes.

23   Q.   So when you say "locked in," do they lock you in 23 hours

24   a day?

25   A.   Yes.
```

```
 1    Q.   And if you're not locked in, does that mean you've got
 2    some freedom of movement?
 3    A.   For an hour, yes.
 4    Q.   No, but if you're not locked in, like let's say you
 5    weren't in trouble --
 6    A.   Yeah, you can be out all day.
 7    Q.   Then you can be out all day; is that correct?
 8    A.   Yes.
 9    Q.   And is there -- pardon me because I've never been there
10    -- is it like are all the women --
11    A.   Yes.
12    Q.   --housed together?
13    A.   Yes.
14    Q.   And is it like a pod where there's a central location?
15    A.   Yes.
16    Q.   And are there TVs?
17    A.   Yes.
18    Q.   And I don't know, cards or something?
19    A.   Yes.
20    Q.   Something to do during the day?
21    A.   Yes.
22    Q.   And you're free to hang out in this central area if
23    you're not in trouble?
24    A.   Yes.
25    Q.   But if you're in trouble, they lock you down 23/7?
```

```
 1    A.   Yes, 23 and 1.
 2    Q.   I'm sorry, 23 and 1. So you wanted to get out of that
 3    situation so you lied to them?
 4    A.   Yeah, I told them it didn't happen.
 5    Q.   Okay. Now did you get fired from your job with the
 6    Department of the Army because of your arrest in 2019?
 7    A.   I got suspended. They just terminated me like a couple
 8    months ago.
 9    Q.   Okay. But it had something to do with that incident,
10    correct?
11    A.   Yes.
12    Q.   So up until that point were you in good standing with
13    them?
14    A.   Yes.
15    Q.   Did they value you as an employee as far as you knew?
16    A.   Yes.
17    Q.   I mean, you were doing a good job, right?
18    A.   Yes.
19    Q.   And how many people did you work with?
20    A.   Um, six, seven.
21    Q.   Okay.  Now you mentioned a property on Hillside Terrace.
22    Do you remember that?
23    A.   Yes.
24    Q.   Did you have a key to that property?
25    A.   Yes.
```

```
 1   Q.   And was anyone living there?  Was Candace Owens living
 2   there?
 3   A.   Yes.
 4   Q.   So Candace Owens had a key as well, correct?
 5   A.   Yes.
 6   Q.   We saw that video of you out in front of the apartment
 7   where you were putting the package in your car.
 8   A.   Yes.
 9   Q.   And I apologize, I don't recall the address.
10   A.   Neither do I.
11   Q.   Okay. And somebody lived in that apartment; is that
12   correct?
13   A.   Yes.
14   Q.   And who was that?
15   A.   Che's mother.
16   Q.   All right. Did you have a key to that apartment?
17   A.   No.
18   Q.   And was this a senior living area or just a regular
19   apartment building?
20   A.   Regular.
21   Q.   Now after you left or -- well, when did you have to leave
22   living at APG?
23   A.   Right after I got suspended.
24   Q.   Okay. So --
25   A.   A month later I moved.
```

```
 1    Q.   So for the sake of argument that would have been May or
 2    June of 2019?
 3    A.   Yes, I moved the end of June.
 4    Q.   And where did you move to?
 5    A.   Abingdon.
 6    Q.   And what address?
 7    A.   Palustris Lane.
 8    Q.   And is that where you were living when you got arrested
 9    for this charge?
10    A.   Yes.
11    Q.   And you were living there with your kids, right?
12    A.   Yes.
13    Q.   Now you testified that you flew out to Arizona and your
14    testimony was you would pick up a package and drive it back;
15    is that correct?
16    A.   Yes.
17    Q.   Now there were times when you flew out there when you
18    didn't pick anything up; is that correct?
19    A.   Yes.
20    Q.   And do you recall how many times you flew out there where
21    you didn't pick anything up?
22    A.   Twice.
23    Q.   Do you recall when that was?
24    A.   No.
25    Q.   And then would you fly back or drive back?
```

```
 1    A.    If I didn't have anything I flew back.
 2    Q.    And so just -- I just want to clarify how that would
 3    happen. So you would get out there thinking you were going to
 4    pick something up?
 5    A.    Yes.
 6    Q.    And then when you got out there and realized you weren't
 7    picking something up would you make a reservation when you
 8    were out there to fly back?
 9    A.    Yes.
10    Q.    So it would just be a one-way from Tucson to Baltimore;
11    is that correct?
12    A.    Yes.
13    Q.    And if you had to estimate sort of what was the time
14    frame between trips?
15    A.    Depending on how much I brought back.
16    Q.    Okay. But you didn't check how much you were bringing
17    back, did you?
18    A.    Um, only a couple times towards the end.
19    Q.    And how would you check?
20    A.    He gave -- Jack gave it to me.
21    Q.    Okay, so you could see what Jack was giving to you?
22    A.    Yes.
23    Q.    And did you weigh it?
24    A.    No.
25    Q.    All right. You'd put it in your car and drive back,
```

```
 1   right?
 2   A.   Yes.
 3   Q.   Now after you lost your job at APG, did you ever get
 4   another job?
 5   A.   I was just doing Instacart during the pandemic for a
 6   couple of months.
 7   Q.   Okay. Because you had a car?
 8   A.   Yes.
 9   Q.   Now the gun that you were showed on Friday, I believe you
10   testified and I just want you to correct me if I'm wrong, that
11   you had said to the police that it was for protection, but
12   that was a lie. It wasn't for protection, you just wanted it;
13   is that correct?
14   A.   Yes.
15   Q.   And when you lied to the police about that, was that when
16   you got interviewed that first time when you got arrested in
17   May of 2020?
18   A.   Um, yes. When I was in the police station.
19   Q.   Okay. I mean, were there other interviews that you had
20   with the police?
21   A.   No. I had an interview at the police station, an
22   interview at the Harford County and then the one here, that
23   was it.
24   Q.   That was it, those three times?
25   A.   Yes, yes.
```

```
 1              MS. FLYNN:  Your Honor, could I have the Court's
 2     indulgence for a minute?
 3              THE COURT:  Yes.
 4              (Discussion held off the record.)
 5              MS. FLYNN:  Your Honor, I have no further questions.
 6              THE COURT:  Very good. Mr. Mann, any
 7     cross-examination, sir?
 8              MR MANN:  Yes, just one question.
 9                C R O S S - E X A M I N A T I O N
10     BY MR. MANN:
11     Q.   Good morning, ma'am.
12     A.   Good morning.
13     Q.   I don't want to sort of bring this up, but I
14     unfortunately have to. There was -- Mr. Romano on Thursday
15     talked about an incident that occurred at CDF or maybe at one
16     of the detention centers where you were -- you lied about
17     having some sort of a sexual contact with another inmate,
18     correct?
19     A.   Yes.
20     Q.   And then Mr. Romano asked you was that Che and you said
21     no. But it also wasn't Mr. Walton either, correct?
22     A.   No, I don't know him.
23              MR MANN:  That's it. Nothing further, Judge.
24              THE COURT:  Any redirect?  Mr. Romano?
25              MR. ROMANO:  No, Your Honor.
```

1    **THE COURT:**  Thank you very much, you can step down,

2    Ms. Thompson.

3    Mr. Romano, next witness.

4    **MR. ROMANO:**  Your Honor, the Government's next

5    witness would be a recall of Detective Battee.

6    **THE COURT:**  Okay, Detective Battee, why don't you

7    approach. Approach the witness box. Before you are seated, I

8    need you to raise your right hand and direct your attention to

9    the courtroom deputy to be sworn in.

10    **(Witness, sworn.)**

11    **THE CLERK:** Thank you, you can have a seat.  Please

12    state and spell your first and last name for the record.

13    **THE WITNESS:**  Detective Brian Battee, B-r-i-a-n

14    B-a-t-t-e-e.

15    **THE COURT:** Mr. Romano, at your pleasure, sir.

16    **BY MR. ROMANO:**

17    Q.   Detective, are you familiar with the term "re-up" as it

18    pertains to drug trafficking organizations?

19    **MR MANN:**  Objection, Judge.

20    **THE COURT:**  Grounds?

21    **MR MANN:**  May we approach?

22    **THE COURT:**  Sure.

23    **(Counsel approached the bench.)**

24    **THE COURT:**  Mr. Mann.

25    **MR MANN:**  Judge, thank you. This detective is not as

```
 1   was told us, being an expert in this so I guess it's
 2   foundational. I thought that the other detective was going to
 3   be talking about the coded language and things like that.
 4              THE COURT:  I think Detective Battee at some point
 5   in time expressed some opinions in his prior direct and on
 6   cross to your questions, I think, and maybe Ms. Flynn's, I'm
 7   not certain.  But I know that he made -- rendered some
 8   opinions regarding what was taking place in both the text
 9   messages and other items; is that correct, Mr. Romano?
10              MR. ROMANO:  Well, Your Honor, in the text messages
11   I think he explained things like "omw," like on my way, things
12   like that which are shorthand.  They're not really coded. The
13   re-up I asked him if he's familiar with it in terms of drug
14   trafficking.  It's not coded language in terms of a phone
15   call. We disclosed who the expert was in terms of coded
16   language. That's Sergeant Underhill and he'll be testifying
17   later.
18              MR MANN:  I'll withdraw.
19              THE COURT:  Thank you.
20              (Counsel returned to their trial tables.)
21              THE COURT:  Mr. Romano, if you could just rephrase
22   for the record.
23              MR. ROMANO:  Thank you.
24   BY MR. ROMANO:
25   Q.   Detective Battee, in terms of drug trafficking
```

```
 1    organizations, if they're going to distribute and then need to
 2    redistribute, is there a term that's associated with that?
 3    A.    Re-ups or resupply.
 4    Q.    And based on the interception calls and text messages,
 5    did you and other investigators determine that the defendant,
 6    Che Durbin, was low on drugs in May of 2020 and needed to
 7    re-up?
 8    A.    Yes.
 9    Q.    And if we could, Detective, if we could go to -- and
10    ladies and gentlemen, if you have your binders in front of
11    you, if we could go to D-4. Do you have one in front of you,
12    Detective?  You do not.
13    A.    I left mine at my spot.
14          MR. ROMANO: Mr. Hamilton, if you could approach the
15    witness.
16    BY MR. ROMANO:
17    Q.    For the record, contained within Government's Exhibit 3-D
18    is a section labeled 3-D4 which are text messages from Mr.
19    Durbin. And specifically I want to direct your attention if I
20    could, please, to a text message that occurs at page 30, Mr.
21    Gasque. So in section 3-D4, page 30, are we all there?  Okay,
22    I see a thumbs up.
23          Detective, if you could, please, tell us first off what
24    is the date of that text message?
25    A.    May 5, 2020.
```

```
 1    Q.   And in what direction was the text sent and actually who
 2    sent the text to who?
 3    A.   Outgoing message from Che Durbin to Edward Pettigrew.
 4    Q.   And what is the content of the -- well, strike that.  Is
 5    this Edward Pettigrew, is that the same individual or a
 6    different individual that we saw in that Royal Farms video
 7    that Detective Sandruck testified to regarding the incident
 8    that occurred at the Royal Farms where both Mr. Durbin and Mr.
 9    Sand -- I mean, Mr. Pettigrew pulled up to the Royal Farms gas
10    pumps and didn't pump any gas?
11    A.   The same.
12    Q.   And what's the content of the text message?
13    A.   "Real low."
14    Q.   Let's look at a couple other text messages here. Starting
15    on page 34 and 35, again in that same section. And again,
16    we'll take them one by one.  But on page 34, section 3-D4 is a
17    text message.  And who is the individuals who are
18    communicating in this particular exchange of text?
19    A.   It was an incoming message from Romaine Timms to Che
20    Durbin.
21    Q.   And the date, sir?
22    A.   May 10, 2020.
23    Q.   And is this the same or a different Romaine Timms than we
24    heard about from testimony of Detective Phipps and Detective
25    Help on Friday with regard to Romaine Timms being in Mr.
```

Battee - direct                                                    IV-36

```
1    Durbin's vehicle squaring the block and then she left and went
2    to Wawa as we heard from Sergeant Helf.  Is that the same
3    Romaine Timms or a different Romaine Timms?
4    A.   The same Romaine Timms.
5    Q.   And what's the content of the text message on page 34?
6    A.   She asked, "Any good news?"
7    Q.   And if we can now let's jump to page 35. And again, these
8    are text messages between Ms. Timms and Mr. Durbin, correct?
9    A.   Correct.
10   Q.   And same date?
11   A.   Yes.  May 10, 2020, approximately one minute later.
12   Q.   All right.  And in response to Ms. Timms asking Mr.
13   Durbin on the text message on page 34, "Any good news?"  How
14   does Mr. Durbin respond?  This is an outgoing text message,
15   right?  So he's sending back to her after she asks him for
16   "Any good news?"  What is he saying?
17   A.   Yes, he responded, "By Tuesday."
18   Q.   And for the record, Tuesday would be May 12th of 2020,
19   correct?
20   A.   Correct.
21   Q.   All right. Just a couple more if we can go to pages 36
22   and 37. And looking at the text on page 36, what is the date
23   of that text, sir?
24   A.   May 10, 2020.
25   Q.   And who were the participants in this text exchange?
```

1    A.   This is an incoming message from Gerrick Jackson to Che

2    Durbin.

3    Q.   And is Gerrick Jackson the same or a different individual

4    than -- we already saw some of these other text messages like

5    "Was the cake already made?"  "It's no good, boss."  "Size

6    21," "Size 14," is that the same or a different Gerrick

7    Jackson?

8    A.   That's the same.

9    Q.   And now if we can turn to the text message on page 37,

10   this is an outgoing text which actually occurs right after the

11   text from Mr. Jackson which I guess I should ask you for the

12   record, what was the text that Mr. Jackson sent?

13   A.   This was an incoming message from Gerrick Jackson to Che

14   Durbin stated "Yo."

15   Q.   And how does Mr. Durbin respond in that outgoing text?

16   A.   He responded a few minutes later.  It says, "Tue," T-u-e.

17   Q.   Let's look at -- let's look at a series of text messages

18   starting on page 40. Now I believe in your testimony early

19   last week you were not able to identify who the person was

20   that had the telephone number 443-673-7906, correct?

21   A.   That's correct.

22   Q.   For sake of clarity if you will, I was just referring to

23   it as the texter 7906, correct?

24   A.   Yes.

25   Q.   So is this an incoming text or an outgoing text to Mr.

```
 1    Durbin from 7906?

 2    A.   This is an incoming.

 3    Q.   And what is the content of the text?

 4    A.   "I've been trying to hit you. Wassup" question mark.

 5    Q.   And what's the date of this text, Detective?

 6    A.   May 11, 2020.

 7    Q.   And if we can now look at the text on page 41. And again,

 8    it's an exchange between 7906 and Che Durbin on May 11th.  And

 9    in response to 7906 asking in the earlier text, "I've been

10    trying to hit you, wassup?"  How does Mr. Durbin respond?

11    A.   "Tomorrow."

12    Q.   And to be sure, there were other individuals who were

13    making similar inquiries. If we turn to 3-D5 which are the

14    text messages from Mr. Walton -- ladies and gentlemen, if we

15    could go to section 3-D5 at page 16. And this is an exchange

16    of text between an individual, Paul Temple and Terrell Walton.

17    And is it an incoming or an outgoing text?

18    A.   This is an outgoing from Terrell Walton to Paul Temple.

19    Q.   And what's the content of that?

20    A.   Terrell Walton texts, "I know nothing happening right

21    now."

22    Q.   And the date, sir?

23    A.   May 8, 2020.

24    Q.   And just one other series of texts that begin on page 17

25    in 3-D5. This is a text from Burton Anderson to Terrell
```

```
 1   Walton. Do you see that, sir?
 2   A.   Yes, sir.
 3   Q.   And this Burton Anderson, is this the same individual
 4   that Mr. Mann was asking you about who has been charged in
 5   Harford County with crack and powder cocaine violations?
 6   A.   That is the same.
 7   Q.   All right. And is this an incoming or an outgoing text?
 8   A.   This is an incoming from Burton Anderson to Terrell
 9   Walton.
10   Q.   And the content of the text is what, please, sir?
11   A.   "What's the word, Boss?"
12   Q.   And if we go to page 18, the date of this text is May
13   11th; is that correct?
14   A.   That's correct.
15   Q.   And is this an incoming or an outgoing text?
16   A.   This is an outgoing from Terrell Walton to Burton
17   Anderson.
18   Q.   And in response to the text from Mr. Anderson it says,
19   "What's the word, Boss?"  What is this text?
20   A.   "Shyt dead."
21   Q.   All right, Detective, now based on these calls,
22   intercepted text messages and the investigation as a whole,
23   did there come a time when you and Detective Sandruck traveled
24   to Tucson, Arizona on May 8th of 2020?
25   A.   Yes.
```

1    Q.   Did you drive there or did you fly there?

2    A.   We flew there.

3    Q.   Do you know whether the defendant, Che Durbin, was in

4    Tucson on May 8, 2020 as well?

5    A.   Yes, he arrived in Tucson.

6    Q.   Do you know how he got there?

7    A.   He drove a Chevy SUV.

8    Q.   And how do you know that, Detective?

9    A.   Because I authored a Court-ordered GPS to be installed on

10   his vehicle.

11   Q.   And what do you mean by a "GPS"?

12   A.   It's a tracking device that assists with locations for --

13   that can be installed on a vehicle per a Court order.

14   Q.   So you have to have a Court order for this, right?

15   A.   Yes.

16   Q.   And when it's installed, what kind of data or information

17   does it tell you?

18   A.   It tells you the location of the vehicle, sometimes

19   within a few meters. It's usually accurate within a few meters

20   which would be a couple feet.

21   Q.   All right. Now in addition to this GPS tracker, once you

22   got out to Tucson, Arizona, was there physical surveillance

23   maintained on Che Durbin?

24   A.   Yes.

25   Q.   And did there come a time when you observed Mr. Durbin at

```
1    the Tucson airport on May 8th of 2020?

2    A.   Yes.

3    Q.   Who did he meet with, if anyone?

4    A.   He met with Jameka Thompson.

5    Q.   And when he met with Jameka Thompson on May 8th of 2020

6    at the Tucson airport, were you able to determine whether or

7    not she had rented a vehicle at the Tucson airport?

8    A.   Yes.

9    Q.   Mr. Gasque, if we could, please, I believe it's

10   Government's Exhibit 19.  But before you pull it up, let me

11   just check my exhibit list. Yeah, Mr. Gasque, if you could,

12   please, Government's 19. Let's go to the next page, please.

13        Now Ms. Thompson actually when she was out there rented

14   more than one vehicle; is that correct?

15   A.   That's correct.

16   Q.   All right, so let's start with this one.  It shows an

17   address of Jessen Court APG, the Proving Ground. You were here

18   when you heard her testify that at one point she was living

19   there?

20   A.   That's correct.

21   Q.   And this particular rental vehicle was a 2019 Dodge G car

22   which I assume stands for Grand Caravan; is that correct?

23   A.   Yes.

24   Q.   And did you see her actually operating this vehicle after

25   she had rented it?
```

1    A.   Yes, I did.

2    Q.   And incidentally with the assistance of law enforcement

3    out in Tucson either DEA or task force officers with the DEA,

4    were they able to get a Court-authorized GPS tracker installed

5    on that particular vehicle?

6    A.   Yes, that's correct.

7    Q.   Okay. And that was done to assist you, correct?

8    A.   Yes.

9    Q.   Were you able to determine where Ms. Thompson and Che

10   Durbin traveled to?

11   A.   Yes, from the airport.  Ultimately ended up at the

12   Staybridge Hotel, Staybridge Inn.

13   Q.   Mr. Gasque, if you could, please, Government's 12.

14   A.   It's a hotel just outside the airport.

15   Q.   And we see guest information indicates Che Durbin,

16   correct?

17   A.   That's correct.

18   Q.   All right. And the arrival date is what, please, sir?

19   A.   May 8, 2020.

20   Q.   And it indicates a departure date, correct?

21   A.   Yes.

22   Q.   Number of nights, one. Indicates number of guests, one,

23   correct?

24   A.   Correct.

25   Q.   All right. Now based on the GPS tracker information on

```
 1    this particular vehicle, this Dodge Grand Caravan, were you
 2    able to determine if that vehicle left the Staybridge Suites
 3    at some point in time?
 4    A.   Yes, it left early morning on Saturday, May 9, 2020
 5    around 6 a.m., traveled to the airport which is just down the
 6    street from the hotel and then returned to the hotel.
 7    Q.   Mr. Gasque, if we could, please pull up Government's
 8    Exhibit 6. And for the record, these are Southwest Airlines
 9    records and we can see the lower right-hand corner we see "SWA
10    000025." If we could go to page 26. And I've highlighted that.
11    Mr. Gasque, if you could, please, just blow it up. And
12    starting at the left we see a date of 5/9/2020, correct?
13    A.   Correct.
14    Q.   And we see a flight that goes from Tucson to Las Vegas
15    and that's in the name of the passenger is Che Durbin; is that
16    correct?
17    A.   Correct.
18    Q.   All right, and then we have a connecting flight if you
19    will that's directly below that that shows Las Vegas to BWI.
20    And again, the passenger is Che Durbin; is that right?
21    A.   That's correct.
22    Q.   And where does it indicate Mr. Durbin was flying to?
23    A.   BWI Airport in Baltimore.
24    Q.   All right.  Now Mr. Durbin has now left at some point on
25    May 9th, Tucson, Arizona. Did you continue to conduct physical
```

1    surveillance of Jameka Thompson out there?

2    A.    That's correct.

3    Q.    And incidentally you were out there with another

4    detective; is that right?

5    A.    Yes.

6    Q.    Who was that?

7    A.    Detective Sandruck.

8    Q.    He was one of the co-affiants on the wire?

9    A.    Yes.

10   Q.    And was some of that surveillance videotaped?

11   A.    Yes, it was.

12   Q.    All right. And we saw a portion of this on Friday, I

13   believe, but it's Government's Exhibit 21. If we could pull

14   that up, Mr. Gasque. And there are a couple of segments here.

15   Let's start with the first segment which is identified

16   MVI0111.

17              **(The videotape was played.)**

18   **BY MR. ROMANO:**

19   Q.    And who is that that we're looking at walking past the

20   Staybridge Inn sign?

21   A.    That's Jameka Thompson.

22              **(The videotape was played.)**

23   Q.    Can we stop it right there for a second?  This white

24   vehicle here, do you recognize that, sir?

25   A.    Yes.

```
1    Q.   What do you recognize that vehicle to be?

2    A.   That's the silver Chevy SUV that Che Durbin left Maryland

3    and arrived in Tucson, Arizona in.

4    Q.   Okay. But he's gone at this point, right?

5    A.   Yes.

6    Q.   Okay.

7              (The videotape was played.)

8    BY MR. ROMANO:

9    Q.   And we see Ms. Thompson lifting the back of a vehicle. Is

10   that the Dodge Grand Caravan?

11   A.   That's correct.

12             (The videotape was played.)

13        MR. ROMANO: Mr. Gasque, I didn't put a timestamp on

14   this, but could you just jump ahead a little bit and let's see

15   if we can shorten this segment here.

16             (The videotape was played.)

17   BY MR. ROMANO:

18   Q.   And you recognize this to be the parking lot at the

19   Staybridge; is that correct, Detective?

20   A.   That's correct. I apologize for the shakiness. It's very

21   hard to keep steady when you're zoomed in.

22             (The videotape was played.)

23   Q.   All right, now we see somebody walking by. Did this

24   particular individual based on the investigation, was he a

25   target or any part of this, sir, or just some random person?
```

```
1    A.    No.   He was determined to be unrelated.

2              MR. ROMANO:   All right, Mr. Gasque, we're at the end

3    of this section. Could we go to the next segment, please?

4    Which for the record is MV 10112, I believe.

5              (The videotape was played.)

6    BY MR. ROMANO:

7    Q.    All right, now if we could stop it right about here. We

8    see Ms. Thompson in this section of the video, correct?

9    A.    That's correct.

10   Q.    And we see an individual with a ball cap on backwards and

11   a green shirt that looks like it says, "Just bugged out" on

12   the back.  Do you know who that is?

13   A.    That's Jack Anderson.

14             MR. ROMANO: Continue, please, Mr. Gasque.

15             (The videotape was played.)

16   BY MR. ROMANO:

17   Q.    Now we see Ms. Thompson speaking.  Did you have a way to

18   capture that audio at all?

19   A.    No.

20   Q.    Okay. So you don't know what they were saying?

21   A.    No.

22             (The videotape was played.)

23   BY MR. ROMANO:

24   Q.    All right, now it's kind of hard to see, but can you

25   determine who the driver of that white Chevy SUV was?
```

1    A.   Yes, that was Jack Anderson.

2    Q.   Not Che Durbin, but Jack Anderson, correct?

3    A.   Correct.

4              **(The videotape was played.)**

5    **BY MR. ROMANO:**

6    Q.   And the vehicle that's trailing it?

7    A.   Is the Dodge Grand Caravan driven by Jameka Thompson.

8    Q.   Okay.  Could we go to the next section, please?  This is

9    113.

10              **(The videotape was played.)**

11   **BY MR. ROMANO:**

12   Q.   It looks like she's pulling some type of roller bag. Do

13   you know what's the location here?

14   A.   I believe this is the side entrance to the DoubleTree

15   motel.

16   Q.   So this is a different hotel, the DoubleTree as opposed

17   to the Staybridge?

18   A.   Yes.

19   Q.   Still in Tucson?

20   A.   Yes, just outside the airport.

21              **(The videotape was played.)**

22   Q.   Before we go to the next section, could you pull up

23   Government's Exhibit 11?  And if -- well, first off, we see

24   the name and the address up top. Jack Anderson, correct?

25   A.   Correct.

```
1    Q.   And Mr. Gasque, if we can now focus on the date. And for
2    the record, what is the arrival date?
3    A.   Saturday -- or correction, May 9, 2020.
4    Q.   And when was the departure date?
5    A.   May 10, 2020.
6    Q.   And it appears that it says "adult/child 1/0" indicating
7    what, sir?
8    A.   One adult, zero children.
9    Q.   All right. Thank you. If we could now, Mr. Gasque, let's
10   go to the next video section, Government's 21, which is for
11   the record, 114.
12           (The videotape was played.)
13   BY MR. ROMANO:
14   Q.   Jump to the next one, please. For the record, it's 115.
15   MV 10115. Now what are we looking at in this, Detective?
16   A.   This is the silver Chevy SUV that was previously being
17   operated by Che from Maryland to Tucson and now being operated
18   by Jack Anderson.  And he is arriving back at the side of the
19   DoubleTree motel and parking next to Jameka's second rental
20   vehicle on the side.
21           (The videotape was played.)
22   Q.   Well, we may have gotten a little ahead of ourselves.
23   When you say "second rental vehicle," she got another vehicle?
24   A.   The vehicle in the previous video was the Chrysler
25   Voyager. And now this is the evening of May 9th and Jack
```

1    returned back to the DoubleTree motel and he exits his vehicle
2    and goes into the side door of the motel.
3    Q.   At any point in time did you also see Jameka Thompson at
4    that location?
5    A.   Yes.
6    Q.   Tell us about that.
7    A.   She left the airport. She drove the Suburban -- I think
8    we would need to go back.
9    Q.   So let's see if we can put it in context. Did there come
10   a time when you learned that Jameka Thompson left Tucson and
11   was driving away?
12   A.   Yes.
13   Q.   Okay. Where was she headed?
14   A.   She was operating the silver Chevy SUV and she got onto
15   I-10 which is an interstate that leads out of Tucson and she
16   was traveling towards New Mexico.
17   Q.   All right. And so she wasn't operating that Dodge Caravan
18   that we saw earlier, correct?
19   A.   Correct.
20   Q.   So she's driving this white SUV that we saw both Mr.
21   Durbin -- or strike that.  We saw Mr. Anderson operating and
22   the GPS tracker had Mr. Durbin taking it from Maryland to
23   Tucson, correct?
24   A.   Correct.
25   Q.   So now Jameka Thompson is in that vehicle?

1    A.    Yes.

2    Q.    And she's headed towards New Mexico?

3    A.    Yes.

4    Q.    And did you and Detective Sandruck physically surveil her

5    at some point?

6    A.    Yes.

7    Q.    How far did you surveil her?

8    A.    We surveilled her until it was determined that she was

9    out of the Tucson area and continuing on I-10 passing the --

10   once she passed the last exit just outside of Tucson, we

11   turned around and she continued on I-10 toward New Mexico.

12   Q.    And you knew that how?

13   A.    Through the GPS tracker.

14   Q.    Okay. But there came a point when that Chevy Suburban

15   according to the tracker information, returned back to Tucson;

16   is that correct?

17   A.    Correct.  About two hours in towards New Mexico, from

18   Arizona to New Mexico, she turned around and the vehicle came

19   back towards Tucson. So we came back towards Tucson as well

20   and picked her up again and continued our physical

21   surveillance.

22   Q.    Okay. And where did you see her when you continued your

23   physical surveillance?

24   A.    We followed her as she came back into the Tucson area and

25   she drove the Suburban or the silver Chevy SUV towards the

```
 1    airport, pulled up around behind the rental car area. She left
 2    the Suburban and got into a black Chrysler Voyager which was
 3    pictured in the -- actually the last two videos and she drove
 4    away back towards the DoubleTree Hotel which was just outside
 5    of the airport.
 6    Q.   Okay, so she -- once she returned with the Chevy Suburban
 7    to the airport, she rented another vehicle?
 8    A.   Yes.
 9    Q.   Government's Exhibit 19 again. And this is page 1. If we
10    can under the rental information, if we can kind of blow that
11    up. So it says, "check out date" meaning that's when she
12    checked the vehicle out was on May 9th; is that correct?
13    A.   Correct.
14    Q.   And check in or when was it due back?
15    A.   It was due back on May 12th of 2020.
16    Q.   Okay. And it indicates it was Jameka Thompson who rented
17    it, correct?
18    A.   Correct.
19    Q.   And if we could just to get the description of the
20    vehicle, if we could scroll down a little bit. So now instead
21    of a Dodge Grand Caravan she's in a Chrysler Voyager; is that
22    right?
23    A.   Yes.
24    Q.   And after she rented this vehicle at the airport, where
25    did she go with this vehicle, initially?
```

```
 1    A.    She drove away from the rental car area out of the --
 2    it's like a parking garage area and drove directly to the
 3    DoubleTree motel which is just outside the airport.
 4    Q.    And who then was operating the Chevy Suburban?
 5    A.    As she pulled into the DoubleTree motel, she parked near
 6    the front and shortly after she arrived and parked in front,
 7    the silver Chevy SUV arrived and pulled up near her and it was
 8    being operated by Jack Anderson. He exited and went into the
 9    DoubleTree.
10    Q.    And did you also observe Ms. Thompson going into the
11    DoubleTree?
12    A.    No, just Mr. Anderson. He went in, she stayed in the car.
13    Q.    Okay. Now I want to direct your attention to the morning
14    of May 10th. Did you observe either Jameka Thompson or the
15    Chrysler minivan that she had rented on that day?
16    A.    The morning of May 10th we woke up and the Chrysler
17    Voyager was gone from the parking lot.
18    Q.    All right. What did you do at that point, Detective?
19    A.    We went to the Staybridge Inn and obtained rental records
20    and then we went to the DoubleTree motel, obtained the rental
21    record and then hopped on the next flight and flew back to
22    Maryland.
23    Q.    And when you say "we," you and Detective Sandruck?
24    A.    Correct.
25    Q.    Okay. So you flew back to Maryland?
```

```
 1    A.   Yes.

 2    Q.   Correct?

 3    A.   Yes.

 4    Q.   All right. Did there come a time when you or members of

 5    the investigative team sought and obtained a search warrant

 6    for that Chrysler Voyager rental vehicle?

 7    A.   Yes.

 8    Q.   As well as Ms. Thompson and her residence, search

 9    warrants; is that correct?

10    A.   Correct.

11    Q.   All right. And ultimately on May 12th which was a

12    Tuesday, did there come a time when Ms. Thompson was observed

13    driving that Chrysler minivan back into Harford County?

14    A.   Yes.  We sent a huge surveillance contingent out towards

15    western Maryland in the I-70 area, Interstate 70 area where we

16    pick her up and follow her I believe just after 9:00, almost

17    10:00 and then we followed her back towards Harford County.

18    Q.   And at some point was she stopped?

19    A.   Yes, as she crossed into Harford County, she was -- a

20    traffic stop was conducted on her vehicle.

21    Q.   And what, if anything, was observed in the vehicle?

22    A.   Cursory search -- she was the only occupant. A cursory

23    search of the vehicle was a suitcase that was pictured in the

24    video that was shown earlier, and unzipped the suitcase and

25    there was two packages inside.
```

```
1    Q.   Did you say there were two packages?

2    A.   Yes, one larger size block-style I believed to be a kilo

3    of cocaine and the other one was slightly smaller. They were

4    both wrapped in black electrical duct tape or black electrical

5    tape.

6    Q.   All right, Detective, I'm going to approach and hand you

7    2-A1 and ask you if you recognize that.

8    A.   Yes, I do.

9    Q.   What do you recognize it to be?

10   A.   The cocaine seized from the suitcase, first block.

11   Q.    2-A2?

12   A.   And this is from the smaller, smaller portion, smaller

13   package that was with it inside the suitcase.

14          MR. ROMANO:  Your Honor, I'm not going to circulate

15   this individually to the jurors, but I'll simply hold them up.

16   BY MR. ROMANO:

17   Q.    2-A1 you indicated is approximately one kilo; is that

18   correct?

19   A.   That's correct.

20   Q.   And 2-A2 is a smaller quantity?

21   A.   Yes.  This is approximately a quarter of a kilo. I don't

22   know the grams off the top of my head for that particular

23   package, but somewhere around 250.

24   Q.   A quarter kilo would be roughly 250 grams, is that what

25   you just said?
```

```
 1   A.   Yes.

 2   Q.   All right. You indicated these were in a suitcase; is

 3   that right?

 4   A.   That's correct.

 5   Q.   Is that the same roller bag that we saw Ms. Thompson

 6   have?

 7   A.   Yes.

 8   Q.   Mr. Gasque, if we could please pull up Government's

 9   Exhibits 2-B1 through 5. Well actually, before we get to that,

10   how about 2-C?  So what are we looking at in this exhibit,

11   Government's 2-C?

12   A.   So this is a picture of the suitcase unzipped and then

13   the top lifted up.  And inside you can see a sneaker and to

14   the right is the compressed package, approximately one

15   kilogram of cocaine.  And then to the left of that kind of

16   sitting on top of it slightly is the smaller parcel or package

17   that ended up having just right around 250 grams of cocaine.

18   Q.   And that's when it was wrapped in the black wrapping, but

19   what I showed you was after it had been taken out of that

20   black wrapping; is that correct?

21   A.   Yes.  I removed all the wrapping and the underlayers to

22   submit for fingerprint and DNA analysis.

23   Q.   Okay. Incidentally, speaking of fingerprint analysis,

24   ultimately was it determined that Jack Anderson's prints were

25   on that?
```

```
1    A.   Yes, it was.

2    Q.   And for the record, ladies and gentlemen, that would have

3    been Government's Exhibit 41-B. We don't need to pull it up at

4    this point, but there was a stipulation with regard to that

5    fingerprint analysis report and it indicated that Mr.

6    Anderson's prints were on that, correct?

7    A.   Correct.

8    Q.   Not Ms. Thompson's or Mr. Durbin's or for that matter,

9    Mr. Walton's, but Jack Anderson's right?

10   A.   Yes.

11   Q.   Okay. Now if we could, let's go to Government's Exhibit

12   -- there's a series of photos in Government's 2-B. Let's start

13   with 2-B1. What are we looking at here?

14   A.   It's a photograph of the kilo with the smaller package on

15   top on a scale to give a general weight.

16   Q.   And that's with all the wrapping on it, correct?

17   A.   Yes, that's -- yes, that's the weight -- the official

18   weight will come from the lab, but that's the weight with all

19   the packaging and the layers that are on top of it holding

20   everything in.

21   Q.   So there's a difference between -- you know the terms

22   gross weight and net weight, right?

23   A.   Correct.

24   Q.   So when it shows 1.412 kilos, that's gross weight. That's

25   all the wrappings, correct?
```

```
1    A.    Correct.
2    Q.    As opposed to the net weight which is after all the
3    wrappings have been removed?
4    A.    That's correct.
5    Q.    Okay. 2-B2, please. What are we looking at in this photo?
6    A.    The photo to the right, 2-B2 is the smaller package
7    placed on the digital scale.
8    Q.    And again, that's gross weight, 324 grams?
9    A.    Yes.
10   Q.    Okay. 2-B3, please. And what are we looking at in this
11   photo?
12   A.    That is the smaller -- correction, the left 2-B3 is a
13   photo of the cocaine from the smaller package after the outer
14   layers were removed and submitted for processing.
15   Q.    Okay.
16   A.    And you can see it's approximately 249 grams on this
17   scale.
18   Q.    Right. And again, still has some wrapping on it, right?
19   A.    Yes.
20   Q.    Okay. 2-B4, please. What are we looking at in this photo?
21   A.    This is the larger kilo portion of -- the larger package
22   that was recovered from Ms. Thompson's suitcase and then an
23   initial slice was made down the middle of the packaging to
24   reveal the contents inside. And the thing in my right hand is
25   a cocaine ID swab or a field test. And once placed on the
```

1   surface of cocaine, it will show if it's positive for the

2   presence of cocaine.  It will field test, will show the color

3   blue.  And that's just a photo of the positive field test

4   right there.

5   Q.   And a field test is a presumptive test, it's not the same

6   as what the chemist actually does, correct?

7   A.   Yes.  This is just to tell us what the drug is.

8   Q.   Okay. So if it field tested negative let's say for baby

9   powder or something like that, that wouldn't show up -- it

10  would show negative on the field test, correct?

11  A.   Yes.  And it would still be sent to the lab ultimately

12  for the official analysis.

13  Q.   But in this particular case there was a field test and at

14  least the presumptive result was it was cocaine, correct?

15  A.   Yes.

16  Q.   Okay. And then finally, Mr. Gasque, 2-B5. And what are we

17  looking at here, Detective?

18  A.   This is a larger package, the kilo of cocaine once the

19  outer layers were removed and exposing the compressed powder

20  inside.

21  Q.   All right.  Now after Ms. Thompson was stopped on the

22  side of the road, was she transported anywhere?

23  A.   Yes.  Detective Baldwin got into the -- so we were on the

24  shoulder of 95, on the fast shoulder. And our southern

25  precinct for the sheriff's office in Harford County was just

```
 1    down the street. So the determination was made by our
 2    supervisors to transport her, Jameka Thompson, and the vehicle
 3    back to a sally port area where they could be searched
 4    properly and safely. So Detective Baldwin drove the Chrysler
 5    Voyager rental vehicle back to the southern precinct and the
 6    uniforms that conducted the traffic stop for us transported
 7    Ms. Thompson back to the same facility.
 8    Q.   And did an interview take place at the southern precinct?
 9    A.   Yes.
10    Q.   Okay. Prior to the interview occurring with Ms. Thompson,
11    was she advised of her rights?
12    A.   Yes, she was.
13    Q.   Did she agree to be interviewed?
14    A.   Yes.
15    Q.   Who was present for the interview?
16    A.   Myself and Corporal Wolfe.
17    Q.   Now was it recorded in some fashion, Detective?
18    A.   We recorded it and the interview was conducted in an
19    interview room and the interview was recorded and the
20    interview was archived in the system.
21    Q.   What does that mean?
22    A.   So it was saved in the system under the case number and
23    the defendant's name or the person being interviewed's name
24    and then -- so it's in the system.
25    Q.   Okay. Was there a transcript of the interview?
```

```
1    A.   Yes. So the interview was ultimately transcribed by our
2    office assistant.
3    Q.   Okay. Now is the Harford County Sheriff's Department in
4    possession of the videotape of that interview with Ms.
5    Thompson?
6    A.   No.
7    Q.   Can you tell us what happened or why?
8    A.   So we looked into it prior to the trial and the video
9    recording system that was used for all of our internal
10   interview rooms was switched over to a new system.  And none
11   of the files that were archived were transferred to the new
12   system. So the video -- the recording was lost. There was
13   never a video, it was just audio recording.
14   Q.   And to your knowledge was a copy of the transcript that
15   was prepared, was that provided to defense counsel?
16   A.   Yes.
17   Q.   Okay. Now at the time of the interview with Ms. Thompson
18   there on May 12th, can you describe her physical or her
19   emotional condition as it appeared to you?
20   A.   Yes.  She was visibly shaking.  And during the interview
21   she would continuously repeat the question as if she was
22   zoning out or just not able to process everything really.
23   Q.   What time of the day or night did the interview take
24   place?
25   A.   The interview took place right around 3 a.m., I believe.
```

```
1    Q.   And after speaking with you and Corporal Wolfe, what
2    happened to Ms. Thompson?
3    A.   She was ultimately transported to the Harford County
4    Detention Center for processing.
5    Q.   Okay. And the cocaine that was identified in Government's
6    Exhibits 2-A1 and 2, what did you do with that?
7    A.   Submitted it to the Maryland State Police lab for
8    analysis.
9    Q.   Now after the arrest of Ms. Thompson, did you attempt to
10   determine if there were additional trips that she made to
11   Tucson?
12   A.   Yes.
13   Q.   Okay. And in that regard did you also attempt to query
14   airlines or rental car records?
15   A.   Yes.
16   Q.   And did you receive some airline records and some car
17   rental records as a result of those inquiries?
18   A.   Yes.
19   Q.   Okay. Is it fair to say that while you received some
20   records, you didn't -- there were some companies, airline or
21   rental cars that you never heard back from?
22            MS. FLYNN:   Objection.
23            THE COURT:   Sustained.
24   BY MR. ROMANO:
25   Q.   Were you able to obtain all the rental car records that
```

1    you requested?

2    A.    No.

3    Q.    Were you able to retain all of the airline records that

4    you requested?

5    A.    No.

6    Q.    All right. Did you prepare a summary, Detective, for

7    those records that you could or did receive?

8    A.    Yes. Once I received everything back I put things in

9    order by date as a chronological log of the events that

10   happened.

11   Q.    I'm going to show you in a minute, Government's Exhibit

12   47 and ask you if you recognize this exhibit.

13   A.    I do.

14   Q.    And what do you recognize it to be, Detective?

15   A.    This is the chronological log I put together based on the

16   information I received back from the companies that responded.

17   Q.    And your summary here is captioned, "travel details."

18   These are based on the records that are already in evidence;

19   is that correct?

20   A.    That's correct.

21   Q.    All right. I'm going to use the Elmo for these. This is

22   Government's Exhibit 47. And let's start with January, 2019.

23   If you could just walk us through this exhibit. What are we

24   looking at for these entries?

25   A.    So this is -- so the little icons to the left determine

1    whether or not it was a vehicle or rental car for the icon
2    that's showing a vehicle.  And then the ones for airplane
3    would indicate airline records.  And there's another one for a
4    hotel, it's a little guy sleeping in a bed.  And then there's
5    also one indicating a parcel which is a little icon indicating
6    a package.
7    Q.   If you could, please just walk us through -- and we'll go
8    through these month by month or date by date. Starting in
9    January, 2019, what are we looking at here?
10   A.   The subpoenaed records indicate on January 4, 2019 Che
11   Durbin rented a vehicle from Avis in Tucson, Arizona and he
12   listed Jameka Trump as a driver.
13   Q.   What do we have the next day, January 5th?
14   A.   January 5, 2019 Che Durbin took a flight, a Delta flight
15   from Tucson, Arizona back to Philadelphia airport.
16   Q.   And January 7th?
17   A.   And on January 7th, the rental vehicle was returned in
18   Fallston, Maryland with a total mileage of 2,439 miles and a
19   credit card ending in 6264 was used for payment.
20   Q.   Were you able to determine whose credit card 6264 was?
21   A.   Connected to Che Durbin.
22   Q.   All right. Let's jump to April, 2019. Starting on April
23   19th, what are we looking at?
24   A.   April 19, 2019 Jameka Thompson had a Delta flight from
25   Baltimore to Tucson, Arizona. That same day she rented a

```
1    vehicle from Avis in a small suburb outside of Tucson which is
2    Tanque Verde, Arizona and the vehicle was returned to
3    Aberdeen, Maryland after driving 2,387 miles and paid for with
4    a credit card ending in 6264, the same as the January trip.
5    Q.   And how about August, 2019, what are we looking at there?
6    A.   Jameka Thompson took an American Airlines flight from
7    Philadelphia to Tucson and I don't have any other records for
8    that trip.
9    Q.   All right. Let's go to the second page, October of 2019.
10   A.   On October 25, 2019 Jameka Thompson rented a vehicle from
11   Avis in Phoenix, Arizona and three days later she returned the
12   vehicle in Fallston, Maryland after driving 2,489 miles and
13   used for payment was a credit card ending in 5469. And
14   Fallston, Maryland is in Harford County, just north of
15   Aberdeen.
16   Q.   Okay. And that credit card ending in 5469, whose credit
17   card is that?
18   A.   Che Durbin.
19   Q.   How about January, 2020.
20   A.   January, 2020 was the -- this section describes the
21   details surrounding the parcel that U.S. Postal Inspector Mike
22   Pecukaitis testified to earlier. It was the money parcel that
23   was intercepted. So on January 22, 2020 the parcel of money
24   was mailed from Havre de Grace, Maryland to Jack Anderson in
25   Tucson, Arizona. The next day, Jameka Thompson boarded a
```

Battee - direct

1    flight on Delta Airlines from Baltimore and arrived in Tucson,

2    Arizona. That same day, the parcel was intercepted by U.S.

3    Postal Inspector and had -- well, was detected and then he had

4    it rerouted back to his domicile in Linthicum, Maryland. And

5    then on January 24, 2020, he served a search warrant on the

6    parcel and resulted in the recovery of $82,300 in U.S.

7    currency. Jameka Thompson flew back to Maryland on unknown

8    flight information.

9    Q.   How do you know she flew back as opposed to drive back?

10   A.   She stated that.

11   Q.   In her testimony?

12   A.   Yes.

13   Q.   Okay. Let's go to April of 2020. Walk us through that.

14   A.   April 21, 2020, Jameka Thompson boarded a Delta flight

15   from Baltimore, Maryland to Tucson, Arizona. That same day she

16   rented a vehicle from Avis in Tucson, Arizona. Three days

17   later she returned the vehicle in Fallston, Maryland after

18   driving 2,387 miles.  And the same credit card used as the

19   last rental ending in 5469.

20   Q.   And again for the record, whose credit card is ending in

21   5469?

22   A.   Che Durbin.

23   Q.   Incidentally, do you see the mileage for that, for April

24   2020?  2,387 miles?

25   A.   Yes.

```
1    Q.   I want to go back to the first page of Government's 47.
2    Do you see the mileage for the April, 2019 one?
3    A.   Yes.
4    Q.   It's the same mileage?
5    A.   Yes, it is.
6    Q.   All right. And that takes us to May of 2020. And what are
7    we looking at here, Detective?
8    A.   So these are some of the events that we just talked about
9    in reference to the Tucson surveillances and ultimately,
10   Jameka Thompson's traffic stop as she entered Harford County
11   in the rental vehicle. So on May 7th and 8th, Che Durbin drove
12   the Chevy Suburban from Aberdeen, Maryland to Tucson, Arizona.
13   On May 8th, Jameka Thompson took a Delta flight from
14   Baltimore, Maryland to Tucson. She rented a car from National
15   which is the parent company of the company rented in Tucson
16   from the airport. May 8th, Jameka Thompson and Che Durbin
17   stayed at the Tucson, Arizona Staybridge Hotel.  On May 9,
18   2020 Che Durbin took a Southwest flight from Tucson, Arizona
19   back to Baltimore, Maryland.  That afternoon, Jameka Thompson
20   returned her first rental vehicle in Tucson and she began to
21   drive back the Chevy SUV that Che Durbin drove out there back
22   towards Maryland. About two hours into her trip she turned
23   around, returned to the airport. Jameka Thompson rented her
24   second vehicle, the Chrysler Voyager at the airport in Tucson,
25   Arizona and then she stayed at the DoubleTree hotel and then
```

```
1   left in the early morning hours of May 10, 2020 and started
2   her trip back towards Maryland.
3        On May 12, 2020 Jameka Thompson was stopped and the
4   search warrant was served and the two packages of cocaine were
5   recovered from her suitcase in the back of the rental vehicle.
6   Q.   Thank you, sir.
7            THE COURT:  Mr. Romano, did you reach a good
8   breaking point?
9            MR. ROMANO:  Yes, we have Your Honor, actually.
10  Thank you.
11           THE COURT:  I'll tell you what, we're going to go
12  ahead and take our mid-morning break. We'll take a mid-morning
13  break for about 15 minutes or so. Ladies and gentlemen, please
14  don't discuss this case among yourselves, allow anyone to
15  discuss this case with you. Continue to keep an open mind
16  about this case throughout all the evidence, my instructions
17  on the law, as well as closing argument. Don't do any
18  independent research on this case.
19       So with that, we're going to take about a 15, maybe
20  20-minute break.  We'll go until about 12:30, 12:40 and then
21  we'll take our break for lunch. Thank you very much, ladies
22  and gentlemen.
23           (Jury exited the courtroom at 11:01 a.m.)
24           THE COURT:  All right, Detective, you can step down.
25  Everyone could be seated. I'll remind you you shouldn't
```

```
 1    discuss your testimony during the course of the break. Mr.
 2    Romano, have you wrapped up your direct or no?
 3              MR. ROMANO:  I'm sorry, Your Honor?
 4              THE COURT: Did you wrap up your direct?
 5              MR. ROMANO:  Yes, I did.
 6              THE COURT:  Then we'll tender the witness in front
 7    of the jury and then Ms. Flynn will go ahead and proceed. Is
 8    there anything else that we can productively handle before we
 9    take our break?
10              MR. ROMANO:  I don't believe so, Your Honor.
11              THE COURT:  Ms. Flynn?
12              MS. FLYNN:  No, Your Honor.
13              THE COURT:  Thank you very much.
14              MS. FLYNN:  Thank you.
15              (Recess was taken from 11:01 to 11:25 a.m.)
16              THE COURT:  Detective Battee, you can come on up.
17              (The jury reentered the courtroom at 11:25 a.m.)
18              THE COURT:  All right, everyone could be seated. Mr.
19    Romano, any more questions for this witness?
20              MR. ROMANO:  No, Your Honor.  I have no further
21    questions at this time.
22              THE COURT:  Very good, Ms. Flynn?
23              MS. FLYNN:  Thank you, Your Honor.
24                C R O S S - E X A M I N A T I O N
25    BY MS. FLYNN:
```

1    Q.   Good morning again, Detective.

2    A.   Good morning, ma'am.

3    Q.   Can you hear me?

4    A.   Yes.

5    Q.   So I am curious, this silver SUV, is that a Chevy

6    Suburban?

7    A.   Yes.

8    Q.   And it's my understanding that that vehicle was driven

9    from Maryland to Arizona by Mr. Durbin; is that correct?

10   A.   Yes.

11   Q.   And then at some point Mr. Durbin leaves and goes to Las

12   Vegas and then back to Baltimore, correct?

13   A.   Yes.

14   Q.   And Mr. Anderson got into the vehicle, right?

15   A.   Yes.

16   Q.   And then at some point Ms. Thompson was driving that

17   vehicle, correct?

18   A.   Yes.

19   Q.   But ultimately when she left finally Tucson, she was

20   driving a black rental vehicle, correct?

21   A.   Yes.

22   Q.   So the Chevy Suburban was left in Tucson, correct?

23   A.   Correct.

24   Q.   Whatever happened to that vehicle?

25   A.   I don't have any firsthand knowledge of that, but I

```
 1    believe that it was recovered in Tucson sometime later by
 2    authorities in Tucson.
 3    Q.    And that was actually a stolen vehicle; is that correct?
 4    A.    I believe it was, but I don't know for sure. I don't have
 5    -- I don't have any records or I didn't speak to anyone that
 6    officially said yes, this vehicle was reported stolen and --
 7    but I believe it was, yes.
 8    Q.    Okay. Now you testified that you saw Mr. Durbin in
 9    Arizona; is that correct?
10    A.    Correct.
11    Q.    And it was at the airport, correct?
12    A.    Yes.
13    Q.    And did you ever see Mr. Durbin and Mr. Anderson
14    together?
15    A.    Yes, I believe that that night at the Staybridge he came
16    out of the hotel in the parking lot near his -- near the
17    Suburban and then a Land Rover or Range Rover pulled up and
18    that Range Rover we believe was occupied by Jack Anderson and
19    a couple other males.
20    Q.    Okay. You don't have any video of that, do you?
21    A.    No, I don't.
22    Q.    Okay. Now that you mention it, Mr. Anderson on that video
23    that we saw, drove up in a black -- I'm going to say
24    Challenger maybe?
25    A.    Yes.
```

1   Q.   Am I right about that?

2   A.   Yes.

3   Q.   And who was driving that vehicle?

4   A.   I'm not sure.

5   Q.   Now it appeared to me that there might have been three

6   people in the vehicle. It looked like Jack Anderson got out of

7   the back seat. Am I right about that?

8   A.   Yeah, there was at least three. A driver, a front

9   passenger that got out and let Mr. Anderson out and then Mr.

10  Anderson was behind the front passenger.

11  Q.   Okay. And were you able to ever -- I mean, did you get

12  the license plate of that Challenger?

13  A.   Yes, I believe that was captured and followed up with the

14  authorities in Tucson that were assisting us that day.

15  Q.   Do you know to whom that Challenger was registered?

16  A.   I don't.

17  Q.   Did you do any follow-up on that Challenger?

18  A.   No.

19  Q.   Okay. And as far as the other two or three people that

20  were in that vehicle, were you ever able to determine who they

21  were?

22  A.   No.

23  Q.   Did you conduct any investigation to determine who they

24  were?

25  A.   No, not in Tucson, no.

```
 1    Q.   Okay. Now you also testified there was some guy walking
 2    through the video wearing a blue T-shirt. Do you remember
 3    that?
 4    A.   Yes.
 5    Q.   And Mr. Romano asked you if he had anything to do with
 6    this and you said no, it was determined he had nothing to do
 7    with this?
 8    A.   Yes.
 9    Q.   How is it that you determined he had nothing to do with
10    this?
11    A.   Because he approached from our right. We were watching
12    them across the street to our left and he continued across and
13    just walked through.
14    Q.   Okay, but you never figured out who he was, did you?
15    A.   No, I did not.
16    Q.   You don't know his name, you don't know if he could have
17    been a lookout, something like that?
18    A.   Yes.
19    Q.   Okay.
20    A.   Yes, I don't know.
21    Q.   You don't know.  So you testified you determined he had
22    nothing to do with it, but you didn't actually do anything
23    other than watch what was going on and conclude in your
24    opinion that he had nothing to do with it, correct?
25    A.   That's correct.
```

```
1    Q.   And that Challenger drove away.  I'm talking about at the

2    Staybridge. We see Ms. Thompson getting into a rental vehicle.

3    We see Mr. Anderson get into the Suburban and we see the

4    Challenger drive away as well; is that correct?

5    A.   That's correct.

6    Q.   Okay. Did anyone follow that Challenger?

7    A.   Not to my knowledge, I don't believe so. We all stayed

8    with Jameka Thompson who was -- our primary focus was

9    surveillance, as well as Mr. Anderson who I believe was the

10   kilo supplier for Che Durbin.

11   Q.   So you were out there with Detective Sandruck; is that

12   correct?

13   A.   That's correct.

14   Q.   And were there members of the Arizona law enforcement

15   that were helping you?

16   A.   Yes.

17   Q.   So how many people were conducting surveillance?

18   A.   Myself and Detective Sandruck were in one rental vehicle

19   and then I don't know how many people were with them. I

20   believe there were at least a couple, because we all hooked up

21   on one communication device that we can all communicate while

22   we're out there.  And so there were several from the Tucson --

23   I don't know what police department, but they were TFOs or

24   Task Force Officers which are deputized by the DEA to work

25   investigations out there.
```

```
1    Q.   Okay, so when you say "at least a couple," do you mean a
2    couple officers or a couple cars full of officers?
3    A.   There were at least -- there were several vehicles
4    because we did conduct moving surveillance which entailed
5    multiple vehicles following Mr. Anderson and Ms. Thompson and
6    I don't know how many people were assigned per vehicle.
7    Q.   Okay.
8    A.   So there were multiple vehicles assisting us with the
9    surveillance.
10   Q.   Okay.  So for the sake of argument, they were there to
11   assist you.  They were there because you asked them to be
12   there, correct?
13   A.   Correct.
14   Q.   So they would have done what you asked them to do,
15   correct?
16   A.   Yes.
17   Q.   In the hierarchy, if somebody had to make a decision it
18   would have been you and Detective Sandruck about what to do;
19   is that correct?
20   A.   For the most part we would have had a heavy influence on
21   it and they would have done their best to accommodate us,
22   barring any unknown circumstances by us such as neighborhoods
23   or where things were going or areas of operation and things of
24   that nature. We wouldn't have any natural knowledge of that.
25   The whole place was foreign to us.
```

```
1    Q.   Sure.

2    A.   So they did guide us through everything.

3    Q.   Fair enough. But ultimately they were there at your

4    direction; is that correct?

5    A.   Yes.

6    Q.   And just for the sake of argument, if you're conducting

7    an investigation in another state, is it protocol for you to

8    -- I assume it's protocol for you to notify the local law

9    enforcement; is that correct?

10   A.   Yes.  It would be a courtesy, yes.

11   Q.   And have you ever done that before?

12   A.   Not out west.  We've gone to New York, we've gone to New

13   Jersey, I've gone to Delaware.

14   Q.   So do you always have local law enforcement assisting or

15   do you -- sometimes you just tell them you're going to be

16   there and they don't help?

17   A.   If it was just a pass-through such as you following a

18   suspect let's say, for instance, to New York City, you would

19   just continue through -- obviously you're going to pass

20   through multiple jurisdictions on Interstate 95, the Jersey

21   Turnpike and then if you need the assistance, then are you

22   going to be there for a long time?  Like we were there for

23   three days so we definitely notified them and we needed

24   assistance with surveillance because we knew that he was

25   driving so he was mobile, and we didn't know how the events
```

```
 1    were going to unfold as we came into the area.
 2    Q.   Okay. Now you testified that these credit cards -- and we
 3    see the last four digits on your Exhibit 47. You testified
 4    that those were both Mr. Durbin's credit cards; is that
 5    correct?
 6    A.   That's correct.
 7    Q.   And do you have documentation?
 8    A.   That's from the Avis rental agreements and there's a long
 9    list of Avis vehicles that were rented by Mr. Durbin and paid
10    for by Mr. Durbin using that card.
11    Q.   Was he somehow like a member of Avis or something like
12    that?
13    A.   I believe he may have had like a discount points account
14    or something with them, but I don't know that there's any
15    official membership or something of that nature. I'm not sure.
16    Q.   Okay. Now Ms. Thompson paid for some of the flights
17    herself, isn't that correct?
18    A.   I'm not sure, but I believe so.
19    Q.   Okay. I mean, if the record says, "Bill to Jameka
20    Thompson" with her address, that would suggest the bill went
21    to her, correct?
22    A.   Yes, yes.
23    Q.   And at the time -- well, her address at some point,
24    pardon me -- was on Palustris Lane; is that correct?
25    A.   Yes.
```

```
 1    Q.    All right.  Now were you involved in the stop of Ms.
 2    Thompson?
 3    A.    Yes.
 4    Q.    All right. And you were involved in the execution of
 5    search and seizure warrants as a result of the stop of Ms.
 6    Thompson; is that correct?
 7    A.    Myself and Corporal Wolfe stayed with her at the southern
 8    precinct while once she was stopped and in custody, then
 9    multiple teams went out and served the search warrants at
10    multiple locations related to Mr. Durbin and Ms. Thompson.
11    Q.    And a whole bunch of other people, right?
12    A.    Yes, a whole bunch of other people. There was a search
13    warrant crew for every location that we searched that night.
14    Q.    Okay.
15    A.    But myself and Corporal Wolfe stayed at the southern
16    precinct.
17    Q.    So was it your expectation from an investigatory point of
18    view that May 12th was when you were going to arrest Ms.
19    Thompson?
20    A.    We weren't -- we didn't know for sure ahead of time.
21    Q.    Okay. So when you say you had search warrant teams, I
22    mean, did you have to bring people in because that was the day
23    or did you kind of have everybody ready because you knew it
24    was going to happen soon-ish?
25    A.    So in a situation like that we knew she was in route from
```

```
 1    Tucson.  We know that generally -- and you can find this out
 2    by Google Maps how long it can take you to drive. It's
 3    approximately two days. And so we kind of knew, May 12th.  We
 4    had no idea when.  It would depend on her whether or not she
 5    drove straight through the night, if she only got a couple
 6    hours sleep.  A lot of variables come into play. So all those
 7    teams were on standby for us.
 8    Q.   So you alerted them that it's coming. We don't know
 9    exactly when, but we're going to need a bunch of teams because
10    you were expecting to serve a bunch of search warrants; is
11    that correct?
12    A.   Yes.
13    Q.   And were you the affiant on those search warrants?
14    A.   I might have been an affiant on some of them, but not all
15    of them. I believe most of them might have been written by
16    Corporal Maddox while we were in Tucson just wrapping things
17    up. He stayed behind.
18    Q.   In anticipation?
19    A.   Yes.
20    Q.   I mean, you sort of saw what was at the end of the line?
21    A.   Yes.
22    Q.   So you knew it was going to be a lot of work so you guys
23    started getting ready, correct?
24    A.   That's correct.
25    Q.   And you are aware that Ms. Thompson's house was searched
```

```
 1   and three smartphones were recovered from her house; is that
 2   correct?
 3   A.   If that's what the paperwork says, yes. I wasn't at her
 4   search warrant, but I believe you. I'm sure if that's what the
 5   paperwork says, yes.
 6   Q.   Okay.
 7   A.   But I don't have firsthand knowledge of how many phones.
 8   Q.   And are you aware that Mr. Durbin was stopped when he was
 9   driving out to Arizona somewhere in the middle of the country,
10   I'm going to say Indiana?
11   A.   Yes.
12   Q.   And he was stopped by local law enforcement; is that
13   correct?
14   A.   That's correct.
15   Q.   And that wasn't at your direction; is that correct?
16   A.   No, it was not.
17   Q.   It was totally random, it was some sort of traffic stop,
18   right?
19   A.   Yes.
20   Q.   And are you aware that he had a couple of car titles in
21   the vehicle at the time he was stopped?
22   A.   Yes.
23   Q.   And that the officers thought there was something weird
24   about that and they took pictures of those titles; is that
25   correct?
```

```
1    A.    That's correct.
2    Q.    And the titles were for a 2017 Ram pickup and a 2020
3    Chevy sports utility vehicle; is that correct?
4    A.    Yes.
5    Q.    Now you're aware that Mr. Durbin's residence at 1487
6    Wellspring was also the subject of a search and seizure
7    warrant; is that correct?
8    A.    That's correct.
9    Q.    And as a result of the execution of that search and
10   seizure warrant there were two or three vehicles recovered
11   that were determined to be stolen; is that correct?
12   A.    Yes.
13   Q.    And one of those vehicles, I believe you testified that
14   Mr. Durbin drove a black Honda Accord; is that correct?
15   A.    That's correct.
16   Q.    And we saw that in some of these videos; is that correct?
17   A.    Yes.
18   Q.    And was it determined that that vehicle was stolen?
19   A.    I believe so.
20   Q.    And did you also ever see him driving a white Range
21   Rover?
22   A.    Yes, I did.
23   Q.    And it was determined that that car was stolen as well,
24   right?
25   A.    I believe so.
```

1    Q.   And did you ever see him driving any other vehicles?

2    A.   Yes, a Dodge -- black Dodge Challenger similar to the one

3    in the video, but different.

4    Q.   Well, was it different or was it the same vehicle?

5    A.   I believe it was different.

6    Q.   What makes you think that?

7    A.   Because I believe it was seized by us in one of the

8    search warrants.

9    Q.   The Challenger?

10   A.   I believe so, yes.

11   Q.   Okay. So obviously it couldn't be in two places at one

12   time?

13   A.   Correct.

14   Q.   But I guess it looked like --

15   A.   It's a popular vehicle and a popular color is black or

16   dark gray, yes.

17   Q.   Okay, but as far as you know it was seized the night of

18   the execution of the search and seizure warrants?

19   A.   I believe so, yes.

20   Q.   And I'm going to say for the sake of argument, was that

21   May 12th or 13th?

22   A.   Yes.

23   Q.   Like late night, early morning?

24   A.   Sometime in that time frame, yes.

25   Q.   Okay.  And are you aware that there were also, like, keys

Battee - cross                                        IV-82

1    to vehicles that you couldn't necessarily match up to a

2    vehicle seized at Mr. Durbin's house?

3    A.    Yes.

4    Q.    And phones recovered, right?

5    A.    Yes.

6    Q.    Now this tracking device for this Chevy Suburban, that's

7    the vehicle we saw in Arizona?

8    A.    Yes.

9    Q.    When was that tracking device placed on the vehicle?

10   A.    I believe May 7th.

11   Q.    In anticipation of the Arizona trip?

12   A.    Yes.

13   Q.    Okay. And you just testified Mr. Durbin had a couple of

14   vehicles. Did you ask for tracking devices to be placed on all

15   of them?

16   A.    We had tracking devices I believe on all of the vehicles

17   that you mentioned, the Land Rover, the Dodge Challenger, as

18   well as the Honda Accord.

19   Q.    And the Suburban?

20   A.    And the Suburban, yes.

21   Q.    So four tracking devices, correct?

22   A.    Yes.

23   Q.    Okay. And did you have any tracking devices on any

24   vehicles owned by Ms. Thompson?

25   A.    Technically the Honda Accord that Mr. Durbin drove every

1    single day for the majority of the investigation was

2    registered to Ms. Thompson and the Dodge Challenger, the black

3    one that you mentioned earlier was also registered, I believe,

4    to Ms. Thompson. So technically, yes, but not her Infiniti SUV

5    that you saw in the first video.

6    Q.   Okay. Did she own that Infinite SUV in May of 2020?

7    A.   Yes, I believe so.

8    Q.   Okay. We saw it in May of 2019.

9    A.   I believe she had the same vehicle, yes.

10   Q.   Okay. I have no further questions.

11            THE COURT:  Mr. Mann?

12            MR MANN:  Judge, no further questions from me.

13            THE COURT:  Mr. Romano, anything else?

14            MR. ROMANO:  Yes, Your Honor, just a couple on

15   redirect.

16            THE COURT:  At your pleasure.

17              R E D I R E C T   E X A M I N A T I O N

18   BY MR. ROMANO:

19   Q.   Detective, if I understood your testimony on

20   cross-examination, this black Honda that Ms. Flynn just asked

21   you about that you said you believe was stolen was actually

22   registered in Jameka Thompson's name?

23   A.   Yes.

24   Q.   Okay. And that's the same black Honda that we saw Mr.

25   Durbin driving when he met Mr. Pettigrew at the Royal Farms

1   store?

2   A.   Yes, it was.

3   Q.   Okay. And that's the same block Honda that Detective

4   Phipps testified that he saw when Mr. Durbin squared the block

5   with Romaine Timms, correct?

6   A.   Yes.

7   Q.   Okay. And it sounded like there's at least one or more

8   other vehicles that Mr. Durbin drove but he had registered in

9   Ms. Thompson's name; is that correct?

10  A.   That's correct.

11  Q.   Okay. And just one final question, when Mr. Durbin was

12  stopped in Indiana in the Indianapolis area, the police

13  discovered more than just two titles, didn't they?

14  A.   I believe so, yes.

15  Q.   What else did they discover?

16  A.   Also $15,000 in cash.

17  Q.   Thank you, sir.

18          **THE COURT:**  Any recross on those issues?

19          **MS. FLYNN:**  No, Your Honor.

20          **THE COURT:**  Mr. Mann?

21          **MR MANN:**  None for me, Judge, thank you.

22          **THE COURT:**  Thank you, Detective.  You can step

23  down.

24          **THE WITNESS:**  Thank you, Your Honor.

25          **(Witness, excused.)**

```
 1                 THE COURT:  Thank you. Mr. Romano, next witness.

 2                 MR. ROMANO:  Mr. Hamilton.

 3                 THE COURT:  Mr. Hamilton, next witness.

 4                 MR. HAMILTON:  Thank you, Your Honor.  The

 5      Government calls Ms. Stephanie Laufert.

 6                 THE COURT:  All right. Ms. Laufert, why don't you

 7      come on forward. Come into the witness box.  Before you're

 8      seated, I need you to raise your right hand and direct your

 9      attention to the courtroom deputy to be sworn in.

10                 (Witness, sworn.)

11                 THE CLERK: Thank you, you can have a seat.  Please

12      adjust the microphone, speak directly into it. Please state

13      and spell your first and last name for the record.

14                 THE WITNESS:  My name is Stephanie Laufert.

15      S-t-e-p-h-a-n-i-e  L-a-u-f-e-r-t.

16                 THE CLERK: Thank you.

17                 THE COURT:  Ms. Laufert, if you'd like you certainly

18      are able to remove your mask if you have been fully

19      vaccinated. But you certainly can keep it on if it is your

20      preference. Also, if you have not been fully vaccinated, you

21      should remain masked at all times.

22            Mr. Hamilton, at your pleasure, sir.

23                 MR. HAMILTON:  Thank you, Your Honor.

24                 D I R E C T   E X A M I N A T I O N

25      BY MR. HAMILTON:
```

1    Q.    Good morning.  Where are you employed?

2    A.    By the Maryland State Police Forensic Sciences Division.

3    Q.    What is your title?

4    A.    Forensic Scientist III.

5    Q.    What is a Forensic Scientist III?

6    A.    I test evidence for the presence or absence of controlled

7    dangerous substances.

8    Q.    And how long have you been a forensic scientist with the

9    Maryland State Police?

10   A.    I've been employed four years.

11   Q.    What is your formal education?

12   A.    I have a bachelor's degree of chemistry from Stevenson

13   University awarded in 2014, and a master's degree in forensic

14   science with a chemistry concentration awarded by Stevenson

15   University in 2015.

16   Q.    Do you hold any professional certifications?

17   A.    I'm a certified chemist by the Maryland Department of

18   Health.

19   Q.    Now what type of training, if any, do you receive to

20   become a Forensic Scientist III?

21   A.    So at the Maryland State Police, we go through an

22   in-house training program which includes a series of modules

23   of the different drug types which include readings, training

24   samples.  And at the end of each module we have to pass an

25   oral and written exam. After all of those are completed, we

```
 1    move on to training cases. I don't remember the exact number,
 2    but at the end of all of those we have a competency test which
 3    our mock trial is based on. And after all of that is
 4    completed, everything gets sent to the Maryland Department of
 5    Health to award us certification.
 6    Q.    Now do you routinely chemically analyze substances to
 7    determine whether they contain narcotics?
 8    A.    Yes.
 9    Q.    How often do you do that?
10    A.    Probably about 33 cases or items, my bad.  33 items a
11    week.
12    Q.    A week. Approximately how many exhibits would you say
13    you've analyzed in your career?
14    A.    That would be over 5,000.
15    Q.    And how many of them have cocaine?
16    A.    It would be a rough estimate, probably about a third of
17    those.
18    Q.    Okay. What are the standard tests you have performed to
19    conduct an analysis of something to determine whether it has
20    controlled substances?
21    A.    So to test a substance, we do a series of presumptive
22    color tests, a presumptive instrumental test and a
23    confirmatory instrumental test.
24    Q.    Could you please tell us a little bit about each of those
25    tests?
```

1    A.   So the presumptive color test, they change a color when
2    you put your substance in. They give a general idea of what
3    you're looking at. The presumptive instrumental test or Gas
4    Chromatography with Flame Ionization Detection or GC-FID is an
5    instrumental test.  Basically it separates the components of
6    the mixture and gives you a retention time. We compare those
7    retention times to known standards. The confirmatory test that
8    we use is the Gas Chromatography-Mass Spectrometry or GC-MS,
9    that's the one that gives you the molecular data. It looks
10   just the same as the GC-FID where it separates the components,
11   but at the very end you get a mass spectra which is a
12   molecular fingerprint.
13   Q.   And how many times would you say you've performed these
14   tests?
15   A.   Pretty often. Probably every day.  Every item that's
16   analyzed usually goes through those tests.
17   Q.   Okay. And to perform your duties as a forensic chemist,
18   do you use specialized equipment?
19   A.   Yes.
20   Q.   Is that equipment approved by the laboratory and
21   scientific community?
22   A.   Yes.
23   Q.   Are the instruments you use standard in chemical forensic
24   fields?
25   A.   Yes.

Laufert - direct                                                    IV-89

1    Q.   And what instruments do you primarily use?

2    A.   Like I said before, the GC-FID and the GC-MS.

3    Q.   Are you trained on the proper use of these instruments?

4    A.   Yes.

5    Q.   And how many times would you say you've used them?

6    A.   Every day.

7    Q.   Does your lab have specific procedures for the handling

8    of substances that might end up being evidence in a criminal

9    trial?

10   A.   Yes.

11   Q.   Are you trained on those procedures?

12   A.   Yes.

13   Q.   Do you follow them?

14   A.   Yes.

15   Q.   Have you previously testified in court concerning the

16   analysis that you have performed?

17   A.   I have.

18   Q.   And how many times?

19   A.   Ten times.

20   Q.   And on those occasions were you qualified as an expert?

21   A.   Yes.

22        **MR. HAMILTON:** Your Honor, the Government yields to

23   defense counsel to voir dire Ms. Laufert's expertise.

24        **THE COURT:**  In the area of chemical analysis?

25        **MR. HAMILTON:**  Yes, Your Honor.

**JA184**

```
 1                THE COURT:  Ms. Flynn, any voir dire?
 2                MS. FLYNN:  Your Honor, I have no voir dire and no
 3      objection to her being designated as an expert.
 4                THE COURT:  Mr. Mann?
 5                MR. MANN:  None from me.
 6                THE COURT:  Ladies and gentlemen of the jury, you
 7      should consider this particular witness an expert in the area
 8      of controlled substance analysis and testing. Thank you.  At
 9      your pleasure.
10                MR. HAMILTON:  Thank you, Your Honor.
11      BY MR. HAMILTON:
12      Q.   Ms. Laufert, I'm showing you Government Exhibit 1-C on
13      your screen. Can you see 1-C?  Can you see it, ma'am?
14      A.   Yes.
15      Q.   Do you know what this document is?
16      A.   This is my lab report.
17      Q.   How do you know that?
18      A.   My signature is on the second page.
19      Q.   What was this report about?
20      A.   This is the report that was generated for the analysis I
21      performed.
22      Q.   And what was the evidence you were analyzing?
23      A.   A block of compressed substance.
24      Q.   I'm showing you what is marked as Government Exhibit 1-A.
25      Do you know what this is?
```

1    A.    Yes.

2    Q.    How do you know?

3    A.    I know because it matches my description. It also has the

4    FSD number on that top barcode and then if you flip it over on

5    the other side, my initial should be on the heat seal.

6    Q.    And did you perform an analysis on this?

7    A.    Yes, I did.

8    Q.    Thank you. What was the purpose of conducting that

9    analysis, Ms. Laufert?

10   A.    To determine the presence or absence of controlled

11   dangerous substance.

12   Q.    And where did you get that substance from?

13   A.    It was brought to the lab by the Harford County Sheriff's

14   Office.

15   Q.    Do you know if it was connected to any investigation?

16   A.    All I know is the defendant listed was Jameka Thompson.

17   Q.    And how much of that substance was there when it was

18   brought to you?

19   A.    About 933 grams.

20   Q.    933?

21   A.    My bad, 993.

22   Q.    Okay. Was that the net weight or the gross weight?

23   A.    Was the net weight.

24   Q.    And what is net weight?

25   A.    So net weight is just the substance itself. Gross weight

```
 1    would include any outer packaging.
 2    Q.   Now did you perform your analysis on this substance in
 3    accordance with the established lab policies and procedures?
 4    A.   Yes.
 5    Q.   What tests did you perform on that?
 6    A.   I did our series of presumptive color tests, our
 7    presumptive instrumental, and our confirmatory instrumental.
 8    Q.   Would that be the color test, the GC-FID and the GC-MS
 9    that you previously described?
10    A.   Yes.
11    Q.   What was the result of those testings?
12    A.   The result was cocaine Schedule II.
13    Q.   And 993-and-a-half grams?
14    A.   Yes.
15    Q.   And did you generate and sign the lab report after your
16    analysis?
17    A.   Yes.
18    Q.   Now Ms. Laufert, I'm going to show you what's marked as
19    Government Exhibit 2-C. Or my apologies.  One moment please,
20    Your Honor. I'm sorry, I'm showing you Government Exhibit 2-D.
21    Do you know what this is?
22    A.   This is another lab report.
23    Q.   How do you know?
24    A.   My signature is on the second page.
25    Q.   And now I'm going to show you what is marked as
```

```
 1        Government's Exhibit 2-A1 and 2-A2. Do you know what this is?
 2   A.    That is the first item.
 3   Q.    And what is it?
 4   A.    It's a block of compressed substance.
 5   Q.    Do you recognize this?
 6   A.    Yes.
 7   Q.    And what is this?
 8   A.    That is a compressed and powdery white substance.
 9   Q.    Are these the substances you performed the analysis on
10   for the report?
11   A.    Yes.
12   Q.    Thank you. And again, what was the purpose of analyzing
13   those substances?
14   A.    To determine the presence or absence of controlled
15   dangerous substance.
16   Q.    And where did you get that evidence?
17   A.    It was also brought to the lab by the Harford County
18   Sheriff's Office.
19   Q.    Do you know if it was connected to a case or
20   investigation?
21   A.    The defendant listed on the chain of custody form was
22   Jameka Thompson.
23   Q.    And how much was there of each substance?
24   A.    Item one was 997 grams, approximately, and the second one
25   was 246, approximately.
```

 1    Q.   Did you perform your analysis in accordance with the

 2    established lab policies and protocols?

 3    A.   Yes.

 4    Q.   And which test did you perform on these substances?

 5    A.   These substances I did the presumptive color test, a

 6    presumptive instrumental test, and two confirmatory

 7    instrumental tests.

 8    Q.   And these are the tests we discussed before, correct?

 9    A.   Yes.

10    Q.   What was the result of your testing here?

11    A.   Cocaine Schedule II.

12    Q.   And you generated the report and signed it after you

13    completed your analysis?

14    A.   Yes.

15    Q.   Thank you.  I have no further questions for you at this

16    time.

17              **THE COURT:**  Any cross, Ms. Flynn?

18              **MS. FLYNN:**  Yes, Your Honor.

19              **THE COURT:**  Thank you.

20              **C R O S S - E X A M I N A T I O N**

21    **BY MS. FLYNN:**

22    Q.   Good morning, ma'am.

23    A.   Good morning.

24    Q.   So was it coincidence that you did both of the tests in

25    this particular case?

Laufert - cross                                          IV-95

```
1    A.   I believe my supervisor noticed that I did the first one
2    and then gave me the second one after it came in.
3    Q.   Okay. And you work for the Maryland State Police,
4    correct?
5    A.   Yes.
6    Q.   And so do you do all the analysis for cases that are
7    generated out of Harford County?
8    A.   Yes.
9    Q.   Is that because they don't have their own lab?
10   A.   To my knowledge, yes.
11   Q.   And do you do analysis for pieces of evidence from other
12   jurisdictions as well?
13   A.   Yes.
14   Q.   In addition I suppose the Maryland State Police have
15   their own cases; is that correct?
16   A.   That is true.
17   Q.   So as a forensic chemist, do you spend all day every day
18   testing narcotics?
19   A.   Not all day.
20   Q.   I mean, are there other things that you test besides
21   controlled dangerous substances?
22   A.   No.
23   Q.   Okay. So you are a drug chemist?
24   A.   Yes.
25   Q.   Analyst; is that correct?
```

```
 1    A.    Yes.
 2    Q.    Like that's all you do?
 3    A.    Yes, it is.
 4    Q.    So you might not do it all day, every day, but that's all
 5    you do?
 6    A.    Yes.
 7    Q.    You're not testing blood or any of that stuff, just
 8    drugs?
 9    A.    Just drugs.
10    Q.    And I'm assuming there's all sorts of drugs that get
11    presented to you, correct?
12    A.    Yes.
13    Q.    I mean, heroin, fentanyl, prescription medication,
14    marijuana, all sorts of things, right?
15    A.    Yes.
16    Q.    And I would assume you're trained equally as vigorously
17    regardless of the alleged narcotic; is that correct?
18    A.    Yes.
19    Q.    Okay. So you had testified a couple of times when asked
20    how much did something weigh you said approximately 997 grams,
21    correct?
22    A.    Yes.
23    Q.    Actually on the report like the one we just saw it says
24    997.5 grams; is that correct?
25    A.    It is.
```

1    Q.   So when you say "approximate," you actually weighed
2    everything precisely; is that correct?
3    A.   Yes.
4    Q.   So when you say "approximate," was that just kind of a
5    manner of speaking?
6    A.   Yes.
7    Q.   But your report accurately reflects precisely what
8    something weighed; is that correct?
9    A.   Yes.
10   Q.   I'm assuming your scales are very, very sensitive; is
11   that correct?
12   A.   They are calibrated at least twice a year.
13   Q.   Okay. So speaking of that, I'm assuming -- or correct me
14   if I'm wrong -- the lab probably has to go through
15   accreditation from time to time; is that correct?
16   A.   Yes.
17   Q.   And have you been present when that was happening?
18   A.   I believe so.
19   Q.   But that probably happens every couple of years or
20   something, right?
21   A.   Yes.
22   Q.   Okay. And I'm assuming the lab has always passed its
23   accreditation, correct?
24   A.   Yes.
25   Q.   And these machines that you're talking about that you use

```
 1    for the presumptive instrument test and the confirmatory test,
 2    are those calibrated on a regular basis?
 3    A.   When they're first purchased, they go through a
 4    validation before we can even start using them for case work.
 5    And then every day they do go through a daily calibration.
 6    Q.   Okay. And that's so you can be absolutely confident about
 7    the results that the machine is generating; is that correct?
 8    A.   Yes.
 9    Q.   Okay. Because obviously you have to rely on the testing
10    and the instruments in order to reach a conclusion; is that
11    correct?
12    A.   Yes.
13    Q.   Okay. Now all you do is process alleged narcotics for law
14    enforcement agents, right?
15    A.   Yes.
16    Q.   So for the sake of argument, you could find yourself in
17    court regarding every single case, correct?
18    A.   Correct.
19    Q.   And you generate reports with the precise results of your
20    testing and send them back to the law enforcement agent; is
21    that correct?
22    A.   Correct.
23    Q.   Because this is all evidence, right?
24    A.   Can you repeat that?
25    Q.   Potentially -- your job is to process items of evidence
```

```
1    from criminal cases; is that correct?
2    A.   Correct.
3    Q.   So it's important that all of the paperwork be perfectly
4    clear, correct?
5    A.   Yes.
6    Q.   And that it all be absolutely precise; is that correct?
7    A.   Correct.
8    Q.   And you had mentioned a term, you said "chain of
9    custody"?
10   A.   Yes.
11   Q.   And can you explain to the ladies and gentlemen what
12   "chain of custody" means?
13   A.   So the chain of custody is basically a list of every
14   person that has handled the evidence itself.
15   Q.   Okay. And once again, people have to sign a sheet or
16   something like that so that looking back on it, anybody could
17   look at the documentation and be absolutely sure about who
18   touched what and when, correct?
19   A.   Correct.
20   Q.   And so it gets transported to your lab and then where
21   does it stay?
22   A.   So it stays in our central receiving unit until it's
23   ready to be picked up for me to test.
24   Q.   And then once you test it, where does it go?
25   A.   Until I'm ready to return it to central receiving it's
```

```
1    kept in my own locked cabinet.

2    Q.   And what is central receiving?

3    A.   Central receiving is basically where all the evidence

4    that comes into the lab is kept until it's ready to be

5    analyzed.

6    Q.   Okay. Now this presumptive color test, is that, I mean,

7    like are you dipping a strip into liquid or something?  Like

8    how do you do a color test?

9    A.   So our color tests are reagents that we put in spot plate

10   so they're liquid. They're usually one color or no color at

11   all.  And once you add your substance in, then they change a

12   color.

13   Q.   Okay. So if you put fentanyl in, do you get a different

14   color?

15   A.   It depends on the specific color test.

16   Q.   Okay, but I guess the purpose of the color test at least

17   is to give you some direction; is that correct?

18   A.   Correct.

19   Q.   And I guess if there was no color at all, there might be

20   some suggestion that there was no CDS; is that correct?

21   A.   It's a possibility, yes.

22   Q.   I mean, I imagine you've tested things where no narcotics

23   are found; is that correct?

24   A.   Yes.

25   Q.   So the color test gives you sort of a hint about what
```

```
 1    you're looking at, right?

 2    A.   Yes.

 3    Q.   And you'll have to help me with this, the presumptive

 4    instrument test, what kind of machine do you use?

 5    A.   The Gas Chromatography Flame Ionization Detection,

 6    GC-FID.

 7    Q.   And once you put it through that, you get a result,

 8    correct?

 9    A.   Yes.

10    Q.   And then just to be sure, you do a confirmatory test; is

11    that correct?

12    A.   Yes.

13    Q.   And that's another kind of machine?

14    A.   Yes, it is.

15    Q.   And what's that called?

16    A.   That's a Gas Chromatography Mass Spectometry.

17    Q.   And is that a different kind of science?

18    A.   Yes.

19    Q.   Okay, so those two machines, those two instruments do two

20    different things?

21    A.   Yes.

22    Q.   And so basically you test three times so you can be

23    absolutely sure of what the item is; is that correct?

24    A.   Yes.

25    Q.   So when you testified that you did the testing and you
```

1    concluded that it was cocaine, right?

2    A.    Yes.

3    Q.    Or cocaine base I think you said?

4    A.    I just said cocaine.

5    Q.    Just cocaine?

6    A.    Yes.

7    Q.    Okay. You have absolutely no doubt whatsoever that those

8    items are, in fact, cocaine; is that correct?

9    A.    Based on the presumptive colors, the presumptive

10   instrumental and the confirmatory I can definitely tell you

11   that it was cocaine.

12   Q.    And what you did to test these items is what you do every

13   time you test items, right?

14   A.    Yes.

15   Q.    Okay, I have no further questions.

16              **THE COURT:**  Mr. Mann?

17              **MR MANN:**  Judge, thank you very much.

18              **C R O S S - E X A M I N A T I O N**

19   BY MR. MANN:

20   Q.    Ms. Laufert, good afternoon. Both of these items that you

21   tested about roughly about a year apart, both of those were

22   cocaine, correct?

23   A.    Correct.

24   Q.    They were powder cocaine, correct?

25   A.    They were a compressed and powdery substance, yes.

```
1     Q.   Neither of them were cocaine base, correct?
2     A.   I can only tell you about the two from the 2020 case,
3     specifically, that they were not cocaine base.
4     Q.   And what about the one from 2019?
5     A.   I did not do a confirmatory test to confirm.
6     Q.   Okay. So that one just comes up as cocaine and you're
7     saying that was a compressed brick, correct?
8     A.   Yes.
9     Q.   And the one from 2020 you actually did a test on that to
10    determine whether or not that was related to cocaine base and,
11    in fact, it was not?
12    A.   It was not.
13    Q.   Both came as compressed bricks though, correct?
14    A.   To my knowledge, yes.
15    Q.   Both came from the same law enforcement organization,
16    correct?
17    A.   Correct.
18    Q.   And both had the same defendant's name, Jameka Thompson
19    on there, correct?
20    A.   Yes.
21    Q.   Now the difference between -- and, in fact, we are
22    talking about cocaine base, that's also known as crack,
23    correct?
24    A.   Correct.
25    Q.   And that is, in fact, a different substance from cocaine
```

```
1    that you tested in this case, correct?  They are -- they are
2    chemically different?
3    A.   Yes, they are.
4             MR. MANN: Nothing further.
5             THE COURT:  Any redirect, Mr. Hamilton?
6             MR. HAMILTON:  No thank you, Your Honor.
7             THE COURT:  Thank you very much, ma'am. You can step
8    down.
9             (Witness, excused.)
10            THE COURT: Next witness?
11            MR. ROMANO:  Sergeant Underhill.
12            THE COURT:  Ladies and gentlemen, we're going to
13   break for lunch in about 30 minutes. Sergeant, why don't you
14   come on forward. And you can come to the witness stand. Before
15   you are seated, I need you to direct your attention to the
16   courtroom deputy and raise your right hand for me, sir.
17   Courtroom deputy is to your right.
18            (Witness, sworn.)
19            THE CLERK: Thank you, you can have a seat. Please
20   speak into the microphone and state and spell your first and
21   last name for the record.
22            THE WITNESS:  Name is Sergeant Brandon Underhill.
23   B-r-a-n-d-o-n  U-n-d-e-r-h-i-l-l.
24            THE COURT:  Thank you. Mr. Romano, at your pleasure,
25   sir.
```

*****

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
 2                       NORTHERN DIVISION

 3    UNITED STATES OF AMERICA,   )
                                  )
 4         vs.                    )   CRIMINAL CASE NO. GLR-20-0210
                                  )
 5    CHE DURBIN and TERRELL      )            VOLUME V
      WALTON,                     )
 6                                )
           Defendants.            )
 7    _____ )

 8                        Tuesday, March 8, 2022
                              Courtroom 7A
 9                         Baltimore, Maryland
                              JURY TRIAL
10
      BEFORE:  THE HONORABLE GEORGE LEVI RUSSELL, III, Judge
11
      For the Plaintiff:
12    Christopher Romano, Esquire
      Jason Hamilton, Esquire
13    Special Assistant United States Attorneys
      36 S. Charles Street, Fourth Floor
14    Baltimore, Maryland  21201

15    For the Defendants:
           For Che Jaron Durbin:
16             Catherine Flynn, Esquire
               Law Office of Catherine Flynn
17             217 North Charles Street, Second Floor
               Baltimore, Maryland  21201
18         For Terrell Darnell Walton:
               Tyler Mann, Esquire
19             Law Offices of Mann and Risch
               101 E. Chesapeake Avenue, Suite 100
20             Towson, Maryland  21286
      Also Present:
21         Brian Battee, Harford County Sheriff's Office
           Damon Gasque, IT, U.S. Attorney's Office
22    ===================================================
                          Reported by:
23             Nadine M. Bachmann, RMR, CRR
                 Federal Official Court Reporter
24             101 W. Lombard Street, 4th Floor
                  Baltimore, Maryland  21201
25                     410-962-4753
```

# T A B L E   O F   C O N T E N T S

                                                              Page

Government Rests                                                40


WITNESS                 DIRECT    CROSS      REDIRECT        RECROSS

Che Durbin

     By Ms. Flynn:    42                     169

     By Mr. Romano:                                          178

***** 

```
 1          (Proceedings commenced at 9:10 a.m.)
 2          MR. ROMANO:  Thank you, Your Honor.  Good morning.
 3    This is the matter of United States versus Che Durbin and
 4    Terrell Walton. Criminal Case GLR 20-210. Representing the
 5    United States, Special Assistant U.S. Attorneys Jason Hamilton
 6    and Chris Romano and we're here for the continuation of the
 7    trial.
 8          THE COURT:  Very good. Thank you very much. Ms.
 9    Flynn?
10          MS. FLYNN:  Good morning, Your Honor.  Catherine
11    Flynn.  I represent Mr. Durbin, who is standing to my left.
12          THE COURT:  All right, Mr. Durbin, good morning to
13    you, sir. Mr. Mann.
14          MR MANN:  Judge, good morning.  My name is Tyler
15    Mann, M-a-n-n. I represent Mr. Walton, who is to my left.
16          THE COURT:  All right, Mr. Walton, good morning to
17    you, sir. Everyone can be seated. We concluded yesterday with
18    the Government conditionally resting their case pending an
19    organization of the various evidentiary exhibits getting
20    marshalled together.
21       Mr. Romano, I take it that's been accomplished?
22          MR. ROMANO:  Yes, Your Honor. Mr. Gasque has
23    indicated to me that we have put our exhibits into evidence
24    that we want.
25          THE COURT:  Well, if he says it then I guess it's
```

```
 1    true.
 2                MR. ROMANO:  Absolutely it is.
 3                THE COURT:  And the second issue was I afforded Mr.
 4    Durbin and Mr. Walton as well, although Mr. Walton indicated
 5    yesterday through Counsel that he did not intend on
 6    testifying -- but I afforded Mr. Durbin the opportunity to
 7    consult with Counsel overnight and make a determination at
 8    least at this point whether or not he intended on testifying.
 9    Ms. Flynn, has your client made a decision in that regard?
10                MS. FLYNN:  I believe he has.
11                THE COURT:  Okay.
12                MS. FLYNN:  Is that correct, sir?
13                DEFENDANT DURBIN:  Yes.
14                THE COURT:  Okay. And that decision is?
15                MS. FLYNN:  I believe he will be testifying.
16                THE COURT:  Okay.
17                MS. FLYNN: Is that correct, sir?
18                DEFENDANT DURBIN:  Yes.
19                THE COURT:  And you had the opportunity to speak
20    with your attorney, Ms. Flynn, about this decision?
21                DEFENDANT DURBIN:  Yes.
22                THE COURT:  And were you pleased with the
23    representation and advice that she's given you thus far?
24                DEFENDANT DURBIN:  Yes.
25                THE COURT:  And were all of your questions answered?
```

 1              THE DEFENDANT:  Yes.

 2              THE COURT:  All right.  And you recall the intention

 3      of the Government to cross-examine you regarding previous

 4      criminal convictions; is that correct?

 5              DEFENDANT DURBIN:  Yes.

 6              THE COURT:  Okay. You need to speak up because she's

 7      taking down every word. And knowing that these criminal

 8      convictions which do relate to drug distribution and are

 9      impeachable offenses under 608 and 609 will not be used for

10      the purposes of determining whether or not you committed the

11      instant offense, but they can be used for the purpose of

12      determining your credibility up on the stand. You know that,

13      sir?

14              DEFENDANT DURBIN:  Yes.

15              THE COURT:  All right. And so with that, Ms. Flynn,

16      are you satisfied that your client is making this decision to

17      testify both knowingly and voluntarily and willingly after

18      full knowledge and consultation with you?

19              MS. FLYNN:  Yes, Your Honor.

20              THE COURT:  All right. Mr. Romano, do you believe

21      the Court needs to voir dire the defendant any further?

22              MR. ROMANO:  I do, Your Honor.

23              THE COURT:  Yes.

24              MR. ROMANO:  I think that the Court -- or I'll put

25      on the record that with regard to the defendant's testimony,

1    if he were to lie during the course of his testimony, he could

2    be subject to additional prosecution for perjury since he'll

3    be under oath.

4        Secondly, if he were to be convicted, there is the

5    potential for an enhanced punishment as a result of

6    obstruction based on his testimony. So I think that needs to

7    be conveyed to the defendant as well.

8        **THE COURT:**  Thank you very much. You heard Mr.

9    Romano indicate that in the event that it's determined by the

10   Government that you committed perjury by testifying falsely,

11   the Government at its option could decide to charge you with a

12   perjury count.

13       Second, in the event that you testify and, indeed, are

14   nevertheless found guilty, at sentencing the Government could

15   move or, quite frankly, the Court, namely me, could find on

16   its own that by testifying the way you did you obstructed

17   justice by testifying falsely. The determination on whether or

18   not you obstructed justice for the purposes of an offense

19   level enhancement is determined by me through what we call a

20   preponderance of the evidence. In other words, more likely

21   than not. I don't need to make a finding on whether or not you

22   obstructed justice by providing false statements beyond a

23   reasonable doubt. Do you understand, sir?

24       **DEFENDANT DURBIN:**  Yes, sir.

25       **THE COURT:**  And knowing all of that do you still

```
1    continue to wish to choose to exercise your right to testify?
2              DEFENDANT DURBIN:  Yes, sir.
3              THE COURT:  All right, very well. Ms. Flynn, I did
4    see and I looked up this morning the state pattern instruction
5    which indicated that for the purposes of impeachment through a
6    prior conviction, that I will instruct the jury that you may
7    consider this evidence in deciding whether or not the
8    defendant is telling the truth, but for no other purpose. You
9    must not use this conviction as any evidence the defendant
10   committed the crime charged in this case. That's sort of the
11   state one, but I'm open to suggestions from anyone on what --
12             MS. FLYNN:  Your Honor, I forwarded the state
13   language to Mr. Romano last night. He sent back a tweak as he
14   says and I forwarded that to Ms. Fales. I wasn't able to print
15   it last night, so I just e-mailed that to her five or ten
16   minutes ago so it should be in --
17             THE COURT:  I tell you what, Ms. Fales is having a
18   well-deserved day off today.  So I'm going to dispatch my law
19   clerk to pull that up and to print that out.
20             MS. FLYNN:  Thank you.
21             THE COURT:  Does it model something similar to what
22   I just sort of read?
23             MR. ROMANO:  It does, Your Honor. It's to use my
24   word which Ms. Flynn just indicated, it tweaks it a little
25   bit. It's more consistent -- not that the state is
```

1  inconsistent, but there's additional language in Federal Jury

2  Instructions that says it can be used -- that his statements

3  or the convictions coupled with other evidence could be used

4  to assess credibility. That's all.

5          **THE COURT:** Understood. I will have that printed out

6  and I will include it as far as the proposed instruction.

7      Also, I would suggest that we create a redacted version

8  of the indictment. I know when I'm reading the charges in the

9  indictment, I'm excising out any of the other co-defendants,

10  but if we wanted to send the indictment back to the jury, then

11  it seems to me that we've got to have a redacted version of

12  that excising out the other co-defendants who have already

13  pled guilty. Would you agree or disagree or how do you want to

14  handle it?

15         **MS. FLYNN:** I would ask that it be redacted if it's

16  going back. I don't know why --

17         **THE COURT:** It doesn't have to go back. You know --

18         **MS. FLYNN:** I wouldn't request that it go back to

19  the jury.

20         **THE COURT:** That's fine. It won't go back, but I'll

21  read the sum and substance of what is in the charge. I've had

22  cases where it has gone back and we've redacted it, I've had

23  cases where it hasn't gone back.

24      Also, I'll need the Government at some point in time --

25  oh, Mr. Mann, I did not consult you on that, I'm sorry.

```
 1                  MR MANN:  Judge, I apologize.  My client and I were
 2      having a little bit of a conversation, so --
 3                  THE COURT:  Would you like me to review what I said?
 4                  MR MANN:  Just very quickly, I apologize.
 5                  THE COURT:  So how far back do you want me to go,
 6      the instruction?
 7                  MR MANN:  So we're not sending the instructions
 8      back?
 9                  MS. FLYNN:  No, the indictment.
10                  THE COURT:  No, we're talking about sending the
11      indictment -- I was asking whether or not the parties wish to
12      have a redacted version of the indictment sent back.  Ms. Flynn
13      indicated that she does not.  I've had instances where I have
14      sent the redacted indictment back to the jury and other
15      instances where it hasn't gone back.  So as far as your
16      client's position is concerned, would you wish to be
17      consistent with Ms. Flynn and not send it back?
18                  MR MANN:  What did Mr. Romano say?
19                  THE COURT:  Mr. Romano is up in the air.
20                  MR MANN:  I want to do the opposite of what he says.
21                  THE COURT:  So you're going to join Ms. Flynn in not
22      sending the indictment back?
23                  MR MANN:  Yes, the opposite of the Government is
24      what I want.
25                  THE COURT:  Okay, fair enough. So with that, what
```

1    I'd like to do is review the proposed instructions and if

2    everyone has a copy of that in front of them -- I had to

3    modify them slightly and I would ask Counsel to join me in

4    attempting to modify them slightly because I instruct first,

5    not last. So we need to modify that so it's done accordingly.

6        A verdict sheet, Mr. Romano, I take it the Government

7    will have that ready to go by the time this case goes back to

8    the jury?

9        **MR. ROMANO:**  We will, Your Honor. Actually, I have

10   one prepared. I can hand it up to the Court with copies to

11   Counsel now if we want to review that as part of --

12       **THE COURT:**  That's fine. We can do that as well if

13   you want to give Counsel a copy and we'll do that after we go

14   through the proposed instructions.

15       All right, we'll review the verdict sheet in a minute. So

16   if everyone has their instructions in front of them, I'm going

17   to read Court's Instruction No. 1, Introduction. Court's

18   Instruction No. 2, Instructions as a Whole: Court's

19   Instruction No. 3, Duty to Follow Instructions. Court's

20   Instruction No. 4, Jury Determines Facts. Court's Instruction

21   No. 5, Consideration of Evidence.

22       And just for the purposes of this record, I'm referring

23   to ECF document No. 138.

24       Court's Instruction No. 6, Government as a Party. We'll

25   need to have the proposed instructions sent to the chamber's

```
 1    inbox as opposed to Debbie, Ms. Fales directly. It may have

 2    been sent to Ms. Fales directly.

 3              MS. FLYNN:  It was.

 4              THE COURT:  Okay, so he can't get into her e-mail,

 5    but --

 6              MS. FLYNN:  I'll just have to turn on my hotspot.

 7              THE COURT:  What's that?

 8              MS. FLYNN:  I have to turn on my hotspot.

 9              THE COURT:  That's fine, take your time.

10     Court's Instruction No. 6, the Government as a Party. Court's

11    Instruction No. 7, Improper Consideration. Court's Instruction

12    No. 8, Sympathy. Court's Instruction No. 9, Punishment.

13    Court's Instruction No. 10, Jury to Consider Only These

14    Defendants. Court's Instruction No. 11, Indictment is Not

15    Evidence. Court's Instruction No. 12, Consider Only The

16    Charges. Court's Instruction No 13, Variance, Dates.  Court's

17    Instruction No. 14, Presumption of Innocence, Burden of Proof.

18    Court's Instruction No. 15, Direct and Circumstantial

19    Evidence. Court's Instruction No. 16, Specific Investigation

20    Techniques Not Required. Court's Instruction No. 17,

21    Stipulation of Facts. Court's Instruction No. 18, Inference To

22    Find. I modified that instruction to say that during the trial

23    -- well, during the trial you may have heard -- well, no.  I

24    won't modify it. I say, during the trial you have heard the

25    evidence and the attorneys use the term "inference" and in
```

```
1    their arguments may ask you to infer. Follow me?  Because I'm
2    instructing first. Any objection to that modification?
3              MR. ROMANO:  No, Your Honor.
4              MS. FLYNN:  No, Your Honor.
5              MR MANN:  None, Judge.
6              THE COURT:  Court's Instruction No. 19,
7    Impermissible to Infer Participation by Mere Presence. Court's
8    Instruction No. 20, Impermissible to Infer Participation From
9    Association.  Court's Instruction No. 21, Knowledge,
10   Willfulness, Intent.  Court's Instruction 22, Credibility of
11   Witnesses. Court's Instruction 23, Parties Not Bound by
12   Witness. Court's Instruction No. 24, Number of Witnesses.
13   Court's Instruction No. 25 as to Mr. Walton, Improper
14   Consideration of Defendant's Right not to Testify. Court's
15   Instruction No. 26 will be the instruction related to Mr.
16   Durbin testifying and the use of that, any impeachment
17   evidence. And specifically for the record, I'll read it.
18        "You have heard evidence that Che Durbin has been
19   convicted of one or more crimes. You may consider that
20   evidence together with other pertinent evidence in deciding
21   how much weight to give his testimony. You must not consider
22   the convictions as evidence that the defendant committed the
23   crimes charged in this case."  That will be Court's -- or
24   Instruction 26.
25             Instruction 27, Biases and Hostility. I note that -- do
```

```
 1    we have witnesses that harbored biases or hostility?

 2              MR. ROMANO:  I don't believe there's any evidence of

 3    that, Your Honor. And when you look at the instruction it

 4    says, "consider evidence of resentment or anger."  I don't

 5    think there's any evidence in the record whatsoever.

 6              THE COURT:  Right.  I flagged that.  Ms. Flynn, do

 7    you concur?

 8              MS. FLYNN:  Yes.

 9              THE COURT:  Mr. Mann, do you concur?

10         MR MANN:  Judge, I don't believe it was a witness

11    that applied to me.  I would say it may apply to Ms. Thompson,

12    but it's not pertinent to my client so I don't want to step on

13    anyone's toes.

14              THE COURT:  So in the event Ms. Flynn chooses not to

15    have the instruction read, you've got no objection to that

16    position?

17              MR MANN:  I have no objection.

18              THE COURT:  All right.  Ms. Flynn, in light of what

19    you've heard from Mr. Mann, do you wish to have that

20    instruction read?  I'm just not quite sure that we've heard

21    evidence of resentment.

22              MS. FLYNN:  You know what, I was reading the second

23    line about the Government. So yes, I would ask for it to be

24    read.

25              MR. ROMANO:  Well, Your Honor, in order to have an
```

```
1   instruction you have to have -- it has to be supported by
2   evidence.  And respectfully, I don't think there's been any
3   evidence if we're talking about Jameka Thompson, of resentment
4   or anger which some Government witness may have had towards a
5   defendant. There's been no testimony -- in fact, the testimony
6   was that she lied to protect him, she loved him, she wanted to
7   get married to him. There's nothing in the record. So I don't
8   think just out of whole cloth we can use this instruction. It
9   may be a correct statement of the law if there's evidence to
10  support it.
11          THE COURT:  Ms. Flynn, what is the evidence to
12  support any resentment or anger?
13          MS. FLYNN:  Well, it also says bias.
14          THE COURT:  Bias. So where is the evidence of bias?
15          MS. FLYNN:  Ms. Thompson did testify that Mr. Durbin
16  was involved in another relationship and that could be deemed
17  to be bias as far as why she was testifying against him.  So I
18  would agree that based on her testimony, I didn't hear anger
19  or hostility, but there could be an implicit bias given her
20  relationship with Mr. Durbin.
21          THE COURT:  I'm wondering -- and this goes back to
22  the -- I'm thinking about the testimony and it could be that
23  we heard something about her -- maybe it was her statement or
24  maybe from an examination of her endearing herself to Mr.
25  Durbin.
```

```
 1                   MS. FLYNN:  And she self-diagnosed a mental health
 2        issue.
 3                   THE COURT:  That he was --
 4                   MS. FLYNN:  Because of her relationship with Mr.
 5        Durbin.
 6                   THE COURT:  Right.  The self-diagnosis was that she
 7        was infatuated with him or --
 8                   MS. FLYNN:  Obsessed.
 9                   THE COURT:  Obsessed with him and protecting him,
10        arguably.  And I'm trying to see where -- okay, I hear you,
11        Mr. Romano.  I'm just trying to do the leap myself.
12                   MR. ROMANO:  Right. I don't think we can.
13                   THE COURT:  So she was obsessed with him and that's
14        why she violated the terms of her supervised release on
15        multiple occasions. And now is betraying him by testifying
16        against him. Does that sound right to you?
17                   MS. FLYNN:  Essentially, yes. But she also did
18        testify that she was aware that my client was in another
19        relationship. So concurrently with her obsession there was
20        arguably a love triangle.
21                   THE COURT:  Well, do you want to redact out
22        "resentment or anger" or do you want to keep that in?
23                   MS. FLYNN:  As I said, I'm not sure that she
24        specifically testified to resentment or anger, but certainly I
25        think there's a bias.
```

| | |
|---|---|
| 1 | **THE COURT:**  Okay, "so you should specifically |
| 2 | consider evidence of bias."  Is that what you would suggest |
| 3 | that at the very least modifying? |
| 4 | **MS. FLYNN:**  Yes. |
| 5 | **THE COURT:**  All right, Mr. Romano? |
| 6 | **MR. ROMANO:**  Your Honor, there's no evidence of |
| 7 | bias. If anything, she was biased towards him if we consider |
| 8 | what the Court was raising a minute ago about she was |
| 9 | infatuated with him.  There's no evidence of a love triangle. |
| 10 | She wasn't crossed about that. She wasn't asked if she was |
| 11 | jealous or had some motivation now to testify against him |
| 12 | because he was involved in another relationship. That wasn't |
| 13 | even asked of her. That's pure speculation that that's what |
| 14 | motivated her to testify. I don't see -- when you're going to |
| 15 | have an instruction, there has to be some basis or foundation |
| 16 | for it. And bias, when we're talking about bias, we're talking |
| 17 | about bias against. And, if anything, if we want to use that |
| 18 | word here, it's a bias for him. She lied to the police.  She |
| 19 | testified that when she was arrested, she lied.  And I said, |
| 20 | "Why did you lie?"  And she says, "Because I wanted to protect |
| 21 | him." |
| 22 | There's no evidence that she says now on the witness |
| 23 | stand, Yeah, I'm up here testifying about Mr. Durbin because |
| 24 | he's in a love triangle or he's in a relationship with another |
| 25 | person.  You know, she was asked about why she lied which was |

1    to protect him, which, if anything, is a bias for him.  It's

2    not a bias against him.

3        So I don't see where unless I missed it in the record,

4    that there's any evidence, you know, and let's not just gloss

5    over resentment or anger, there's still bias.  And I don't see

6    for the same reasons, there's no evidence of resentment or

7    anger. There's no evidence of bias against Mr. Durbin.

8        **THE COURT:**  Right.  The main thing it's not bias in

9    favor of him, it's bias against him.  And she testified

10   against him.  And, of course, there's going to be argument

11   that the -- I'm not quite sure.  I'm trying to figure out how

12   the argument other than for her own benefit that can be made.

13   It's not like she was angry. Ms. Flynn and Mr. Mann are going

14   to say hey, she's testifying because she wants to get a

15   reduced sentence.

16       **MR. ROMANO:**  Presumably, right.  And that's

17   argument.  That's fair argument for them.  But that doesn't

18   mean that that converts to an instruction by the Court to the

19   jury.

20       **THE COURT:**  Okay, all right.  I'm going to

21   acknowledge the request. I'm going to deny the request to read

22   this instruction. I don't believe that there's been evidence

23   demonstrating biases or resentment or anger against Mr. Durbin

24   that's been presented, but your request is noted and denied so

25   I'm going to take that one out.

```
 1          Court's Instruction looks like 27, All Available Evidence
 2    need not be produced. Court's Instruction No. 28, Court
 3    Rulings. Court's Instruction -- Government's requested
 4    instruction, Transcripts of Recording. Any objection?  It's
 5    just simply the admonishment that I had given them at the
 6    outset that the transcripts should not be admitted as
 7    evidence.
 8                MS. FLYNN:  Yes.
 9                MR MANN:  Yes, Judge.
10                THE COURT:  Okay. Indeed, is the notebook -- we were
11    talking about that, that we were going to take out the
12    transcripts in the notebook and just give them the text
13    messages.
14                MR. ROMANO:  Right.  And I think Mr. -- again, Mr.
15    Gasque with his ability, rather than rip them out he can just
16    print out those text messages in a hardcopy and that way we
17    don't need to have a book that's, you know, got pages that
18    have been ripped out of it.
19                THE COURT:  Or, quite frankly, the big Government
20    logo on top of it.
21                MR. ROMANO:  Well, we were still going to put that
22    on there. In all seriousness --
23                THE COURT:  Just the straight evidence.
24                THE CLERK: Your Honor, we're not sending any
25    physical paper back to the jury.
```

1          THE COURT:  So we're going to have to scan that.

2          THE CLERK: Everything will be on the thumb drive.

3          MS. FLYNN:  That's why I got up. I thought they were

4     already included in one of the Government's exhibits that was

5     uploaded.  Along with the calls, the text messages are printed

6     in one of the folders.  Am I right?

7          MR. ROMANO:  I don't know why -- I mean, what's the

8     aversion to paper?  I'm sorry, I'm missing this.

9          THE COURT:  I don't see -- I mean, we can -- as long

10    as the tabbed exhibit is not part of the thumb drive that is

11    included in the thumb drive that's going to go back, I've got

12    no problem with submitting a paper exhibit.

13         MR. ROMANO:  Thank you, Your Honor.

14         MS. FLYNN:  But Your Honor, it's duplicative of what

15    they're getting on the thumb drive.

16         THE COURT:  Well, my point is -- well, if it's

17    duplicative of what they're getting on the thumb drive, that's

18    fine. But my point is what they've got on the thumb drive

19    should not include transcripts.

20         MS. FLYNN:  I agree with you.  I understand that.

21         THE COURT:  Right.

22         MS. FLYNN:  I guess this is my question: I don't

23    want to emphasize one piece of evidence versus the other. So

24    we're not sending them any other paper.

25         THE COURT:  That's fine. I've got no issues. My

 1  whole issue, Ms. Flynn, is that I don't want the transcripts

 2  going back there. And if the transcripts are included on an

 3  electronic filing that was submitted by the Government as part

 4  of the package of the big notebook package, then those are

 5  going to have to be excised out of what goes back to the jury.

 6          **MS. FLYNN:** I would just ask that they be deleted by

 7  the thumb drive portion that's going to the jury.

 8          **THE COURT:** When I said "excised," that's exactly

 9  what I meant. Can we accomplish that?

10          **THE CLERK:** So what happened is I did get a new thumb

11  drive from Mr. Gasque this morning. Right now IT has it to

12  make sure there's no bugs or anything on it so they have to

13  scan it before I can actually plug it back into the computer,

14  check all the admitted exhibits that were admitted. So once I

15  get that back I can do that. We can wait until maybe the jury

16  goes to lunch and I can take time out to go over everything.

17          **THE COURT:** That's fine. And just like we would at

18  the conclusion of any case when we had the hard exhibits, I

19  always ask Counsel to get together, review exactly what is

20  going back to the jury and take a look at it before it goes

21  back there. So that would be one sort of thing that you'll put

22  on your checklist to make sure okay, we're going to make sure

23  these transcripts aren't going back, but we'll also have the

24  -- we'll have the text messages go back.

25          **MS. FLYNN:** And just for the record, I don't have an

 1  aversion to paper, I just think it has to be all or nothing.

 2  Like everything goes back in paper form or not.

 3          **THE COURT:**  I agree. I mean, I think that parsing it

 4  out -- I'm not quite sure that will make a huge difference,

 5  but I see your point that it might emphasize one portion of

 6  evidence over the other especially if I don't give an

 7  instruction on that, like "ladies and gentlemen, we're giving

 8  this to you.  Don't provide any additional weight to it

 9  because it's being handed to you in paper form over electronic

10  form, it's just simply for the purposes of party convenience."

11  I could give an instruction like that which would moot it, but

12  it seems to me that we can easily accomplish it this way.

13      Government's Jury Instruction No. 2, Wiretaps. Any

14  objection?

15          **MS. FLYNN:**  No.

16          **THE COURT:**  Any objection?

17          **MR MANN:**  None, Judge.

18          **THE COURT:**  Government's Requested Jury Instruction

19  No. 3, I'm going to excise out "or defense." I don't believe

20  there's any defense summary evidence. Any objection to this

21  instruction?

22          **MR MANN:**  None, Judge.

23          **MS. FLYNN:**  No.

24          **THE COURT:**  Government's Requested Jury Instruction

25  No. 4, Witness Credibility. Any objection?

1          **MS. FLYNN:**  No, Your Honor.

2          **MR MANN:**  None, Judge.

3          **THE COURT:**  Government's Requested Jury Instruction

4     No. 5, Accomplices Called by Government. Any objection?

5          **MS. FLYNN:**  No, Your Honor.

6          **MR MANN:**  No, Judge.

7          **THE COURT:**  Government's Requested Instruction No.

8     6, Co-defendants' Plea Agreement. Any objection?

9          **MS. FLYNN:**  No, Your Honor.

10          **MR MANN:**  No, Judge.

11          **THE COURT:**  Government's Requested Jury Instruction

12     No. 7, Expert Witnesses -- Expert Witness. I've made a

13     redaction to make the reference to the expert witness in the

14     masculine. I've also added in, "I have permitted a witness."

15     So I believe there's only been one singular expert witness --

16     oh, there have been two.

17          **MR. ROMANO:**  The chemist, Your Honor.

18          **THE COURT:**  Right, thank you.

19          **MR. ROMANO:**  So it would say "he or she."

20          **THE COURT:**  Thank you very much. You are absolutely

21     right.

22          **MR. ROMANO:**  So like the last -- the third line from

23     the bottom is you will have to pluralize it "because I allowed

24     the witness," it should be "witnesses."

25          **THE COURT:**  "Allowed the witnesses," right. Got it.

1    Thank you. Government's Requested Jury Instruction No. 8,

2    Multiple Counts, One Defendant.  Court's Instruction No. 9,

3    Introduction To -- oh, is that a Government instruction?  Oh,

4    any objection to Government Instruction No. 8?

5            **MS. FLYNN:**  No, Your Honor.

6            **MR MANN:**  No, Judge.

7            **THE COURT:**  Court's Instruction No. 9, Introduction

8    to Charges.  Government's Requested Instruction No. 10, Count

9    One. I'm going to read the indictment sections, excising out

10   reference to any other defendant in the case.

11       Government's Requested Instruction No. 11, Conspiracy,

12   Purpose of Statute. Any objection?

13           **MS. FLYNN:**  Your Honor, I would object to this. I'm

14   not sure that it's necessary to instruct the jury as to why

15   Congress has decided that this needs to be a separate crime.

16   They're going to be advised as to what the crime is, but why

17   it's a crime I'm not sure is relevant to the jury's evaluation

18   of the facts in deciding if our clients are guilty or not

19   guilty of that crime.

20           **THE COURT:**  Mr. Romano?

21           **MR. ROMANO:**  Your Honor, it's a correct statement of

22   law.  It comes from Sand and Siffert.  I would ask the Court

23   to give it.

24           **THE COURT:**  All right. Objection noted, overruled.

25   Mr. Mann, do you join Ms. Flynn's objection?

```
1              MR MANN:  Yes, Judge.

2              THE COURT:  Thank you.  Government's Requested

3    Instruction No. 12, any objection?

4              MS. FLYNN:  No, Your Honor.

5              MR MANN:  No, Judge.

6              THE COURT:  Government's Requested Jury Instruction

7    No. 13, Elements of Conspiracy, Count One. Any objection?

8              MS. FLYNN:  No, Your Honor.

9              MR MANN:  No.

10             THE COURT:  Government's Requested Jury Instruction

11   No. 14, Existence of Agreement.

12             MS. FLYNN:  No objection.

13             MR MANN:  None.

14             THE COURT:  Government's Requested Jury Instruction

15   No. 15, Membership in Conspiracy. Any objection?

16             MS. FLYNN:  No, Your Honor.

17             MR MANN:  Nope.

18             THE COURT:  Government's Requested Jury Instruction

19   No. 16, Membership in Conspiracy. Any objection?

20             MS. FLYNN:  No, Your Honor.

21             MR MANN:  Nope.

22             THE COURT:  Government's Requested Jury Instruction

23   No. 17, Acts and Declaration of Co-conspirators. Any

24   objection?

25             MS. FLYNN:  No, Your Honor.
```

```
 1              MR MANN:  None.

 2              THE COURT:  Okay. Government's Requested Jury

 3    Instruction No. 18, Definition of Distribution. Any objection?

 4              MS. FLYNN:  No, Your Honor.

 5              MR MANN:  None.

 6              THE COURT:  Government's Requested Jury Instruction

 7    No. 19, Definition of Possession. Any objection?

 8              MS. FLYNN:  No, Your Honor.

 9              MR MANN:  None, Judge.

10              THE COURT:  Government's Requested Jury Instruction

11    No. 20, Inference of Control Over Place Where Found. Any

12    objection?

13              MS. FLYNN:  No, Your Honor.

14              MR MANN:  None from me, Judge.

15              THE COURT:  Government's Requested Jury Instruction

16    No. 21, Proof of Intent.  Any objection?

17              MS. FLYNN:  No.

18              MR MANN:  No, Your Honor.

19              THE COURT:  Government's Requested Jury Instruction

20    No. 22, Amount of Controlled Substance. Any objections?

21              MS. FLYNN:  No.

22              THE COURT:  Government's Requested Jury Instruction

23    No. 23, Counts Two and Three.  Any objection?

24              MS. FLYNN:  No, Your Honor.

25              MR MANN:  None, Judge.
```

```
 1              THE COURT:  Government's Requested Jury Instruction
 2    No. 24, Counts Two and Three, Elements of Offense. Any
 3    objection?
 4              MS. FLYNN:  No, Your Honor.
 5              MR MANN:  Judge, when you read it will you read it
 6    as "Counts Two and Three, Elements of the Offense?"  I just
 7    want to know how you will address the jury as to that.
 8              THE COURT:  Right.
 9              MR MANN:  Actually, and before you answer that, I
10    guess my question is when you read it, do you read it sort of
11    as a narrative to the jury?  Some judges -- it won't say, you
12    know, and now definition of possession.  It will -- they will
13    just read it as a narrative as continuing and continuing and
14    continuing.
15              THE COURT:  I'm going to read what's in the
16    parenthetical. I'll say, "Proof of intent. Intent ordinarily
17    may not be proved by so and so." And they will see -- if
18    they're looking, they'll see me flip the page and then I'm
19    going to begin Counts Two and Three, elements of offense.
20              MR MANN:  Okay, yes.
21              THE COURT:  And I'll go right into it.
22              MR MANN:  Thank you for clarifying. No objection,
23    Judge.
24              THE COURT:  Counts Two and Three, Knowledge that the
25    Drugs were Narcotics, Government's Jury Instruction 25. Any
```

```
 1    objection?

 2              MS. FLYNN:  No, Your Honor.

 3              MR MANN:  None, Judge.

 4              THE COURT:  Counts -- Government's Requested Jury

 5    Instruction 26, Counts Two and Three, Method of Proving

 6    Knowledge. Any objection?

 7              MS. FLYNN:  No.

 8              MR MANN:  No, Judge.

 9              THE COURT:  Government's Requested Instruction 27,

10    Counts Two and Three, Joint Possession. Any objection?

11              MS. FLYNN:  No.

12              MR MANN:  No.

13              THE COURT:  Government's Requested Instruction 28,

14    Counts Two and Three, Intent to Distribute. Any objection?

15              MS. FLYNN:  No, Your Honor.

16              MR MANN:  No.

17              THE COURT:  Government's requested instruction 29,

18    Aiding and Abetting. Any objection?

19              MS. FLYNN:  No, Your Honor.

20              MR MANN:  Not as it is written here, Judge.  Thank

21    you.

22              THE COURT:  Government's Requested Jury Instruction

23    No. 30, Type and Amount of Controlled Substance, Counts Two

24    and Three. Any objection?

25              MS. FLYNN:  No.
```

```
1                    MR MANN:  None from me, Judge.

2                    THE COURT:  Court's 29 -- Court's Instruction No.

3      29, Duty to Deliberate.

4                    MS. FLYNN:  I have no objection. I have it listed as

5      31 for the sake of argument.

6                    MR. ROMANO:  Because we eliminated a couple

7      instructions.

8                    THE COURT:  Right. We just eliminated -- we're going

9      from Government's instructions to Court instructions. I

10     typically read these instructions right before I provide -- I

11     let them go back. So in other words, it will be after closing,

12     after closings, but in this particular instruction I'll read

13     it before closings. So I'm going to do Duty to Deliberate:

14     "Your verdict must represent the considered judgment of each

15     of you." And then after your closings I'm going to read

16     Communications with the Court, as well as the Verdict Form

17     before they go back to the jury room after closings. That will

18     be one of the last instructions that I provide, as well as

19     Reaching a Verdict. So there are three instructions that I

20     will give after your closing argument.

21                    MS. FLYNN:  Just to clarify, Your Honor, does that

22     mean you'll show them the verdict sheet after we've closed?

23     They won't see it before?

24                    THE COURT:  Correct, correct. They won't see it

25     before, unless you'd like to show that to them. If you want to
```

```
 1    show it to them, that's fine. But I typically when I talk
 2    about the verdict sheet, I hold it up and I sort of go through
 3    the questions with them and what they need to do. But if you
 4    wanted to show it to them ahead of time, I've got no problem
 5    with that.
 6              MS. FLYNN:  Okay.
 7              THE COURT:  And what we'll do is we'll take out
 8    "Government's proposed verdict form" obviously in that verdict
 9    sheet and we'll just say "verdict form." And then any
10    objections to the verdict form as I just modified it?
11              MS. FLYNN:  Preliminarily, Your Honor, I would ask
12    that the first question that it be "not guilty" and "guilty."
13    As opposed to "guilty" -- as opposed to this way.
14              THE COURT:  Any objection?
15              MR. ROMANO:  Yeah, Your Honor.  Where I come from
16    by the alphabet we start with G and then work the other way
17    around.  So it should be guilty and not guilty.
18              THE COURT:  Oh boy.
19              MS. FLYNN:  Where I come from they're presumed
20    innocent until proven guilty.
21              THE COURT:  But then where he comes from, he's got
22    the burden of proof.
23              MR. ROMANO:  Right.  And it's alphabetical.  So this
24    is the form -- not that the Court is bound by it, but this is
25    the form that we traditionally and typically use.
```

```
1              THE COURT:  I've never -- Ms. Flynn, I note that.
2    Alphabetically it makes sense to me.  I don't -- I'm not quite
3    sure I've never seen the "not guilty" go first. It's the
4    Government's burden of proof.  I understand the presumption of
5    innocence, but that's something that we can discuss in
6    argument.  Plus in my final instructions and I'm going to hear
7    from Mr. Mann before I make a final conclusion on this -- but
8    in my instructions, I'm going to tell them how do you find --
9    if you find him not guilty, you check this box. If you find
10   him guilty, you check this box. I mean, I'm going to spell
11   that out for them so it's not like there's going to be any
12   ambiguity or any confusion.
13             MS. FLYNN:  Okay, well if you would note my
14   objection.
15             THE COURT:  Your objection is noted. But I promise
16   you, I'm going to make it perfectly clear that if the
17   Government -- if you find -- "How do you find as to Che Durbin
18   as to Count One?  If you find him guilty, you'll check this
19   box. If you find him not guilty, you'll check this box." And I
20   will put enough emphasis in it that the fact that one is
21   placed in front of the other doesn't necessarily mean that
22   it's suggestive of one way or the other.  All right?  Mr.
23   Mann?
24             MR MANN:  Judge, I was joining Ms. Flynn.
25             THE COURT:  Noted.
                              * * * * *
```

```
 1                    THE COURT:  Mr. Durbin.

 2                    DEFENDANT DURBIN:  Yes.

 3                    THE COURT:  If you could, if you've been fully

 4       vaccinated, you may remove your mask. If you choose to not

 5       remove your mask or you have not been fully vaccinated, then

 6       you shall remain masked. Do you understand, sir?

 7                    DEFENDANT DURBIN:  Yes, sir.

 8                    THE COURT:  All right, very good. If you could,

 9       please state and spell your full name for the record.  You can

10       remain seated.

11                    DEFENDANT DURBIN:  Thank you. Che Durbin.  C-h-e

12       D-u-r-b-i-n.

13                    THE COURT:  All right, Ms. Flynn, at your pleasure.

14                    MS. FLYNN:  Thank you.

15                      D I R E C T   E X A M I N A T I O N

16       BY MS. FLYNN:

17       Q.   Good morning, Mr. Durbin.

18       A.   Good morning.

19       Q.   Can you hear me?

20       A.   Yes.

21       Q.   I need to remind you to keep your voice up because you're

22       being recorded and the jury needs to hear you and because of

23       masks, that's sometimes difficult.

24       A.   All right.

25       Q.   And it's my understanding you're half vaxed; is that
```

```
 1    correct?
 2    A.    Yes.
 3    Q.    How old are you?
 4    A.    43.
 5    Q.    In 2019 where were you living?
 6    A.    1487 Wellspring Drive.
 7    Q.    And in 2020 where were you living?
 8    A.    1487 Wellspring Drive.
 9    Q.    How long had you been living there?
10    A.    At this time in 2019, probably for about a year.
11    Q.    Okay.  And is that in Harford County?
12    A.    Yes.
13    Q.    Did you grow up in Harford County?
14    A.    Yes.
15    Q.    And do you have family members in Harford County?
16    A.    Yes.
17    Q.    Does your mother live in Harford County?
18    A.    Yes.
19    Q.    Where does she live?
20    A.    1003 Warwick Drive.
21    Q.    And do you have a grandmother in Harford County?
22    A.    Yes.
23    Q.    And where does she live?
24    A.    901 Barnett Lane.
25    Q.    And what is your mother's name?
```

1    A.    Sheryl Durbin.

2    Q.    And what's your grandmother's name?

3    A.    Doris Durbin.

4    Q.    And do you also have a significant other?

5    A.    Yes.

6    Q.    And what's her name?

7    A.    Tracy Murray.

8    Q.    And where does she live?

9    A.    1487 Wellspring Drive.

10   Q.    Okay. So the two of you live together?

11   A.    Yes.

12   Q.    Okay.  And how long have you been living together?

13   A.    Well, probably for since 2009.

14   Q.    All right. On and off?

15   A.    Yeah.

16   Q.    I mean, as long as you were in Maryland, is that where

17   you were living?

18   A.    Yes.

19   Q.    Now do you have any prior criminal convictions that you

20   received in the last ten years or where the sentence was

21   completed in the last ten years?

22   A.    Yes.

23   Q.    And are those convictions regarding narcotics?

24   A.    Yes.

25   Q.    Are those convictions for Possession with Intent to

```
 1    Distribute narcotics?

 2    A.    Yes.

 3    Q.    Did you receive one of those convictions in this court?

 4    A.    Yes.

 5    Q.    Did you receive one of those convictions in Harford

 6    County Circuit Court?

 7    A.    Yes.

 8    Q.    And did you serve time for those convictions?

 9    A.    Yes.

10    Q.    So when were you ultimately released?

11    A.    2016.

12    Q.    And at that point did you move back with Tracy Murray?

13    A.    Yes.

14    Q.    And then what were you doing for a living?  How did you

15    make money after you got out of jail?

16    A.    Well, I was driving -- when I first got out of jail I was

17    working for a truck company, GCC Equipment. So probably after

18    a year-and-a-half doing that, they let me go because of

19    insurance purposes because I had got in an accident.  So then

20    I was working like privately for a friend that I know.  He has

21    a truck -- I was working three days a week out of that.  And

22    then I got an LLC with selling cars. I was under somebody's

23    dealer's license selling cars.

24    Q.    Okay. So when you say you got an LLC, did you create an

25    LLC?
```

```
 1    A.    No.
 2    Q.    Okay.  So you were working under somebody else's dealer's
 3    license?
 4    A.    Right.
 5    Q.    And how does that work selling cars in that way?
 6    A.    Well, I receive -- I get a card so I'm able to go to
 7    different auctions like Manheim, BWI, Manheim and all the
 8    auctions basically in the country.
 9    Q.    Okay. Because you have the dealer's license you're
10    entitled to do that?
11    A.    Yes.
12    Q.    And then what would you do with the cars once you bought
13    them at the auction?
14    A.    Well, I would sell them.
15    Q.    Okay. Did you fix them up or --
16    A.    Some of them had to be fixed, yes.  Some of them had to
17    be fixed.
18    Q.    Okay. Now did there come a time when you discovered that
19    some of these cars were not -- might have been stolen
20    vehicles?
21    A.    Yes.  Well, when I first got my license like I was
22    selling quite a few, so it came a point where the person that
23    I was under, he was telling me that I couldn't sell with a
24    certain amount of cars because of taxes.  So he was limiting
25    like how many cars I was able to sell because he was also --
```

```
 1    he had about three or four other people and for tax purposes
 2    he was like well, you know, we don't want you to buy cars over
 3    this amount or that amount.
 4    Q.   And so did you do something else in order to maintain
 5    your car sales business?
 6    A.   Yes.  I was introduced to somebody.  Or in the beginning
 7    I was introduced to somebody and I was believing -- I was
 8    under the assumption that the cars that I was getting, being
 9    as though he had a title with them, that they were legal. But
10    after a certain point I realized that the vehicles weren't
11    legal because of the price of the car and, you know,
12    everything that was involved in it.
13    Q.   All right.  So when you say you received a title, what do
14    you mean by that, like you just --
15    A.   Like in the beginning I was under the assumption if the
16    car had a title, then it was legal. But then after like a
17    little research, like I had took a car -- I had bought a car
18    and took a car to somebody that I know works for a car dealer.
19    And once I took it to him, he ran the title and then he
20    checked the car and he was like, the VIN is not even right.
21    Q.   The VIN number?
22    A.   Yeah, the VIN number. He said the VIN numbers don't even
23    match up. So when I was buying these cars in the beginning, I
24    never knew that the VIN numbers didn't match. I never even
25    checked it. I got the title and I seen that it looked like the
```

**JA235**

```
 1   title -- the car that was on the title, it looked like that's
 2   what I had and I just went with it from there.
 3   Q.   Okay. So at some point you become aware that the cars
 4   that you were selling were not legit; is that a fair way to
 5   say it?
 6   A.   Yes.
 7   Q.   Did that stop you?
 8   A.   No.
 9   Q.   Okay.  Were you making a profit selling these cars?
10   A.   Yes.
11   Q.   So where would you sell these stolen vehicles with titles
12   that were maybe on their face legit, but really weren't?
13   A.   Well, I would go to people that were, like, in the
14   streets basically that I know that didn't care.
15   Q.   Okay.
16   A.   And I would tell them that like, well, it has a title to
17   it.  You would be able to legally, legally you can register
18   these cars, legally you can register them, but if there come a
19   time where you don't want the car no more, you have to sell
20   the car to somebody else that didn't care about the background
21   of the car.
22   Q.   All right. So you could legally register it, but
23   ultimately your ownership was --
24   A.   Ultimately if you tried to get rid of that car to
25   another, like a legit car dealership like to trade it in or
```

**JA236**

```
 1    something, you was gonna get caught.
 2    Q.   Okay. But could you insure the car if you had the title?
 3    A.   Yes.
 4    Q.   Could the buyer insure the car?
 5    A.   Yeah, because you could go to a tag and title place and
 6    they would read the title and it was like the title was legit,
 7    but the car wasn't.
 8    Q.   Okay.  And was there a particular source where you would
 9    buy these vehicles?
10    A.   Yes, I had a couple of them.
11    Q.   Okay.  And do you know Jack Anderson?
12    A.   Yes.
13    Q.   And do you know where he lives?
14    A.   Well, he has two addresses.
15    Q.   And do you know those two addresses?
16    A.   One was in Arizona and one was in White Marsh.
17    Q.   Do you happen to know, did he grow up in Maryland or did
18    he grow up in Arizona?
19    A.   He grew up in Arizona.
20    Q.   And so why, do you know why he has a place in Maryland?
21    A.   Well, under my -- from my knowledge from what I know is
22    he had, like, a drug business in Maryland.
23    Q.   Okay. Now was Jack Anderson involved with this vehicle
24    sales scheme?
25    A.   Yes, he was. He was also, like, he would tell me the kind
```

```
1   of cars that his friends wanted and then I would tell the
2   people that I was dealing with who was getting the cars and
3   they would go get the cars that he wanted.
4   Q.   Now the people that you would direct to go get the cars,
5   did you direct them to steal the cars or just --
6   A.   No, no.
7   Q.   Okay.
8   A.   No, I just tell whoever asks me for a car I would just
9   send them what it was that they wanted and then they would
10  call me when they had it.
11  Q.   And do you know to whom Jack was selling these cars?
12  A.   Well, he sold them to -- a couple, like in a couple
13  videos you saw like that black Challenger.  That was one of
14  the cars. And the phone conversation I had a reference to the
15  Challenger and the blue one. That was another car that was
16  stolen. But like the trucks that I used to get for him he used
17  to give them to the Mexicans in Arizona and they would take
18  them back home.
19  Q.   Across the border?
20  A.   Yeah.
21  Q.   Where maybe the documentation --
22  A.   It don't matter.
23  Q.   Didn't apply?
24  A.   Yeah, it don't matter, yeah.
25  Q.   So how long would you say you and Mr. Anderson sort of
```

```
1    worked this car thing together?
2    A.   Probably about a year.
3    Q.   Okay.  So I want to ask you some specific questions
4    regarding the evidence that the Government has provided in
5    this case, okay?
6    A.   Yes.
7    Q.   So initially, do you know Jameka Thompson?
8    A.   Yes.
9    Q.   And how do you know Jameka Thompson?
10   A.   We was in a relationship.
11   Q.   And do you recall how and where you met her?
12   A.   Well, I met her in August, 2017. I know she said '18, but
13   it was really '17 is when I met her, yes.
14   Q.   When did you two start in a relationship?
15   A.   Probably soon after that.
16   Q.   And at the time were you living with Ms. Murray?
17   A.   Yes.
18   Q.   And did Ms. Murray know about Ms. Thompson?
19   A.   No.
20   Q.   Did Ms. Thompson know about Ms. Murray?
21   A.   Yes.
22   Q.   Now when you say you were in a relationship, would you
23   say you were boyfriend/girlfriend, was it like a regular --
24   A.   It was a regular, like, you know, I had a girlfriend.
25   Q.   But would you spend her birthday with her, for instance?
```

```
 1   A.    Maybe around her birthday.
 2   Q.    Okay. And did there -- well, strike that. You heard what
 3   Ms. Thompson testified to; is that correct?
 4   A.    Yes.
 5   Q.    And you heard she was involved in transporting cocaine
 6   from Arizona; is that correct?
 7   A.    Yes.
 8   Q.    Were you involved with her activity in transporting
 9   cocaine from Arizona?
10   A.    No.
11   Q.    Were you involved with her distributing cocaine in
12   Maryland?
13   A.    No. I don't know how to distribute cocaine.  I just know
14   that she was driving from Arizona to Maryland.
15   Q.    Okay.
16   A.    I don't know nothing about her distributing in Maryland.
17   Q.    Okay. So let me direct your attention specifically to May
18   17th of 2019.
19   A.    Yes.
20   Q.    Do you recall seeing that video that the Government
21   introduced that was filmed from the second floor of an
22   apartment?
23   A.    Yes.
24   Q.    Was that you on the video?
25   A.    Yes.
```

1    Q.   Can you describe to the ladies and gentlemen of the jury

2    what happened that day?

3    A.   Well, that day -- earlier in that day I got a text from

4    Jameka saying that she was waiting on a package from Jack and

5    I said "Oh, okay." And then she told me, "Well, I put it in

6    the --

7              MR. ROMANO:  Your Honor, I'm going to object. I'm

8    going to object to the hearsay testimony.

9              THE COURT:  Sustained.

10   BY MS. FLYNN:

11   Q.   Okay, Mr. Durbin, you can't testify as to what Jameka

12   said to you, but you can testify as to what you did as a

13   result of what Jameka said to you.

14   A.   Well --

15   Q.   Did there come a point when you went to -- whose house

16   was that?

17   A.   That's my mother's house.

18   Q.   Did there come a point when you went to your mother's

19   house?

20   A.   Yeah, I got a call -- actually, I got a call from my

21   mother saying that Jameka --

22             MR. ROMANO:  Objection.

23             THE COURT:  Sustained.

24   BY MS. FLYNN:

25   Q.   Okay, Mr. Durbin, you can't testify as to what other

```
 1    people said to you, okay?

 2    A.   Okay.

 3    Q.   You can testify as to what you did -- hold on -- as a

 4    result of what somebody said to you, okay?

 5    A.   Okay.

 6    Q.   So did there come a point that you went to your mother's

 7    house?

 8    A.   Yes.

 9    Q.   And did you do that at the direction of somebody else?

10    A.   No.

11    Q.   Did you do that because somebody asked you to?

12    A.   No.

13    Q.   Well, why did you go there that day?

14    A.   Because I go there -- that's my mother. I go to my

15    mother's house every day.

16    Q.   Okay. And were you there waiting for the mailman?

17    A.   No.

18    Q.   Did you see the mailman show up?

19    A.   Yes.

20    Q.   Okay. When you got there, like when we saw you outside on

21    that video, where was Jameka?

22    A.   I believe she was in the house at the time.

23    Q.   Okay. Inside your mother's apartment?

24    A.   Yes.

25    Q.   And was your mother there?
```

```
 1    A.    Yes.
 2    Q.    Okay. So let me just ask you this:  True Homes, LLC, what
 3    was that?
 4    A.    That was an LLC that she created because she was trying
 5    to get into the real estate business.
 6    Q.    Okay. She testified that it had something to do with a
 7    trucking business?
 8    A.    No, it was a real estate business, but being as though I
 9    asked her could I put my trucking business under her LLC.
10    Q.    Okay, so did you do that?
11    A.    Yes, she did that.
12    Q.    Okay. Did you have anything to do with the paperwork?
13    A.    No, I didn't have nothing to do with it at all.
14    Q.    Did she ever get into the real estate business?
15    A.    She went to real estate class. She went to classes.
16    Q.    Do you know if she ever got her license?
17    A.    No, she didn't.
18    Q.    Okay. So that day on May 17, 2019, we saw you out in
19    front of the house; is that correct?
20    A.    Yes.
21    Q.    And the Government's witness actually testified that you
22    appeared to be anxious and pacing back and forth on the phone.
23    Do you remember that?
24    A.    Yes.
25    Q.    So can you describe to the ladies and gentlemen of the
```

```
 1    jury what you were doing?
 2    A.   I was waiting on -- I pick my mail up from there every
 3    day.
 4    Q.   So is that your mailing address?
 5    A.   Yes.
 6    Q.   You don't have mail going to Wellspring as a general
 7    proposition?
 8    A.   No, not really. I have, like, some things, but most of my
 9    mail goes to my mother's house because my mother doesn't move.
10    That's been my mailing address there since 1997.
11    Q.   Okay.  So were you anxious that day?
12    A.   No.
13    Q.   Were you pacing back and forth feeling anxiety?
14    A.   No.
15    Q.   Is that just something you do when you're on the phone?
16    A.   Yeah, and plus I was smoking. I was smoking marijuana so
17    I don't know if that had anything to do with it.
18    Q.   Okay.  And can you smoke inside your mom's house?
19    A.   Absolutely not.
20    Q.   Okay.  So did you go -- I mean, what happened when the
21    mailman showed up?
22    A.   The mailman showed up and he asked me about a particular
23    box. He asked me did the box belong to me because it had my
24    mother's address on it and I told him no. And then he was
25    like, well, I never seen this, no mail like this LLC come to
```

```
 1    this address before. And then Jameka walked out the door and
 2    then I said it belong to her.
 3    Q.   And so who took the package?
 4    A.   She didn't -- she took the package and went in my
 5    mother's house and then that's when I left.
 6    Q.   And where did you go?
 7    A.   Well, I was driving and I got on Route 40 and then I got
 8    pulled over by the police.
 9    Q.   Okay, did you get arrested?
10    A.   Yes.
11    Q.   All right. Now did you see Jameka leave?
12    A.   No.
13    Q.   Now that video that we saw of Jameka putting the package
14    in the car, moving it from the front seat to the back seat,
15    were you present when any of that was happening?
16    A.   At that point I was already detained.
17    Q.   Okay.  And you were pulled over on the side of the road
18    at that point?
19    A.   Yes.
20    Q.   All right. Do you know where she was going with the
21    package?
22    A.   Yes.
23    Q.   Where is that?
24    A.   To Candace, to her other apartment.
25    Q.   Okay, so this other apartment?
```

```
1    A.    Yes.

2    Q.    Who lived there?

3    A.    Candace, a girl named Candace, yeah.

4    Q.    And did Jameka -- Jameka testified she had a key to that

5    apartment; is that correct?

6    A.    Yes.

7    Q.    Did you have a key to that apartment?

8    A.    No.

9    Q.    And Candace was living there; is that correct?

10   A.    Yes.

11   Q.    And how do you know that's where Jameka was planning on

12   going?

13   A.    Because she told me that's who the package belonged to.

14   Q.    Okay.

15         MR. ROMANO:  Objection. Move to strike.

16         THE COURT:  Sustained. Jury shall disregard the last

17   answer.

18   BY MS. FLYNN:

19   Q.    So Mr. Durbin, was that package meant for you?

20   A.    No.

21   Q.    Did you know what was in that package?

22   A.    She told me.

23   Q.    Ms. Thompson?

24   A.    Yes.

25   Q.    Did you have personal knowledge of what was in that
```

```
 1   package?
 2   A.   No.
 3   Q.   Was that -- as I said, was that package directed to you?
 4   A.   No.
 5   Q.   Do you know who that package was from?
 6   A.   Jack.
 7   Q.   All right. Do you -- but Jack's name was not on the
 8   return address; is that correct?
 9   A.   Right.
10   Q.   Okay. Now there was another package that we heard
11   testimony about with I think it was approximately $82,000.
12   A.   Yes.
13   Q.   Okay. And that was a package that was addressed from you
14   to Jack Anderson; is that correct?
15   A.   Yes.
16   Q.   Did you send that package?
17   A.   No.
18   Q.   Did you package up what was in it?
19   A.   No.
20   Q.   Were you aware that there was 82,000 in there?
21   A.   Yes.
22   Q.   Okay.  And you were aware that the return address was
23   yours; is that correct?
24   A.   I never seen the package mailed out at all. I had the box
25   at first. I just had the box.
```

```
 1    Q.    Okay, well let me ask you, were there times at which you
 2    sent Jack Anderson money?
 3    A.    No.
 4    Q.    All right. Now you were aware that your fingerprint was
 5    on the Beats box; is that correct?
 6    A.    Yes, yes.
 7    Q.    Do you have an explanation of how that came about?
 8    A.    Because I was supposed to -- I was supposed to got three
 9    Suburbans for Jack, but the three Suburbans that my friend had
10    had, they didn't have no titles with them, so Jack didn't want
11    them because he couldn't -- because he was selling them to
12    Mexicans and they didn't have the title. He didn't want
13    nothing that didn't have a title with it. So I gave the box
14    back to Jameka.
15    Q.    I'm sorry, I don't quite understand that. Why did you
16    have the box in your hand at all?
17    A.    Because he gave me -- because she gave me the box to get
18    the vehicles, but when I went to go get the vehicles, I didn't
19    have the right paperwork to it.
20    Q.    Okay. Now there came a point in May of 2020, I'm going to
21    say May 6, 7, 8, right around there when you were driving to
22    Arizona; is that correct?
23    A.    Yes.
24    Q.    And what vehicle were you driving to Arizona?
25    A.    The Chevy Suburban.
```

                                    *****

```
1   Q.   Were you in the Harford County Detention Center?

2   A.   Yes, I was.

3   Q.   Did you make this call?

4   A.   No.

5   Q.   All right.  Now Mr. Durbin, you heard Ms. Anderson -- I'm

6   sorry, you heard Ms. Thompson testify that she was doing all

7   of that activity at your direction. Do you recall that?

8   A.   Right.

9   Q.   Were you telling her what to do?

10  A.   No.

11  Q.   Were you involved in her drug business?

12  A.   No.

13  Q.   Why not?

14  A.   Well, I told her in the beginning that I didn't want to

15  be involved with whatever her and Jack had going on.

16  Q.   Why not?

17  A.   I already been -- like I can't explain being involved

18  with that another time, like my penalties was too harsh to be

19  dealing with that type of drugs.

20  Q.   Is that because you had been convicted previously?

21  A.   Because I had been convicted, yes.

22  Q.   And you were aware of what would happen to you if you got

23  back into that business?

24  A.   Right.

25  Q.   Now you're aware, you just testified for half-an-hour
```

```
 1    about selling marijuana, right?
 2    A.   Right.
 3    Q.   And you're aware that that's illegal, right?
 4    A.   Yes.
 5    Q.   Okay. And you also testified about selling stolen cars,
 6    right?
 7    A.   Yes.
 8    Q.   And you're aware that's illegal, right?
 9    A.   Yes.
10    Q.   Okay. So you were willing to engage in illegal activity;
11    is that correct?
12    A.   Yes.
13    Q.   But you weren't willing to engage in the cocaine
14    business, right?
15    A.   No, no.
16    Q.   How do you distinguish those?
17             MR. ROMANO:  Objection.
18             THE COURT:  Overruled.  You can answer.
19    BY MS. FLYNN:
20    Q.   You can answer. What's the difference to you?
21    A.   To me, well, the penalties for me is I just didn't want
22    to be involved in that, in selling no crack or no cocaine. I
23    just didn't want to be involved. That's something she, she,
24    she, she needed money and that's something she wanted to do
25    with him on her own. And I told her when she, when she, when I
```

```
 1   was aware of what she wanted to do and she told me what she
 2   wanted to do I told her I didn't want to be involved in it.
 3   Q.   But you had actually introduced her to Jack; is that
 4   correct?
 5   A.   Yes.
 6   Q.   Okay. So speaking of money, Ms. Thompson said you were
 7   paying all her bills.
 8   A.   That's not true.
 9   Q.   Do you recall that?
10   A.   That's not true.
11   Q.   Were you paying all her bills?
12   A.   No.
13   Q.   Now do you know how she was paying rent -- well, strike
14   that. The rent on the place that she was living in after she
15   left Aberdeen Proving Grounds, were you paying that rent?
16   A.   No.
17   Q.   Were you paying her BG&E bill?
18   A.   No.
19   Q.   Were you paying her car insurance?
20   A.   No.
21   Q.   Okay. Now did you go out to Arizona with Ms. Thompson in
22   January of 2019?
23   A.   Yes.
24   Q.   Why?
25   A.   Because we was going to a party, like me and -- I have
```

```
 1    other cousins that's from Arizona that live in Maryland. And,
 2    I mean, I only see our two, but when we took that flight it
 3    was probably about eight of us.
 4    Q.   Okay. May I approach?
 5                 THE COURT:  Yes.
 6                 MS. FLYNN:  Mr. Gasque, could you pull up Exhibit
 7    47?  Government's Exhibit -- okay.
 8    BY MR. FLYNN:
 9    Q.   Mr. Durbin, I'm directing your attention to the exhibit
10    that Mr. Gasque kindly has displayed that is Government's
11    Exhibit No. 47. You saw that yesterday, right?
12    A.   Yes.
13    Q.   So in that first three or four lines regarding January
14    2019, it indicates that Che Durbin rented a vehicle from Avis
15    in Tucson and listed Jameka Trump as the driver and it has a
16    credit card ending in 6264. So I want to ask you about your
17    credit cards and Ms. Thompson, okay?  Did you have a credit
18    card as far as you know ending in 6264?
19    A.   I can't remember, but it's possible. I had over ten
20    credit cards, so --
21    Q.   Okay. Was Ms. Thompson allowed -- I mean, did you give
22    her some of your credit cards?
23    A.   No.  She had one of them, one or two of them she had.
24    She would use them on occasions.
25    Q.   Did the two of you have any credit cards that were
```

1    jointly titled?

2    A.   No.

3    Q.   Did you attempt to get a credit card in the True Homes,

4    LLC name?

5    A.   Yes, we tried to get credit cards in her business

6    account, yes.

7    Q.   And was that possible?

8    A.   No, because they said her credit wasn't -- she went

9    through a divorce and a bankruptcy, so they wouldn't put it in

10   me and her name, but they would put it -- they would use my

11   name because my credit was good.

12   Q.   Okay. So it's certainly possible that this credit card

13   ending in 6264 --

14          MR. ROMANO:  Objection, speculation.  "Certainly

15   possible."

16          THE COURT:  Sustained.  Rephrase.

17   BY MS. FLYNN:

18   Q.   All right, the credit card ending in 6264, is that yours?

19   A.   Yes.

20   Q.   Okay. I'm not asking if you've memorized your credit card

21   numbers.

22   A.   Yes.

23   Q.   Okay.

24   A.   I'm saying that because it says I rented the rental car.

25   Q.   Okay. Did you make your credit cards available to Ms.

1    Thompson?

2    A.    Yes.

3    Q.    All right. Now April of 2019, this exhibit indicates that

4    Ms. Thompson flew to Arizona.  Did you go to Arizona?

5    A.    No.

6    Q.    Did you have anything to do with whatever she did in

7    Arizona in April of 2019?

8    A.    No.

9    Q.    All right. Now August of 2019 the Government's exhibit

10   indicates that Ms. Thompson flew to Arizona on August 16th,

11   but they don't have any information about a car rental or a

12   hotel. Do you know whether or not Ms. Thompson went to Arizona

13   in August of 2019?

14   A.    No, I can't remember.

15   Q.    Okay. Did you go to Arizona in August of 2019?

16   A.    No.

17   Q.    And page 2, please, thank you. Now October of 2019,

18   there's a suggestion that Ms. Thompson was in Arizona; is that

19   correct?

20   A.    Yes.

21   Q.    And that she rented a vehicle from the Avis in Phoenix,

22   correct?

23   A.    Yes.

24   Q.    And the credit card ending in 5469, do you know if that's

25   your credit card?

```
1   A.    I can't remember.

2   Q.    All right. Well, once again, did Ms. Thompson have access

3   to your credit cards?

4   A.    Yes.

5   Q.    Meaning did you --

6   A.    I don't know how she would have rented a vehicle in my

7   name and I'm not there for a rental car.

8   Q.    Okay. But did you actually physically hand her credit

9   cards to use, like that she kept in her wallet?
```

10            **MR. ROMANO:**  Objection, leading, leading.

11            **THE COURT:**  Sustained.

12 **BY MS. FLYNN:**

```
13  Q.    How is it that Ms. Thompson would have a credit card of

14  yours?

15  A.    She would ask me. Or sometimes, like, she didn't -- like

16  sometimes she would tell me she needed something.  Sometimes I

17  didn't know what credit card she took until she gave it back.

18  Q.    Now January 2020, do you see that on the exhibit?

19  A.    Yes.

20  Q.    They're saying that a parcel is mailed from Havre de

21  Grace to Jack Anderson in Tucson and Jameka Thompson flies to

22  Tucson on January 23rd.  And that was the parcel that the

23  postal inspector testified was seized by the postal inspector,

24  correct?

25  A.    Right.
```

```
 1    Q.   And there was $82,300 in that parcel.  Do you see that?
 2    A.   Yes.
 3    Q.   And that parcel, the return address was -- the name on
 4    the return address was your name with the Wellspring -- I'm
 5    sorry, with an address associated with you; is that correct?
 6    A.   Yes.
 7    Q.   Now what do you know about that package?
 8    A.   Well, I know the money -- Jack gave me the money and he
 9    was trying to purchase a few vehicles.  But like I said
10    before, I couldn't produce the paperwork for the vehicles.
11    They got the vehicles that he wanted, but they didn't have the
12    paperwork.  So when I contacted him, he said that he didn't
13    want the vehicles because there wasn't nothing he could do
14    with them. So I gave the box back to Jameka.
15    Q.   Was that for the purpose of giving the money back to
16    Jack?
17              MR. ROMANO:  Objection.
18              THE WITNESS:  Yes.
19              MR. ROMANO:  Objection, leading.
20    BY MS. FLYNN:
21    Q.   What was the purpose for giving the box to Jameka?
22    A.   To give the money back to Jack.
23    Q.   Now we go to April of 2020 where the Government's records
24    indicate that Ms. Thompson flew to Arizona. And did you go to
25    Arizona with her?
```

```
1    A.   No.

2    Q.   And then she flew out to Arizona like three weeks later;

3    is that correct, in May?

4    A.   I don't know about -- May 12th?  You mean May 9th?

5    Q.   Yes.

6    A.   Yes.

7    Q.   Okay, so in May of 2020 you drove out?

8    A.   I see it now.  Yes, I drove out there.

9    Q.   And you've already testified that was to drop off the

10   car, right?

11   A.   Right.

12   Q.   Now for the sake of argument, how often, like this car

13   business, how busy did that keep you?

14   A.   Busy.

15   Q.   And would you -- were there other people that you would

16   drive and drop off cars to?

17   A.   Yes.

18   Q.   Other than Jack?

19   A.   Correct.

20   Q.   And were those people in Maryland or were they in other

21   states?

22   A.   Maryland and Arizona. The ones that went out there

23   through Jack was for whoever he had involved that wanted to

24   buy a car.

25   Q.   Did you have other people other than Jack?
```

```
 1    A.    Yeah, in Maryland.
 2    Q.    That you would conduct these transactions with?
 3    A.    Yes, yes.
 4    Q.    But not in any other states?
 5    A.    No.
 6    Q.    Okay. And what kind of payment would you want for these
 7    vehicles?  Meaning did you take checks or credit cards or
 8    cash?
 9    A.    No, cash.
10    Q.    Was this for the sake of argument, an all-cash business?
11    A.    Yes.
12    Q.    And when you would purchase the car from somebody, how
13    would you purchase the vehicle?
14    A.    Cash.
15    Q.    Okay.  Did you keep records?
16    A.    No.
17    Q.    Okay. Did you deposit that money in the bank?
18    A.    No.
19    Q.    Okay. Can you -- if you remember, can you testify as to
20    how many vehicles you may have sold to Jack Anderson?
21    A.    Probably -- well, probably about eight.
22    Q.    And was there ever a time that he would come to Maryland
23    and drive the cars himself back to Arizona?
24    A.    Yeah, most -- that's the first time I ever drove them out
25    there. Usually he'll take them from Maryland and take them
```

1    back out there his self.

2    Q.   Would he have other people drive them for him?

3    A.   Yes.

4    Q.   Was Jack usually responsible for getting the vehicles to

5    Arizona?

6    A.   Yes.

7    Q.   And so why did you decide to drive this one out to him?

8    A.   Because he paid me.

9    Q.   He paid you to drive?

10   A.   Paid me extra to drive, yeah, to bring them out there to

11   him.

12   Q.   And why is that?

13   A.   Because he has something else he was doing.

14   Q.   Okay. And physically these other people that you would

15   sell cars to, were they in Harford County only or --

16   A.   Harford County, Baltimore City, I forgot.  Newark, New

17   Jersey.

18   Q.   And how would someone from Newark, New Jersey find you to

19   buy a car from you?

20   A.   Because I know people from Newark, New Jersey and I let

21   them know.

22   Q.   Okay. Now just to be clear, you were aware of what Ms.

23   Thompson was doing generally; is that correct?

24   A.   Yes, that's why I didn't want her to ride with me and

25   that's why I could have got her to drive the other vehicle,

```
1    but I didn't want to -- I just didn't want to be involved in
2    what she is doing. I know she was supposed to go out there, so
3    I didn't want to be involved in it.
4    Q.   And when she would come back from Maryland --
5    A.   Yes.
6    Q.   --do you know what she would do with anything she brought
7    back from Arizona?
8    A.   Well, usually she was supposed to take -- I don't know
9    what happened this time, but usually she was supposed to take
10   it back to her storage.
11   Q.   Her what?
12   A.   Her storage.
13   Q.   And do you know what happened to it after that?
14   A.   She would call him and let him know where it was at and
15   then whenever he got to Maryland, he would call her.
16   Q.   And when you refer to "him," do you mean Jack Anderson?
17   A.   Yes.
18   Q.   Okay.  And do you have a key to the storage unit?
19   A.   No.
20   Q.   Did you have anything to do with what she was doing --
21   A.   I never been there.
22   Q.   Okay, but you're aware she has it?
23   A.   Yes.
24            MS. FLYNN: Your Honor, I have no further questions.
25            THE COURT:  All right, Counsel, why don't you
```

```
 1    approach.
 2                    (Counsel approached the bench.)
 3              THE COURT:  Now this is the time I get to extend the
 4    courtesy to the Government. Mr. Romano, would you like to take
 5    the luncheon recess now or would you like to proceed with your
 6    cross-examination?  It depends on what the length of it is,
 7    but if we go to 12:30, they would have been sitting for two
 8    hours so I will defer to you.
 9              MR. ROMANO:  Well, before I answer that I don't know
10    whether Mr. Mann is going to cross-examine.
11              THE COURT:  Mr. Mann -- well, I didn't expect -- go
12    ahead, Mr. Mann.
13              MR MANN:  Well, who goes first?
14              THE COURT:  I was going to go right to you and
15    then --
16              MR MANN:  At this point I don't have any questions.
17              THE COURT:  Okay.
18              MR MANN:  So I don't have any questions now.
19              THE COURT:  Okay, so what we'll do is -- and
20    assuming Mr. Mann doesn't have any questions between now and
21    the time he goes back to trial table, what do you want to do?
22              MR. ROMANO:  Well, as Rumpole of the Bailey once
23    said, the art of doing cross-examination is like walking a
24    tightrope. It's best done when uninterrupted.
25              THE COURT:  So we would take our lunch.  I'm just
```

1    going to limit the lunch break to one hour and they'll come

2    back, then we'll proceed.

3          **MR. ROMANO:**  Okay.

4          **THE COURT:**  All right, very good.  Then I don't know

5    that we're going to proceed to any additional witnesses, then

6    we'll go to Mr. Mann, and then we'll go to rebuttal, if any.

7    Okay, all right, very good. I'll start with you, Mr. Mann.

8          **MR MANN:**  Thank you, Judge.

9          **(Counsel returned to their trial tables.)**

10          **THE COURT:**  Mr. Mann, any additional questions of

11    this witness on cross?

12          **MR MANN:**  Judge, I do not have any questions of this

13    witness right now.

14          **THE COURT:**  Okay, very well. Ladies and gentlemen,

15    we're going to take our luncheon break. We've been going now

16    for about an hour-and-a-half or so. So we're going to take a

17    break for lunch, but we're going to limit it to one hour so we

18    can get started again.

19          So ladies and gentlemen, please don't discuss this case

20    among yourselves, allow anyone to discuss this case with you.

21    Continue to keep an open mind about this case. Avoid all

22    contact with anyone that you see associated with the parties.

23    In the event anything questionable occurs, don't discuss it

24    with your fellow jurors and as I indicated, please keep an

25    open mind throughout all the testimony, my instructions on the

```
 1    law, as well as closing argument.

 2         So with that, enjoy your lunch.  We'll see you back at

 3    1:00.

 4              (Jury exits the courtroom at 11:58 p.m.)

 5         THE COURT:  All right, everybody could be seated.

 6    Mr. Durbin, I'll ask that you not discuss your testimony

 7    during the course of the break. Counsel, is there anything

 8    else we can handle productively before we take our luncheon

 9    recess?

10         MR. ROMANO:  No, Your Honor.  Thank you.

11         MS. FLYNN:  Your Honor, I just want to make the

12    record that it's my understanding that that admonishment

13    includes me and Mr. Durbin. Mr. Durbin, I'm not allowed to

14    speak to you in the middle of your testimony.

15         THE COURT:  About the testimony in the case,

16    obviously.  Because it's as if, Mr. Durbin, you're still up

17    here on the stand and you wouldn't have the opportunity to

18    consult with Ms. Flynn in the middle of cross-examination or

19    now about your testimony. I wouldn't allow that.  So it's as

20    if you're still here on the stand.  The only reason we're

21    taking the break is to give the jury a luncheon recess because

22    it's that time. All right?  Thank you.

23         All right, we can step down. Mr. Mann, anything from you?

24         MR MANN:  Nothing, Judge.  Thank you.

25         THE COURT:  Thank you.
```

```
 1              (Luncheon recess was taken from 11:59 to 1:01 p.m.)

 2              THE COURT:  Counsel, are we ready for the jury?

 3              MR. ROMANO:  Yes, Your Honor.

 4              THE COURT:  All right.

 5              (The jury arrived at 1:02 p.m.)

 6              THE COURT:  Mr. Durbin, I'll remind you you're still

 7      under oath.  Could you state and spell your full name for the

 8      record, please?

 9              DEFENDANT DURBIN:  Che Durbin.  C-h-e  D-u-r-b-i-n.

10              THE COURT:  Mr. Romano, at your pleasure, sir.

11             C R O S S - E X A M I N A T I O N

12      BY MR. ROMANO:

13      Q.   Mr. Durbin, on direct examination you testified that you

14      have both a federal conviction here in the United States

15      District Court for Conspiracy to Possess with the Intent to

16      Distribute crack cocaine, didn't you?

17      A.   Yes.

18      Q.   You also have a conviction in the Harford County Circuit

19      Court for Possession with Intent to Distribute Controlled

20      Dangerous Substance?

21      A.   Yes.

22      Q.   Was that marijuana or was that cocaine?

23      A.   That was cocaine.

24      Q.   All right. And you know Jameka Thompson.  I think you

25      said you met her in actually what, 2017, 2018?
```

```
 1    A.    I believe it was 2017.

 2    Q.    2017.

 3    A.    August, yeah.

 4    Q.    Okay. And how about Jameka Thompson, to your knowledge

 5    did she have any felony drug convictions until you introduced

 6    her to Jack Anderson?

 7    A.    Not that I know of.

 8    Q.    Yeah.

 9    A.    I know that she had a conviction, but --

10    Q.    I asked you if she had any felony drug convictions.

11    A.    I wouldn't know that.  I don't think so.

12    Q.    Yeah. Now the address that you were living in 2019 and

13    2020, what address what was that?

14    A.    1487 Wellspring Drive.

15    Q.    And you had a live-in girlfriend or significant other

16    living there, you've known her for ten years or more; is that

17    right?

18    A.    Yes.

19    Q.    What was her name?

20    A.    Tracy Murray.

21    Q.    Okay. Now you sat here and heard Jameka Thompson testify

22    that you and Jameka were going to get married, correct?

23    A.    Yes.

24    Q.    All right. And you were hoping that you and she could get

25    married so you could block her testimony as a husband and
```

```
1    wife, didn't you?

2    A.    Absolutely not.

3    Q.    Whose idea was it to get married?

4    A.    Hers.

5    Q.    Was she in love with you?

6    A.    She said she was.

7    Q.    Okay, but you weren't in love with her?

8    A.    Not really.

9    Q.    Not really, you just used her for a number of purposes,

10   right?

11   A.    No.

12   Q.    No?

13   A.    No.

14   Q.    You introduced her to Jack Anderson, didn't you?

15   A.    She met him through me, yes.

16   Q.    Well, when you say she met him through you, you

17   introduced her to him?

18   A.    It wasn't really an introduction. It was a party.

19   Q.    A party?

20   A.    Yes.

21   Q.    Oh, is this the party in January of 2019?

22   A.    Yes.

23   Q.    Okay. That's the party where the two of you flew out?

24   A.    Yes.

25   Q.    Okay. And that party, you left the next day, didn't you?
                            *****
```

```
 1    A.    No.
 2    Q.    Was it Jameka's idea to create an LLC?
 3    A.    Yes.
 4    Q.    Do you have -- I mean, this is a 35-page document. Did
 5    you read every line of this document?
 6    A.    No.
 7    Q.    Now if you could go to Page 5. And the second paragraph
 8    it says, "The purposes for which the company is formed are to
 9    own and manage real estate," correct?
10    A.    Right, correct.
11    Q.    That's number one. Number two is to engage in any other
12    lawful business?
13    A.    Right.
14    Q.    Correct?
15    A.    Right.
16    Q.    And number 3 it says, "to have all the powers permitted
17    under Section 4A 203 of the corporations and associations
18    article of the Maryland Annotated Code." Now do you have any
19    idea what Section 4A 203 of the corporations and associations
20    article of the Maryland Annotated Code is?
21    A.    No.
22    Q.    Okay. But it clearly says that the purpose of the LLC is
23    to engage in the real estate business, as well as to engage in
24    any other lawful business; is that correct?
25    A.    Yes.
```

1    Q.   And that was signed by Jameka, correct?

2    A.   Yes.

3    Q.   On October 12, 2018?

4    A.   Yes.

5    Q.   Now who found the lawyer?

6    A.   She did.

7    Q.   And when you did -- when you were signing these

8    documents, do you recall, were you in person or was it

9    electronic?

10   A.   I believe it was electronic.

11   Q.   Okay. And did you sign where you were directed to sign?

12   A.   Yes.

13   Q.   Okay. And on page 33 it says, "The list of the members,

14   capital and percentages." And that's where it's listed Che

15   Durbin and that's at Jameka's address on the Aberdeen Proving

16   Ground; is that correct?

17   A.   Yes.

18   Q.   And Jameka at the Aberdeen Proving Ground; is that

19   correct?

20   A.   Yes.

21   Q.   And it indicates that you put a sum total of $548.96 into

22   the formation of this corporation; is that correct?

23   A.   Yes.

24   Q.   But you weren't living at Aberdeen Proving Ground, were

25   you?

```
1    A.    No.

2    Q.    All right. And then I want to just direct your attention,

3    I'm sorry, back to Page 5 one more time.

4    A.    Um-hum.

5    Q.    And it says, the third, it says, "The address of the

6    principal of the company in this state is 1003 Warwick Drive,

7    Apartment 1B, correct?

8    A.    Correct.

9    Q.    And that's the name and the address of the resident

10   agent, correct?

11   A.    Correct.

12   Q.    And that is your mother's address, your permanent

13   address; is that correct?

14            MR. ROMANO:  Objection to characterization of

15   "permanent address."  He said he lived --

16            THE COURT:  Sustained.

17            MS. FLYNN:  I apologize.

18   BY MS. FLYNN:

19   Q.    How would you define the 1003 Warwick Drive?

20   A.    That's my mother's address.

21   Q.    And how long has she lived there?

22   A.    For 26 years.

23   Q.    And what is the purpose of you using that address?

24   A.    Well, I use that address because I couldn't have the

25   paperwork coming to my girlfriend's.
```

```
1    Q.   Okay. Who decided that True Homes, LLC should be located
2    at 1003 Warwick Drive?
3    A.   That was her idea.
4    Q.   Okay. And who decided how the percentages of the LLC
5    should be divided?
6    A.   She did.
7    Q.   Did you have any intention of getting your real estate
8    license?
9    A.   No.
10   Q.   Did you have any intention of conducting any real estate
11   business?
12   A.   No.
13   Q.   Which of the two of you was intending on conducting real
14   estate business?
15   A.   She was.
16   Q.   Okay. Now there was a point in time where Mr. Romano was
17   asking you about when you went to Arizona in January of 2019?
18   A.   Yes.
19   Q.   And you flew back; is that correct?
20   A.   Right.
21   Q.   And Ms. Thompson drove back; is that correct?
22   A.   Right.
23   Q.   Why did she drive back and you flew back?
24   A.   Because Jack didn't want to pay for the tickets for him
25   and his wife.  And since I already had the rental car in her
```

```
 1    name -- I mean, I already had the rental car in my name and
 2    her as the driver, he paid her to drive him out there.
 3    Q.   Okay.  So when Jameka drove back from Tucson to Maryland?
 4    A.   Yes.
 5    Q.   Who was in the vehicle with her?
 6    A.   Her, Jack, his wife and his son.
 7    Q.   Okay.
 8              MR. ROMANO:  Objection, I don't know how he knows
 9    that, Your Honor.
10              THE COURT:  Sustained. Well, I'll let you recross on
11    that issue.
12              MR. ROMANO:  Thank you.
13    BY MS. FLYNN:
14    Q.   Mr. Durbin, what is the basis of your knowledge for who
15    was in the vehicle?
16    A.   Well, the reason she didn't fly back was because Jack had
17    asked her if --
18              MR. ROMANO:  Objection, hearsay.
19              THE COURT:  Sustained.  Nonresponsive.
20    BY MS. FLYNN:
21    Q.   For the sake of argument, did you see Jameka when she got
22    back to Maryland?
23    A.   No.
24    Q.   Did you see her get in the car?
25    A.   No.
```

```
 1    Q.    Did you see her get in the car with anybody else?
 2    A.    No.
 3    Q.    Okay. So are you relying on Jameka as far as whatever
 4    happened on that trip?  You weren't there?
 5    A.    Well, I seen Jack when he came and he told me.
 6              MR. ROMANO:  Objection, move to strike.
 7              THE COURT:  Sustained. Jury should disregard the
 8    last response.
 9    BY MS. FLYNN:
10    Q.    Did you see Jack in Maryland in January?
11    A.    Yes.
12    Q.    Did you see Jack in Maryland in -- in Tucson in January?
13    A.    Yes.
14    Q.    Ask did you see him in Tucson on January 3rd or 4th?
15    A.    I seen Jack -- I came back I think on the next morning
16    and I seen him a couple days later.
17    Q.    Okay. And in Maryland?
18    A.    Yes.
19    Q.    Okay. Now you were asked a couple of questions about Ms.
20    Walls?
21    A.    Yes.
22    Q.    You described her as an older lady. How old is she?
23    A.    She's about 60.
24    Q.    Okay. And as far as you know does she use cocaine?
25    A.    I don't know.
```

1    Q.   Okay. Does she smoke marijuana?

2    A.   Yes.

3    Q.   Now we all know that you have a prior record for cocaine;

4    is that correct?

5    A.   Right.

6    Q.   And you made reference to the cost of cocaine back when

7    you were selling?

8    A.   Right.

9    Q.   Okay. So in the mid -- in 2013, how much was a gram of

10   cocaine?

11   A.   $50.

12   Q.   Okay. And when you were selling cocaine, as far as you

13   know, did you have customers that were buying from other

14   people?

15   A.   Yes.

16   Q.   As far as you know, did you have customers that were

17   buying other drugs from other people?

18   A.   Yes.

19   Q.   Okay. Now that Chevy Suburban that we've been talking

20   about --

21   A.   Yes.

22   Q.   That ultimately remained in Arizona; is that correct?

23   A.   Yes.

24   Q.   Do you have any idea what Jack did with it?

25   A.   I don't know what he did with it, but I know it got

```
 1    tooken.
 2    Q.   Okay. But it was in Arizona the last time you checked?
 3    A.   Right.
 4    Q.   Correct?
 5    A.   Right.
 6    Q.   And something I just want to clarify. Where did Jameka
 7    meet Jack, physically was it in Maryland or Arizona?
 8    A.   Maryland.
 9    Q.   Okay. And Jack had a place here; is that correct?
10    A.   Right.
11    Q.   And does he have friends and family here as far as you
12    know?
13    A.   Yes.
14    Q.   And the Government was saying you introduced Jameka to
15    Jack. Was it at a social event that they met?
16    A.   Yes.
17    Q.   And did you see -- did you and Jameka see Jack at more
18    than one social event?
19    A.   Yes.
20    Q.   And did Jack's wife, was she present at these social
21    events?
22    A.   Yes.  That's how they really began talking, but them two
23    had a lot in common.
24    Q.   Okay. So is it a fair statement that Jameka Thompson
25    became friendly with Jimmica Anderson?
```

```
 1    A.   Yes.
 2              MS. FLYNN: I have no other questions.
 3              THE COURT:  Mr. Mann, anything?
 4              MR MANN:   No, nothing from me, Judge, thank you.
 5              THE COURT:  Any redirect, Mr. Romano?  -- I mean
 6    recross?
 7              MR. ROMANO:  Just briefly. Thank you, Your Honor.
 8              R E C R O S S - E X A M I N A T I O N
 9    BY MR. ROMANO:
10    Q.   True Homes, that company, was it Jameka's idea that she
11    would only have one percent and you would have 99 percent?  It
12    was her idea?
13    A.   I don't remember that, but I thought it was supposed to
14    be 50/50.
15    Q.   Well --
16    A.   Like I remember something, signing something that said
17    50/50.  I don't know where 99 percent and one percent, I don't
18    know who would do something like that. That doesn't --
19    Q.   Well, I'm not asking if you knew who would do something
20    like that, I'm asking you was it your idea or Jameka's idea
21    that you would have 99 percent and she would only have one
22    percent?
23    A.   That had to have been Jameka's idea. This was her idea.
24    Q.   Okay, it was her idea that she would only have one
25    percent and you would have 99. Let me ask you another
```

```
 1      question.
 2                  MS. FLYNN:  If you could let him finish.
 3                  THE COURT:  Well, it's either yes or no.
 4                  THE WITNESS:  No, that wasn't my idea.
 5      BY MR. ROMANO:
 6      Q.   It was or it wasn't?
 7      A.   It was not my idea.
 8      Q.   So let me ask you one other question:  Whose idea was it
 9      to register that stolen Honda in Jameka's name?  Was that your
10      idea or was that her idea?
11      A.   That was my idea.
12      Q.   Okay. Thank you, sir.  That's all I have.
13                  THE COURT:  Thank you.  Anything else, Ms. Flynn?
14                  MS. FLYNN:  No, Your Honor.
15                  THE COURT:  Mr. Mann?
16                  MR MANN:  Judge, I'm good.  Thank you.
17                  THE COURT:  Mr. Durbin, you can step down.
18                  (Witness, excused.)
19                  THE COURT:  All right, ladies and gentlemen, we have
20      approached our mid-afternoon break. We've been going for about
21      an hour-and-a-half now. I'm going to talk to the lawyers about
22      scheduling for the balance of the day.  And so what we'll do
23      is we'll take 15 minutes or so, get you to stretch your legs
24      and then we will get to a point where we're probably going to
25      wrap up testimony. Thank you very much.
```

*****

```
 1              THE COURT:  Before we get the jury, I've had an
 2     inquiry. Ms. Flynn, I'm going to revisit your bias and
 3     hostility instruction.  And the reason why I'm going to do
 4     that is I believe that Mr. Durbin, I guess, acknowledged
 5     through a question from Mr. Romano about all the losses that
 6     were suffered by Ms. Thompson. And so I'm wondering, it seems
 7     to me that that may create, at least colorably sufficient to
 8     maybe read the instruction Biases or Hostility Towards a
 9     Defendant in Testifying.
10          Ms. Flynn, I don't know, do you still want me to read
11     that instruction?
12              MS. FLYNN:  I would and I'm having trouble finding
13     it. Do you know what number or what page?
14              THE COURT:  Bear with me.  It was originally Court's
15     Instruction 26, Biases and Hostility.
16              MS. FLYNN:  Yes. I would still be requesting it.
17              THE COURT:  You'd still be requesting it. Mr.
18     Romano, do you object?  But I'm sort of inclined given the
19     losses that Ms. Thompson suffered that were sort of put out
20     there at the very end in which it was implied that she was
21     telling the truth.  And as a result of the losses I'm thinking
22     that it could be that that could create an idea of maybe some
23     hostility towards Mr. Durbin.
24              MR. ROMANO:  Again, there's no evidence in the
25     record of that. It's all speculation. She was not crossed and
```

```
 1    said, are you doing this because, you know, he's got a
 2    girlfriend or he's got two girlfriends or because you lost
 3    your job?  In fact, when I asked her, you know, given what
 4    happened, was it worth it?  There was an objection and the
 5    Court sustained the objection. So there's no evidence in the
 6    record. And, you know, there's nothing that was -- it's a
 7    fact, what's in evidence is she lost her job. She lost her
 8    liberty. She lost her security clearance. But there's nothing
 9    then that says yeah, because I've lost all of that --
10            THE COURT:  I'm angry at Mr. Durbin.
11            MR. ROMANO:  Correct.  So while I appreciate the
12    Court's contemplating it, I don't see that the landscape has
13    changed at all, notwithstanding the testimony by this
14    defendant. I mean, he didn't even, you know, say yeah, she's
15    doing this because she's trying to get back at me. In fact, I
16    asked him if he loved her, he said "Nah, not really." But when
17    I asked if she loved him, I think the inference, if not -- I
18    didn't write down what he said, but I don't think he denied.
19            THE COURT:  She wanted to get married.
20            MR. ROMANO:  Yeah. So again, I just simply don't
21    see -- you know, again the instructions have to be based on
22    the evidence and the facts that are generated in the case, not
23    on suppositions or -- and, you know, if they want to argue
24    that, they can. I'm not suggesting that they can't argue it,
25    but I don't see, you know, as I understand the law, the
```

```
 1    instructions have to be based on evidence that's been

 2    generated and there is no evidence of that.

 3           THE COURT:  All right, I was going one way, you

 4    brought me back, Mr. Romano. So your request is noted, Ms.

 5    Flynn and as well as Mr. Mann joining it and I will go ahead

 6    and not read the instruction.

 7           MR. ROMANO:  Thank you, Your Honor.

 8           THE COURT:  But you can argue it. All right, we're

 9    ready for the jury.

10           MR. ROMANO:  Your Honor, excuse me --

11           THE CLERK:  Should I hold the jury?

12           MR. ROMANO:  Were we going to do this at the bench

13    as far as the Rule 29 without the jury or with the jury?

14           THE COURT:  I was going to do it with the jury

15    because everyone was going to submit on the record.

16           MR. ROMANO:  Okay, all right.

17           THE COURT:  And then I was just going to quietly --

18           MR. ROMANO:  I apologize.  I wasn't sure how the

19    chronology was going to go.

20           THE COURT:  If there was going to be a more robust

21    argument, I would just do it in open court outside their

22    presence.

23           MR. ROMANO:  Thank you.

24           (The jury reentered the courtroom at 3:00 p.m.)

25           THE COURT:  All right, everyone could be seated.
```

1  Ladies and gentlemen, we are prepared to continue on with the

2  case.  Ms. Flynn, are you calling your next witness?

3        **MS. FLYNN:**  Your Honor, I have no further witnesses

4  and I would rest on behalf of Mr. Durbin.

5        **THE COURT:**  Thank you very much. Mr. Mann, any

6  additional witnesses from you, sir?

7        **MR MANN:**  Judge, on behalf of Terrell Walton, we

8  rest.

9        **THE COURT:**  All right.  Mr. Romano, any rebuttal

10  witnesses, sir?

11        **MR. ROMANO:**  No, Your Honor.  Thank you.

12        **THE COURT:**  Okay, very well.  I'll see Counsel up

13  here at the bench.

14        **(Counsel approached the bench.)**

15        **THE COURT:**  All right, motions?

16        **MS. FLYNN:**  On behalf of Mr. Durbin I will renew my

17  Motion for Judgment of Acquittal and submit on prior

18  arguments.

19        **MR MANN:**  On behalf of Mr. Walton, Judge, I will as

20  well.

21        **THE COURT:**  Government's response?

22        **MR. ROMANO:**  Your Honor, we would just reincorporate

23  our arguments in response to their Rule 29 motion.

24        **THE COURT:**  Very well.  Pending before the Court is

25  a Motion for Judgment of Acquittal pursuant to Rule 29. I've

1  considered the evidence in this case and even looking at the

2  evidence in the light not most favorable to the non-moving

3  party which is the Government, I do believe that there has

4  been sufficient evidence put forward to support a conviction

5  on all three counts in this matter. And as a result, for these

6  reasons, as well as reasons previously stated on the record

7  subsequent to the Government's closing of its case in chief,

8  the Court will go ahead and deny the motion.

9       Counsel, is there anything else that needs to be placed

10  on the record before we step back?

11           **MR. ROMANO:**  No, Your Honor.

12           **MR MANN:**  No, sir.

13           **THE COURT:**  Okay, very good. Thank you.

14           (**Counsel returned to their trial tables.**)

15           **THE COURT:**  All right, ladies and gentlemen, due to

16  the professionalism and efficiency of the attorneys in this

17  case, we have completed the testimonial portion as I promised

18  you, well ahead of schedule.

19       What will happen now is I'm going to read you the

20  instructions that are going to guide you regarding

21  consideration of the verdict in this matter. Once I conclude

22  the instructions -- and they're kind of lengthy -- we're going

23  to adjourn for the day. And then tomorrow morning I'm going to

24  have you arrive at 9:15. It will be at that time that we will

25  present closing arguments in the case. And I anticipate that

```
1    you will have this case for deliberations maybe around 12:30

2    or something, around lunchtime or very soon thereafter. 12

3    o'clock or 12:30 or maybe immediately after lunch.

4         So with that, I'm going to give you the instructions that

5    you are going to follow in this matter:

6              Members of the jury, now that you have heard all the

7    evidence, it is my duty to instruct you on the law applicable

8    to this case. You are not to be concerned with the wisdom of

9    any rule of law. It is your duty to follow the law as I state

10   it and to apply the law to the facts as you find them from the

11   evidence. It is your duty to base your verdict on legal

12   principles that I give you, even if you believe that my

13   instruction is wrong or that the legal principle is unwise. It

14   would be a violation of your sworn duty for you to base a

15   verdict upon a view of the law that differs from the

16   instructions of the Court.

17        Instructions as a Whole: In my instructions, I may state

18   some rules or ideas in varying ways. I do this to make the

19   rule or idea clear and not to emphasize it over other

20   instructions. You're not to single out any certain sentence or

21   individual point or instruction and ignore the others. Rather,

22   you are to consider all of my instructions as a whole and you

23   are to regard each instruction in light of all others.

24        In deciding the facts of this case, you must not be

25   swayed by biases or prejudice or favor as to any party. Our
```

1    system of law does not permit jurors to be governed by

2    prejudice or sympathy or public opinion. The parties and the

3    public expect that you will carefully and impartially consider

4    all of the evidence in the case, follow the law as stated by

5    the Court, and reach a just verdict, regardless of the

6    consequences. This case should be considered and decided by

7    you as an action between two persons of equal standing in the

8    community and holding the same or similar stations in life.

9    The law is no more respectful of one person than another. And

10    all persons stand equal before the law and are to be dealt

11    with as equals in a court of justice.

12        You and only you are the judges of the facts. If any

13    expression of mine or anything that I may or may not have done

14    or said would seem to indicate my opinion as to the facts, I

15    instruct you to disregard it.

16        In my instructions I may refer to some of the evidence,

17    testimony, or exhibits in the case. In their closing

18    arguments, Counsel will refer to some of the evidence,

19    testimony, or exhibits. In reaching your verdict, you are not

20    limited to the evidence referred to by Counsel or by me. You

21    may consider any evidence that you believe to be influential.

22        Consideration of the Evidence: It is your duty to

23    determine the facts. In doing so, you must consider only the

24    evidence I have admitted in the case. The term "evidence"

25    includes sworn testimony of witnesses, the exhibits admitted

1    in the record, and stipulations reached between the parties.

2    Remember that any statements, objections, or arguments made by

3    the lawyers are not evidence in the case.

4        The function of the lawyers is to point out those things

5    that are most significant or most helpful to their side of the

6    case.  And in doing so, to call your attention to facts or

7    inferences that might otherwise escape your notice. In the

8    final analysis, however, it is your own recollection and

9    interpretation of the evidence that controls in the case. What

10    the lawyers say is not controlling.

11        While you must base your verdict solely on the evidence,

12    you are permitted to draw such reasonable inferences from the

13    testimony and exhibits as you feel are justified in light of

14    common experience. In other words, you may make deductions and

15    reach conclusions which reason and common sense lead you to

16    draw from the facts which have been established by the

17    testimony and evidence in the case.

18        A jury must view the Government as a party -- the

19    Government as a party.  A jury must view the case objectively

20    and dispassionately. The jury must never be swayed by

21    sympathy, favoritism, prejudice or bias.  To use the well-worn

22    baseball analogy, the jury is like an ideal umpire, must call

23    the plays objectively, call them as you see them. In other

24    words, the jury must neutrally and objectively weigh the

25    evidence and reach a verdict based solely on the evidence in

1  the case.  The fact that the prosecution is brought in the
2  name of the United States of America entitles the Government
3  to no greater consideration than that accorded to any other
4  party to the litigation. By the same token, the Government is
5  entitled to no less consideration. All parties whether
6  Government or an individual, stand as equals at the bar of
7  justice.

8      Improper Consideration: Your verdict must be based solely
9  on the evidence developed at trial or the lack of evidence. A
10  jury should never be influenced by the defendant's race,
11  religion, natural origin, sex, or age. Such considerations are
12  irrelevant. All persons are equal in a court of law and they
13  are entitled to a fair and impartial trial.

14      It would be equally improper for you to allow any
15  feelings you might have about the nature of the crimes charged
16  to interfere with your decision-making process. To repeat,
17  your verdict must be based exclusively upon the evidence or
18  lack of evidence in the case.

19      Under your oath as jurors, you are not to be swayed by
20  sympathy. You are to be guided solely by the evidence in this
21  case and the central question that you must ask yourselves as
22  you sift through the evidence is: Has the Government proven
23  the guilt of each defendant beyond a reasonable doubt?  It is
24  for you alone to decide whether the Government has proven that
25  each defendant is guilty of the crimes charged solely on the

1  basis of the evidence and subject to the law as I charge you.

2  It must be clear to you that once you let fear or prejudice or

3  biases or sympathy interfere with your thinking, there is a

4  risk you will not arrive at a true and just verdict.

5    If you have a reasonable doubt as to any defendant's

6  guilt, you should not hesitate for any reason to find a

7  verdict of acquittal for that defendant. But on the other

8  hand, if you should find that the Government has met its

9  burden of proving a defendant's guilt beyond a reasonable

10  doubt, you should not hesitate because of sympathy or any

11  other reason to render a verdict of guilty for that defendant.

12    Punishment: The question of possible punishment of a

13  defendant is of no concern to the jury and should not in any

14  sense enter into or influence your deliberations. The duty of

15  imposing sentence rests exclusively upon the Court. Your

16  function is to weigh the evidence in the case and to determine

17  whether or not the defendants are guilty beyond a reasonable

18  doubt, solely upon the basis of such evidence. Under your oath

19  as jurors you cannot allow a consideration of the punishment

20  which may be imposed upon the defendants if they are convicted

21  to influence your verdict in any way or in any sense to enter

22  into your deliberations.

23    Jury to Consider Only These Defendants: You will be

24  asked to decide the following questions in this case:  First,

25  in regards to Count One, whether the Government has proven

1    beyond a reasonable doubt the guilt of Che Jaron Durbin and

2    Terrell Darnell Walton.

3        Second, the Government has -- second, whether the

4    Government has proven beyond a reasonable doubt the guilt of

5    Mr. Durbin as to Count Two.

6        Third, whether the Government has proven beyond a

7    reasonable doubt the guilt of Mr. Durbin in regards to Count

8    Three. You are not being asked whether any other person has

9    been proven guilty. Your verdict should be based solely upon

10   the evidence or lack of evidence as to these defendants in

11   accordance with my instructions and without regard to whether

12   the guilt of other people has or has not been proven.

13       With these preliminary instructions in mind, let us turn

14   to the charges against the defendant as contained in the

15   indictment. I remind you that the indictment itself is not

16   evidence. It merely describes the charges made against the

17   defendants. It is an accusation. It may not be considered by

18   you as any evidence of the guilt of the defendants.

19       In reaching your determination of whether the Government

20   has proved the defendants guilty beyond a reasonable doubt,

21   you may consider only the evidence introduced or the lack of

22   evidence.

23       The defendants are not charged with committing any crimes

24   other than the offenses contained within the indictment. You

25   should consider only the charges.

1    Variance, Dates:  While we are on the subject of the

2    indictment, I should draw your attention to the fact that the

3    indictment charges that specific acts and offenses occurred on

4    or about a certain date. The proof need not establish with any

5    certainty the exact date of the specific acts or offenses. The

6    law only requires a substantial similarity between the dates

7    alleged in the indictment and the dates established by the

8    testimony or exhibits.

9    Presumption of Innocence, Burden of Proof: Although the

10   defendants have been indicted, you must remember that an

11   indictment is only an accusation. It is not evidence. The

12   defendants have pled not guilty to that indictment. As a

13   result of the defendants' pleas of not guilty, the burden is

14   on the prosecution to prove beyond a reasonable doubt -- to

15   prove guilt beyond a reasonable doubt. This burden never

16   shifts to the defendant for the simple reason that the law

17   never imposes upon a defendant in a criminal case the burden

18   or duty of calling any witness or producing any evidence.

19   The law presumes a defendant to be innocent of all of the

20   charges against him. I therefore instruct you that the

21   defendants are presumed by you to be innocent throughout your

22   deliberations until such time, if ever, you as a jury are

23   satisfied that the Government has proven them guilty beyond a

24   reasonable doubt.

25   The defendants began this trial here with a clean slate.

1      This presumption of innocence alone is sufficient to acquit a

2      defendant unless you as jurors are unanimously convinced

3      beyond a reasonable doubt of their guilt after careful and

4      impartial consideration of all the evidence in this case. If

5      the Government fails to sustain its burden against either

6      defendant, you must find that defendant not guilty. This

7      presumption was with the defendants when the trial began and

8      remains with each, even now as I speak to you and will

9      continue with the defendants into your deliberations unless

10     and until you are convinced the Government has proven the

11     defendant's guilt beyond a reasonable doubt.

12         As I mentioned to you at the beginning of the trial,

13     there are generally speaking two types of evidence from which

14     the jury may properly find the truth. One is direct evidence

15     such as testimony of an eyewitness. The other is

16     circumstantial evidence, the proof of a chain of circumstances

17     pointing to the existence or nonexistence of certain facts. As

18     a general rule, the law makes no distinction between direct

19     and circumstantial evidence, but simply requires that the jury

20     find the facts in accordance with the preponderance of all of

21     the evidence in the case, both direct and circumstantial.

22         During the trial, you have heard testimony of witnesses

23     and argument or may hear argument from Counsel that the

24     Government did not utilize specific investigative techniques.

25     You may consider these facts in deciding whether the

 1    Government has met its burden of proof because as I told you,

 2    you should look to all of the evidence or lack of evidence in

 3    deciding whether the defendants are guilty. However, you are

 4    also -- you also are instructed that there is no legal

 5    requirement that the Government use any of these specific

 6    investigative techniques to prove its case. Your concern as I

 7    have said is to determine whether or not on the lack -- on the

 8    evidence or lack of evidence each defendant's guilt has been

 9    proved beyond a reasonable doubt.

10         A stipulation of fact is an agreement among the parties

11    that a certain fact is true. You must regard such agreed facts

12    as true.

13         During the trial, you have heard the attorneys use the

14    term "inference" and in their arguments they may ask you to

15    infer on the basis of your reason, experience, and common

16    sense from one or more established facts the existence of some

17    other fact. An inference is not a suspicion or a guess. It's a

18    reasoned, logical decision to conclude that a disputed fact

19    exists on the basis of another fact which you know exists.

20         There are times when different inferences may be drawn

21    from facts whether proved by direct or circumstantial

22    evidence. The Government asked you to draw one set of

23    inferences, while the defense asked you to draw another. It is

24    for you and you alone to decide what inferences you will draw.

25         Impermissible to Infer Participation From Mere Presence:

1    You may not infer that a defendant's guilt -- that a defendant

2    is guilty of participating in criminal conduct merely from the

3    fact that he was present at the time the crime was being

4    committed and had knowledge that it was being committed.

5        Impermissible to Infer Participation from Association:

6    You may not infer that a defendant was guilty of participating

7    in criminal conduct merely from the fact that he associated

8    with other people who were guilty of wrongdoing.

9        Knowledge, Intent, Willfulness: In a criminal case, a

10   defendant may be found guilty only if he acted willfully,

11   intentionally or with knowledge. Knowledge, willfulness, and

12   intent involve the person's state of mind. Accordingly, this

13   is a fact you are called upon to decide. Medical science has

14   not yet devised an instrument which can record what was in

15   one's mind in the distant past. Rarely is direct proof

16   available to establish the state of one's mind. This may be

17   inferred from what he or she says or does, his words, actions,

18   conduct as of the time of the occurrence of certain events.

19       Credibility of witnesses: Now I have said that you should

20   weigh and consider all of the evidence. This does not mean,

21   however, that you must accept all of the evidence as true or

22   accurate. You are the sole judges of the credibility or

23   believability of each witness and the weight to be given to

24   his or her testimony. In weighing testimony, the testimony of

25   a witness, you should consider his or her relationship to the

1    plaintiffs or the defendants; his or her interest, if any, in

2    the outcome of the case; his or her manner of testifying; his

3    or her opportunity to observe or acquire knowledge concerning

4    the facts about which he or she testified; his or her candor,

5    fairness and intelligence and to the extent that he or she has

6    been supported or contradicted by other credible evidence. In

7    short, you may accept or reject the testimony of any witness

8    in whole or in part.

9         It is legitimate for an attorney to seek to discredit or

10   impeach a witness by, among other things, demonstrating that

11   all or part of the witness testimony is materially false.

12   Likewise, an attorney may seek to impeach a witness

13   demonstrating that the witness made a prior inconsistent

14   statement. This is done by showing that before trial the

15   witness made a statement that is inconsistent with or

16   contradicts the witness' trial testimony. If you find that a

17   witness has been impeached, you must decide what impact, if

18   any, the impeachment has on the believability of the witness'

19   testimony. The believability of the witness is for you and you

20   alone to decide.

21        Party Not Bound by Witness. No party is bound by the

22   testimony of the witnesses called by that party. Each party is

23   entitled to contradict or rebut the testimony of any witness

24   called by them. After making your own judgment, you may give

25   the testimony of each witness such weight, if any, you may

1    think it deserves.

2         Number of Witnesses:  The test is not which side brings

3    the greater number of witnesses or presents the greater

4    quantity of evidence, but rather which witness and which

5    evidence appeals to your minds as being most accurate and

6    otherwise trustworthy.

7         The defendant, Mr. Walton, did not testify in this case.

8    Under our constitution, the defendant has no obligation to

9    testify or present any other evidence because it is the

10   prosecution's burden to prove the defendant guilty beyond a

11   reasonable doubt. That burden remains with the prosecution

12   throughout the entire trial and never shifts to the

13   defendants. The defendant is never required to prove he is

14   innocent. You may not attach any significance to the fact that

15   Mr. Walton did not testify. No adverse inference against him

16   may be drawn by you because he did not take the witness stand.

17   You may not consider this against the defendant in any way in

18   your deliberations in the jury room.

19        You have heard evidence that Che Durbin has been

20   convicted of one or more crimes. You may consider that

21   evidence together with other pertinent evidence in deciding

22   how much weight to give his testimony. You must not consider

23   the convictions as evidence that the defendant committed the

24   crimes charged in this case.

25        All Evidence Need Not Be Produced:  The law does not

1    require the prosecution to call as witnesses all persons who

2    may have been present at any time or place involving the case

3    or who may have -- who may appear to have some knowledge of

4    matters in issue at this trial.

5        Court Rulings: At times throughout the trial, the Court

6    has been called upon to pass on the admissibility of certain

7    offered evidence. You should not be concerned with the Court's

8    rulings or the reasons for them.  Whether evidence that has

9    been offered is admissible or not is purely a question of law

10   and a matter left to the Court.

11       In admitting the evidence to which an objection has been

12   made, the Court does not determine what weight should be given

13   to such evidence. You must not guess what the answer might

14   have been to any question to which I -- to which an objection

15   was sustained and you must not speculate as to the reason the

16   question was asked or the reason for the objection.

17       Transcripts and Recordings:  The Government has been

18   permitted to hand out a typed document that it prepared

19   containing the Government's interpretation of what appears on

20   tape recordings or on recordings which have been received as

21   evidence. Those are given to you as an aid or a guide to

22   assist you in listening to the recordings. However, they are

23   not in and of themselves evidence. Therefore, when the

24   recordings were played, I advised you to listen very carefully

25   to them as they were played. You alone should make your own

interpretation of what appears on the recording based upon what you heard. If you think that you heard something differently than appeared on the transcript, then what you heard is controlling. The text messages that were admitted are evidence, however.

Wiretaps:  The Government has offered evidence in the form of tape recordings of telephone calls with the defendants and others which were obtained without the knowledge of the parties to the conversation, but with the consent and authorization of the Court. These so-called wiretaps were lawfully obtained. The use of this procedure to gather evidence is perfectly lawful and the Government is entitled to use the wiretaps in this case.

Charts and Summary Evidence: The Government has presented exhibits in the form of charts and summaries. I decided to admit these charts and summaries in place of the underlying documents that they represent in order to save time and avoid unnecessary inconvenience. You should consider these charts and summaries as you would any other evidence.

Witness Credibility: It must be clear to you by now that the Government and the defendants are asking you to draw very different conclusions from various factual issues in the case. Deciding these issues will involve making judgments about the testimony of the witnesses you have listened to and observed. In making these judgments, you should carefully scrutinize all

1    of the testimony of each witness, the circumstance under which

2    the witness testified and any other matter in evidence that

3    may help you to decide the truth and the importance of each

4    witnesses' testimony.

5        Your decision whether or not to believe a witness may

6    depend on how that witness impressed you. How did the witness

7    appear?  Was the witness candid, frank, and forthright or did

8    the witness seem evasive or suspect in some way?  How did the

9    way the witness testified on direct examination compare with

10   how the witness testified on cross-examination?  Was the

11   witness consistent or contradictory?  Did the witness appear

12   to know what he or she was talking about?  Did the witness

13   strike you as someone who is trying to report his or her

14   knowledge accurately?  These are examples of the kind of

15   common sense questions you ask yourselves in deciding whether

16   a witness is or is not truthful.

17       How much you choose to believe a witness may also be

18   influenced by the witness' biases. Does the witness have a

19   relationship with the Government or the defendant that may

20   affect how he or she testified?  Does the witness have some

21   incentive, loyalty, or motive that might cause him or her to

22   shade the truth?  Does the witness have some biases,

23   prejudice, or hostility that may cause the witness to give you

24   something other than completely accurate -- a completely

25   accurate account of the facts he or she testified to?  You

1    should also consider whether the witness had an opportunity to

2    observe the facts he or she testified about. Also, you should

3    consider whether the witness' recollection of the facts stands

4    up in light of the other evidence in the case.  In other

5    words, you must try to do -- in other words, what you must try

6    to do in deciding credibility is to size up a person just as

7    you would in any important matter when you're trying to decide

8    if a person is truthful, straightforward, and accurate in his

9    or her recollection.

10        Accomplices Called by the Government: You have heard a

11   witness who testified that she was actually involved in the

12   planning and carrying out of the crimes charged in the

13   indictment. The Government argues as it is permitted to do

14   that it must take its witnesses as it find them. It argues

15   that other people who themselves take part in criminal

16   activity have the knowledge required to show criminal behavior

17   by others. For those very reasons, the law allows the use of

18   accomplice testimony. Indeed, it is the law in federal courts

19   that the testimony of an accomplice may be enough in itself

20   for conviction if the jury finds the testimony establishes

21   guilt beyond a reasonable doubt. However, it's also the case

22   that accomplice testimony is of such a nature that it must be

23   scrutinized with great care and viewed with particular caution

24   when you decide how much of that testimony to believe.

25        I have given you some general considerations on

1    credibility and I will not repeat them all here, nor will I

2    repeat all the arguments that will be made on both sides.

3    However, let me say a few things that you may want to consider

4    during your deliberations on the subject of accomplices.

5         You should ask yourself whether the so-called accomplice

6    would benefit more by lying or by telling the truth. Was her

7    testimony made up in any way because she believed or hoped

8    that she would somehow receive favorable treatment by

9    testifying falsely? Or did she believe that her interest

10   would be best served by testifying truthfully? If you believe

11   the witness was motivated by hopes of personal gain, was the

12   motivation one that would cause her to lie or was it one that

13   would cause her to tell the truth? Did this motivation color

14   her testimony? In sum, you should look at all the evidence

15   deciding what credence and what weight, if any, you want to

16   give to the accomplice witness.

17        Co-defendant Plea Agreement. In this case, there has been

18   testimony from a Government witness who pled guilty after

19   entering into an agreement with the Government to testify.

20   There is evidence that the Government agreed to dismiss some

21   charges against the witness in exchange for the witness'

22   agreement to plead guilty and testify at this trial against

23   the defendants. The Government also promised to bring the

24   witness' cooperation to the attention of the sentencing court.

25   The Government is permitted to enter into this kind of plea

```
 1    agreement. You, in turn, may accept the testimony of such
 2    witness and convict the defendants on the basis of this
 3    testimony alone if it convinces you of the defendant's guilt
 4    beyond a reasonable doubt. However, you should bear in mind
 5    that a witness who has entered into such an agreement has an
 6    interest in this case different from any ordinary witness. A
 7    witness who realizes that she will be able to obtain her own
 8    freedom or receive a lighter sentence by giving testimony
 9    favorable to the prosecution has a motive to testify falsely.
10    Therefore, you must examine her testimony with caution and
11    weigh it with great care. If after scrutinizing her testimony
12    you decide to accept it, you may give whatever weight, if any,
13    you find it deserves.
14        Expert Witnesses Generally:  In this case I have
15    permitted certain witnesses to express their opinions about
16    matters that are at issue. A witness may be permitted to
17    testify to an opinion on those matters about which he or she
18    has special knowledge, skill, experience, and training. Such
19    testimony is presented to you on the theory that someone who
20    is experienced and knowledgeable in the field can assist you
21    in understanding the evidence or reaching an independent
22    decision on the facts. In weighing this opinion testimony, you
23    may consider the witnesses' qualifications, his or her
24    opinions, the reasons for testifying, as well as all other
25    considerations that ordinarily apply when you are deciding
```

1    whether or not to believe a witness' testimony. You may give

2    the opinion testimony whatever weight, if any, you find that

3    it deserves in light of all of the evidence in this case. You

4    should not, however, accept opinion testimony merely because I

5    allowed the witnesses to testify concerning his or her

6    opinion. Nor should you substitute it for your own reason,

7    judgment, or common sense. The determination of the facts in

8    this case rest solely with you.

9        Multiple Counts, One Defendant:  The indictment contains

10    a total of three counts. Each charges the defendant, Che

11    Durbin, with a different crime. You must consider each count

12    separately and return a separate verdict, guilty or not guilty

13    for each.  Whether you find the defendant, Che Durbin, guilty

14    or not guilty as to one offense does not affect your verdict

15    as to any other offense charged.

16        Likewise, Defendant Terrell Walton is only charged in

17    Count One. You should consider whether he is guilty or not

18    guilty as to Count One only.

19        Introduction to Charges. The instructions which I've just

20    given you are more or less of a general nature applicable to

21    all criminal cases before this Court. We'll next consider the

22    crimes with which the defendants are charged in the

23    indictment.

24        The alleged crimes are charged in what is called a count.

25    A count may charge more than one defendant. Accordingly, a

1    defendant may be charged in more than one count of the

2    indictment. Remember that there are two defendants. Therefore,

3    when you consider each count, you must consider each defendant

4    separately. For example, I am going to instruct you on the

5    conspiracy count. You will have to determine whether each

6    defendant is guilty of conspiracy.

7        Now I'm going to give you the specific instructions

8    relevant to this particular case.

9        Count One of the indictment in the conspiracy charge:

10    Count One charges a conspiracy to violate the laws of the

11    United States governing controlled substances. Count One

12    charges the defendant as follows: From on or about May 19

13    through in or about May 2020, in -- I'm sorry, May 2019

14    through and about May 2020 in the District of Maryland,

15    District of Arizona and elsewhere, Che Jaron Durbin and

16    Terrell Darnell Walton, the defendants herein, did knowingly,

17    willfully and unlawfully combine, conspire, confederate, and

18    agree with each other and with others known and unknown to the

19    grand jury to knowingly, intentionally, and unlawfully

20    distribute and possess with intent to distribute, a quantity

21    of a mixture or substance containing a detectable amount of

22    cocaine and cocaine base commonly known as crack cocaine, a

23    Schedule II controlled substance in violation of Title 21

24    United States Code § 841.

25        Quantity of Controlled Substance Involved in the

1    Conspiracy: With respect to Che Jaron Durbin, the amount
2    involved in the conspiracy attributable to each of them as a
3    result of their own conduct and the conduct of other
4    co-conspirators reasonably foreseeable to them is 5 kilograms
5    or more of a mixture or substance containing a detectable
6    amount of cocaine, a Schedule II controlled substance in
7    violation of Title 21 United States Code § 841 (b)(1)(A).
8        With respect to Terrell Darnell Walton, the amount
9    involved in the conspiracy attributable to each of them as a
10   result of their own conduct and the conduct of other
11   conspirators reasonably foreseeable to them is 28 grams or
12   more of a mixture or substance containing a detectable amount
13   of cocaine base, crack cocaine, a Schedule II controlled
14   substance, and a quantity of a mixture or substance containing
15   a detectable amount of cocaine, a Schedule II controlled
16   substance in violation of Title 21 United States Code §
17   841(b)(1)(B) and 841(b)(1)(C).
18       Count One charges the defendants with Conspiracy to
19   Distribute and Possess with Intent to Distribute Controlled
20   Dangerous Substances, specifically cocaine and cocaine base
21   commonly known as crack cocaine.
22       Conspiracy, Purpose of Statute: The crime of conspiracy
23   to violate a federal law is an independent offense. It is
24   separate and distinct from the actual violation of any
25   specific federal law which the law refers to as substantive

1    crimes. Indeed, you may find the defendants guilty of the

2    crime of the conspiracy to commit an offense against the

3    United States even though the substantive crime which was the

4    object of the conspiracy was not actually committed. Moreover,

5    you may find the defendant guilty of conspiracy despite the

6    fact that he was incapable of committing the substantive

7    offense.

8        Congress has deemed it appropriate to make conspiracy

9    standing alone a separate crime, even if the conspiracy was

10   not successful. This is because collective criminal activity

11   poses a greater threat to public safety and welfare than

12   individual conduct and increases the likelihood of success of

13   a particular criminal venture.

14       Count One, relevant statute. Count One of the

15   indictment is brought under § 846 of Title 21 which provides

16   in pertinent part that any person who conspires to commit an

17   offense defined in subchapter -- of this subchapter has

18   violated the criminal laws of the United States. You are

19   instructed that a violation of § 841(a)(1) of Title 21 is an

20   offense defined in this subchapter and that 841(a)(1) provides

21   in pertinent part that it shall be unlawful for any person

22   knowingly or intentionally to distribute, dispense or possess

23   with intent to distribute or dispense a controlled substance.

24       You are further instructed that as a matter of law, that

25   cocaine and crack cocaine are Schedule II controlled

1    substances. You must, of course, determine whether or not the
2    materials in question were, in fact, cocaine or crack cocaine.
3    In doing so, you may consider all evidence in the case which
4    may aid in determination of that issue including the testimony
5    of any witness who may testify either to support or to dispute
6    the allegations that the materials in question were cocaine or
7    cocaine base, or any stipulation between the parties regarding
8    the nature and the substances.

9        The Government may prove materials were cocaine and crack
10   cocaine through either direct or circumstantial evidence. A
11   example of direct evidence is the testimony of a chemist who
12   has done a chemical analysis of the materials. Circumstantial
13   evidence would be evidence from which you could infer the
14   materials were cocaine or crack cocaine, such as testimony
15   concerning the names used by the defendants to refer to the
16   materials or testimony about materials' appearances. Whether
17   the Government relies on direct or circumstantial evidence to
18   prove the materials were cocaine and crack cocaine it must
19   prove so beyond a reasonable doubt.

20       Elements of Conspiracy, Count One: In order to satisfy
21   its burden for Count One, the Government must establish each
22   of the following essential elements beyond a reasonable doubt:
23   First, that two or more persons entered the unlawful agreement
24   charged in the first count of the indictment; second,
25   defendants in question knowingly became members of the

1    conspiracy.

2        Existence of Agreement: The first element which the

3    Government must prove beyond a reasonable doubt to establish

4    the offense of conspiracy is that two or more persons entered

5    the unlawful agreement charged in the indictment. In order for

6    the Government to satisfy this element, you need not find that

7    the alleged members of the conspiracy met together and entered

8    into any express or formal agreement. Similarly, you need not

9    find that the alleged conspirators stated in words or in

10   writing, what the scheme was, its object or purpose or every

11   precise detail of the scheme or means by which its object or

12   purpose was to be accomplished. Indeed, it is sufficient for

13   the Government to show that the conspirators acted tacitly,

14   came to acting -- I'm sorry, it is sufficient for the

15   Government to show that the conspirators tacitly came into a

16   mutual understanding to accomplish an unlawful act by means of

17   a joint plan or common design.

18       You may, of course, find the existence of an agreement to

19   disobey or disregard the law has been established by direct

20   proof. However, since conspiracy is by its very nature

21   characterized by secrecy, you may also infer its existence

22   from the circumstances of the case and the conduct of the

23   parties involved. In a very real sense then the context -- in

24   the context of conspiracy cases, actions often speak louder

25   than words. In this regard, you may in determining whether an

 1    agreement existed here, consider the actions and statements of

 2    all those you find to be participants as proof that a common

 3    design existed on the part of the persons charged and his

 4    co-conspirators to act together for the accomplishment of an

 5    unlawful purpose.

 6        Membership in the Conspiracy:  The second element which

 7    the Government must prove beyond a reasonable doubt to

 8    establish the offense of conspiracy is that the defendants

 9    knowingly, willfully, and voluntarily became a member of the

10    conspiracy.  If you are satisfied that the conspiracy charged

11    in the indictment existed, you must then ask yourselves who

12    the members of the conspiracy were.

13        In deciding whether the defendants were, in fact, members

14    of the conspiracy, you should consider whether the defendants

15    knowingly and intentionally joined the conspiracy. Did they

16    participate in it with knowledge of its unlawful purpose and

17    with specific intention of furthering its business or

18    objective as an associate or worker?  In that regard, it has

19    been said that in order for a defendant to be deemed a

20    participant in a conspiracy, he must have had a stake in the

21    venture or its outcome. You are instructed that while proof of

22    a financial interest in the outcome of a scheme is not

23    essential, if you find that the defendants had such an

24    interest, that is a factor which you may properly consider in

25    determining whether or not the defendants were members of the

1    conspiracy charged in the indictment.

2         As I mentioned a moment ago, before the defendants can be

3    found to have been a conspirator, you must first find that

4    they knowingly joined the unlawful agreement or plan. The key

5    question therefore is whether the defendant joined the

6    conspiracy with an awareness of at least some of the basic

7    aims and purposes of the unlawful agreement. It's important

8    for you to note that the defendant's participation in the

9    conspiracy must be established by independent evidence of

10   their own acts or statements and a reasonable inference which

11   may be drawn from them.

12        A defendant's knowledge is a matter of inference from the

13   facts proved. In that connection, -- I'm sorry, in that

14   connection I instruct you that to become a member of the

15   conspiracy, a defendant need not have known the identities of

16   each and every member, nor need he have been apprised of all

17   of their activities. Moreover, the defendant need not have

18   been informed as to all of the details or the scope of the

19   conspiracy in order to justify an inference of knowledge on

20   his part.

21        Further, a defendant need not have joined in all of the

22   conspiracy's unlawful activities. To the extent that the

23   defendant's participation has no bearing -- I'm sorry, the

24   extent of the defendant's participation has no bearing on the

25   issue of a defendant's guilt. A conspirator's liability is not

1    measured by the extent or duration of his participation.

2    Indeed, each member may perform separate and distinct acts and

3    may perform them at different times. Some conspirators play

4    major roles, while others play minor parts in the scheme. An

5    equal role is not what the law requires. In fact, even a

6    single act may be sufficient to draw a defendant within the

7    ambit of the conspiracy.

8         I want to caution you, however, that a defendant's mere

9    presence at the scene of the alleged crime does not by itself

10   make him a member of the conspiracy. Similarly, mere

11   association with one or more members of the conspiracy does

12   not actually make a defendant a member. A person may know or

13   be friendly with a criminal without being a criminal himself.

14   Mere similarity of conduct or the fact that they may have

15   assembled together and discussed common aims and interest does

16   not necessarily establish proof of the existence of a

17   conspiracy.

18        I also want to caution you that mere knowledge or

19   acquiescence without participation in the unlawful plan is

20   insufficient. Moreover, the fact that acts of the defendant --

21   moreover, the fact that the acts of a defendant without

22   knowledge merely happened to further the purposes or

23   objectives of the conspiracy does not make the defendant a

24   member. More is required under the law. What is necessary is

25   that the defendants must have participated with knowledge of

1  at least some of the purposes or objectives of the conspiracy

2  and with the intention of aiding in the accomplishment of

3  those lawful ends.

4      In sum, the defendants with an understanding of the

5  unlawful character of the conspiracy must have intentionally

6  engaged, advised, or assisted in it for the purposes of

7  furthering the illegal undertaking. They thereby become

8  knowing and willing participants in the unlawful agreement.

9  That is to say, conspirators.

10     Membership in the Conspiracy: An individual need not join

11 a conspiracy at the inception or remain active in it until it

12 ends to be found guilty of the conspiracy. Moreover, each

13 person joining a conspiracy is taken to adopt and is bound by

14 the prior acts and statements of other conspirators made in

15 furtherance of the conspiracy and during its pendency, even if

16 made before the individual in question may have joined the

17 conspiracy.

18     Acts and declarations of co-conspirators. You will recall

19 that I have admitted into evidence against the defendants, the

20 acts and statements of others because these acts and

21 statements were permitted by persons who the Government

22 charges were also confederates or co-conspirators of the

23 defendants on trial.  The reason for allowing this evidence to

24 be received against the defendant has to do with the nature of

25 the crime of conspiracy. A conspiracy is often referred to as

1    a partnership in crime. Thus, as in other types of

2    partnerships, when people enter into a conspiracy to

3    accomplish an unlawful end, each and every member becomes an

4    agent for the other conspirators to carry out the conspiracy.

5    Accordingly, the reasonable and foreseeable acts,

6    declarations, statements, and omissions of any member of the

7    conspiracy and in furtherance of the common purpose of the

8    conspiracy are deemed under the law to be the acts of all the

9    members and all of the members are responsible for such acts,

10   declarations, statements, and omissions.

11        If you find beyond a reasonable doubt that the defendants

12   were members of the conspiracy charged in the indictment, then

13   any act done or statement made in furtherance of the

14   conspiracy by persons also found by you to have been members

15   of the conspiracy, may be considered against the defendants.

16   This is so even if such acts were done and statements were

17   made in the defendant's absence and without his knowledge.

18        However, before you may consider the statements or acts

19   of co-conspirators in deciding the issues related to the

20   defendant's guilt, you must first determine that the acts and

21   statements were made during the existence and in furtherance

22   of the unlawful scheme. If the acts were done or the

23   statements made by someone who you do not find had been a

24   member of the conspiracy or if they were done or said -- or if

25   they were not done or said in furtherance of the conspiracy,

1    they may not -- may be considered by you -- I'm sorry, let me

2    read that.  Or if they were not done or said in furtherance of

3    the conspiracy, they may be considered by you as evidence only

4    against the member who did or said them.

5        Definition of Distribution: As stated above, Count One

6    charges a conspiracy involving the distribution or Possession

7    with Intent to Distribute cocaine. As a result, definitions of

8    distribute and possession are in order. The word "distribute"

9    means to deliver a narcotic. "Deliver" is defined as an actual

10   constructive or attempted transfer of a narcotic. Simply

11   stated, the word "distribute" and "delivered" mean pass on or

12   to hand over to another or cause to be passed on or handed

13   over to another, or to try to pass on or hand over to another,

14   narcotics.

15       Distribution does not require a sale. Activities in

16   furtherance of the other -- activities in furtherance of the

17   ultimate sale such as vouching for the quality of the drugs,

18   negotiating for or receiving the price and supplying or

19   delivering drugs may constitute distribution. In short,

20   distribution requires a concrete involvement in the transfer

21   of drugs.

22       Definition of Possession. The legal concept of possession

23   may be different from everyday usage of the term, so I'm going

24   to explain it in a little bit of detail, in some detail.

25   Actual possession is what most of us think of as possession.

1     That is, having physical custody or control over an object.

2     For example, if you find the defendant had the drugs on his

3     person, you may find he had possession of the drugs. However,

4     a person need not have actual physical custody of an object in

5     order to be in legal possession of it. If an individual has

6     ability to exercise substantial control over an object that he

7     does not have physical custody of, then he is in possession of

8     that item.

9          An example of this from everyday experience would be a

10    person's possession of items he keeps in a safe deposit box of

11    his bank.  Although the person does not have physical custody

12    of those items, he exercises substantial control over them and

13    so has what is known as constructive possession of them.

14         Another example, suppose A is negotiating the price of

15    cocaine with B. Standing next to A is C who has several

16    envelopes of cocaine in his pocket. After a period of

17    negotiation, A directs C to hand over to B a few of the

18    envelopes. B hands some money to A. In this situation, you

19    could find that C had possession of the narcotics because he

20    had them in his pocket. However, you could also find that A

21    had possession of the narcotics because of his proximity to

22    the drugs, his association with person C in actual possession

23    of them, and his negotiation over the price. This example is

24    not conclusive, but simply meant to illustrate the notion of

25    constructive possession.

1    Possession of drugs cannot be found solely on the ground
2    that the defendant was near or close to the drugs, nor can it
3    be found simply because the defendant was present at a scene
4    where drugs were involved or solely because the defendant
5    associated with the person who does control the drugs or the
6    property where they are found. However, these factors may be
7    considered by you in connection with all other evidence in
8    making your decision whether a defendant conspired to possess
9    drugs.

10    Inference from Control Over Place Where Found:  A
11    defendant may own or have control over the place where
12    narcotics are found such as a vehicle or residence. When a
13    defendant is the sole person having such ownership or control,
14    this control is significant evidence of the defendant's
15    control over the drugs themselves. Thus, his possession of
16    drugs. You should note, however, that a defendant's sole
17    ownership or control of a residence or vehicle does not
18    necessarily mean the defendant had control or possession of
19    drugs found in it. A defendant may also share ownership or
20    control of the place where the drugs are found. In this event,
21    the drugs may be possessed by only one person, or by some
22    people who control the place or by all of them. However,
23    standing alone the fact that a particular defendant had joint
24    ownership or control over the place where drugs were found is
25    not sufficient evidence to find the defendant possessed the

1    drugs found there.

2        In order to find that a particular defendant possessed

3    drugs because of his joint possession or control over the

4    place where they were found, you must find beyond a reasonable

5    doubt that the defendant knew about the presence of the drugs

6    and intended to exercise control over them.

7        Proof of intent:  Intent ordinarily may not be proved

8    directly because there's no way of fathoming or scrutinizing

9    the operation of the human mind. But you may infer the

10   defendant's intent from the surrounding circumstances. You may

11   consider any statements made and any act done or omitted by

12   the defendant and all other facts and circumstances in

13   evidence which indicate their state of mind. You may consider

14   it reasonable to draw the inference and find that a person

15   intends the natural and probable consequences of acts

16   knowingly done or knowingly omitted. As I've said, it is

17   entirely up to you to decide what facts to find from the

18   evidence.

19       Amount of Controlled Substances:  If you find that the

20   Government has proven the defendants guilty of conspiracy

21   charged in Count One, that is, that the alleged conspiracy

22   existed in that the defendant knowingly and intentionally

23   became members of the conspiracy, then you must determine

24   beyond a reasonable doubt what type and quantity of controlled

25   substance is attributable to the defendants. In determining

```
1    what type and quantity of controlled substance is attributable
2    to a particular defendant, you should consider the following:
3    First the defendant is accountable for any type of -- any type
4    and quantity of drugs which he personally distributed or
5    possessed with intent to distribute.
6         Second, a defendant is also accountable for the type and
7    quantity of drugs which he attempted to or planned to
8    distribute or possess with intent to distribute.
9    Specifically, the defendant is accountable for those drugs
10   even if those drugs were never actually obtained or
11   distributed so long as an objective of the conspiracy was for
12   the defendant to distribute or possess with intent to
13   distribute such a type and quantity of drugs.
14        Third, a defendant is also accountable for any type and
15   quantity of drugs which another member of the conspiracy
16   distributed or possessed with intent to distribute as part of
17   the conspiracy so long as it was reasonably foreseeable to the
18   defendant that such a type and quantity of drugs would be
19   involved in the conspiracy which he joined.
20        Fourth, a defendant is also accountable for any type and
21   quantity of drugs which another member of the conspiracy
22   attempted or planned to distribute or possessed with intent to
23   distribute so long as it was reasonably foreseeable to the
24   defendant that such type and quantity of drugs would be
25   involved in the conspiracy which he joined.
```

1          A defendant is accountable for those drugs even if those
2     drugs were never actually obtained or distributed by other
3     members of the conspiracy, so long as an objective of the
4     conspiracy was for the other members of the Conspiracy to
5     distribute or possess with intent to distribute such a type
6     and quantity of drugs. These last two rules apply even if the
7     defendant did not personally participate in the acts or plans
8     of his co-conspirators, or even if the defendant did not have
9     actual knowledge of those acts or plans so long as those acts
10    or plans were reasonably foreseeable to the defendant.

11         The reason for this is simply that the co-conspirator is
12    deemed to be the agent of all other members of the conspiracy.
13    Therefore, all of the co-conspirators bear criminal
14    responsibility for the acts and plans that are undertaken to
15    further the goals of the conspiracy.

16         Your finding about the types and quantities of controlled
17    substances attributable to each defendant will be noted on the
18    verdict form.  And I've got a verdict form here which I will
19    review with you prior to going in.  But basically it has
20    questions and specific quantity amounts, assuming that you
21    find the defendant -- even one of the defendants guilty or not
22    guilty as to the -- or guilty as to any of the offenses.

23         Now your findings about the types and quantities of
24    controlled substances attributable to each of the defendants
25    as indicated will be noted on the verdict form which I will

1    end up discussing momentarily.

2         Counts Two and Three:  Counts Two and Three charge the

3    defendant, Che Jaron Durbin with Possession of Controlled

4    Substances with the Intent to Distribute. The indictment reads

5    as follows: On or about May 19, 2019 in the District of

6    Maryland, the defendant, Che Jaron Durbin, did knowingly and

7    intentionally possess with intent to distribute 500 grams or

8    more of a mixture or substance containing a detectable amount

9    of cocaine, a Schedule II controlled substance in violation of

10   Title 21 United States Code § 841 (b)(1)(B) and 18 United

11   States Code § 2. The law makes it a crime for any person to

12   knowingly, intentionally possess with intent to distribute

13   controlled substance.

14        Count Two and Three, Elements of the Offense: In order to

15   prove these charges, the Government must establish beyond a

16   reasonable doubt each and every one of the following elements

17   of the crime charged in Counts Two and Three. First, that the

18   defendant, Che Durbin, possessed narcotic drugs. Second, the

19   defendant, Che Durbin knew he possessed narcotic drugs and

20   third, that the defendant, Che Durbin, intended to distribute

21   the narcotics drugs. I've already instructed you in connection

22   with the first count of the indictment, that cocaine

23   hydrochloride and cocaine base are narcotic drugs and

24   controlled substances. Likewise, I've already instructed you

25   in connection with the meaning of the first element that the

1    Government must prove, namely possession.

2         Counts Two and Three, Knowledge that Drugs were

3    Narcotics:  The second element the Government must prove for

4    Counts Two and Three is that the defendant, Che Durbin, knew

5    that he possessed narcotics. The Government must prove beyond

6    a reasonable doubt that the defendant, Che Durbin, knew he

7    possessed narcotics and that it was possession -- and that its

8    possession was not due to carelessness, negligence, or

9    mistake. If you find the defendant, Che Durbin, did not know

10   he possessed narcotics, then you must find him not guilty.

11        Count Two and Three, Method of Proving Knowledge:  Your

12   decision whether the defendant, Che Durbin, knew the material

13   he intended to distribute was cocaine, involves a decision

14   about his state of mind. It's obviously impossible to directly

15   prove the operation of the defendant's mind. But a wise -- but

16   wise and intelligent consideration of all the facts and

17   circumstances shown by the evidence and exhibits in this case

18   may enable you to infer what the defendant's state of mind

19   was.

20        In our ever day affairs we continuously -- we are

21   continuously called upon to decide from the actions of others

22   what their state of mind is. Experience has taught us

23   frequently, actions speak louder and more clearly than spoken

24   or written words. Therefore, you may rely in part on

25   circumstantial evidence in determining the defendant's state

1   of mind.

2       Counts Two and Three, Joint Possession: More than one

3   person can have control over the same drugs. When this occurs,

4   people have what is called "joint possession." For purposes of

5   determining the defendant's guilt, joint possession is no

6   different from sole possession. However, the defendant does

7   not have joint possession of a controlled substance simply

8   because he associates with a person who does have possession

9   and control over the drugs. You cannot find the defendant

10  possessed drugs unless you find that he exercised substantial

11  control over them either on his own, or acting with another

12  person.

13      Counts Two and Three, Intent to Distribute:  If you find

14  that the defendant, Che Durbin, knowingly possessed cocaine,

15  then you must decide whether he intended to distribute it.

16  Simply stated, the word "distribute" means pass on or hand

17  over to another, or cause to be passed on or handed over to

18  another, or attempted to pass on or handed to another,

19  narcotics.  In short, intent to distribute requires an

20  intention to be involved in the transfer of drugs.

21      The same considerations that apply to your determination

22  whether the defendant, Che Durbin, knew that he possessed

23  controlled substances apply to your decision concerning his

24  intention to distribute them. Since you cannot read a

25  defendant's mind, you must make inferences from his behavior.

```
1    However, you may not convict the defendant unless these
2    inferences convince you beyond a reasonable doubt that the
3    defendant intended to distribute the drugs. When I say to you
4    that you must find the defendant intended to distribute the
5    drugs, that does not mean you must find that he intended to
6    personally distribute or deliver the drugs. It is sufficient
7    if you find the defendant intended to cause or assist the
8    distribution of the controlled substances by others. Basically
9    what you're determining is whether the drugs in the
10   defendant's possession were for personal use or for the
11   purposes of distribution. Often it is possible to make this
12   determination from the quantity of drugs found in the
13   defendant's possession. For example, it would be highly
14   unlikely that a person with 50,000 doses of amphetamines
15   possessed them for personal consumption. The possession of a
16   large quantity of narcotics does not necessarily mean the
17   defendant intended to distribute them. On the other hand, a
18   defendant may have intended to distribute controlled
19   substances even if he did not possess large amounts of them.
20   Other physical evidence such as paraphernalia or packaging for
21   processing of drugs can show such an intent. There might also
22   be evidence of a plan to distribute. You should make your
23   decision whether the defendant intended to distribute the
24   controlled substances in his possession from all the evidence
25   presented.
```

1          Aiding and Abetting:  With regard to Count Two and Three,

2     Possession with Intent to Distribute Controlled Substances,

3     the Government alleges that the defendant, Che Durbin,

4     committed the charged offenses under the aiding and abetting

5     statute. Under the aiding and abetting statute, it is not

6     necessary for the Government to show that a defendant himself

7     physically committed the crime with which he is charged in

8     order for you to find that person guilty.  A person who aids

9     or abets another to commit an offense is just as guilty of

10    that offense as if he committed it himself. Accordingly, you

11    may find the defendant, Che Durbin, guilty of the offenses

12    charged if you find beyond a reasonable doubt that the

13    Government has proved that another person actually committed

14    the offenses with which the defendant, Che Durbin, is charged

15    and that the defendant, Che Durbin, aided and abetted the

16    person in the commission of the offense.

17         As you can see, the first requirement is that you find

18    another person has committed the crime charged. Obviously no

19    one can be convicted of aiding and abetting the criminal acts

20    of another if no crime was committed by the other person in

21    the first place. But if you find the crime was committed, then

22    you must consider whether or not the defendant, Che Durbin,

23    aided or abetted the commission of the crime.

24         In order to aid an abet another to commit a crime, it's

25    necessary that the defendant, Che Durbin, willfully and

1    knowingly associated himself in some way with the crime and
2    that he willfully and knowingly seeks by some act to help the
3    crime succeed.
4        Participation in a crime is willful if the action is
5    taken voluntarily or intentionally or in this case -- or the
6    case of a failure to act with specific intent to fail to do
7    so, something the law requires to be done. That is to say with
8    bad purpose, either to obey or disregard the law.
9        To establish the defendant knowingly associated himself
10   with the crime, the Government must establish the defendant
11   had the requisite mental state. For example, Counts Two and
12   Three, the defendant, Che Durbin, must have known that drugs
13   were being possessed with intent to distribute.  I'm sorry,
14   must have known that the drugs being possessed with the
15   intention of being distributed. To establish that, the
16   defendant -- to establish that the defendant participated in
17   the commission of the crime, the Government must prove the
18   defendant engaged in some affirmative conduct or overt act for
19   the specific purpose of bringing about the crime. Mere
20   presence of the defendant when the crime is being committed,
21   even coupled with knowledge by the defendant that the crime is
22   being committed or mere acquiescence by the defendant in the
23   criminal conduct of others, even with guilty knowledge is not
24   sufficient to establish aiding and abetting.
25       And aider and abetter must have some interest in the

1    criminal venture. To determine whether a particular criminal

2    defendant aided or abetted the commission of the crime with

3    which he is charged, ask yourself these questions: Did he

4    participate in the crime charged as something he wished to

5    bring about?  Did he associate himself with the criminal

6    venture knowingly and willfully?  Did he seek his actions to

7    make the criminal venture succeed?  If he did, then the

8    defendant is an aider or abettor and therefore, guilty of the

9    offense.

10        If, on the other hand, your answers to the series of

11   questions are no, then the defendant is not an aider or

12   abetter and you must find him not guilty.

13        Type and Amount of Controlled Substance in Counts Two and

14   Three.  If you find that the Government has proven the

15   defendant, Che Durbin, guilty of Counts Two and Three, that is

16   Possession with Intent to Distribute controlled substances,

17   then you must determine beyond a reasonable doubt what type

18   and quantity of controlled substance is attributable to him.

19   For Counts Two and Three, you may determine the type and

20   quantity of controlled substance attributable to Che Durbin by

21   considering the type and quantity of substance actually or

22   constructively possessed by him and the type and quantity of

23   controlled substance jointly or solely possessed by Durbin.

24        I've already defined for you the concepts of joint and

25   sole possession, as well as the concepts of actual or

```
1   constructive possession. Your finding on the type and quantity

2   of controlled substance attributable to Che Durbin as to

3   Counts Two and Three will be noted on the verdict form which I

4   will discuss when you receive this case for deliberations.

5           Counsel, come up to the bench.

6           (Counsel approached the bench.)

7           THE COURT:  All right, any objections or exceptions

8   other than what was previously noted?

9           MS. FLYNN:  In order to preserve the record I would

10  renew my objections to the two instructions.

11          THE COURT:  That was the bias instruction?

12          MS. FLYNN:  Correct.

13          THE COURT:  And what was the other one?

14          MS. FLYNN:  And the other one was the nature of the

15  law of conspiracy.

16          THE COURT:  Oh, right, right, right, the purpose of

17  the statute.

18          MS. FLYNN:  The purpose of the statute.

19          THE COURT:  The purpose of the statute.  That is

20  noted. It was already preserved, but that is fine. Other than

21  those objections, any objections to my instructions?

22          MS. FLYNN:  No.

23          MR MANN:  No.

24          MR. ROMANO:  No, Your Honor.

25          THE COURT:  What I'm going to do, I'm going to read
```

1   the Duty to Deliberate, Communication to the Court and Verdict

2   Form form after your closing when I send them back in the jury

3   room. Right now I'm go to send them home.

4                    **(Counsel approached the bench.)**

5             **THE COURT:**  Ladies and gentlemen, I've concluded 98

6   percent of my instructions to you. There's some last

7   instructions that I'll give you tomorrow right before you go

8   back into the jury room to begin your deliberations.

9        We have not heard the closing arguments of counsel. I

10  would ask overnight that you respect the case and the process

11  which I know that you will do and not discuss the case with

12  anyone.  Not discuss the case with your significant person or

13  family member or friend at home, but just simply wait until

14  after a verdict is rendered before you end up discussing it.

15       So with that, we're going to adjourn for the day. I'm

16  going to have you return back to the jury room at 9:15

17  tomorrow. At that point in time we will be prepared to give

18  closing arguments.  And you're going to see -- you'll probably

19  see a podium or table right there, right out in front of you

20  which will be used by the attorneys in closing argument.

21       As I indicated as well, please don't discuss this case

22  amongst yourselves, allow anyone to discuss this case with

23  you.  Continue to keep an open mind about this case throughout

24  all the evidence, my instructions on the law, as well as

25  closing argument. Don't do any independent research of this

```
 1    case on your own and if anything questionable happens, don't
 2    discuss it with your fellow jurors. Just simply write a note,
 3    get it to your foreperson, Juror No. 1, and I will end up
 4    addressing it.
 5         So with that, have a safe evening.  You can leave your
 6    notebooks there and I will see you tomorrow at 9:15. Again,
 7    9:15.
 8                   (Jury excused at 4:21 p.m.)
 9              THE COURT:  All right, everybody could be seated.
10    Counsel, is there anything else that we can handle
11    productively before we conclude?
12              MR. ROMANO:  Not from the Government, Your Honor.
13              MS. FLYNN:  No, Your Honor.
14              THE COURT:  Mr. Mann?
15              MR MANN:  Judge, are you going to collect the
16    transcript binders from them prior to our --
17              THE COURT:  Yes.
18              MR MANN:  Prior to our closing?
19              THE COURT:  Are you going to refer -- is anyone
20    going to refer to the transcripts during closing argument?
21    Okay, so what we'll do is they'll hold onto it up until then,
22    but I'll ask Counsel to -- I'm pretty sure I will remember,
23    but I'll ask Counsel just to double down and remind me to
24    collect the binders before they go back to begin
25    deliberations.
```

```
 1              MR MANN:  Well, I would actually make a request that
 2    we collect them prior to doing closings.  I think it's
 3    perfectly fine to reference the calls and reference what our
 4    recollections are, but I don't want to foresee a time where if
 5    I'm making reference to it, jurors start flipping through the
 6    book again. I think that their attention should be on us. Your
 7    Honor has told them that what we're discussing is not evidence
 8    and so I don't think they should have demonstrative evidence
 9    in their hand while we're making reference to or doing a
10    closing argument that they can sort of draw their attention
11    from it.
12              THE COURT:  Well, the PowerPoint -- the Government
13    is going to put the transcripts and the text messages on the
14    Elmo. They're going to see them.
15              MR MANN:  That would be my request.
16              MR. ROMANO:  If he doesn't want to use them, that's
17    fine.  He doesn't have to. That doesn't mean that we shouldn't
18    be able to.
19              THE COURT:  Right.  The transcripts are not going to
20    go back, but they can be referred to as they were referred to
21    during the course of trial. I've admonished them both during
22    the presentation of the transcripts, as well as during
23    instructions that they weren't substantive evidence. They're
24    not coming back with them. Counsel are free to argue precisely
25    that, stating that rule of law and telling them to give what
```

```
 1   weight, if any, they believe it deserves with regard to that
 2   interpretation. So I'm going to allow Counsel to -- but the
 3   books will be collected immediately after the Government's
 4   close and I would ask that the Government make sure that that
 5   happens.
 6           MR. ROMANO:  We will.
 7           THE COURT:  After the rebuttal. Is there anything
 8   else?  Mr. Mann?
 9           MR MANN:  Not from me, Judge.  Thank you.
10           THE COURT:  Thank you very much.  See you tomorrow.
11   I'll have Counsel come in at 9:00 tomorrow.
12           (Proceeding concluded at 4:23 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
                    *****
```

```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
 2                         NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,   )
                                 )
 4        vs.                    )   CRIMINAL CASE NO. GLR-20-0210
                                 )
 5   CHE DURBIN and TERRELL      )           VOLUME VI
     WALTON,                     )
 6                               )
          Defendants.            )
 7   _____)

 8                     Wednesday, March 9, 2022
                           Courtroom 7A
 9                       Baltimore, Maryland
                            JURY TRIAL
10
     BEFORE:  THE HONORABLE GEORGE LEVI RUSSELL, III, Judge
11

12   For the Plaintiff:
     Christopher Romano, Esquire
13   Jason Hamilton, Esquire
     Special Assistant United States Attorney
14   36 S. Charles Street, Fourth Floor
     Baltimore, Maryland  21201
15
     For the Defendants:
16        For Che Jaron Durbin:
              Catherine Flynn, Esquire
17            Law Office of Catherine Flynn
              217 North Charles Street, Second Floor
18            Baltimore, Maryland  21201
          For Terrell Darnell Walton:
19            Tyler Mann, Esquire
              Law Offices of Mann and Risch
20            101 E. Chesapeake Avenue, Suite 100
              Towson, Maryland  21286
21   Also Present:
          Brian Battee, Harford County Sheriff's Office
22        Damon Gasque, IT, U.S. Attorney's Office
     _____
23                        Reported by:
                   Nadine M. Bachmann, RMR, CRR
24              Federal Official Court Reporter
                101 W. Lombard Street, 4th Floor
25                Baltimore, Maryland  21201
                       410-962-4753
```

```
1                T A B L E   O F   C O N T E N T S

2

3     CLOSING ARGUMENTS                                  PAGE

4         On behalf of the Government:

5             By Mr. Hamilton:                       7

6         On behalf of Defendant, Che Durbin

7             By Ms. Flynn:                         27

8         On behalf of Defendant, Tyrell Walton

9             By Mr. Mann:                          49

10        Rebuttal argument on behalf of the Government

11            By Mr. Romano:                        72

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2              MR. ROMANO:  Calling the matter of United States
3   versus Che Durbin and Terrell Walton. Criminal Case GLR
4   20-00210. Representing the United States, Special Assistant
5   U.S. Attorneys Jason Hamilton, Christopher Romano and we are
6   here for continuation of the trial.
7              THE COURT:  All right, Ms. Flynn?
8              MS. FLYNN:  Good morning, Your Honor.  Catherine
9   Flynn on behalf of Mr. Durbin, who is standing to my left.
10             THE COURT:  All right, Mr. Durbin and Mr. Mann.
11             MR MANN:  Judge, good morning.  My name is Tyler
12   Mann, M-a-n-n. I represent Mr. Walton, who is to my left.
13             THE COURT:  All right.  Mr. Walton, good morning to
14   you. Everyone could be seated. Counsel, the only reason why I
15   came out is just a small matter. I reviewed -- I was thinking
16   about Ms. Flynn's objections and Mr. Mann's objections to the
17   hostility or resentment instruction and I realized when I was
18   reading the instructions to the jury, that Court's Instruction
19   22, as well as Government's Requested Instruction No. 4 really
20   talk specifically about witness credibility and, indeed,
21   specifically about bias, prejudice, and hostility. So I just
22   want to make sure that the record is clear that I believe that
23   the concerns related to not reading the resentment instruction
24   that was requested would be covered based upon at least the
25   evidence that we ended up receiving. But, Ms. Flynn, your
```

```
1    objection is noted and preserved. And Mr. Mann, your joining

2    that objection is noted and preserved.

3            MR MANN:  Thank you, Judge.

4            THE COURT:  Yes, Ms. Flynn?  Oh, you were going to

5    say something?

6            MS. FLYNN:  Not about that.

7            THE COURT:  Okay, I'll hear from you.

8            MS. FLYNN:  Your Honor, just a couple of things.  I

9    went down to lockup this morning to see Mr. Durbin before we

10   started and he was just pulling in, so the marshal indicated I

11   wouldn't have time. So I'm asking if I could just have a

12   moment or two to speak to Mr. Durbin after Mr. Hamilton is

13   finished.

14           THE COURT:  Oh, okay.

15           MS. FLYNN:  If I could go in the back with him, for

16   instance.

17           THE COURT:  Oh, okay, okay.

18           MS. FLYNN:  I don't need to go back down to lockup.

19   I just haven't talked to him since yesterday.

20           THE COURT:  Okay, would you prefer -- I don't think

21   all of our jurors are here yet. All of our jurors are not here

22   yet. If you would like to go back into lockup with him now.

23           MS. FLYNN:  Great, great.

24           THE COURT:  That would be perfectly fine.  And how

25   long do you anticipate meeting with him?
```

```
 1              MS. FLYNN:  Just a few minutes. I mean, I just want
 2    to sort of --
 3              THE COURT:  No problem. If we could, I don't know
 4    whether or not according to marshal's protocol we could make
 5    arrangements to have Ms. Flynn speak to Mr. Durbin back there
 6    or whether or not she needs to go downstairs to do so.
 7              A U.S. MARSHAL: She'd have to go downstairs or we'd
 8    have to stay there with them.
 9              THE COURT:  Now I take it you would like the privacy
10    of being able to speak to him alone as opposed to having the
11    other marshals stand with him?
12              MS. FLYNN:  That's up to you, Mr. Durbin.
13              THE COURT:  Or, Ms. Flynn, the noise button is
14    pretty good at masking. I'd be more than happy to have you sit
15    there. I'll put the noise button on and mask your conversation
16    if you want.
17              MS. FLYNN:  Are you okay with that?  Then we can sit
18    here. I thought we were ready to start, so --
19              THE COURT:  No, no, no, no. So what I'll do is Mr.
20    Durbin will stay there. I'll put the masking button on so that
21    you and Mr. Durbin can have a private conversation.
22              MS. FLYNN:  And the one other thing I just want to
23    put on the record just to make sure it's preserved is my
24    objection to the language in the verdict form with the
25    "guilty" coming before the "not guilty."
```

```
 1                    THE COURT:  Absolutely.
 2                    MS. FLYNN:  I would ask that it be reversed and "not
 3       guilty" be first and then "guilty."
 4                    THE COURT:  Right. And I noted that I overruled the
 5       objection and I fully -- as I indicated, I fully intend on
 6       spelling that out specifically to them regarding guilt or no
 7       guilt. Just simply if you find him guilty, you check this box.
 8       If you find him not guilty, you check this box.
 9                    MS. FLYNN:  Okay, thank you.
10                    THE COURT:  All right.
11                    (Ms. Flynn consulted with her client privately.)
12                    MR. ROMANO:  Mr. Durbin, Ms. Flynn, I just wanted to
13       let you know all of our jurors are here. Take your time, but I
14       wanted to let you know we are ready to go.
15                    MS. FLYNN:  Okay.
16                    (Ms. Flynn continued to consult with her client in
17       private.)
18                    THE COURT:  Mr. Mann, are you ready to go?
19                    MR MANN:  I'm ready.
20                    THE COURT:  Ms. Flynn is ready?
21                    MS. FLYNN:  Ready, Your Honor.
22                    THE COURT:  Government is ready?
23                    MR. ROMANO:  Yes, Your Honor.
24                    THE COURT:  Very good, we'll grab the jury.
25                    (Jury entered the courtroom at 9:26 a.m.)
```

```
 1              THE COURT:  All right, everyone could be seated.
 2    Good morning, ladies and gentlemen. Glad to see you made it
 3    back here safe and sound. We are ready to proceed with closing
 4    argument in this case.  The Government will proceed with its
 5    opening close, followed by Ms. Flynn and Mr. Mann with their
 6    closing argument and the Government can choose if they wish to
 7    provide rebuttal.
 8         I'm going to try to stagger these whereby the Government
 9    will go first with their closing, followed by Ms. Flynn. We
10    will likely have a short break or recess for about ten minutes
11    or so, allow you to stretch your legs and then we'll proceed
12    with Mr. Mann and his closing argument and then the
13    Government's rebuttal. I will have some final closing
14    instructions to you and then you will begin this case as far
15    as the deliberations are concerned.
16         So with that, Mr. Hamilton, are you prepared to begin
17    your opening close?
18              MR. HAMILTON:  I am, Your Honor. Since I'm
19    double-vaxed and boosted, I will be doing it without a mask.
20              THE COURT:  Thank you.
21              MR. HAMILTON:  Good morning, ladies and gentlemen.
22    On behalf of the Government and surely defense counsel as
23    well, thank you for your time, your patience and your
24    attention during the course of this trial. Throughout it,
25    you've seen and heard the overwhelming evidence that the
```

1    defendants, Mr. Che Durbin and Mr. Terrell Walton were engaged

2    in a criminal conspiracy to distribute cocaine and crack

3    cocaine in Maryland. And in doing so, that Mr. Durbin

4    possessed on two separate occasions, more than 500 grams of

5    cocaine.

6        We'd like to discuss some of the Court's instruction and

7    the evidence that resulted in the defendants being charged in

8    this case.

9        Let's be clear, this is a case about cocaine and crack

10   cocaine. Mr. Durbin and Mr. Walton dealt in cocaine and crack,

11   not marijuana. This is a case about kilos, not cars.

12       Sergeant Underhill is a recognized expert with a decade

13   of narcotics experience. He testified about the coded language

14   of the defendants and how it was clearly referencing cocaine

15   and crack cocaine. Terms like "powder," "cake," "undone,"

16   "hard" or "soft," "one and one," "other." All of these were

17   about cocaine as powder or crack. And all of these were used

18   by the defendants to communicate with their co-conspirators

19   and their customers.

20       Mr. Durbin even agreed with Sergeant Underhill about the

21   definition of terms such as "hard" and "soft" and what a

22   "Vick" is. But incredibly, Mr. Durbin now asks you to believe

23   that although Sergeant Underhill was accurate about all the

24   terms, all the weights, all the methods, he was somehow wrong

25   about which drug was involved. That simply makes no sense in

1    the context of everything you have heard throughout this

2    trial.

3        Before you on the table is the cocaine that was seized in

4    this case, in 2019, taken from this doll, and again in 2020,

5    tested and chemically verified by Forensic Scientist Stephanie

6    Laufert. Cocaine.

7        Now let's look at the specifics of each charge, starting

8    with Count One. The Government has charged both defendants

9    each with one count of Conspiracy to Distribute and Possess

10   with an Intent to Distribute Cocaine.

11       Now at the beginning of this trial, defense counsel for

12   Mr. Walton said the Government wouldn't be able to prove its

13   case because we wouldn't be able to show you Mr. Walton

14   physically dealing drugs or with the proceeds of those drugs

15   in his other hand. But to prove a conspiracy charge, the

16   Government doesn't have to do that. We only need to prove two

17   things: First, that the defendants entered into an agreement

18   with one or more persons to distribute and possess with intent

19   to distribute cocaine. And second, that the defendants

20   knowingly and voluntarily participated in it.

21       Now when we talk about an agreement, keep in mind it

22   doesn't have to be a formal one, a written contract, it's

23   merely a mutual understanding and it can be spoken, it can be

24   unspoken. You can infer an agreement exists by the actions to

25   disobey or disregard the law. Actions such as dealing in

1    cocaine. And you can consider how these actions are proof of a
2    common design to act together to accomplish an unlawful act.
3    In other words, actions can speak louder than words.

4        Now let's look at how that worked. First, Mr. Durbin has
5    to get the cocaine to Maryland. Let's start with the 993 grams
6    of cocaine that he received in the mail from Jack Anderson in
7    May of 2019. Inspector Pecukaitis testified that Jack Anderson
8    used a fake name and a fake address to mail that cocaine to
9    True Homes, LLC at 1003 Warwick Drive where Mr. Durbin's
10   mother lived. True Homes, LLC, a business that Mr. Durbin has
11   a 99 percent interest in, despite his surprise at that
12   revelation when confronted with the paperwork he signed.

13       On May 17, 2019 you heard how detectives watched Mr.
14   Durbin sit outside his mother's apartment, how he was anxious,
15   pacing around, awaiting the arrival of that package and the
16   mailman.  And how when the mailman came he tried to flag him
17   down.  And then he waited for the mailman to come up, he
18   immediately jumped up and followed him inside.

19       Ms. Thompson testified that Mr. Durbin said there was
20   cocaine in that package and instructed her to drive it to
21   their apartment. Now Mr. Durbin says that's not true. He says,
22   "I didn't know there was cocaine in that package until the
23   morning of." And he was very upset that Ms. Thompson would
24   have cocaine sent to his mother's address. And that doesn't
25   make any sense because had he been so upset about Ms. Thompson

1  running her cocaine business through his mother's apartment,
2  why did he continue to date her?  Why did he continue to let
3  her use his credit card?  Why did he travel to Arizona with
4  her when he knew she was running cocaine with Jack Anderson?
5  And when the police did stop Ms. Thompson in route per Mr.
6  Durbin's instructions to their apartment, they found the
7  package that had been mailed, unopened.  And they opened it,
8  and they found this:  A Minecraft doll, which as you may
9  recall, was oddly stitched. And when they opened that, 993
10  grams of cocaine.
11      Now before this package had arrived from Jack Anderson
12  there were three mystery packages that were sent to him. The
13  first was in Ms. Thompson's name on January 3, 2019. And this
14  is where the first of several amazing coincidences occurred,
15  according to Mr. Durbin, because the package is sent on
16  January 3, 2019. And Mr. Durbin just happens to fly the next
17  day to Tucson, Arizona where Jack Anderson lives. He flew from
18  Philadelphia to Tucson. He flew on January 4th, supposedly for
19  a party with eight other people who came along with him. That
20  must be quite the party to travel across the country on a
21  plane with other people.
22      But if you look at the records and the evidence, you're
23  going to see that that party occurs the night of January 4th
24  for Mr. Durbin.  And at 7 in the morning on January 5th, he's
25  back on a plane, leaving Tucson.

```
 1          Now the second parcel was sent to Jack Anderson on April
 2    18, 2019. And this one was listed as coming from Doris Durbin
 3    at her senior home. Doris Durbin is the grandmother of the
 4    defendant, Mr. Durbin. Mr. Durbin said he sent that package
 5    and he claimed it was all legal because he wouldn't put his
 6    grandmother at risk by doing something illegal and associating
 7    her with it. If everything in that package was on the up and
 8    up, everything is legal and there's nothing to be worried
 9    about, why is Doris Durbin's name on it?  Why is the return
10    address for Doris Durbin at a senior home?  Why isn't it the
11    defendant, Mr. Durbin?  Because it's not legal and he doesn't
12    want it coming back on him. Just like the $82,300 that was
13    later intercepted.
14          Mr. Durbin also said that the package contained paper,
15    but he couldn't quite remember. He mailed four pounds of paper
16    to his partner in an illegal car ring under his grandmother's
17    name, but he can't remember what it is. But later when he's
18    confronted about a random text exchange between him and Ms.
19    Walls over the sale of cocaine, he has total recall for that.
20          And then another coincidence, because the very next day
21    Ms. Thompson flies out to Tucson. She rents a car and she
22    drives back to Maryland.
23          Let's talk about that $82,300. Not a check, not a debit
24    card. Instead, 930 individual bills in $20s and $100
25    denominations wrapped in rubber bands and hidden in a wireless
```

```
 1    headphones box. First, Mr. Durbin claimed he didn't know what
 2    was in that box and that he's never sent any money to Mr.
 3    Anderson. Then he switches it up. He's sitting up there and he
 4    says "Oh, I did send that. That was money for cars that Jack
 5    Anderson didn't want." And then he explains that initially the
 6    Mexicans who were going to get those cars didn't need titles,
 7    but then they did. There was no money, but then there was
 8    money. The more Mr. Durbin speaks, the more inconsistent his
 9    story becomes.
10         And he also claims he didn't actually send the money. He
11    said he had Ms. Thompson do it. Why would he do that?  Why
12    would he have someone who he says he's avoiding her cocaine
13    business and he's in business with Mr. Anderson for something
14    completely different -- why would he give the money for the
15    cars to Jameka Thompson to mail on his behalf?  You know why,
16    it's because it's money for cocaine that he's dealing with the
17    help of Mr. Jack Anderson.
18         Now if you look at the flight records alongside the car
19    rental records, you'll see how frequently either Mr. Durbin or
20    Ms. Thompson flew to Arizona.  And the car would be rented in
21    Arizona and then driven across country back to Maryland.
22    Government's Exhibit 47 lays that out for you.
23         Ms. Thompson testified she'd travel at Mr. Durbin's
24    request to Arizona eight times.  And she drove back in a
25    rental vehicle, avoiding border patrol and police checkpoints
```

1    to bring him 40 kilos of cocaine.

2        You heard the details of that last trip to Tucson in

3    2020. Not just from Ms. Thompson, but from Detective Battee

4    who flew out there and surveilled her throughout it. Ms.

5    Thompson told you how she flew to Arizona while Mr. Durbin

6    drove cross country, and that while in Tucson they met up with

7    Jack Anderson. That after she took Mr. Durbin to the airport

8    so he could fly back, she began to fly back to Maryland with

9    the cocaine that she had picked up on Mr. Durbin's behalf. And

10   how she had driven two hours and reached New Mexico before Mr.

11   Durbin called her and said, "Go back."  Jack has got more

12   cocaine for you."

13       Mr. Durbin corroborates that himself. You heard his

14   intercepted conversation with Jack Anderson's wife, Jimmica on

15   May 9, 2020. She relays to Mr. Durbin that Jack was waiting on

16   the other stuff to come and he's about to go to Jameka right

17   now. And that as soon as Jack got the other phone, he'd give

18   Mr. Durbin a call.

19       Again, Mr. Durbin has another explanation that doesn't

20   make any sense when you think about it. He testified that he

21   was desperately trying to reach Jack and that he couldn't

22   reach him. That he got Jimmica Anderson's phone number, called

23   her and that that transcript, that audio recording was of her

24   calling him back.

25       But you heard that recording.  When she calls, does he

1  sound desperate to talk to Jack Anderson?  So desperate that

2  he hunted down Jimmica's phone number?  Not at all. He's calm

3  and he doesn't ask her to pass the phone to Jack. He doesn't

4  ask her to relay any message to him. And when she says that

5  Jack was waiting on the other stuff and meeting Jameka, he

6  says, "All right."

7      He claimed he was trying to avoid Jack's cocaine

8  dealings. But if that's true, why is Jimmica Anderson telling

9  him about the other stuff, and Jack's meeting with Jameka

10  Thompson?  If he's trying to avoid that side of that, the

11  cocaine business, why isn't he telling her to shut up about

12  that sort of thing?  Because he's neck deep in it.  And she's

13  telling him that there's more cocaine coming his way. And as

14  we saw, he's hoping by Tuesday, May 12th.

15      Look at the time frame of some of the other calls and

16  texts you heard where Mr. Durbin is waiting for Ms. Thompson

17  to return from Arizona with his cocaine. On May 10th, Mr.

18  Ringgold called Mr. Durbin wanting more shoes.  And Mr. Durbin

19  tells him, "Probably tomorrow or Tuesday."

20      Gerrick Jackson had texted Mr. Durbin previously about

21  cake, that Sergeant Underhill told you is a reference to

22  crack, making powder cocaine into crack. Gerrick Jackson

23  texted Mr. Durbin who responds again, "Tuesday."

24      Now Mr. Durbin testified that this was about a new supply

25  of marijuana coming in. So when Ms. Thompson and her cocaine

1    arrives on Tuesday, Mr. Durbin is going to have a completely
2    unrelated supply of marijuana that just happens to arrive on
3    Tuesday as well. What a coincidence. Yet another one.
4         And recall that Romaine Timms texted Mr. Durbin on May
5    10th about, "Any good news?"  And Mr. Durbin responds,
6    "Tuesday." Now Mr. Durbin said, "That wasn't about drugs."
7    According to him, not everything is about drugs. Think for a
8    minute how amazing Tuesday, May 12th is. Ms. Thompson happens
9    to be returning with more cocaine. Mr. Durbin happens to have
10   a new supply of marijuana coming in.  And now there's some
11   completely unrelated news, good news for Ms. Romaine Timms,
12   that something is going to happen on that Tuesday.
13        And Mr. Durbin's Tuesday response, Zeek from Travelodge
14   that wants's basketball, well that just happened to be a
15   mistake. And then what Mr. Durbin would likely claim to be
16   another unrelated coincidence, Burton Anderson texts Mr.
17   Walton on May 11th asking him, "What's the word?"  And Mr.
18   Walton who like Mr. Durbin is waiting on the resupply of
19   cocaine responds, "Shit's dead."
20        You can see that once the cocaine reaches Maryland, the
21   distribution of it mirrors the communications here. Mr. Durbin
22   sold directly to Pettigrew, Jackson, Ringgold, Timms and
23   Walls. You know this because he admitted it. He sat up here
24   and said, "I deal drugs to these people." Now he claims it's
25   only marijuana, but we know that's not true. And he also sold

 1    to Mr. Walton and Mr. Wells. And in turn, Mr. Walton sold to

 2    Burton Anderson and Ms. Lee Ann Taylor. This is the network.

 3    Mr. Durbin uses Ms. Thompson to get cocaine from Jack

 4    Anderson. Then the defendants, Mr. Durbin, Mr. Walton,

 5    knowingly and willingly distribute that cocaine here in

 6    Maryland.

 7         You recall the testimony you heard from the various law

 8    enforcement officers and how they investigated this case. They

 9    walked you through their investigation, their techniques, and

10    what they saw and heard while conducting surveillance and

11    reviewing the intercepted communications. Recall the testimony

12    about the weight, the sizes, and the codes, crack versus

13    powder, which even Mr. Durbin admitted was accurate.

14         But you don't have to rely on their testimony alone

15    because you have the recordings of the defendants'

16    communications. You have the texts. All their communications

17    with their co-conspirators. Now given Mr. Walton's admission,

18    an incredible version of events, let's move on to Mr. Walton.

19         Mr. Walton talked repeatedly to his fellow conspirator,

20    Mr. Mike Wells, about their dealings. He tells him, "It's show

21    time. I got more. Everything is still moving. We just keep

22    flipping that shit until yo comes. I'll probably get another

23    one from him." He later tells Mr. Wells to "Put together 8 of

24    them" which Sergeant Underhill told you was code for eight

25    individual packets of narcotics.

1    Mr. Wells tells Walton in an April call that he can "mix
2   it up." Sergeant Underhill testified that meant preparing
3   powder cocaine into crack cocaine. In early May of 2020 Mr.
4   Wells tells Mr. Walton, "I just get the leftover of what you
5   do. I need something. We'll swap out. Like a Vick or something
6   quick." Recall what you heard what a Vick is.
7    Mr. Walton sold cocaine to Burton Anderson. Burton
8   Anderson is trying to buy crack. Mr. Walton tells him, "I
9   ain't got nothing but powder. Nothing but the pow. I got a
10   little of the raw" to which Burton Anderson responds, "I don't
11   give a fuck, that's good enough. I mean, I need something."
12    In a later call, Mr. Walton tells Burton Anderson that he
13   can "get it the other way," which Sergeant Underhill explained
14   means get it as crack.
15    Mr. Walton also sold crack and cocaine to several other
16   people. He tells an unknown caller he "ain't got no pow
17   though. I ain't got nothing." Because he forgot to tell Mike
18   Wells and he "ran through that other shit." When he's out of
19   crack, he texts Deandre Randall that he "only got pow." And at
20   least five different calls and texts he talks to various
21   people like Chiminic Brown about the clock. The clock as
22   Sergeant Underhill testified is a digital scale used to
23   measure narcotics. Or as Mr. Durbin admittedly calls it, a
24   bench.
25    One customer texted Mr. Walton that he needs a B-ball.

1  And another asked if he would front him two B-balls and zips

2  because he was broke after paying his sister's bail.

3       Now Mr. Walton told Mr. Wells that he was "riding by

4  myself all day like a businessman." It is clear what kind of

5  businessman Mr. Walton is. And it's equally clear he is in

6  business with and conspiring with Mr. Durbin.

7       The detectives testified that Mr. Durbin was called by

8  nicknames in this case, "Bro," "Big Bro." You heard Mr. Walton

9  tell Mr. Wells that he was "already hollered at Big Bro." And

10  later he says he's going to "holla at Bro so he can get that

11  shit the other way." And as Sergeant Underhill testified that

12  in the context of this case in narcotics trafficking, "holla"

13  is code for a drug transaction.

14       Other times, Mr. Walton just refers to Mr. Durbin as Che.

15  Talking again with Mike Wells Mr. Walton says, "I tried to hit

16  Che back to get the last two, but he ain't going to be back

17  though." And on May 8, 2020 when Mr. Durbin is trying to get

18  more cocaine from Jack Anderson in Tucson, Mr. Walton calls

19  Burton Anderson and says, "Call Che, right?"  And Burton

20  Anderson responds, "Yeah."

21       Ladies and gentlemen, a conspiracy to distribute

22  controlled substances requires an agreement that is knowingly

23  and willingly entered into. It does not require a written

24  statement agreement because actions speak louder than words.

25  But here we have both. We have both defendants' own words and

1    their actions demonstrating their knowing and willing

2    agreement to sell cocaine and cocaine base, crack cocaine in

3    Maryland. Given everything you heard and saw throughout the

4    trial, the videos, the intercepts, the testimony, common sense

5    tells you that the defendants are guilty as to Count One.

6        Now when you do find them guilty you're going to be asked

7    on the verdict form to determine which drugs they conspired to

8    distribute. As we've talked about, this is a case about

9    cocaine and crack cocaine. We heard Sergeant Underhill's

10   expert testimony about the terms and code used by both

11   defendants, "cake." "The other way." "Hard," "soft,"

12   "underdone." The numerous references to having only powder or

13   conversely, having something other available.

14       After you determine the type of drugs, you're going to be

15   asked to determine what is the quantity of those drugs that

16   the defendants are responsible for or could reasonably foresee

17   their co-conspirators being responsible for. With Mr. Durbin,

18   the most cocaine you'll need to find is five kilograms which

19   is clearly evident from what you see here and what you have

20   heard.

21       According to the lab reports and Ms. Stephanie Laufert,

22   this is 993-and-a-half grams of cocaine. The equivalent of 994

23   of these Sweet and Low packages.  This is 1,221 grams of

24   cocaine. And Ms. Thompson testified that she smuggled 40 kilos

25   of cocaine from Arizona for Mr. Durbin. And it's clear that

1    Mr. Durbin is dealing cocaine between the period of May 2019

2    when this is intercepted and May 2020 when this is

3    intercepted. The $82,300 is money for cocaine.

4         The evidence shows that Mr. Durbin sold some quantity of

5    cocaine base. It is also reasonably foreseeable that his

6    co-conspirators, Mr. Walton, Mr. Burton Anderson, and Mike

7    Wells, would traffic in some amount of crack cocaine as well.

8         As to Mr. Walton you will be asked to find the quantity

9    of cocaine either greater or lesser than 100 grams and the

10   evidence supports the finding of greater. You'll recall the

11   frequent communications indicating that all he had was powder

12   or conversely, that he was all out of powder.

13        You are also asked to find whether it was reasonably

14   foreseeable to Mr. Walton that through his or his

15   co-conspirator's actions, more than 28 grams of crack were

16   trafficked. Again, not to belabor the point here, but you have

17   the texts.  You have the audio recordings and you have the

18   definitions of terms indicating crack cocaine. These are the

19   elements of the crime, the corresponding evidence, and the

20   type and quantity of narcotics for Count One.

21        Now let's talk about Count Two, Possession with Intent to

22   Distribute cocaine. Only Mr. Durbin has been charged with this

23   particular offense and here are the elements, there are three:

24   The first is that Mr. Durbin possessed cocaine on or about May

25   17, 2019. Now under the law, possession can be the standard

physical custody of something, but it can be constructive.
When someone is considered to legally possess something,
because they have substantial control over it if not actual
physical custody. Mr. Durbin had direct custody of the cocaine
on May 17, 2019 and he also had constructive possession of it
due to his relationship with Ms. Jameka Thompson.

According to Ms. Thompson, Mr. Durbin paid her bills, her
rent. He admitted that she used his credit cards. She had,
according to the paperwork you saw, an obsessive mental health
issue that made her dependent on Mr. Durbin. While in prison,
she suggested they get married to which he agreed, despite
testifying here that he didn't really love her.

Mr. Durbin anxiously awaited the mailman on May 17, 2019,
flagging him down when he arrived, following him inside. He
gave the package of cocaine to Ms. Thompson to deliver to
their apartment. When she drove off with this cocaine and this
doll, she may have had temporary physical control of it, but
it remained constructively Mr. Durbin's. Had the police not
intercepted it, the cocaine would have fallen under his direct
physical control again for distribution once he went to their
apartment.

The second element is whether Mr. Durbin had knowledge
that he possessed cocaine that day. As discussed, he was under
investigation for cocaine trafficking. By the time the cocaine
had arrived in the mail at 1003 Warwick Drive, three mystery

1    packages had already been mailed to Jack Anderson in Tucson.

2    He admitted to sending one of those using his grandmother's

3    name and return address. And Ms. Thompson testified that Mr.

4    Durbin was the one who told her about the cocaine when he told

5    her to take it and drive it to their apartment. Common sense

6    and the evidence says that Mr. Durbin knew there was cocaine

7    in that package that day.

8         And the third element is whether Mr. Durbin intended to

9    distribute the controlled substances. Clearly the answer is

10   yes. Mr. Durbin received 993-and-a-half grams of cocaine or as

11   I said, the equivalent of 994 of these. Detective Underhill

12   testified that such a quantity is intended for distribution,

13   not personal use. And as the chart shows, as the evidence and

14   testimony has shown, Mr. Durbin was the center of an entire

15   network of dealers here in Maryland. That cocaine was for

16   distribution.

17        These are the elements and the corresponding evidence of

18   Count Two. Based on it and your own reasoning, it's clear that

19   Mr. Durbin is guilty of knowingly possessing over 500 grams of

20   cocaine on May 17, 2019 with the intent to distribute it. And

21   once again, when you find him guilty you will be asked to

22   determine the quantity and type of narcotics involved.

23        Again, not to belabor the point, but as we have

24   discussed, this is 993 grams of cocaine as scientifically

25   established by Ms. Laufert, over 500 grams.

1          Now let's talk about Count Three, Possession with Intent

2     to Distribute Cocaine. Again, only Mr. Durbin has been charged

3     with this particular offense. And here are the elements: The

4     first element is that Mr. Durbin possessed cocaine on or about

5     May 12, 2020. Mr. Durbin has been charged under the aiding and

6     abetting statute, meaning that the Government does not need to

7     show that Mr. Durbin physically committed the crime, but that

8     he took affirmative action to support the commission of the

9     crime.  Here the evidence clearly establishes that he took

10    affirmative action to bring cocaine into Maryland on May 12,

11    2020. You saw how all this worked. Mr. Durbin traveled to

12    Arizona and obtained cocaine from Jack Anderson. He paid for

13    Ms. Thompson to fly out and then he rented her a car to drive

14    back with it to Maryland. Once he left, she took the custody

15    of the cocaine to deliver it to his control here in Maryland.

16         Detective Battee testified how he observed both Mr.

17    Durbin and Ms. Thompson meeting with Jack Anderson in Tucson.

18    And Ms. Thompson testified that once she had picked up that

19    initial packet of cocaine, Mr. Durbin called her and told her

20    to go back and get more. Recall that conversation we talked

21    about, the one that makes no sense between Mr. Durbin and

22    Jimmica Anderson, unless we see it for what it really is, a

23    conversation about additional cocaine.

24         And recall the various communications of Mr. Durbin at

25    the time. He texted and called other people saying he was

1    returning from out there and he expected to have something by

2    Tuesday when Ms. Thompson returned to Maryland.

3         Under the aiding and abetting statutes, Mr. Durbin took

4    affirmative action to arrange the transportation of this

5    cocaine into Maryland. Had Ms. Thompson not been arrested upon

6    her arrival, Mr. Durbin would have taken direct physical

7    control of it.  And even if you do believe Mr. Durbin that he

8    wanted nothing to do with this cocaine, wasn't aiding and

9    abetting, he was because he sat up here and he admitted that

10   from the start he knew that Ms. Thompson and Jack Anderson

11   were in business dealing cocaine together. He knew that and

12   yet he still allowed her to use his credit card to rent cars

13   and drive back with that cocaine to bring it to Maryland.

14        The second element is whether he had knowledge that it

15   was cocaine. Well, when you think about all the evidence we

16   just discussed over the course of this and this argument and

17   you look at the totality of the circumstances, common sense

18   shows that Mr. Durbin knew he possessed cocaine in May of

19   2020.

20        And the third element is, again, whether it was intended

21   for distribution. As already discussed, Mr. Durbin is at the

22   center of a cocaine conspiracy.  And Sergeant Underhill

23   testified that that amount of cocaine is not for personal use,

24   it's for distribution. Distribution within this network.

25        Once you find Mr. Durbin guilty of Count Three, you will

1    again be asked to determine the quantity and type of narcotic.

2    As we have discussed, it is cocaine and it is over 500 grams.

3        There you have it, ladies and gentlemen. How Mr. Durbin's

4    and Mr. Walton's drug conspiracy worked and distributed

5    cocaine and cocaine base throughout Maryland. You've heard the

6    charges and the relevant law and you've seen the evidence of

7    how Mr. Durbin used Ms. Thompson to get cocaine from Jack

8    Anderson in Tucson and how she smuggled it back to Maryland,

9    across the country from him. That once he got it, Mr. Durbin

10    and Mr. Walton distributed cocaine and crack cocaine and how

11    on May 17, 2019 and again on May 12, 2020, Mr. Durbin

12    possessed more than 500 grams of cocaine.

13        But to believe Mr. Durbin's version of events you must

14    believe in coincidence over and over and over again. That when

15    he first happens to fly out, it's to a party, the day after

16    the first package to Jack Anderson. Then how Ms. Thompson

17    happens to fly out to Tucson after that second package in his

18    grandmother's name goes to Jack Anderson. And then how on

19    Super Tuesday, May 12, 2020, you have not only Jameka Thompson

20    coming back to town with a resupply of cocaine, he's also

21    getting a fresh resupply of marijuana.  And something good is

22    going to happen completely unrelated for Ms. Timms. And

23    finally, that Mr. Walton and Burton Anderson just happened to

24    be texting about "shit being dead" during that window of

25    resupply.

```
 1          The universe has to spectacularly align for that to even
 2    be plausible.  Or you could rely on your logic and your common
 3    sense and you can see how the evidence, the charges, and the
 4    law all fits together and how Terrell Walton is guilty of
 5    Count One and Che Durbin is guilty of all counts. Thank you
 6    for your kind attention.
 7                 THE COURT:  Thank you very much, Mr. Hamilton.
 8                 MR. HAMILTON:  Thank you, Your Honor.
 9                 THE COURT:  And I will get you to remove the items,
10    unless Ms. Flynn would like them at the trial table.
11                 MS. FLYNN:  No, thank you.
12                 THE COURT:  Yes, Mr. Hamilton, if you could remove
13    the evidence on the trial table, that would be great.
14          All right, Ms. Flynn, as soon as Ms. Herndon has her
15    apparatus set up. Ms. Flynn, are you prepared to give your
16    closing?
17                 MS. FLYNN:  Yes.  Thank you, Your Honor.
18          Good morning, ladies and gentlemen. As you know, I'm
19    Catherine Flynn. I represent Mr. Durbin and I want to take
20    this moment to address you and sum up what I believe we saw
21    over the last five or six days.
22          Now as the Court explained to you, because the Government
23    has the burden of proof, they get to address you twice. So
24    you'll hear from either Mr. Romano or Mr. Hamilton after
25    myself and Mr. Mann address you. So I just have this one
```

1    opportunity.

2         Now something I want you to keep in mind, you heard all

3    of those instructions and there was a lot of information that

4    you got from the judge.  But one of the instructions that you

5    heard is that these gentlemen are presumed to be innocent

6    until and unless the Government can prove them guilty beyond a

7    reasonable doubt. Now beyond a reasonable doubt is probably a

8    term you've heard, you know, in popular culture, in the media,

9    et cetera. You may never have had the opportunity to actually

10   put that into practice and make a decision about whether or

11   not I'm convinced of something beyond a reasonable doubt. It's

12   probably not a standard that you use in your everyday

13   decision-making, but it is the legal standard that's required

14   in a criminal trial.

15        Now it's up to you to decide what beyond a reasonable

16   doubt means to you as far as individuals and collectively as

17   the jury. But I want you to keep this in mind as you're sort

18   of evaluating the evidence. Now the Government has proven one

19   thing beyond a reasonable doubt, no question about it, and

20   that was through the testimony of the chemist. The chemist

21   testified that those items that the Government provided to you

22   were, in fact, cocaine. And how do we know that?  And how do

23   we know that beyond a reasonable doubt?  Well, we know that

24   because the chemist testified. We've got these protocols,

25   we've got these tests and they, in fact, do three tests to be

1  sure that what they're testing is, in fact, cocaine. Now they

2  do that because this is the Maryland State Police lab. That's

3  their job. And they know that this is evidence that's going to

4  be used in a Criminal Trial where the standard of proof is

5  beyond a reasonable doubt. So obviously the protocols that are

6  in place at the Maryland State Lab are done so that the

7  chemist is able to walk into court and say, I know this is

8  cocaine. I know that because I do the color test, then I do

9  the instrument test and then just to be sure, we do this

10 confirmatory test with a separate machine.  And those machines

11 are calibrated on a regular basis.  It's an accredited lab.

12 The people who work there have years of experience.  And then

13 they have all this paperwork that they have to fill out which

14 includes the chain of custody documentation so they can be

15 sure about everybody who has touched the evidence and they can

16 be sure of what the evidence is. Fair enough. And so that's

17 why the chemist came in and testified, "I'm an expert, I can

18 reach this conclusion and I know that's cocaine."

19     Now the Government may come and tell you that their

20 obligation is not to prove something beyond all doubt, it's

21 just beyond a reasonable doubt. And it's not to a scientific

22 certainty, it's beyond all reasonable doubt. But the

23 Government is the prosecuting agency. The Government is the

24 party that is accusing Mr. Durbin of a crime. They're the

25 party that is prosecuting him. They're the party that is

1    asking you to convict him. And their burden is to prove to you

2    each and every element of the crime beyond a reasonable doubt.

3    That's a legal requirement.

4        So when you're looking at the evidence, I want you to

5    keep in the back of your mind sort of the quality of the

6    evidence that's been provided to you so that you can sort of

7    compare and contrast the quality of the testimony and the

8    evidence that has been provided to you through each witness.

9        So I'm going to start with Jameka Thompson. We all heard

10   her testify. We all heard her say, "I was facing at least ten

11   years so I decided to plead guilty and cooperate." And she's

12   going to come in here and stand before Judge Russell and the

13   Government is going to say, "She cooperated. We want her to

14   get a benefit when she's sentenced as a result of her

15   cooperation."  And the Government is the body that decides if

16   she was valuable, whether or not her cooperation was

17   sufficient, whether or not her testimony was believable in

18   order to make that argument to the judge. And this judge is

19   going to decide, you know, what's the value of her

20   cooperation?  How valuable do I think she was as a witness?

21   How valuable was her testimony?  How truthful was her

22   testimony?  Because she doesn't want to go to jail for ten

23   years. She's got kids, she's got a life and the only way that

24   she could get out of this -- because obviously we know what

25   she was doing -- was to come in here and testify and make that

```
1    deal.
2          Now you were instructed, you need to review the testimony
3    of a witness who got a benefit from their testimony, you need
4    to review that with great care and with great skepticism,
5    knowing that she struck a deal to benefit herself.
6          Now we know Ms. Thompson lied to the police when she got
7    arrested in May of 2020. We know she lied to the authorities
8    at CDF, the Chesapeake Detention Facility where she's locked
9    up when she got caught in this sexual encounter. And we know
10   she lies when she gets caught to try and get herself out of
11   it.
12         This is what we also know: Jameka Thompson has a master's
13   degree in business administration. She was working for the
14   Department of the Army as a supply chain manager. This is a
15   highly competent woman. She's very bright. She's very
16   ambitious and up until she ended up in front of you, very
17   successful. But she has a master's degree in business
18   administration and was working for the Army. So she
19   self-diagnoses herself when she's in jail and she's caught
20   because she violates her conditions of pretrial release, with
21   an obsessive mental disorder where she's so dependent on Mr.
22   Durbin that she's incapable of doing anything other than
23   succumbing to this obsessive mental disorder.  This is a woman
24   who worked for the Department of the Army, okay?  So you need
25   to sort of look at her as a whole and make a judgment about
```

1    how reliable she is as a witness. Somebody who lies over and

2    over and over again. Now she came in here and told you she

3    lied, but that's only because she got caught.

4        So what we know is that Jameka Thompson was flying out to

5    Arizona and driving cocaine back. Now something she said when

6    I asked her is, "Did you have a storage unit?" She said,

7    "Yeah." "Did you tell the Government that?" "Yeah." Now

8    something I want you to keep in mind sort of generally

9    throughout my argument if you would, is that this is the

10   United States Federal Government. Imagine the resources they

11   have when they want to go after somebody. Imagine the

12   resources they have to follow-up and investigate something. I

13   would imagine those resources are somewhat unlimited. So Ms.

14   Thompson says, "I have a storage unit." Now if anyone has had

15   a storage unit, you know, you have to go in, register and you

16   have to pay for it.  And then you often -- there's a keypad to

17   get in or there's some registration when you go in and out of

18   the storage unit. There are records associated with that

19   storage unit. Did we see any of those records?  Of course not.

20       Now Mr. Durbin testified, "I didn't have anything to do

21   with what she was doing with the cocaine."  But let's be

22   logical. Where did she take that cocaine?  She took it to her

23   storage unit.  Now she testified that she took the cocaine --

24   she was intending on taking the cocaine in May of 2019 to this

25   address at Hilltop Terrace where nobody lived and they often

1    stayed there. And then she testified that Ms. Owens lived

2    there and she had a key. Mr. Durbin didn't have a key.

3        So when she gets caught, she lies and then when she gets

4    caught she tries to get out of it. But she had the storage

5    unit, not Mr. Durbin. And she's saying to you, "I drove 40

6    kilos of cocaine back to Maryland."

7        Now something I thought was a little curious in watching

8    the state -- the Government's presentation of evidence is

9    imagine, where are you putting 40 kilos of cocaine?  Where are

10   you cooking 40 kilos of cocaine?  They're talking about this

11   whole conspiracy of selling crack cocaine.  Who is cooking the

12   crack cocaine?

13       You heard they executed search and seizure warrants, a

14   lot of them in May of 2020. Did you see any evidence of where

15   cocaine was stored, where it was packaged, where it was cooked

16   to make it crack cocaine?  Where is this giant drug operation

17   being conducted?  I don't know.  It might have been in Jameka

18   Thompson's storage unit, but we'll never know. But keep that

19   in mind.

20       Keep in mind the numbers that she's suggesting and sort

21   of the sophistication of what would be required to get away

22   with that. Who could figure that out?  I don't know, maybe

23   somebody with a master's degree and a supply chain manager.  I

24   would imagine the logistics of what she was doing for the Army

25   could be transferred quite easily to the logistics of what she

```
 1    might need to do a cocaine operation.
 2         Now you heard Mr. Anderson also had a spot in White
 3    Marsh.  He had a condominium. Now we didn't see any records of
 4    that. We saw no confirmation. The Government didn't follow-up.
 5    I don't know if they even asked. We never saw any of Jack
 6    Anderson's calls, but what is clear is that Jameka was working
 7    with Jack Anderson to distribute these narcotics.
 8         Now something we don't have is we have no calls between
 9    Che Durbin and Jameka Thompson. We have no calls between Che
10    Durbin and Jack Anderson. We have no text messages. Now the
11    Government might suggest Mr. Durbin being the criminal
12    mastermind that he is, only talked on FaceTime with those guys
13    because interestingly, you can't capture FaceTime
14    conversations. We heard the detectives testify to that. And so
15    maybe that's why we don't have any of these communications.
16         You heard Mr. Hamilton say, you know, "Che called Jameka
17    and told her to turn around when she was driving back from
18    Tucson in May of 2020." Well, we don't have that. We have no
19    evidence of that. We have no documentation of that. And so
20    maybe it was a FaceTime call, but my understanding there's
21    still a record, like a data record of that call that exists,
22    they just can't capture the actual conversation.  We didn't
23    see any of that, did we?  No.
24         The problem with what the Government has presented to you
25    -- and both myself and Mr. Mann said this to you in our
```

1    opening -- is there is a lot of speculation and there's a lot

2    of guesswork. Mr. Hamilton said to you, "You have to use your

3    common sense to reach a conclusion because we can't actually

4    provide you the evidence you need to rely on in order to reach

5    a conclusion beyond a reasonable doubt." So they come in here

6    and they present witnesses who are saying, "This is what we

7    think happened.  Based on our vast experience and expertise,

8    this is what we think happened. And we need you to trust us

9    and use your common sense and believe that." So I want to talk

10   about a couple of specifics.

11        Romaine Timms.  Remember we heard the detectives say he

12   was sitting outside of Romaine Timms' house? We don't have any

13   documentation of this, but he saw Mr. Durbin drive up, Mr.

14   Durbin go in the house. He was there for four or five minutes

15   and then they walked out and he and Ms. Timms got in the car

16   and they squared the block, like there was somehow some

17   criminal activity that was occurring when they drove around

18   the block. Now frankly, quite logically, if Mr. Durbin was

19   delivering drugs to Ms. Timms, wouldn't he do it inside the

20   house?  Why would he do it in the car?  If you want to talk

21   about common sense. But you heard from Mr. Durbin, "Yeah I

22   went over there.  We're friends and we wanted to smoke some

23   weed so we got in the car, we drove around the block and we

24   smoked some weed."

25        Now I understand it's the Government's job to sort of

1    assign the most nefarious conclusions to any interaction. It's

2    not their job to give somebody the benefit of the doubt, but

3    it is your job to take a look at that and say, beyond a

4    reasonable doubt are we convinced about what happened that

5    day?

6        Because then they said that Ms. Timms went later to a gas

7    station and did what they thought was a hand-to-hand buy. But

8    they didn't arrest a buyer, they didn't arrest a seller.

9    They're just speculating that that's what they think happened

10    afterwards.

11        And that's why I say, okay, go back to the chemist who

12    testified about her confidence level of what she testified to.

13    Is it good enough for the Government to come to you and say

14    Yeah, that's pretty much what we think.  We don't have a

15    buyer, we don't have a seller, but logically that's probably

16    what happened so use your common sense and conclude that that

17    was a drug deal. So therefore, you have to conclude that Mr.

18    Durbin is dealing to Romaine Timms.

19        That's just one. Let's go to this video with Mr.

20    Pettigrew. And you're going to have all of these exhibits on a

21    hard drive or in some capacity so you can review all of the

22    videos and all of the evidence that has been provided to you.

23        But in that Pettigrew video where they're at the gas

24    station, Mr. Durbin testified, "I was there.  I got in the

25    back seat to talk to Mr. Pettigrew's wife." Now law

```
1    enforcement, remember they were watching.  They couldn't zoom
2    in, so they were watching the video, but there was tint on the
3    car.  They couldn't really see what was going on in the car.
4    They're assuming what was going on in the car, but they don't
5    know what was going on in the car. Mr. Durbin testified, "I
6    went there, I gave some weed to his wife and I got out,"
7    essentially.
8         Now the Government is going to suggest that everything
9    Mr. Durbin said was a lie and that you shouldn't believe him
10   and that, of course, it wasn't weed. Well, how do you know?
11   Right?  You don't know. Mr. Durbin told you, "I was selling
12   weed to Mrs. Pettigrew." A perfectly reasonable explanation.
13   No reason not to believe that. He testified, "I was selling
14   weed." He testified -- although he didn't have to, he had an
15   absolute right to remain silent.  He took that stand because
16   he wanted to tell you what was happening. He wanted to tell
17   you what was going on. He wanted to explain that to you. He
18   wanted you to know.  Even though he was advised, I could get
19   myself criminally convicted for what I'm saying on the stand
20   because I'm admitting to criminal behavior, he said, "I don't
21   care.  I want to testify." He wanted to testify despite the
22   fact he does have prior criminal convictions.  And you've been
23   instructed that you can use those convictions to decide
24   whether or not he's telling the truth. You can't use those
25   convictions to reach the conclusion that he must be guilty
```

1   this time because he has prior convictions. But he said, "I've
2   got these prior convictions. I wasn't going to do it again. I
3   recognize the cost of the decision I made earlier. I'm not
4   doing that again. So I'm going to sell weed."

5       Now the Government was quite reliant on Sergeant
6   Underhill and what he said to you with his expertise of coded
7   language, et cetera. But I asked him, "Well, what do you know
8   about weed?  Have you been on the street?  Have you been
9   conducting, you know, criminal investigations?  Do you know
10  anything about medical marijuana" He said, "No."  Like sorry,
11  I haven't been dealing with investigating crimes since medical
12  marijuana came onto the scene. And remember he said that
13  LeBrons were code?  And I said, "Well, how much are LeBrons?"
14  He said, "I have no idea." Well then how do you know that's
15  code for something?  If you have -- I mean, you can't pick and
16  choose what you know about. If you're going to come in here
17  and testify as an expert, you better have researched your
18  field and know what you're talking about. If you're going to
19  say "I believe LeBrons are a reference to drugs," you better
20  know what LeBrons cost.

21      But more importantly, he didn't know anything about the
22  marijuana business, the cost of marijuana, nothing like that.
23  And that's important because I think you can all conclude
24  there's a lot of marijuana out there right now. There are
25  medical marijuana dispensaries that Mr. Durbin told you, he

1   sells marijuana that he gets from the dispensary. He sells

2   marijuana that he gets on the street.  And Sergeant Underhill

3   doesn't know anything about the marijuana business. He's a

4   cocaine guy, evidently.  And so, you know, maybe it's

5   confirmatory bias, like what he knows about is cocaine, so

6   everything he hears is cocaine.

7        Something that I thought was interesting and didn't

8   necessarily expect is, you know, the Government introduced

9   these phone calls and you're going to be able to hear all the

10  calls. You're going to be able to read the texts. But there

11  was that one phone call that I asked -- I think it was

12  Detective Battee about where the Government concluded that

13  there was a collect call from a Maryland -- a correctional

14  facility to Mr. Walton. And in the report the Government says

15  that call is from Che Durbin. And he came in here and he

16  testified that that call is from Che Durbin.

17       Now something we all know now is that call was not from

18  Che Durbin. That call was from somebody in a different

19  facility. We all know that Mr. Durbin was in the Harford

20  County Detention Center. He testified to that. Detective

21  Battee agreed that Mr. Durbin physically could not have made

22  that call, that we know it wasn't him.

23       No, that might seem like a minor point, but it's just

24  sort of the tip of the iceberg about how this investigation

25  was conducted and how the conclusions were reached. So had

1   that not been pointed out to them on cross-examination, the

2   Government would be coming up here and saying, "Mr. Durbin

3   called Terrell Walton from jail." Because they decided that

4   that's what happened. Now they were wrong, absolutely wrong.

5   So what else were they wrong about? That's what you have to

6   ask yourselves when you are evaluating the evidence.

7        Mr. Hamilton gets up here and he says, "We know this is

8   what happened" on any particular day. Well, they don't know

9   what happened. They're speculating as to what happened. Like

10  they said, Jameka Thompson said, "I was driving back from

11  Arizona. I got to New Mexico when I got a call. I turned

12  around and I came back." Well, do we know that that's what

13  happened? Do we have any evidence that that's what happened?

14       The Government's theory all along was that Che Durbin was

15  directing Jameka Thompson. I guess it didn't occur to them

16  that Ms. Thompson would have had the capability of running her

17  own organization. Maybe it's because she's a woman, I don't

18  know. Maybe it's because she had no prior criminal record, I'm

19  not sure. Because they were incapable of assessing this from

20  the perspective that maybe Jameka was the one calling the

21  shots because they wanted Mr. Durbin. He was their target. So

22  Jameka is the perfect person to give them Mr. Durbin.

23       So imagine this case without Ms. Thompson, if the only

24  thing the Government could have provided to you were these

25  random calls and texts and suppositions and speculations based

1    on package labels from the post office. They needed Ms.

2    Thompson and she saw her way out. And so she lied to you to

3    benefit herself.  And she's done that over and over and over

4    again. And the Government didn't really do anything to

5    corroborate what she testified to. She said Mr. Durbin paid

6    all her bills. You heard that. "My BGE bill, my rent, my phone

7    bill, my car payment, my insurance." Okay, last time I checked

8    there's a paper trail that could be gathered about bills.

9    Right?  We all pay bills. They're on-line, there's paper,

10   literal paper. There's virtual records. Right?  So if you're

11   going to call a witness to come in here and testify that Mr.

12   Durbin was controlling me, Mr. Durbin was paying for

13   everything, wouldn't you respect the process enough to come in

14   with documentation to back that up?

15       Now I don't know if we don't have those documents because

16   they don't exist because she's lying or we don't have the

17   documents because the Government didn't bother, I'm not sure.

18   But the point is, they're asking you to believe her without

19   giving you anything to rely on, just her word.

20       Now Mr. Romano when he was questioning my client, brought

21   up this issue of the LLC. And it was referenced today as well

22   that somehow because Mr. Durbin was 9 -- because he was a 99

23   percent partner, that is somehow evidence that he was actually

24   in charge of everything. That a package came to the house,

25   listed in the True Homes, LLC and he's the controlling member

1    of LLC -- of the LLC and therefore, you need to decide that he

2    really was in charge. Now you'll have the document from the

3    lawyer's office about that LLC. It's 35 pages long.  I

4    wouldn't expect you to read the entire thing, but we have Ms.

5    Thompson who testified, she set up the LLC, she said, because

6    of this trucking business that they wanted to conduct. Now,

7    quite frankly, in the documentation it says it was set up for

8    real estate and she signed it. Now keeping in mind, she's the

9    one with the business degree, okay?  And Mr. Durbin testified

10   this was a real estate business.  And then you can put under

11   the umbrella of the business, other companies. But she's the

12   one who got the LLC together. She told you, "I was the one who

13   dissolved it." She's the one who knows how to do all of that.

14   He didn't testify that he knew anything about how to conduct

15   any of that. She's the one who contacted the attorney and set

16   up this LLC.

17       Now it very well may have been set up for -- she very

18   well may have intended to get a real estate license and run a

19   real estate business, but she wanted to back off of that and

20   say, you know, this was for a trucking company and nothing

21   ever happened.  And I didn't ask her what was the percentage

22   in the LLC, neither did Mr. Romano.  I'm not sure what she

23   would have testified to, but the fact that she made Mr. Durbin

24   the 99 percent owner of this business doesn't really translate

25   into saying well, then he must have been the guy in charge of

1    everything that she did.

2         Now she lied to you over and over again, over and over

3    and over again. She exaggerated to you over and over and over

4    again and she was sort of trying to push any responsibility of

5    any of this off of her and that she's just this poor, mentally

6    ill, obsessed woman who isn't capable of making any decisions

7    for herself and it's just big old mean Che Durbin telling her

8    everything that she should be doing.

9         Obviously you all have to make a decision about whether

10   or not you believe that, but the person that I saw come in

11   here and testify was a wildly competent woman, very successful

12   in her life, who made a decision to go into the drug business

13   with Jack Anderson. And Jack Anderson was traveling back and

14   forth from Tucson, to Maryland, to his apartment that we have

15   no documentation of because the Government either didn't know

16   or didn't check or didn't follow-up on, to conduct this

17   business with Ms. Thompson.

18        Now as I said, my client didn't have to come up here and

19   testify. But he wanted you to know, sort of I made a strategic

20   decision when I got out of jail that I was not going to go

21   into the drug business and he started selling cars. And then

22   one thing led to another and he ends up selling stolen cars.

23   And it was a pretty sophisticated operation.  And he said he

24   had customers in Maryland, he had Jack Anderson in Tucson and

25   there was a business decision, there was money for cars.

```
 1              And you saw and you heard when his house got raided,
 2      there was no evidence of drugs, but there was evidence of
 3      stolen cars. There were three stolen cars on the property.
 4              Now something that I thought was interesting yesterday is
 5      Mr. Romano kept asking my client about in whose name the cars
 6      were registered and said, you know, "You registered the car in
 7      Ms. Thompson's," like you let this woman drive around in a
 8      stolen car. Mr. Durbin testified, "I can't get tags in
 9      Maryland because I owe taxes." Perfectly reasonable
10      explanation. And yet the Government is trying to twist this
11      like it's manipulative and my client is in charge of Ms.
12      Thompson and putting her in harm's way by having her drive
13      stolen cars.
14              You be the judges of whether or not Jameka made that
15      decision. Perfectly happy to drive the car. So there's a Range
16      Rover, there's a Honda and there was one other car. There was
17      the Suburban, there was a Challenger.  Like this was a
18      full-time gig with these cars. And they had to come up with
19      the titles, they had to come up with the tags.  And Mr. Durbin
20      may have known sort of passively what Jameka was into, but he
21      wasn't doing anything to help her run that business.  He
22      didn't have anything to do with that business once the drugs
23      got back to Maryland.  That was all on Jameka and that was on
24      Jack Anderson. And frankly, there's not a shred of evidence to
25      suggest that's not true. You've got a couple of texts and a
```

1    couple of calls from Mr. Durbin talking to people, basically

2    agreeing to sell the marijuana.

3        You heard him testify, "I got marijuana from the

4    dispensary. I sell that." That's exotic essentially, versus

5    the marijuana that he gets on the street to sell. All sort of

6    for the purpose so that he can smoke for free from the

7    dispensary. And the Government is going to tell you, you can't

8    rely on that because Mr. Durbin isn't a reliable person.

9        That's up to you to decide. You heard every word that he

10   had to say to you. You heard everything he testified to. You

11   heard that he didn't have to testify, but he wanted you to

12   understand what was going on.  He wanted you to understand

13   what he was doing. And what he was doing was selling stolen

14   cars and selling marijuana.

15       Now something that was brought up this morning as well as

16   yesterday is whether or not essentially my client testified

17   that he was selling these cars to Jack and that Jack was

18   selling them to guys from Mexico who didn't really get

19   particularly hinky about the paperwork. Now Mr. Durbin wasn't

20   in charge of who Jack was selling these cars to. Mr. Durbin

21   testified, it's my understanding that's who Jack was selling

22   these cars to. But Mr. Durbin never testified, I knew who the

23   customers were for every transaction.  I knew what was going

24   to happen with every vehicle. So maybe Jack was selling these

25   cars to Mexican guys who took them across the border who

1    didn't care.  Maybe he was selling them to other people who

2    lived in Arizona. We don't know. And, quite frankly, the

3    Government did find evidence of the stolen car stuff when they

4    raided my client's house, but they didn't do any

5    investigation. They didn't follow-up and see what happened

6    with these cars. You heard my client got pulled over in

7    Indiana with two titles and money. Now he testified it was

8    $1,500, the detective testified it was $15,000, but it wasn't

9    seized.  We don't have any pictures. But my client wasn't

10   detained. I mean, he went to Arizona. But the Government was

11   well aware that he was driving around with these titles.  They

12   were well aware once they raided his house that he had these

13   stolen vehicles. They were well aware that the VIN numbers

14   were no good. But there was no follow-up investigation on that

15   and maybe that choice was made because we don't want to blow

16   our theory about him being in charge of a drug operation. What

17   if we come up with information about this stolen car thing and

18   that explains the connection to Jack Anderson?  Well, why

19   would we do that?

20        So you didn't see any evidence whatsoever about any

21   investigation. And it was only when I cross-examined law

22   enforcement that they even admitted that there was evidence of

23   this stolen car stuff. That was not something that the

24   Government brought out on direct and they don't have any

25   obligation to do so. But certainly it's fair for you to ask

1    yourselves, gee, I wonder why they didn't do any digging into

2    this.  At the very least they could have charged him with more

3    stuff, but maybe it would have blown their theory to bits.

4    Because they don't actually have any direct evidence to prove

5    their theory.

6        And that's what's important for you to keep in mind when

7    you're evaluating the evidence, that this is inference, it's

8    speculation, and it's guesswork. And the reason my client

9    wanted to take the opportunity to testify was to be able to

10    sort of flesh out and respond to the accusations from the

11    Government and explain to you exactly what happened.

12        And something I just want you to also keep in mind is

13    this was an investigation that went on for two-and-a-half,

14    three months. And I don't know, this cast of characters that

15    the Government is providing to you, Edward Pettigrew, Gerrick

16    Jackson, Romaine Timms, Sharon and Lache, what they're

17    suggesting is that my client was moving 40 kilos of cocaine

18    throughout Harford County. And that he had this whole network

19    of people. That's a pretty sophisticated drug operation. And

20    we didn't see any evidence of that whatsoever.

21        Listen to those calls. Listen to those people. These are

22    people calling and saying, "I got 50 bucks."  And my client

23    testified that was for weed. But can you imagine what it would

24    take to move 50 bucks worth of cocaine, 40 kilos?  That is

25    absolutely ridiculous.

```
1        Now maybe Jameka Thompson was doing that.  Maybe she was,
2   you know, breaking it down and selling half a kilo to somebody
3   and half a kilo to somebody else. We don't know because we
4   haven't seen her calls. As far as I know there was no -- I
5   don't know if there was a tracking device on her car. We don't
6   know where she went. We don't know what was in that storage
7   unit. Maybe that storage unit had the packaging material, the
8   scales, the cooking material, the tally sheets, the records,
9   the money. Like where is the money from moving 40 kilos of
10  cocaine?  Where is the money?  We didn't see any of that and,
11  quite frankly, maybe it's sitting in the storage unit for all
12  we know. Maybe the bill is being paid and it's sitting in the
13  storage unit. But if you need a private place to break down
14  cocaine, package it up and get rid of it, cook it up, a
15  storage unit would be a pretty darn good place to do it. It's
16  pretty private. Like I said, maybe it's all still there, I
17  don't know. But you need to sort of compare the evidence
18  that's been provided to you with this theory, this grand
19  theory of all of these drugs coming into Harford County. It
20  just doesn't make any sense.
21        So I appreciate you listening to me and I tried to
22  highlight what I thought was most important, but obviously as
23  I said, you all have the evidence. You all have the job to
24  evaluate that evidence and decide whether or not what has been
25  proven to you beyond a reasonable doubt.  And I would suggest
```

```
1    to you that you will find my client not guilty of all of these

2    charges. Thank you very much.

3         THE COURT:  Thank you very much, Ms. Flynn. Ladies

4    and gentlemen, we're going to go ahead and take our break,

5    mid-morning break for about 15 minutes, so enough time to

6    stretch your legs and maybe use the restroom. Please don't

7    discuss this case among yourselves. Please don't allow others

8    to discuss this case around you. Keep an open mind throughout

9    all of the balance of the closing arguments. And you will have

10   this case for deliberations very soon, probably before lunch.

11      So with that, please go back -- we're going to adjourn

12   for about 15 minutes and then we will conclude the argument.

13   Thank you very much.

14        (Jury exited the courtroom at 10:43 a.m.)

15        THE COURT:  All right, everyone could be seated.

16   Counsel, can we handle anything productively before we

17   conclude for the break, Mr. Romano?

18        MR. ROMANO:  No, Your Honor.

19        THE COURT:  Mr. Mann?

20        MR MANN:  No, Your Honor.

21        THE COURT:  Ms. Flynn?

22        MS. FLYNN:  No, Judge.

23        THE COURT:  15 minutes.

24        (Recess was taken from 10:43 to 10:59 a.m.)

25        THE COURT:  All right, you could have a seat,

                         *****
```

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA      :

     v.      :

     :      **Criminal Case No.  GLR 20-0210**

CHE DURBIN,      :

     :

TERRELL WALTON,      :

     :

     **Defendants**      :

     :

     :

...oOo...

## VERDICT FORM

### COUNT ONE

How do you find as to the Defendant, CHE DURBIN, as to **COUNT ONE**?

Guilty ___✓___          Not Guilty _____

If you have found the Defendant, CHE DURBIN, guilty as to **COUNT ONE**,

How much cocaine do you find was reasonably foreseeable to the Defendant CHE DURBIN (choose only one of the options below)?

_____ 5 kilograms or more

___✓___ 500 grams or more, but less than 5 kilograms

_____ Less than 100 grams

Was there an amount of "crack cocaine" reasonably foreseeable to the Defendant CHE DURBIN?

___✓__ YES

_____ NO

1

**JA378**

How do you find as to the Defendant, TERRELL WALTON, as to **COUNT ONE**?

Guilty _____✓_____        Not Guilty _____

If you have found the Defendant TERRELL WALTON guilty as to **COUNT ONE**,

How much cocaine do you find was reasonably foreseeable to the Defendant TERRELL WALTON (choose only one of the options below)?

____✓____ 100 grams or more

_____ Less than 100 grams

How much "crack cocaine" do you find was reasonably foreseeable to the Defendant TERRELL WALTON (choose only one of the options below)?

____✓____ 28 grams or more

_____ Less than 28 grams

2

## COUNT TWO

How do you find the Defendant, CHE DURBIN, as to **COUNT TWO**?

Guilty _____✓_____          Not Guilty _____

If you have found the Defendant, CHE DURBIN guilty as to **COUNT TWO**,

How much cocaine do you find was reasonably foreseeable to the Defendant CHE DURBIN (choose only one of the options below)?

____✓____ 500 grams or more

_____ Less than 500 grams

## COUNT THREE

How do you find the Defendant, CHE DURBIN, as to **COUNT THREE**?

Guilty _____✓_____          Not Guilty _____

If you have found the Defendant, CHE DURBIN guilty as to **COUNT THREE**,

How much cocaine do you find was reasonably foreseeable to the Defendant CHE DURBIN (choose only one of the options below)?

____✓____ 500 grams or more

_____ Less than 500 grams

**The foregoing constitutes the unanimous verdict of the jury.**

SIGNATURE REDACTED          3-10-2022
FOREPERSON                  DATE

3

**JA380**

LAW OFFICES OF

# MANN & RISCH

A LIMITED LIABILITY COMPANY

NATHANIEL K. RISCH
TYLER L. MANN

ALLISON N. BUSH

TYLER@MANNRISCH.COM

(410) 929-5145  MAIN
(410) 307-1007  FAX

101 EAST CHESAPEAKE AVENUE, SUITE 403
TOWSON, MARYLAND 21286

WWW.MANNRISCH.COM

August 22, 2022

_By PACER_
The Honorable George L. Russell III
United States District Court for the District of Maryland
101 W. Lombard Street
Chambers 7A
Baltimore, MD 21201

   _RE:_ _United States v. Terrell Walton_
     <u>Criminal Case No. GLR-20-0210</u>

Dear Judge Russell:

  I write to you on behalf of my client, Mr. Terrell Walton, who is to be sentenced on September 9, 2022, at 2:00 pm. After a jury trial, Mr. Walton was found guilty of Count One: Possession with Intent to Distribute Controlled Substances in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841 (b)(1)(B). In anticipation of the upcoming sentencing hearing, I wanted to provide the Court with some general information about Mr. Walton and this case to ensure that the Court sentence Mr. Walton to the requested 92 months.

**Personal History**

  Mr. Walton was born on July 21, 1986, in Havre de Grace, Maryland to Michael Walton and Patty Ann Washington. Mr. Walton's parents never married, and he is their only child. Mr. Walton grew up with his father and only saw his mother on special occasions.

  Mr. Walton's childhood was riddled with instability, exposure to drugs, and poverty. Throughout his childhood, Mr. Walton watched his father struggle with addiction to crack cocaine. His father was in and out of jail as a result of his drug problems. While his father's jail sentences were usually short in duration, they were frequent in quantity. When his father was in jail, Mr. Walton would sometimes stay with his mother, but would often stay with his paternal grandparents. When Mr. Walton's father was home, he maintained steady employment as a cook, but did not have enough money to support himself and Mr. Walton. Because of this, the two lived in section 8 housing and usually only had one bedroom to share. To this day, Mr. Walton and his

**JA381**

father maintain a very close relationship and frequent contact. However, Mr. Walton and his mother maintain very little communication.

Despite being the only child born from the union of his parents, Mr. Walton has a few half siblings on his mother's side, namely 38-year-old Mark Hilyard, 34-year-old Ashley Washington, and 28-year-old Alicia Washington. Mr. Walton maintains a good relationship and regular contact with both of his maternal half-sisters.

Growing up, Mr. Walton attended schools in the Harford County School System. He went to Aberdeen High School where he completed the tenth grade. While Mr. Walton did not obtain his high school diploma at Aberdeen High School, he went on to earn his GED in 2012 while incarcerated at Western Correctional Institution. Since then, Mr. Walton has gone on to earn a few certificated in different disciplines, namely a carpentry certificate in 2014, a sheet metal certificate in 2015, and a graphic arts certificate in 2019.

Mr. Walton has a long history with mental health issues dating back 2008 when he was like 22 years old. At this time, Mr. Walton was serving his first significant amount of time in jail. On top of that, right before that term of incarceration began, Mr. Walton's best friend had just been murdered. The stress of losing such a close friend, coupled with the stress of serving a lengthy sentence took its toll on Mr. Walton. He was having a hard time adjusting because of this and it greatly affected his mental health. Mr. Walton was prescribed Thorazine while incarcerated in an attempt to cope with his mental health issues. Mr. Walton was on this medication for approximately the next 18 months. Years later, in 2021, while Mr. Walton was incarcerated in Warsaw, Virginia, he attempted suicide. Mr. Walton states that the reason for this suicide attempt was because of the terrible conditions he faced while incarcerated there and the fact that he was frequently being placed in solitary confinement. After this incident, Mr. Walton was transported from Warsaw, Virginia to Chesapeake Detention Facility.

Mr. Walton has also had a long history with substance abuse. At just 9 years old, Mr. Walton began drinking alcohol. This habit stayed with him throughout his adult life as Mr. Walton states that he has been drinking alcohol all day every day for years. A few years later, at age 11, Mr. Walton began using marijuana. This too stuck with him and until his instance arrest had been his daily drug of choice. At age 16, Mr. Walton used Ecstasy for the first time. He continued using ecstasy weekly up until his instance offense. Interspersed with the regular alcohol, marijuana, and ecstasy use, Mr. Walton experimented with Xanax a few times in his teenage years. This however did not turn into a habit for Mr. Walton as he did not like the affects of the drug. The only treatment Mr. Walton has received for his substance abuse issues was a five-month substance abuse program through Gaudenzia that he successfully completed in 2014 while incarcerated. Mr. Walton hopes to receive further substance abuse treatment while incarcerated or upon supervised release.

2

**JA382**

Mr. Walton is not married but has been in a relationship with Tiedre Wilson since the two were children. They were living together in Elkton, Maryland up until his current arrest. He and Ms. Wilson do not have any children together. The couple maintains regular communication and Ms. Wilson has been a big source of support for Mr. Walton.

Mr. Walton is generally in good physical health with the exception of an injury to his left leg that he sustained in a car accident less than two weeks before his arrest. The injuries he sustained in that collision have resulted in bone growing on top of bone on his left leg that will require surgery to correct. This injury causes Mr. Walton constant pain and causes him to walk with a limp. Mr. Walton is not prescribed any medication for the pain but is currently using Tylenol on a regular basis in an attempt to cope with the pain.

Mr. Walton has limited employment history. Prior to his arrest in 2021, Mr. Walton worked at a Lidl Warehouse in Cecil County, Maryland and at International Paper Warehouse in New Jersey. Since Mr. Walton's instant arrest, he has not had any form of employment and therefore has no income.

**Criminal History**

The Presentence Investigation Report classifies Mr. Walton as a criminal history category V, with a score of eleven. Mr. Walton's criminal record dates back to 2005 when he was just 19 years old. However, Mr. Walton has only three criminal convictions. His criminal history score is correctly calculated in the presentence report, and Mr. Walton vehemently objects to an upward departure.

**Nature and Circumstance of the Offence**

Mr. Walton accepts full responsibility for his actions in this indictment. As was expressed at trial, Mr. Walton never denied distributing drugs, it was the quantity the Government alleged, that was at issue.  When interviewed by the Ms. Cameron for the PSR, Mr. Walton advised he respected the jury's decision in the case.  Mr. Walton certainly understands the seriousness of distributing drugs, but felt he had little other choice to provide for himself and his loved ones.

**Response to Governments Request for Upward Departure and Variance**

The Government is seeking an outrageous upward variance of 65 months over the top of the guidelines.  This upward variance is based on Government's conclusion that Mr. Walton is guilty of assaulting individuals at two institutions, the characterization that his criminal history category inadequately represents his criminal history, and his likelihood of recidivism.  The Defense vehemently objects and disputes each of these points.

3

**JA383**

The Government submits reports from Northern Neck Regional Jail as proof of Mr. Walton's dangerousness. These reports are filled with unreliable hearsay. The first mention of Mr. Walton is in regards to a June 13, 2021 stabbing incident. Even if this information in these reports was reliable, and the Defense does not submit they are, another inmate stabbed the victim. The remainder of the reports revolve around rudeness to staff, certainly common in jail, and alleged contraband, where Mr. Walton is one of five other inmates alleged involved.

In regards to the April 10, 2022 incident at Chesapeake Detention Facility, it is alleged that Mr. Walton assaulted Che Durbin, his co-Defendant, in the eye and ear. No contraband was recovered from the scene and neither Mr. Walton or Mr. Che Durbin cooperated with staff. The sole evidence that Mr. Walton was the perpetrator is an alleged statement to Capt. Dabbs, in which Mr. Walton admitted to the assault because "Durbin, snitched like a bitch." This statement is contradictory to evidence from trial, that although Mr. Durbin did testify on his own behalf, he made no statements in regards to Mr. Walton.
To hold this against Mr. Walton violates his due process rights, and essentially forces the Defense to fight a case in which he is not been charged.

Mr. Walton's criminal history is poor. His criminal history category is a V, with a score of 11. Despite a poor record being considered by the Federal Sentencing Guidelines, the Government attempts to use acquitted charges against Mr. Walton as evidence of his dangerousness. The Government cites no additional information, only relying on the fact that this case is Mr. Walton's third felony durg offense as evidence of his risk of recidivism. Essentially arguing the State courts were being too lenient. This characterization violates Mr. Walton's due process rights. Though his record is admittedly poor, it is not so exceptional that an outrageous 65-month upward variance is called for. The sentencing guideline framework allocates for a poor record, and in Mr. Walton's case sets the appropriate guidelines at 92-115 months.

## COVID-19

Keeping individuals incarcerated in facilities where the COVID-19 virus is running rampant is a violation of the inmates' 8th amendment protections against cruel and unusual punishment. The 8th amendment of the United States Constitution states that cruel and unusual punishments shall not be inflicted. USCS Const. Amend. 8. "The Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984)). "The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a

prisoner to a sufficiently substantial 'risk of serious damage to his future health…'" *Id.* at 843 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). To show "substantial risk" the inmate must be able to show that "he is incarcerated under conditions posing substantial risk of serious harm." *Id.* Deliberate indifference must be more than mere negligence but can be satisfied by "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 836.

While an "accidental or inadvertent failure to provide adequate medical care to a prisoner would not violate the Eighth Amendment, 'deliberate indifference to serious medical needs of prisoners' violated the amendment because it constitutes the unnecessary and wanton infliction of pain contrary to contemporary standard of decency." *Helling*, 509 U.S. at 32 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

COVID-19 pandemic in jails and prisons has caused and is continuing to cause terrible living conditions for the inmates. The densely populated facilities and close living quarters makes it difficult, if not impossible, to follow safety precautions to stop the spread of the virus among inmates. Being confined to these dormitory style living spaces where social distancing is not possible only facilitates the rapid spread of an already quickly spreading deadly disease. Keeping inmates in such close quarters puts the inmates in harm's way, especially inmates who are elderly and/or inmates who have compromised immune systems. Being forced to live in these conditions where adequate medical care may not be available and where the rapid spread of the virus from inmate to inmate and correctional officer to inmate, constitutes a serious risk to the future health of the inmates.

The conditions in which inmates are living and the constant risk of being exposed to the virus has created dangerous and deadly conditions for the inmates and serious risks to their future health that constitutes a violation of the inmates' 8th amendment protections against cruel and unusual punishment.

### Downward Variance from Federal Sentencing Guidelines or a 2-Point Reduction in Federal Sentencing Guidelines

The impact that the COVID-19 pandemic has had on correction facilities and the inmates incarcerated in these facilities constitutes a mitigating circumstance not taken into consideration when sentencing guidelines were originally formulated and therefore warrants individualized sentences, varying downward from the original guidelines.

18 USCS § 3553 (a) defines the factors to be considered by the Federal Courts when imposing a sentence and includes such factors as the nature and circumstance of the offense, history of the defendant, the need for the sentence, the sentencing ranges established, and more.

5

**JA385**

18 USCS § 3553 (b)(1) provides some guidance for the application of the sentencing guidelines when imposing a sentence and states, in pertinent part:

"Except as provided in paragraph (2), the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

28 USCS § 991 (b)(1)(B) states that the purpose of the United Stated Sentencing Commission is to:

"provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices …"

This reference to taking into account mitigating or aggravating circumstances not initially considered in the making of the guidelines that warrant individualized sentences found in both sections shows the importance of the individualized sentence when certain circumstances, such as the unprecedented circumstances of the COVID-19 pandemic, are occurring that were not considered when creating the sentencing guidelines.

Because the factors taken into consideration under § 3553 (a) do not include unprecedented or extraordinary circumstances such as those being experienced due to the COVID-19 pandemic, § 3553 (b)(1) becomes even more important.

Due to the fact that there was no way the circumstances surrounding the COVID-19 pandemic could have been considered when originally creating sentencing guidelines, the current circumstances should be considered a mitigating factor not taken into account when creating the guidelines and therefore warrant individualized sentences, differing from the guidelines, taking into consideration the effect of the COVID-19 pandemic.

## Conclusion

Mr. Walton respectfully submits that a sentence of 92 months is the appropriate sentence for this particular offense. He acknowledges that he made a series of grave and poor decisions that will affect him and his family for the rest of his life. However, Mr. Walton is not a violent or dangerous person. He is not someone who the public must be protected from by way of a lengthy prison sentence.

**JA386**

Mr. Walton will stand before the court on September 9th and accept the Courts sentence for his actions. He will also be supported by his family who may be called upon to speak to his character. Mr. Walton's actions in the crimes laid out in this indictment are not an accurate portrayal of who is really is.

Mr. Walton offers this information not as an excuse, but simply as an explanation for his behavior. The Defense respectfully submits to the Court that the proposed sentence of 92 months is the appropriate disposition in this case. It is sufficient but no longer than necessary to further the sentencing goals of 3553 (a). We appreciate the Court's time and patience in reading this letter.

Very truly yours,

Mann & Risch, LLC


By: */s/ Tyler Mann*
     Tyler Mann

Enc.

CC: AUSA Christopher J. Romano (by electronic mail)

**JA387**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | **Criminal No.  GLR-20-0210** |
| **v.** | * | |
| | * | |
| **CHE DURBIN** | * | |
| **Defendant** | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## SENTENCING MEMORANDUM

Che Durbin, the Defendant, by and through counsel, Catherine Flynn, pursuant to 18 U.S.C. 3553 (d)(1), submits this sentencing memorandum for consideration in this Court's determination of an appropriate sentence and respectfully asserts the following:

## I.  INTRODUCTION

On March 10, 2022, Mr. Durbin was convicted of conspiracy to possess with intent to distribute 500 grams or more of cocaine and possession with intent to distribute 500 grams or more of cocaine.   Sentencing is set for September 16, 2022.

Mr. Durbin was arrested on May 12, 2020 in Harford County and was incarcerated at the Harford County Detention Center.  He had an initial appearance in United States District Court on August 7, 2020.  He has been detained at the Chesapeake Detention Facility since that date.  Therefore, when Mr. Durbin is sentenced, he should be entitled to credit from the date of his arrest.  Mr. Durbin has had an opportunity to review and discuss with undersigned

counsel the pre-sentence report prepared by the U.S. Probation Office in this case and has no objections.

In accordance with Rule 32 of the *Federal Rules of Criminal Procedure* and U.S.S.G. §6A1.3, this memorandum is intended to apprise the Court of the defendant's position with regard to calculation of the advisory guidelines, address any disputes related to sentencing, and to provide important information in support of his sentencing recommendation. For the reasons stated herein and to be further developed at the sentencing hearing, Mr. Durbin submits that a sentence of 120 months of imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing articulated in 18 U.S.C. § 3552(a).

## II.  GUIDELINE CALCULATION

In Count One, Mr. Durbin was convicted of conspiracy to distribute and in Count Two and Three, possession with the intent to distribute 500 grams or more of cocaine. The jury acquitted Mr. Durbin of conspiracy to distribute 5 kilograms or more of cocaine. The base offense level should be 24, pursuant to USSG 2D1.1(5). The Government asks this Court to ignore the jury's considered verdict and sentence Mr. Durbin in accordance with the specific Count for which he was acquitted. Mr. Durbin objects to the Government's argument and requests that he be sentenced in accordance with the actual findings of the jury.

Mr. Durbin has a total of 12 criminal history points placing him into criminal history category VI. Four of the six convictions in Mr. Durbin's past were for misdemeanor crimes.

Mr. Durbin asks that the Court find that the initial appropriate guideline range calls for a sentence between 140-175 months.

### III. PERSONAL HISTORY

In addition to the information provided in the Pre Sentence Report it is important to note that during the course of Mr. Durbin's incarceration, he has suffered significant health issues.

On November 30, 2021 the Defendant was diagnosed with Covid -19. A covid positive inmate was placed in the cell with him.  As a result he developed hypertension, which is a long-term consequence of Covid-19.

On May 15, 2021, the Defendant tore his Achilles Tendon. Mr. Durbin had to fight for months to have testing and a consult with an orthopedic specialist.  On August 5, 2021 the Court ordered proper medical testing for Mr. Durbin.  Finally, on August 29, 2021 Mr. Durbin had an appointment with Dr. Berger at the University of Maryland who recommended an MRI. The MRI was conducted on October 5, 2021 and surgery was recommended.  The surgery was finally performed on January 27, 2022.  Mr. Durbin is currently still suffering from the surgery and has developed an infection at the surgery site which has still not been addressed.  It is anticipated that he will need an additional surgery because of this infection.

On April 11, 2022 Mr. Durbin was attacked by another inmate at the Chesapeake Detention Center and was stabbed in the eye. He waited twenty minutes to be seen by medical while bleeding profusely out of his eye. Mr. Durbin waited an additional forty-five minutes for a van to take him to the hospital. He then waited an additional forty-five

minutes to be seen while still bleeding profusely. This was a medical emergency and 911

should have been called. The family was not notified.  Mr. Durbin is currently blind in

one eye and is awaiting surgery.  His surgery was scheduled for July 14, 2022 and was

cancelled and has not yet been rescheduled.

      The impact that the COVID-19 pandemic has had on correction facilities and the

inmates incarcerated in these facilities constitutes a mitigating circumstance not taken

into consideration when sentencing guidelines were originally formulated and therefore

warrants individualized sentences, varying downward from the original guidelines.

      18 USCS § 3553 (a) defines the factors to be considered by the Federal Courts

when imposing a sentence and includes such factors as the nature and circumstance of the

offense, history of the defendant, the need for the sentence, the sentencing ranges

established, and more.

      18 USCS § 3553 (b)(1) provides some guidance for the application of the

sentencing guidelines when imposing a sentence and states, in pertinent part:

"Except as provided in paragraph (2), the court shall impose a sentence of the kind, and

within the range, referred to in subsection (a)(4) unless the court finds that there exists an

aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into

consideration by the Sentencing Commission in formulating the guidelines that should

result in a sentence different from that described." 28 USCS § 991 (b)(1)(B) states that

the purpose of the United Stated Sentencing Commission is to:

"provide certainty and fairness in meeting the purposes of sentencing, avoiding

unwarranted sentencing disparities among defendants with similar records who have been

found guilty of similar criminal conduct while maintaining sufficient flexibility to permit

individualized sentences when warranted by mitigating or aggravating factors not taken

into account in the establishment of general sentencing practices …"

This reference to taking into account mitigating or aggravating circumstances not

initially considered in the making of the guidelines that warrant individualized sentences

found in both sections shows the importance of the individualized sentence when certain

circumstances, such as the unprecedented circumstances of the COVID-19 pandemic, are

occurring that were not considered when creating the sentencing guidelines.

Because the factors taken into consideration under § 3553 (a) do not include

unprecedented or extraordinary circumstances such as those being experienced due to the

COVID-19 pandemic, § 3553 (b)(1) becomes even more important.

Due to the fact that there was no way the circumstances surrounding the COVID-

19 pandemic could have been considered when originally creating sentencing guidelines,

the current circumstances should be considered a mitigating factor not taken into account

when creating the guidelines and therefore warrant individualized sentences, differing

from the guidelines, taking into consideration the effect of the COVID-19 pandemic.

Mr. Durbin has been incarcerated though the entire pandemic.  In addition to

suffering long term medical issues from Covid-19, he has suffered from a stabbing and a

torn ACL, none of which have been properly addressed by the medical staff at the jail.

Consideration of Conditions of Confinement in Pre-trial Detention

Mr. Durbin was arrested by law enforcement in Harford County and has been incarcerated since May 12, 2020. Mr. Durbin has been detained in conditions very different than a facility run by the Federal Bureau of Prisons – including excessive heat in the summer, excessive cold in the winter, mold and other conditions that have led to health problems for prisoners, and a lack of vocational, recreational, and therapeutic programming as well as subpar medical and psychological services. The stress induced by these poor conditions of confinement have been further exacerbated by the onset of the novel COVID-19 virus, which has created a serious threat to everyone, particularly those in closed settings like prisons. Mr. Durbin, like many other inmates before him, asks this Court to contemplate the conditions he has endured over the past two years and consider awarding him additional credit for time served against his sentence.

Counsel knows that the bench in this District is unfortunately well aware of the conditions at CDF. Courts in other circuits have awarded additional credit against sentences in the form of a downward departure to account for such poor conditions of pre-trial confinement. *See United States v. Franz Sutton,* 2007 WL 3170128 (D.N.J. 2007); *United States v. Pressley,* 345 F.3d 1205, 1218 (11th Cir. 2003); *United States v. Carty,* 264 F.3d 191, 196 (2d Cir. 2001), (pointing to § 3553(b) as a basis, "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines," quoting USSG § 5K2.0); *United States v. Mateo,* 299 F.Supp.2d 201 (S.D.N.Y. 2004); *United States v.*

*Rodriguez*, 214 F.Supp. 2d 1239 (M.D. Ala. 2002); *United States v. Francis*, 129 F.Supp.2d 612, 616 (S.D.N.Y. 2001) (in illegal reentry case, court departs downward one level because defendant's 13 month pretrial confinement in county facility which was qualitatively different conditions than those of pre-sentence detainees in federal facilities operated by the Bureau of Prisons.); *United States v. Bakeas*, 987 F.Supp. 44, 50 (D. Mass. 1997) ( "[A] downward departure is called for when, as here, an unusual factor makes the conditions of confinement contemplated by the guidelines either impossible to impose or inappropriate.").

In light of the extraordinarily poor pre-trial conditions of pre-trial confinement, counsel asks that the Court for a downward variance in the sentence.

## V.  SENTENCING RECOMMENDATION

Undersigned counsel respectfully submits that in light of Mr. Durbin's age and personal history and characteristics, undersigned counsel respectfully submits that a sentence of 120 months is "sufficient but not greater than necessary" to satisfy the sentencing objectives of § 3553(a).

Respectfully submitted,

_____/s/_____
Catherine Flynn
217 North Charles Street, Floor 2
Baltimore, Maryland 21201
Telephone: (410)286-1440
Email: cflynn@catflynnlaw.com

**JA394**

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 2nd day of September, 2022, a copy of the foregoing *Sentencing Memorandum* was filed under seal using the U.S. District Court for the District of Maryland's ECF system and sent via email to AUSA Christopher Romano and U.S. Probation Agent, Jessica Jackson.


_____/s/_____
Catherine Flynn

**JA395**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND (BALTIMORE)

UNITED STATES OF AMERICA                         :

                         v.                      :          No. 1:20CR00210-002

Che Jaron Durbin                                 :

                  Defendant.                     :

                                                 :

_____

FILED ___ ENTERED
LOGGED ___ RECEIVED

SEP 0 7 2022

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY_____ DEPUTY

**DEFENDANT'S PRO SE SUPPLEMENTAL SENTENCING MEMORANDUM**

Che Jaron Durbin

September 2nd, 2022

United Sates District Court
For the District of Maryland (Baltimore)
Honorable Judge George Levi Russell, III
(yks, Deputy Clerk)
101 West Lombard Street
Baltimore, MD. 21201



Re: *United States v. Che Jaron Durbin*
1:20CR00210-002 (GLR)

Dear Honorable Judge Russell, III:

The defendant Che Jaron Durbin is scheduled for sentencing on September 16th, 2022 at 2:00pm, following a jury trial concluding on March 10th, 2022, where the defendant was found guilty on Counts One, Two and Three of the superseding Indictment. A Presentence Investigation was ordered, and prepared May 27th, 2022. The defendant in support and supplement of his retained counsel's submission, presents this *Pro Se* Sentencing Memorandum for the following reasons below.

I.      Relevant Facts

On October, 27th, 2020, the defendant was charged in a five-count superseding Indictment. Count One was a violation of 21 U.S.C. § 846, 21 U.S.C. § 841(b)(1)(A) and Counts Two and Three charged Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. § 841(b)(1)(B). The offenses were alleged to have occurred on or about May 2019 to May 2020 in the District of Maryland, the District of Arizona and elsewhere.

II.     The Offense Conduct & Objections

The government's version of facts established at trial differ significantly from the record and the defendant's version of facts established at trial. The defendant objects the Presentencing Report as follows:

At page 5, Line 5: The defendant states he was found guilty of more than 500 grams but less than 5,000.

At page 5, Line 6: The defendant states he was found guilty of more than 500 grams but less than 5,000.

2

**JA397**

At page 6, Line 11: the defendant objects that his testimony about marijuana, or stolen cars was a willful attempt to obstruct justice. Furthermore, that the jury had to reject that other crimes evidence to convict him on the abovementioned Counts.[1] It is uncontroverted that Mr. Durbin admitted to selling drugs, and denying the accuracy of the government's theory of the case is not willfully obstructing justice.[2] As this Honorable Court knows the defendant does not have to actually sell the specific drug type alleged to be found guilty of Count One of the indictment.[3] Lastly, per *Pinkerton,* Counts Two and Three follow the same reasoning.[4] Therefore, the defendant objects to the § 3C1.1 enhancement.

At Page 6, Line 12: the evidence at trial[5], is as the law proscribes, not the statement and arguments of the lawyers. Preponderance of a fact must follow as the law proscribes. "The

---

[1] As we have just observed, an accused may give inaccurate testimony due to confusion, mistake, or faulty memory. In other instances, an accused may testify to matters such as lack of capacity, insanity, duress, or self-defense. Her testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent. For these reasons, if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out. See U.S.S.G. § 6A1.3 (Nov.1989); Fed.Rule Crim.Proc. 32(c)(3)(D). See also Burns v. United States, 501 U.S. 129, 134, 111 S.Ct. 2182, 2185, 115 L.Ed.2d 123 (1991). *U.S. v. Dunnigan,* 113 S.Ct. 1111, 1117, 507 U.S. 87, 95 (U.S.W.Va.,1993).

[2] Lastly, the Government addresses the picture of Julia. The Government notes that it cannot envision the manner in which this evidence would tend to injure or prejudice the Defendant. Unfortunately, the Government's lack of vision is not evidence that proves that there is no reasonable possibility that the jury's verdict was influenced by the submission of this evidence. U.S. v. Lentz, 2004 WL 3670544, at *29 (E.D.Va.,2004).

[3] Since no overt acts are required to sustain a conviction for a drug conspiracy under 21 U.S.C. § 846, see United States v. Shabani, 513 U.S. 10, 15, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994), the dispositive consideration for Wilkins's limitations claim is whether he withdrew from the conspiracy or the conspiracy ended outside the five-year limitations period. See Walker, 796 F.2d at 49; see also United States v. Seher, 562 F.3d 1344, 1364 (11th Cir.2009) ("The government satisfies the requirements of the statute of limitations for a non-overt act conspiracy if it alleges and proves that the conspiracy continued into the limitations period." (internal quotation marks omitted)). U.S. v. Wilkins, 354 Fed.Appx. 748, 756, 2009 WL 4458531, at *5 (4th Cir.,2009)

[4] For example, in Pinkerton, brothers Daniel and Walter Pinkerton were charged with both substantive violations of the Internal Revenue Code and conspiracy to violate those provisions. There was no evidence to show that Daniel had committed the substantive offense. Nevertheless, his conviction on those offenses was upheld because there was ample proof that Walter, his coconspirator, had committed those offenses during and in furtherance of the unlawful conspiracy. The Court explained that "so long as the partnership in crime continues, the partners act for each other in carrying it forward." Pinkerton, 328 U.S. at 646, 66 S.Ct. 1180. U.S. v. Collins, 415 F.3d 304, 313 (4th Cir.,2005)

[5] Judge Christian stated "In addition the...jurors will be instructed tomorrow morning with my final instructions that will repeatedly tell them what is evidence and what is not evidence." See Trial Transcript Vol. IV, 8 ¶ 4–6, 8–9

3

**JA398**

"preponderance of the evidence standard" requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before the trier of fact may find in favor of the party who has the burden. *Barhoumi v. Obama*, 609 F.3d 416 (D.C. Cir,2010). In the instant case, the jury did not have to believe the fact that Mr. Durbin sold drugs, whether he meant it directly or indirectly because § 846 does not require intent. Likewise, the evidence showed that the parcel was not delivered to Mr. Durbin, in his name or otherwise but to a co-conspirator. The Presentence Report grossly mischaracterizes the evidence submitted at trial and Mr. Durbin objects as a result.

At page 8, Line 24: The defendant objects to a four-level enhancement under § 3B1.1.[6] The government's version of the case was that the defendant was a supplier to an ongoing conspiracy.[7] As according to law nowhere did the Presentence Report point out that the defendant's conduct was otherwise extensive or, notwithstanding his wife, (no evidence he purchased from or derived funds from his wife to sell drugs), involved 5 or more participants.

---

("The following items are not evidence and may not be considered in your deliberation...The statements and arguments of the lawyers for the parties in this case.")

People v. Rouse, 2017 WL 2210643, at *7 (V.I.Super., 2017)
They deny all knowledge of the boy's going in the vessel, and their answer is evidence, and the only direct evidence.

Winsor v. Sampson, 30 F.Cas. 327, 327 (D.C.Mass. 1853); In this connection matter in avoidance is something subsequent to and distinct from or dehors the fact admitted; but, if the admission and avoidance constitute one single fact or transaction, the answer is evidence of both. Hart v. Ten Eyck, supra, 88, and note. Reid v. McCallister, 49 F. 16, 17 (C.C.Or. 1885)

[6]Based on the defendant's role in the offense, increase the offense level as follows:
(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels. § 3B1.1. Aggravating Role, FSG § 3B1.1

[7](a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

4

**JA399**

III.    Auxiliary Argument(s) for Mitigation

Mr. Durbin suffered Two significant injuries while incarcerated pre-trial. A torn achilles and trauma to his eyes due to prison violence. Mr. Durbin intends to file a lawsuit based on the intentional negligence due to the follow up care pursuant to these injuries.[8] Mr. Durbin would ask this Honorable Court to take into mitigation that pending trial Mr. Durbin nearly lost his life and moreover has suffered continuously under the care of the facilities intentionally negligent actions.[9]

Mr. Durbin respectfully submits that pursuant to the hardship of his prison conditions "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Sandin v. Conner, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); see Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996) (per curiam),2 "and we read Sandin to require that we look to actual punishment in making this determination," Scott, 156 F.3d at 287. Factors relevant to determining whether the plaintiff endured an "atypical and significant hardship" include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions" and "the duration of the disciplinary segregation imposed compared to discretionary confinement." Wright v. Coughlin, 132 F.3d 133, 136 (2d Cir.1998). See Palmer v. Richards, 364 F.3d 60, 64 (2nd Cir. ,2004)

---

[8] Deliberate indifference requires proof of intent beyond mere negligence, errors in judgment, inadvertent oversights, or disagreements between doctor and patient about the prisoner's treatment plan. See Estelle v. Gamble, 429 U.S. 97, 105-06 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). "Questions of medical judgment are not subject to judicial review." Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) Rajah v. Virginia, 2019 WL 210940, at *2 (W.D.Va., 2019)

[9] § 5H1.4. Physical Condition, Including Drug or Alcohol Dependence or Abuse; Gambling Addiction (Policy Statement)
Currentness
Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment. § 5H1.4. Physical Condition, Including Drug or Alcohol Dependence or Abuse; Gambling Addiction (Policy Statement), FSG § 5H1.4

5

**JA400**

Moreover, regardless of defendants' vaccination status, "courts reviewing motions for sentence modifications have considered the extent to which onerous lockdowns and restrictions imposed by correctional facilities attempting to control the spread of the virus have made sentences 'harsher and more punitive than would otherwise have been the case.' " Hatcher, 2021 WL 1535310, at *3 (quoting United States v. Rodriguez, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020)); see also United States v. Reiter, No. 87-CR-132 (VSB), 2021 WL 1424332, at *8 (S.D.N.Y. Apr. 15, 2021) (finding the harshness of a vaccinated defendant's conditions of confinement "militate[d] in favor of finding 'extraordinary and compelling reasons' " despite decreased medical risk); United States v. Mcrae, No. 17-CR-643 (PAE), 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021) ("[A] day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison."). "While harsh conditions of confinement alone are insufficient," if those conditions deprive defendants of the services they need to treat "serious mental and physical health issues," such deprivations may support a finding of extraordinary and compelling reasons. Hatcher, 2021 WL 1535310, at *4. Indeed, in United States v. Pina, the court found extraordinary and compelling reasons where prolonged lockdown "substantially curtailed" a defendant's ability to treat his Post-Traumatic Stress Disorder through exercise and "confinement to his cell for 22 hours a day" exacerbated his depression and anxiety. No. 18-CR-179 (JSR), 2020 WL 3545514, at *2 (S.D.N.Y. June 29, 2020). And in Hatcher, the court found the same where prolonged lockdown precluded the defendant, who was struggling with mental health and substance abuse issues, from accessing "mental health care" and "drug abuse treatment." 2021 WL 1535310, at *4. United States v. Qadar, 2021 WL 3087956, at *8–9 (E.D.N.Y., 2021).

CONCLUSION

The Defendant, Lamar Durbin, Pro Se, respectfully request that this Honorable Court review his Pro Se Supplement to his attorney's Sentencing Memorandum and thereby credit the Defendant's submission in the record. The Defendant prays that this Honorable Court assess the instant motion and rules in favor of the Defendant's Request.

6

**JA401**

Dated: Sept, 2nd, 2022

Respectfully Submitted,

/s/ *Che Jaron Durbin*

Che Jaron Durbin, *Pro Se*

```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
2                      NORTHERN DIVISION

3
   UNITED STATES OF AMERICA        )
4              Plaintiff,          )
                                   )
5         v.                       )Criminal No. 20-0210-GLR
                                   )
6  TERRELL WALTON                  )
                 Defendant.        )
7  _____ )
                                      Baltimore, Maryland
8                                     September 22, 2022
                                      2:00 p.m.
9

10             THE ABOVE-ENTITLED MATTER CAME ON FOR
                        SENTENCING HEARING
11         BEFORE THE HONORABLE GEORGE LEVI RUSSELL, III

12

13                    A P P E A R A N C E S

14  On Behalf of the Plaintiff:

15      CHRISTOPHER J. ROMANO, ESQUIRE

16  On Behalf of the Defendant:

17      TYLER L. MANN, ESQUIRE

18  Also Present:
        PAIGE CAMERON, PROBATION
19

20

21

22      (Computer-aided transcription of stenotype notes)

23                      Reported by:
                  Ronda J. Thomas, RMR, CRR
24                 Federal Official Reporter
                101 W. Lombard Street, 4th Floor
25                 Baltimore, Maryland 21201
```

```
1   (2:00 p.m.)
2           MR. ROMANO:  Good afternoon.  This is the matter of
3   United States v. Terrell Walton, it's under Criminal Case No.
4   GLR-20-0210.  Representing the United States Christopher
5   Romano, and we're here for Mr. Walton's sentencing.
6           THE COURT:  Very good.  Thank you.
7       Mr.Mann, also a pleasure.
8           MR. MANN:  Judge, pleasure to be here.  Tyler Mann,
9   M-A-N-N, representing Mr. Walton to my left.  It's nice to be
10  in the front seat, maybe not, but here I am in the front seat
11  for today's sentencing.
12          THE COURT:  Very well.  Mr. Walton, good afternoon to
13  you, sir?
14      Where is Mr. Walton's mask?
15          THE DEFENDANT:  I am so sorry, Your Honor.
16          THE COURT:  That's all right.
17          THE DEFENDANT:  My apologies.
18          THE COURT:  All right.  Consistent with that -- and
19  everyone can be seated.  Consistent with that, we have the
20  Court's masking policies that are currently in place.  They may
21  be changing, I don't know, but they're currently in place, that
22  require masking at all times within the confines of the
23  courtroom, unless you are engaged in a speaking role.  You can
24  remove your mask if you are engaged in a speaking role, but
25  only if you have been fully vaccinated and boosted.  I have
```

```
 1  been fully vaccinated and boosted, and I am engaged in a
 2  speaking role, so I'm going to remove my mask.  In the event I
 3  stop speaking for a prolonged period of time I'll place my mask
 4  back on.
 5       As indicated, we are here for the purposes of a
 6  sentencing.  After a jury trial Mr. Walton was convicted of
 7  Count 1, conspiracy to distribute and possession with intent to
 8  distribute controlled substances in violation of Title 21,
 9  United States Code § 846, 841(b)(1)(B).  There's a minimum
10  mandatory sentence that comes along with this conviction of
11  five years.
12       Mr. Mann, is that an accurate characterization why we're
13  here?
14            MR. MANN:  That's correct, Judge.
15            THE COURT:  Mr. Walton, have you had the opportunity
16  to review the presentence report that was generated in this
17  case?
18            THE DEFENDANT:  Yes, sir.
19            THE COURT:  Have you had the opportunity to speak with
20  your attorney about the report?
21            THE DEFENDANT:  Yes, sir.
22            THE COURT:  Were all of your questions answered?
23            THE DEFENDANT:  Yes, sir.
24            THE COURT:  I've had the opportunity to review the
25  report as well.  I've always reviewed the sentencing memoranda
```

1  that was submitted by the Government, as well as Mr. Mann's

2  sentencing memoranda.

3      I also have reviewed -- Mr. Mann, just to let you know, I

4  did receive a copy of the two character letters that were sent

5  on behalf of Mr. Mann.  One from a -- looks like a person by

6  the name of Ms. Wilson, and then a second one that appears to

7  be sent by Ms. Wilson as well.

8      I note that there are no objections to the presentence

9  report, but a request for an upward departure or and/or a

10 downward departure or a variance to the report, but the

11 ultimate base offense level is still applicable.

12     I note, Mr. Romano, that the Government has set forth the

13 various considerations that the Court would make when

14 determining whether or not it's an upward departure.  Is there

15 any particular preference as to whether or not I consider those

16 arguments that you made as part of a variance or a departure or

17 either way?

18     **MR. ROMANO:**  Your Honor, for the record, first I've

19 been vaccinated and boosted, so I'll remove my mask at this

20 point.

21     As I view it, technically, the upward departure is more

22 relevant to calculating the sentencing guidelines, if you will,

23 in terms of -- because it addresses Criminal History Category,

24 which is one of the purposes of why I'm asking for the

25 departure.  But the variance is somewhat interrelated, although

```
 1   the variance is under Title 18 § 3553(a).  And I'm happy to
 2   address them either individually or collectively, whatever the
 3   Court wishes.
 4        But the way I view it the upward departure actually --
 5   because the court has to figure out, first off, what the
 6   advisory guideline range is, and of course that is somewhat
 7   dependent on what the Defendant's Criminal History Category is.
 8             THE COURT:  Right.
 9             MR. ROMANO:  As you know, the Government is asking for
10   an upward departure from Criminal History Category V to VI.
11             THE COURT:  And then a variance on top of that.
12             MR. ROMANO:  And then a variance, that is correct.
13             THE COURT:  It was because of the request for a
14   variance on top of that I didn't know whether or not you wanted
15   to continue to make the argument with regard to the upward
16   departure or just make the collective argument as part of a
17   variance?
18             MR. ROMANO:  Well, I'm happy to address it
19   collectively.
20             THE COURT:  Right.
21             MR. ROMANO:  And the Court can make its finding --
22             THE COURT:  Parse it out.
23             MR. ROMANO:  -- however it wishes.  But I broke them
24   down simply because as I viewed it the variance is independent,
25   if you will, or separate from what the upward departure is
```

1  because the upward departure pertains to Criminal History

2  Category; whereas, the variance under 3553(a) goes towards what

3  ultimately is sufficient but not greater in terms of the actual

4  imposition of the sentence.

5      **THE COURT:** I got it.  I know, Mr. Mann, you're making

6  an argument that there should be a downward departure based

7  upon the conditions of confinement related to COVID.

8      And I note that the -- the United States Sentencing

9  Guidelines didn't contemplate the conditions of confinement as

10 brought on by COVID, and so it's my understanding you're asking

11 for either a variant sentence or a slight downward variance

12 considering that as part of the 3553(a) factors; is that

13 correct?

14     **MR. MANN:** Yes, Judge.  Our request still falls

15 withing the guidelines, our request of 92 months still on the

16 bottom end.  But certainly being cognizant of COVID and the

17 conditions that my client has suffered pretrial in the four

18 locations that he's been to, and I can touch on some of that as

19 well.

20     **THE COURT:** Okay.  Well, that's good.

21     I note that there aren't any objections to the report with

22 regard to the base offense level.  The base offense level is

23 24.  Pursuant to 2D1.1(a)(5), due to the amount and type of

24 narcotics involved with an offense level of 24 of course, the

25 Defendant does not receive any reduction in the offense level

1  for acceptance of responsibility.  Although, I do note that

2  the -- in the sentencing memoranda he did indicate that he

3  respected the -- at least through counsel he respected the jury

4  verdict.

5       And looking at his criminal history he's got --

6  accumulated nine Criminal History Category points.  He was on

7  probation or otherwise serving a sentence when this -- when he

8  committed the incident offense.  That raises his offense level

9  to 11.  Putting him at a Criminal History Category V.

10      The Government argues that this criminal history is

11  underrepresented based upon the various presentence conduct

12  that has occurred in this case, which would include a finding

13  of assaultive behavior and a guilty plea of assaultive behavior

14  within the institution on another codefendant.

15      So, Mr. Romano, I'll hear from you.  And then I will both

16  on the 3553(a) -- well, I'll hear from you on the Criminal

17  History Category.  I'll make a ruling on that.  And then we

18  will shift -- then I will find out what the sentencing

19  guidelines are, make that determination after I hear from

20  Mr. Mann.  And then we'll go right into the 3553(a) factors.

21          MR. ROMANO:  Thank you, Your Honor.

22          THE COURT:  Thank you.

23          MR. ROMANO:  Your Honor, I'm going to speak from the

24  podium if that's acceptable.

25          THE COURT:  That's fine.

```
 1        MR. ROMANO:  Your Honor, the Government is asking for

 2   an upward departure pursuant to § 4A1.3 of the sentencing

 3   guidelines.

 4        As I've laid out in my memorandum, the standards for an

 5   upward departure are if there's reliable information that

 6   indicates that the Defendant's Criminal History Category

 7   substantially underrepresents the seriousness of his criminal

 8   history, or the likelihood that the Defendant will commit other

 9   crimes, then the Court may in its discretion consider an upward

10   departure.

11        Section 4A1.3 also provides the type of information to

12   support the basis for an upward departure, including prior

13   sentences of substantially more than one year that had been

14   imposed as a result of independent crimes committed by the

15   Defendant on different occasions.  And I'll address that in a

16   mostly.

17        Also, prior similar misconduct established by civil

18   adjudication or in this case a failure to comply with

19   administrative orders, and another factor that can be

20   considered is whether or not the Defendant while pending trial

21   or sentencing on a charge at the time of the incident offense.

22        Just by way of background, as I set forth in my sentencing

23   memorandum, the Defendant was indicted and fled the

24   jurisdiction of Maryland, and ultimately he was found in

25   Delaware where he was arrested by the U.S. marshals.
```

```
 1        His initial place of incarceration was Northern Neck
 2   Regional jail in Warsaw, Virginia.  While he was housed there,
 3   he amassed multiple infractions.  And I provided the Court with
 4   a list of those infractions which is Government's Exhibit 1.
 5        I'm not going to go through all of those infractions, but
 6   suffice it to say there were from my count --
 7             THE COURT:  How do we know what the disposition of
 8   those -- was it -- in other words, how were they disposed of?
 9   I know with the last incident involving the co-defendant it was
10   actually a plea or a guilty plea.  But do we know how it is
11   that -- was it sustained or?
12             MR. ROMANO:  They were, Your Honor.  There was various
13   administrative punishments assessed.  The fact is the defense
14   counsel represents in his sentencing memorandum that the
15   Defendant was placed in administrative segregation or
16   isolation.  And while I did not include actually each specific
17   one, this is just a synopsis of it.  But I would proffer to the
18   Court that these were administratively dealt with in Northern
19   Neck, Virginia.
20             THE COURT:  I note that -- but I note that there were
21   a couple of other -- further back in the documents there was a
22   listing as well of sort of summary disposition of things going
23   back until almost 2009 with various codes.
24             MR. ROMANO:  Your Honor, excuse me, those were
25   actually not at Northern Neck, Virginia.  He wasn't housed
```

 1  there then.  That's, like, a complete history that we got.

 2          **THE COURT:**  Right.  So, like, for example, 102, I

 3  figured out the code 102 is for assaultive behavior on another

 4  inmate.  And I'm looking back, he's got one of those guilty in

 5  2011, another 102 in 2011, you've got another one in 2012.

 6  You've got a 100, which is sort of assaultive behavior, in

 7  2013.  You've got a 402 or 400, which I'm not quite sure what

 8  it is.  But then we've got a 102 which is a guilty one in 2018.

 9  Then another 102 -- a couple of other ones and then another one

10  in 2018 and then a 410 and a 316 guilty as well.

11          So I'm seeing sort of, like, a history of what the codes

12  are for institutional infractions that -- for assaultive

13  behavior that occurred over the history of his criminal career.

14          **MR. ROMANO:**  Right.  And those dates will marry up,

15  Your Honor, with what's in the presentence report from state

16  correction when he was in the Division of Correction.

17          The ones in Northern Neck were ones after he had been A)

18  indicted, B) arrested, and C) transported to Northern Neck.

19          And just to clarify, the two that I view as most serious.

20  One is where the inmate was stabbed and assaulted.  I'm not

21  suggesting that the Defendant was the one who was responsible

22  for the stabbing, but he was involved in the actual physical

23  assault of that inmate.

24          The other one that I think is somewhat telling is the one

25  where he confronts the --

1          THE COURT:  The guard?

2          MR. ROMANO:  -- the guard, and essentially says to

3     him -- I'll put this one up on the ELMO.

4          On the above date and time, and for the record the above

5     date and time is August 13th.  This is shortly before he's

6     transferred to Chesapeake Detention Facility.

7          It says "On the above date and time this writer" --

8     meaning the correctional officer -- "walked into the booking

9     area and Inmate Walton was in the booking cell three.  Inmate

10    Walton started yelling at this writer" -- the correctional

11    officer -- "and became verbally abusive towards the writer.  He

12    stated that 'We are going to have to fight him every day.' He

13    stated that 'When he gets out he's coming back to Warsaw,

14    Virginia' -- which is where Northern Neck is -- 'for me.'"

15         So at that point Northern Neck had had enough of the

16    Defendant and that resulted in his transfer to Chesapeake

17    Detention Facility.  And that leads to a whole other situation

18    where after this trial, and it's detailed in Exhibit 2, the

19    Defendant on April 10th, 2022, which was after the verdict in

20    this case, he assaulted the co-defendant Che Durbin and

21    severely beat him.

22         Those documents are reflected in Exhibit 2 to the

23    Government's submission.  And as a result of that beating, Che

24    Durbin is presently awaiting an operation for an injured eye.

25         For the record, Mr. Durbin's attorney is here in the

courtroom, Catherine Flynn.  I spoke to her briefly before this
proceeding.  She's indicated that surgery or operation or
procedural, if you will, is still pending.  We don't have a
date on that or at least none of us are aware what that date
is, but I asked her specifically "Does Mr. Durbin have any
vision out of that eye," and she indicated to me, in speaking
with him, "He does not."

So that is, again, in my view extremely serious in terms
of the conduct that Mr. Walton was engaged in.

Now, I set forth in my sentencing memorandum a series of
cases, two of which are Fourth Circuit cases, *United States v.
Lawrence* and *United States v. Hanifah*, H-A-N-I-F-A-H, as well
as an Eighth Circuit case, *United States v. Tarantola*, which I
believe are relevant to the Court's consideration in terms of
Mr. Walton's conduct.

In *Lawrence*, as was indicated, he was involved in no fewer
than six incidents in which he assaulted or fought with guards,
was defiant to the guards' orders.  That misconduct was handled
administratively by correctional officers and obviously wasn't
reflected in Mr. Lawrence's record nor is it reflected in the
PSR here.

In the *United States v. Hanifah*, the Fourth Circuit found
that an upward departure was reasonable based on the admitted
gang membership and the fact that the Defendant, Mr. Hanifah
had committed an assault while detained and awaiting

1  sentencing.

2      As Your Honor may recall from the trial -- and I dropped a

3  footnote to that extent here -- that Mr. Walton is an admitted

4  member of the Crips and that's set forth in Paragraph 48.

5  Also, as the Court may recall from the testimony at trial,

6  Mr. Walton had texted one his customers and asked him if he

7  had a "clocc."  In the text, "clock" was spelled C-L-O-C-C.  We

8  have expert testimony that that was just a coded reference to a

9  scale.  But, more significantly, the spelling of "clock," which

10 was C-L-O-C-C, Crips, Your Honor, do not use the letter C-K,

11 which is why it was spelled C-L-O-C-C because C-K according to

12 the Crips can't be used because it stands for Crip killer.

13     The final case that I cited there, which was the Eighth

14 Circuit case of *United States v. Tarantola*, again is relevant

15 to the same type of conduct.  In that case Mr. Tarantola

16 refused to obey orders from correctional officers, had

17 threatened staff members and attempted an assault.  And the

18 Eighth Circuit in that case upheld an upward departure for

19 Mr. Tarantola as well.

20     For those reasons, Your Honor, the Government believes

21 that an upward departure from Criminal History Category V to

22 VI, upward to VI, is warranted based on his conduct while

23 detained, while he was both in pretrial as well as awaiting

24 sentencing, but also that his Criminal History Category

25 substantially underrepresents the seriousness of his criminal

1    history and more significantly the likelihood that he will
2    commit other offenses.
3         Again, as I noted, and his sentencing report shows, this
4    is now Mr. Walton's third felony drug conviction.  And also
5    this offense was committed while he was on parole from an
6    earlier drug offense.  As the presentence report reflects,
7    while he was acquitted of certain crimes, including attempted
8    first-degree murder, attempted second-degree murder,
9    first-degree assault, second-degree assault and reckless
10   endangerment, associated with all of that he was in fact
11   convicted of the state equivalent of felony possession.  And he
12   was -- had his parole revoked as a result of that offense as
13   well.
14        So for those reasons, Your Honor, and pursuant to the case
15   law that I've cited, I believe that an upward departure from
16   Criminal History Category V to VI is warranted in this case,
17   and we would ask the Court to make that upward departure.
18        Thank you.
19        **THE COURT:**  Thank you very much.  Mr. Mann, on that
20   particular argument and then I'll find out -- I'll make a
21   determination what the appropriate guidelines are.  And then I
22   will entertain Mr. Romano on the 3553(a) factors and then of
23   course you.
24        **MR. MANN:**  Judge, thank you very much.  We strenuously
25   object to any upward departure from the guidelines.  I think

1   the guidelines very much are -- fit Mr. Walton's criminal

2   history.  We're not talking about, you know, someone who is on

3   the low end of a II or a III.  We're talking about somebody who

4   has a criminal history score of 11 and is at Criminal History V

5   so almost at the top.  I think that's certainly very much

6   appropriate for the felony convictions that he has.

7        The Government now is attempting to, you know, try to use

8   all of this -- first acquitted -- acquitted crimes against him

9   as they noted and sort of couched with this, well, he was

10  acquitted but he was charged with attempted murder, he was

11  charged with, you know, attempted -- attempted first-degree

12  murder -- they list it out on Page 6 of their memo -- attempted

13  first-degree murder, attempted second-degree murder.  And sort

14  of then saying, oh, well, but only convicted of a firearm

15  crime.  Sort of still trying to hold all these violent acts

16  against him.  Moreover, hoping these infractions against him of

17  which only the issue from CDF he was ever found guilty of.  I

18  know they don't really call it that, but nothing in the record

19  that's been supplied by --

20       **THE COURT:**  No, they found him guilty.  There was an

21  attachment.  I can't recall the exhibit, but --

22       **MR. ROMANO:**  Exhibit 2, Your Honor.  I'm sorry,

23  Exhibit 1, Your Honor.

24       **THE COURT:**  It's littered, it's truly littered with

25  guilty findings while he's been incarcerated.  I'm not quite

 1  sure --

 2          **MR. MANN:**  Judge, it certainly notes there's things

 3  that occurred.  It doesn't say in any respect that there's any

 4  sort of guilty finding.

 5          **THE COURT:**  Yeah, it is.  We must be looking at the

 6  wrong thing.  It's an offender case management system sheet.

 7  It has Mr. -- I'm sorry, it has Mr. Walton's picture at the top

 8  right-hand corner.  It is directly behind -- I don't have the

 9  page -- it's 1 of 1.  It's about --

10          **MR. MANN:**  Government's Exhibit 1, Judge?

11          **THE COURT:**  I'm not quite sure where it is.  Why don't

12  you work your way from the back.

13          **MR. MANN:**  Okay.

14          **THE COURT:**  So from the last page you've got of course

15  the guilty finding related to the assault on the co-defendant

16  and it's one, two, three, four --

17          **MR. MANN:**  Right.

18          **THE COURT:**  -- five, six, seven, eight, nine -- nine

19  pages in.

20          **MR. MANN:**  Okay.

21          **THE COURT:**  It's a listing there with dates going back

22  to '09.

23      Mr. Romano, could you point that out to him?  You know

24  which page I'm referencing, correct?

25          **MR. MANN:**  Oh, I see.  Yes, Judge, I see that page.

```
 1  That's all from the -- those are all from when he was in state
 2  court.
 3        THE COURT:  Right, I know, but the codes -- the codes
 4  are still the -- they're guilty findings.
 5        MR. MANN:  Right.  And so I'm talking -- as I foresee
 6  there's three separate jail issues, jail infractions.  The
 7  Government is using things that occurred well before the
 8  indictment, right.  Jail fractions that occurred when he was in
 9  state Court going as far back as 2007 and then I guess as
10  recently as 2019 --
11        THE COURT:  Right.
12        MR. MANN:  -- when he was in state court, okay.
13        THE COURT:  State prison.
14        MR. MANN:  I'm sorry, yes.
15        THE COURT:  These are guilty findings of him engaged
16  in assaultive infractionary behavior, at least six or seven of
17  them since '09.
18        MR. MANN:  And I certainly see these.
19        THE COURT:  Right.
20        MR. MANN:  I see just a list.  There's nothing else to
21  support other than a list and, again, noting that these
22  occurred well before this indictment.  All right.  I still
23  don't understand the Government's position in trying to couch
24  all of this together.  But my point is you have this -- my
25  client accepting responsibility at CDF, I understand that, for
```

```
 1   an assault that occurred after the guilty finding in this case.
 2   But I'm now particularly talking about what occurred at -- down
 3   at -- not north branch.
 4            THE COURT:  Northern Neck.
 5            MR. MANN:  Northern Neck.  There's nothing to support
 6   other than just hearsay writing on a piece of paper.
 7            THE COURT:  Okay.  Let's assume I give you credit for
 8   that.
 9            MR. MANN:  Right.
10            THE COURT:  You still have assaultive behavior while
11   incarcerated, multiple incidents, including assaultive behavior
12   on a co-defendant in a federal criminal trial after he
13   testified.
14            MR. MANN:  Well --
15            THE COURT:  I'll give you the benefit of the doubt on
16   that.
17            MR. MANN:  Then if you're going to toss out everything
18   from Northern Neck, absolutely.  But it is very interesting to
19   me that now Mr. Romano sits here and says "We're not saying he
20   stabbed anybody at Northern Neck," when he wrote on Page 4 that
21   "He amassed multiple fractions," Government Exhibit 1, "The
22   most serious included participating in an assault and stabbing
23   of another detainee," when that didn't occur.  He stood here
24   and said "He didn't stab somebody, he was involved in a fight
25   when somebody else got stabbed by another inmate."
```

```
 1          THE COURT:  Take that out of the equation.  Take it
 2   out.  Explain to me the finding for a violent assault on a
 3   co-defendant?
 4          MR. MANN:  Judge, that one, that one -- I wish I had
 5   all the answers.
 6          THE COURT:  I've got the answers.
 7          MR. MANN:  I wish I could sit here and explain things
 8   away.
 9          THE COURT:  He beat him because he testified against
10   him.
11          MR. MANN:  But, Judge, that's what I have a real issue
12   about.  That just doesn't make any sense because when
13   Mr. Durbin testified, he didn't testify against my client.
14          THE COURT:  He still testified.
15          MR. MANN:  He testified, and he dug his own hole -- I
16   don't want to say that word "grave" -- he dug his own hole as
17   he sat up there and testified.  And we were in the back and I
18   sat here with baited breath for the entire time he was up
19   there.  I think he was up there for about a couple hours, and I
20   sat there waiting for him to say Mr. Walton's name, waiting for
21   it, and he never did.  He never did.  So he certainly did
22   whatever he did to himself, but he never mentioned my client's
23   name.
24          So that's why what was written in this just doesn't make
25   any sense.  He didn't rat on my client.  He didn't testify
```

1 against him.

2      THE COURT:  He testified against the conspiracy.

3      MR. MANN:  I guess in some general sense, sure.

4      THE COURT:  He's experienced.  He engages in

5 assaultive behavior.  He's a gang member.  They don't tell on

6 each other.  That's the kind -- that's precisely the kind of

7 behavior that co-conspirators engage in that get them beaten by

8 gang member conspiracists drug dealers.  That's what happened.

9 So it makes perfect sense.  I mean, I hear your argument but...

10      MR. MANN:  As it was written, and as I got the

11 information after it had occurred, it just didn't -- for me --

12 well, I am the defense attorney, but it didn't pass the smell

13 test as to how and why it -- how and why -- what my client

14 said, allegedly said it went down.  I can't get around the fact

15 that he stood up in front of the jail board and said, "I'm

16 accepting responsibility for it," and got sanctioned for it.

17 But as to how it went down and the fact that Mr. Durbin said

18 nothing, my client said no other statements other than what was

19 relayed at some point to a sergeant, but the explanation

20 doesn't fit -- doesn't fit for me.  Your Honor has found that

21 it does fit.

22      But I do believe at a Category V, with 11 points and his

23 three prior felony convictions is certainly representative,

24 unfortunately, of my client and his criminal past.  And to now

25 sort of use a bunch of, you know, infractions from before the

 1   indictment occurred, and then we won't talk about Northern

 2   Neck, but indictments that have nothing else supporting it,

 3   leaving us with the sole issue of assault after conviction in

 4   this case I don't think should bump us up -- it would be my

 5   objection -- not bumping us up from a V to a VI.

 6        **THE COURT:**  Noted.  Pending before the Court is a

 7   motion for an upward departure based upon, pursuant to 4A1.3,

 8   based upon a substantial -- in his Criminal History Category

 9   based upon that category being substantially underrepresentive

10   of the seriousness of the Defendant's criminal history with the

11   likelihood the Defendant will commit other crimes.

12        Having reviewed the Defendant's institutional and

13   infractional history that has multiple assaultive behavior

14   guilty findings, in addition to his admission to engaging in

15   assaultive -- seriously assaultive behavior of a co-defendant

16   in this case who is involved in the drug conspiracy and who

17   testified against the -- some or all -- some of the

18   co-conspirators and against the conspiracy, the Court does find

19   that there is a substantial underrepresentation of the

20   seriousness of his criminal history; and further, I certainly

21   do believe that this criminal history underrepresents the

22   likelihood that the Defendant will commit other crimes.  As a

23   result, I am going to raise the Criminal History Category by

24   two points putting him in a Criminal History Category VI.  VI,

25   offense level 24, puts him at a guideline range of between 100

1  and 125 months, and with a supervised release range of between

2  four to five years, with a fine range of between 20,000 and

3  $5 million.  There is a minimum mandatory sentence of five

4  years that comes along with the conviction.

5       Noting your objection, Mr. Mann, is that an accurate

6  calculation of the sentencing guideline range?

7              MR. MANN:  Yes, Judge.  Can you just tell me the

8  numbers one more time.

9              THE COURT:  100 to 125.

10             MR. MANN:  Yes, I agree.

11             THE COURT:  All right.  Mr. Romano, do you agree?

12             MR. ROMANO:  I do.

13             THE COURT:  Very well.  And the supervised release

14 range, just for the courtroom deputy, four to five years, fine

15 range of 20,000 to $5 million, and a minimum mandatory sentence

16 of five years.  That takes us to the guideline level.

17      Does Mr. Walton have an ear piece that we can give him?

18      Mr. Walton, we're going to give you an ear piece, and I'm

19 going to ask counsel to approach with their masks on because

20 this portion of the proceeding will be sealed and shall remain

21 sealed until I order otherwise.

22      Mr. Walton, if for some reason that earpiece does not work

23 or stops working, raise your hand, get my attention and I'm

24 going to go ahead and get you a new one.

25             THE COURT:  We'll get IT to take care of that the next

1  time.

2      This portion of the proceeding will be sealed and shall

3  remain sealed until I indicate otherwise.  Anyone not

4  affiliated with law enforcement I'm going to ask you to leave

5  the court at this time and we will go ahead and grab you as

6  soon as we conclude.  Ma'am, we'll grab you as soon as we

7  finish.

8      (It is the policy of this court that every guilty

9  plea and sentencing proceeding include a bench conference

10  concerning whether the defendant is or is not cooperating.)

11      **THE COURT:**  All right.  Mr. Romano, I think we're at

12  the point now to discuss the 3553(a) factors.  I'll be more

13  than happy to hear from you, sir.

14      **MR. ROMANO:**  Thank you, Your Honor.

15      Your Honor, the Government is also seeking not only the

16  upward departure from the Criminal History Category V to VI but

17  as I indicated in my sentencing memorandum a variance as well

18  pursuant to § 3553(a) of Title 18.  And as Your Honor is well

19  aware, 3553(a) sets forth a number of factors that the courts

20  are to consider when it imposes a sentence, and those factors

21  include the nature and the circumstances of the offense, and

22  the history and characteristics of the Defendant.

23      Second, that the need for the sentence to be imposed

24  reflects the seriousness of the offense, to promote respect for

25  the law, and to provide just punishment for the offense.

1    Two other factors that I think are relevant here:  One is

2    to afford adequate deterrence, adequate deterrence to the

3    criminal conduct; and another significant factor which I think

4    is equally applicable here to protect the public from further

5    crimes of the Defendant.

6        The PSR, coupled with the Exhibits 1 and 2, detail the

7    history and the dangerousness of the Defendant and from the

8    Government's perspective a substantial sentence needs to be

9    imposed to not only reflect the seriousness of the offense, to

10    promote respect for the law, and to provide just punishment,

11    but to afford adequate deterrence and to protect the public.

12        As I've outlined in the sentencing memorandum, the Fourth

13    Circuit case of *United States v. Williams*, which is at 753 F.2d

14    329, which is a Fourth Circuit case, they stated that it's well

15    known that drug trafficking is considered to be carried on to

16    an unusual degree by persons engaged in continuing patterns of

17    criminal activity.

18        And the Court held that the distribution of dangerous

19    substances because of the nature of that activity poses a

20    significant risk of recidivism.

21        And as I've noted, and as the PSR reflects, this is now

22    the Defendant's third felony drug conviction.  Not one, not

23    two, but now he's had his third felony drug conviction.

24    Obviously those sentences that were imposed on the first two

25    did not serve as a deterrent, nor have those sentences

1   protected the public from Mr. Walton's criminal activity.  And
2   now as he's demonstrated, quite frankly, inmates that are
3   incarcerated with him are not safe either.
4        We have received yesterday evening, and I think the Court
5   indicated that it's reviewed, letters from the friends or
6   family members of the Defendant.  And I want to just comment
7   briefly on those and then discuss some of the aspects of the
8   Defendant's sentencing memorandum.
9        Let's start with the letters first.  There's a letter from
10  the Defendant's girlfriend and she says essentially that the
11  Defendant has done -- and the word she used was a 360 since
12  he's been released from jail.  Quite frankly, I think she means
13  a 180, meaning that he's turned himself around.  But,
14  ironically she was accurate when she said 360 because he's come
15  full circle and he's still doing the same thing that he did
16  time and time again.  He continues to distribute narcotics.
17       Incidentally, Your Honor, the author of this letter is the
18  same girlfriend who the Court may recall warned the Defendant
19  of police presence while he was out distributing drugs.  And we
20  played that call, and for the record it's call number 4164
21  between the Defendant and Ms. Wilson and the call is rather
22  brief.
23       Mr. Walton says "Hello."  The girlfriend, Ms. Wilson, says
24  "You coming to Aberdeen?"  Mr. Walton says "Huh?"  Ms. Wilson
25  says "I said, you coming to Aberdeen?"  Mr. Walton says "Why,

 1  what's up?"  Then Ms. Wilson says "Nothing, I just gonna tell
 2  you to be careful because there was a cop sitting out on top of
 3  22," 22 being Route 22 up in Harford County.  So essentially
 4  she's warning him that there's a police presence out there.
 5      Now, I suppose you could say, well, gee, maybe they're
 6  running radar and she doesn't want him to get a speeding
 7  ticket.  But from the totality of the case we know what's going
 8  on here, and she knows what's going on, and she's warning him
 9  there's a police presence out there and to be careful if he's
10  gonna come up route 22.  In fact, he says "I'm not going to be
11  coming" -- later on he says "I'm not coming that way Mama, I'm
12  going" -- and it's inaudible.
13      The second letter that we received through the email were
14  from family members who speak about anger issues that the
15  Defendant has and as if that's a reason or excuse for his
16  behavior.
17      The Defendant may very well need some type of anger
18  management while incarcerated, but that anger has resulted and
19  exhibited itself in conduct that's caused severe injury to
20  others, the consequences of which need to result in a
21  significant sentence, not just to punish the Defendant but to
22  protect the public as well.
23      I have a couple of brief comments about the sentencing
24  memorandum that was submitted by Mr. Mann, and I'm going to
25  address those now.

1        First, on Page 1 he talks about Mr. Walton's personal
2   history and indicates that throughout his childhood Mr. Walton
3   watched his father struggle with addiction to crack cocaine.
4   Again, that's -- there's an irony there when we look at what
5   the Defendant has been doing with his life.  He's trafficking
6   cocaine and responsible for the same misery and hardship to
7   others that he claims he endured.
8        Again, on Page 2 they address -- defense counsel addressed
9   Mr. Walton's long history with mental health issues indicating
10  that he was placed in solitary confinement and faced terrible
11  conditions there while incarcerated.
12       Well, he was placed in solitary confinement because of his
13  behavior, including the assaultive behavior that led to the
14  administrative charges against him that are reflected in
15  Government's Exhibit 1.
16       Page three of the sentencing memorandum by Mr.Mann,
17  criminal history.  He states "Mr. Walton has only three
18  criminal convictions."  Only.  Only three criminal convictions.
19  Well, let's look at what those only three criminal convictions
20  are:  Two felony drug convictions and a felon in possession
21  charge.
22       When we look at the presentence report that details what
23  happened with these convictions starting at Paragraph 26, which
24  for the record is on Page 6, in 2006 Mr. Walton is found guilty
25  of controlled dangerous substance manufacturing and

1    distribution in Circuit Court Harford County.  He's sentenced

2    to 20 years incarceration, 18 years, six months suspended.

3    He's given parole in 2007.  Four months later, in December of

4    2007, he's arrested in connection with a series of offenses

5    which resulted in him being convicted of being a felon in

6    possession which violates his probation.  That 18 years,

7    six-month sentence was somewhat reimposed.  Ultimately, it

8    appears 10 years and six months were suspended.  So he got

9    eight years more now of that 18-year sentence.  He gets out in

10   2015 and then his parole was revoked in 2017 for a new offense.

11       We go to Page 7 and that details the -- Paragraph 27,

12   felon in possession charge where he gets five years

13   incarceration which results in his parole being revoked.

14       And then finally in Paragraph 28 on Page 9 he's arrested

15   again for another felony drug offense.  In 2017 he's found

16   guilty of that.  He's sentenced to five years incarceration,

17   three years and six months of which was suspended.  And he's on

18   supervised probation for two years.

19       He gets released, according to the information in the

20   presentence report, in December of 2019, and three months

21   later, three months later he's intercepted on these wiretaps

22   that led to the indictment and the charge and the conviction in

23   this particular case.

24       **THE COURT:**  And the operation was out of Harford

25   County as I recall.

 1          MR. ROMANO:  It was, Your Honor.  He's right back

 2   where he started.

 3          THE COURT:  That's the amazing thing.  Harford County

 4   is not that large, right.  And they know who their drug dealers

 5   are in Harford County and they know you.  You got a

 6   representation.  So the moment you hit the street, they knew,

 7   they knew, and you just fell right into it.  They knew.

 8   Catching you was easy.  And they're not playing that.

 9          And, Mr. Walton, they don't want you there.  They don't

10   want you there in their -- you're selling drugs and they said,

11   no, we're going to -- we're going to get -- not take the state

12   side, we're going to go ahead and get him charged federally

13   because he's been a thorn in this county selling dope up in

14   this county for years and we're sick of him.  And that's how

15   this case arose.  And it was easy.  Picking him up was easy.  I

16   betcha they knew exactly who he was when they heard him on

17   there.  Exactly.  It was just -- it was too easy.  They just

18   didn't want to get hurt doing it.

19          Sorry about that Mr. Romano.

20          MR. ROMANO:  That's fine, Your Honor.  I think you hit

21   the proverbial nail on the head.  Just a couple other brief

22   comments.

23          One, I think it's now been conceded about the assault on

24   Che Durbin and the comment that was made about -- he attacked

25   Mr. Durbin because he, quote, "Snitched like a bitch," and this

1  was the first opportunity he had and Mr. Durbin was on the

2  phone and essentially he ambushed him if you will while he was

3  on the phone and attacked him.

4      Mr. Mann says, well, he didn't -- Durbin didn't snitch

5  like a bitch, and I think the Court's really explained what

6  really was motivated behind it between the gang credo, if you

7  will, the fact that -- and Mr. Mann says I'm sitting here with

8  baited breath waiting for him to say something about Terrell

9  Walton on the witness stand.  He didn't need to say anything

10  about Terrell Walton on the witness stand because he and

11  Terrell Walton were talking on those calls which were played to

12  the jury, and they heard those.  And they saw these text

13  messages where Mr. Walton and Michael Wells referred to Che

14  Durbin as big bro or big brother.  And the credo is, you know,

15  "Stitches come to snitches."

16          **THE COURT:**  Or "Snitches get stitches."

17          **MR. ROMANO:**  Right.  And in this case Che Durbin got

18  more than stitches.

19      And it's not just this statement that Mr. Mann keeps

20  saying "alleged," "alleged statement."  Not only did he plead

21  guilty -- and it's not just the alleged statement.  I gave him,

22  and the Court has a copy, of the report from the correctional

23  officer who saw the attack, who saw the attack and indicated

24  that it was Mr. Walton who assaulted Che Durbin.  Plus the

25  physical evidence, the nurse examined his hands, the bruises

1  and the injuries to his hands were consistent with attacking
2  Mr. Durbin.
3      So you can engage in some self-serving denial but I think
4  we're past that point.  I think it's pretty damn clear that he
5  attacked Che Durbin on April 10th.
6      This issue about whether he should be deserving of a
7  downward departure or a variance if you will because of COVID,
8  quite frankly, even if the Court were to consider that perhaps
9  in other cases, the Defendant's violence and criminal history
10 trump any potential request here for some type of COVID
11 discount.
12     Finally, in the conclusion section -- I don't know how you
13 marry that statement that's made up with the facts in this
14 case, but Mr. Mann says Mr. Walton is not a violent, dangerous
15 person.  What?  He's not a violent, dangerous person?  I don't
16 know where that's coming from.  I mean, to make that claim,
17 quite frankly, he's asking you to turn a blind eye.  So all due
18 respect to Mr. Durbin, he's asking you to turn a blind eye to
19 his conduct, his behavior and his record to say that he's not a
20 violent or a dangerous person.
21     Terrell Walton is someone that needs to be deterred.  He
22 needs to be punished, and the public needs to be protected from
23 him.  And for those reasons, Your Honor, the Government
24 believes that not just simply an upward departure, but a
25 variance in this case even from that 100 to is 125 months is

1  appropriate, and for those reasons, Your Honor, the Government
2  is respectfully asking the Court to sentence the Defendant to
3  15 years, the minimum mandatory, yes, is five, the maximum is
4  40.  I'm not asking for 40 years.  We're not asking for 20
5  years.  But, quite frankly, a 15-year sentence will at least
6  for some period of time protect the public from Mr. Walton.
7  Whether it will protect the other inmates in the BOP that he
8  encounters remains to be seen, but at least the public could be
9  protected through that period of time.
10       And for those reasons, Your Honor, the Government is
11  asking the Court pursuant to § 3553(a) to impose a sentence of
12  15 years or 180 months for Mr. Walton.  Thank you.
13            **THE COURT:**  Thank you very much, Mr. Romano.
14       Mr. Mann, I'll be more than happy to hear from you, sir.
15            **MR. MANN:**  Judge, the thank you very much.  I'm going
16  to unmask, and I'll stand right here if that's okay.
17            **THE COURT:**  That's fine.
18            **MR. MANN:**  Judge, I first -- I do want to note I did
19  submit these two emails, two letters that were sent to me.
20  They were sent by Ms. Wilson, who is still in my client's life.
21  It's his long-term partner.  She's sorry she could not be here
22  today, and she asked me to read the entirety of the email.
23            **THE COURT:**  I read it.
24            **MR. MANN:**  I know Your Honor did so I'll just submit
25  on us putting that in as my -- as a supporting letter.

```
 1        I also received one from his mom.  His mom is present in
 2   Court, she's there in the pink.  She also wanted me to read her
 3   letter as well.  But I know Your Honor has read it.  So I'm
 4   just going to submit that as well.  Okay, ma'am, is that okay?
 5   I asked her if she could read it, Judge, but she's actually
 6   blind, legally blind.
 7        THE COURT:  I know she had -- there was a reason why
 8   somebody was writing it on her behalf.
 9        MR. MANN:  Yes.
10        THE COURT:  So I presume that she was dictating to the
11   person and that person was putting into words --
12        MR. MANN:  Right.
13        THE COURT:  -- to convey to me and then probably read
14   it back to her to make sure that it was what she wanted.
15        MR. MANN:  And also transporting mom, but also here to
16   support, is his brother as well.
17        Judge, I thank the Court for the time.  I thank the Court
18   for reading through my sentencing memorandum.  I guess at this
19   point I am asking for a downward variance.  I still ask for 92
20   months.  I think that's an appropriate sentence in a case like
21   that.  I would even submit that a sentence of 100 months or the
22   new -- the bottom of the new, as Your Honor has calculated new
23   guidelines, still an appropriate sentence, and it's certainly
24   long enough to cover all the factors of 3553(a).
25        You know, Mr. Walton now is 36 years old, and he is or was
```

```
 1   a resident of Harford County.  I think Your Honor has made

 2   clear that he's persona non grata in Harford County.

 3            THE COURT:  I mean, when he's released he can go right

 4   back up there.

 5            MR. MANN:  He certainly can but I don't think he's

 6   going to be residing in Harford County anymore.  Maybe to all

 7   the task force members --

 8            THE COURT:  If he wants to be a law-abiding citizen,

 9   I'm certain they will welcome him but I guarantee all eyes will

10   be on you.

11            MR. MANN:  That might be good news to everybody that I

12   don't think my client wants to return to Harford County.

13        You know, in many ways, in many ways when we sit here and

14   look through Mr. Walton's past it's something we see all too

15   often.  Mr. Walton's father had a drug addiction.  Counsel

16   wants to call it irony, I just call it sad.  It's sad that his

17   father figure -- his father, male figure in his life, was

18   addicted to drugs, and really there is no -- unfortunately no

19   surprise that he turns to that life himself.  Even at a young

20   age, at 19 years old, getting a very significant sentence he

21   turns to a life of selling drugs to support himself and support

22   the ones around him.

23        He does also, himself, have substance abuse issues as is

24   highlighted in what we wrote here, using Xanax, using ecstasy,

25   as he started with marijuana and alcohol sort of moving on to
```

 1  that.  There was some period where he was sober after doing a

 2  substance abuse program in the hopes that he could further

 3  himself while he's in there in getting more time -- while he's

 4  in there and relieving himself of or to alleviate himself and

 5  to take the programming that can be provided to him.

 6          THE COURT:  Isn't Mr. Walton just an example of what

 7  happens when you got no youthful guidance whatsoever?  Isn't he

 8  the perfect example of when you're nine or 10 years old and

 9  you're subject to financial distress, and you're raised in

10  difficult circumstances and nobody cares about you, whether or

11  not you get an education or otherwise.  And then you get caught

12  up using drugs and in the system.  You get your first

13  conviction at 19.  Then it just starts a perpetual cycle of a

14  tornado where you just spiraled right down the drain it and

15  finds -- he finds himself 15 years later sitting as a criminal

16  defendant in federal court on a drug conspiracy.

17      I mean, it's like -- you can almost predict it.

18          MR. MANN:  And he is unfortunately very much

19  institutionalized because of it.

20          THE COURT:  Right.

21          MR. MANN:  If I went day-by-day, he and I have had

22  this conversation, he's 36 years old and he has spent half, if

23  not a little over half, of his life behind bars.  And so he got

24  out and went back to the only thing he knew how to do.  And

25  it's not an excuse, and it's not a reason to sit here and say,

```
 1   oh, we'll give him a break because that's all he knows.  But
 2   that's sort of the reason behind why he sits in the chair that
 3   he does today.
 4        Judge, I know he wanted me to talk about this and I will
 5   talk about it very briefly.  This case really -- I even said it
 6   in my closing -- this case really was a case about quantity and
 7   nothing more than that.  We saw 40,000 text messages and my
 8   client certainly was unfortunately in the business of selling
 9   drugs, but this case, the reason why we felt, Mr. Walton felt,
10   that we had to go to trial was because of the quantity the
11   Government was looking for us to accept responsibility for
12   versus what we thought or where we thought the guidelines sort
13   of led us to be.
14        I know that he's talked about that a little bit in what
15   he's prepared to say to the court, but I certainly think that
16   this wasn't a case where my client's -- even when we sat with
17   pretrial and I sort of made an argument saying -- and that's
18   why we accepted the jury's verdict -- and I said we sort of
19   accepted responsibility for -- if -- I'm not sure we can.  But
20   certainly -- we still sit here and say this case was more about
21   quantity than more about guilt versus innocence.
22        I do object to the Government's upward variance.  Well, I
23   objected to the departure before, but upward variance.  I think
24   that a 65-month upward variance is inappropriate in light of
25   the 3553(a) factors asking for -- I had calculated 65 months,
```

1  but I guess it would be 35 months over the top of the new

2  guidelines certainly is still vastly inappropriate for why

3  we're here and trying to hold --

4       THE COURT:  What deterrent do I need to give to

5  individuals like Mr. Walton who decide they want to assault

6  witnesses who bear witness against them because that's a real

7  problem.  And what kind of message do I want to send Mr. Walton

8  back with him at the Chesapeake Detention Center so that he can

9  tell everybody else, yeah, I got jammed up with this, you

10 better not beat up on Government witnesses and almost kill

11 them.

12      MR. MANN:  Well --

13      THE COURT:  How, you know --

14      MR. MANN:  I will take some objection that this was a

15 Government's witness.

16      THE COURT:  Who called him?

17      MR. MANN:  He called himself.

18      THE COURT:  Okay, right.

19      MR. MANN:  So if we were in that situation, I would

20 certainly have a very vast different --

21      THE COURT:  Right.

22      MR. MANN:  -- we are in a situation where we had

23 Mr. Durbin attempting in self-serving testimony, which I know

24 the Government wants to say they're all part of the general

25 conspiracy therefore it's testimony against him, I still think

1 that Mr. Durbin was doing what he could to save his butt; and
2 in there, actually I think in some ways, helping my client out
3 in the fact that my client was never mentioned.

4     When I said "Allegedly," I said "Allegedly the statement."
5 There was certainly an altercation between them.  The basis of
6 which I don't know, but I seriously doubt that it was due to
7 my -- Mr. Durbin snitching against all of this because, I don't
8 know, I don't believe that he did however it was -- however it
9 was stated.

10     Judge, I think that a sentence of, you know, that a
11 sentence of 100 months certainly is adequate to tell my client
12 and also to be on Your Honor's probation which -- and you have
13 haven't set -- but being in this courtroom a number of times
14 will be five years, to say that, you know, as -- Bureau of
15 Prisons supervised release does not work the same way as parole
16 and probation.  He and I have discussed this -- I'm sort of
17 talking to him, Judge.  He and I have discussed this.  If you
18 keep messing up on your own, you can keep -- essentially keep
19 the case going almost until the end of your life.  It's not a
20 life sentence but you can keep it going.  And any time you have
21 on the street doesn't count for anything.  You can keep coming
22 back and coming back and coming back and accruing more and more
23 time actually well past -- even if you were given 100 months,
24 well past 100 months you were given the first time.

25     I've said a bunch on his behalf, Judge.  I thank the Court

 1  for taking time to read through my memo.  I still stand by the

 2  request under the COVID.  Northern Neck is -- it's an awful

 3  place.  Northern Neck is a place that does not take kindly

 4  to -- I say this through the experience of talking not just to

 5  my client to a lot of other clients -- does not take kindly to

 6  people from outside of Virginia.  Does not take kindly to

 7  people from Baltimore.  And as I -- in talking with a number of

 8  inmates, do not take kindly to people of color down there.  I

 9  think that has led to what we have seen here, the large number

10  of alleged infractions out of Northern Neck.

11      He did -- I say he did much better.  I think he did better

12  until after -- until they saw an incident, but he did better

13  while he was at CDF.  I know that he was happy to go up there.

14  I think he's going to sit down for a period of time.  He's

15  going to be in the Bureau of Prisons for a period of time.

16  That is not anywhere close to what the DOC provides here in the

17  state of Maryland.  And I think that he will be removed from

18  society for a period of time.  I think 100 months is certainly

19  something that is adequate.  And he'll come back and be, what I

20  hope to be, a productive member of -- not Harford County

21  because I wouldn't recommend he go back there -- but a

22  productive member of Maryland.

23      That's what I'll say, Judge.

24          THE COURT:  Thank you very much.  Mr. Walton, you've

25  got the opportunity to speak to me prior to the imposition of

```
1   sentence.  You don't have to say anything, but if you would
2   like to speak to me I'll be more than happy to hear from you,
3   sir.
4           THE DEFENDANT:  Well, foremost, I never wanted to go
5   to trial in the first place.  I mean, I knew my evidence.  I
6   knew that I was on the phone selling drugs the whole time.  You
7   know what I'm saying?  I never at one time did I ever say I
8   wasn't selling drugs.  The thing was that I was selling drugs
9   by myself, I wasn't in the part of this situation that I got
10  put in.  I just got out of jail and that was the thing that was
11  happening in Harford County and they just put me in it.  You
12  know what I'm saying?  I was never on the phone with no -- with
13  Durbin, ever, like.
14      The thing was -- even on this paper right here, we
15  tried -- I tried to cop out numerous times.  I never wanted to
16  go to trial, Your Honor.  I didn't want to come in and
17  disrespect you or this courtroom or even try to be slick and
18  outsmart.  I was -- I'm redhanded just saying so much stuff on
19  the phone.
20      I was trying to get my time and admit to my guilt.  All my
21  prior drug charges, I admitted to my guilt.  When I'm wrong,
22  I'm wrong.  I understand I'm supposed to have a punishment.  I
23  just wanted to get my punishment and move on.
24      But beings as though, like you say, Harford County has a
25  thing against me, and he's based from Harford County --
```

1            THE COURT:  This isn't personal.  They just don't like
2    drug dealers.
3            THE DEFENDANT:  No, no, sir, I feel like it's personal
4    because before the guidelines even came out he was already
5    trying to get me higher than the guidelines.  So when we
6    contact them -- I have the paper right here where he was trying
7    to sentence me already passed the guidelines that you just
8    said, he been trying to give it to me before I even started
9    trial.  We been trying to cop out.
10        My guidelines before you set it up was 24.  And if I would
11   have admitted to guilty, like my other codefendants, it would
12   have been 21.  And that's what I was trying to do from jump.
13   But he said that I will go to trial and say that you sell more
14   drugs than what he actually charged me with.  I never knew
15   about a quantity hearing or anything like that of the sorts at
16   the time, so I didn't know that I could have one of them or
17   stuff like that.  So I found that out later.
18        But I been -- I never wanted to come in here and play
19   around with the courts because I didn't stand no chance at all.
20   It's so easy to see that I was -- anybody could see that I was
21   selling drugs on the phone, sir.  You know what I'm saying?  I
22   just feel like that I was put in a situation now that now I'm
23   about to get over-punished for my wrongdoing because now I'm in
24   a situation and now I done actually got into an altercation
25   with my co-defendant.

1    But the -- the altercation was way after the Court date.

2  We were on the tier all that time, the whole time.  I knew this

3  guy my whole life.  You feel me, sir?  So, like, I could

4  have -- if it was because of the statements or whatever I could

5  have been attacked him.  We had a disagreement over something

6  totally different and I just felt like I had to get it off my

7  chest because -- I mean, it's wrong, sir.  It's wrong.  But

8  that's what I did.

9    But I never, ever tried to come in this courtroom and play

10  with the courtroom.  And like I say, my prior drug convictions

11  I admitted to my guilt.  But he forced me into trial because he

12  was trying to get me way over my guidelines and the highest

13  person in our indictment copped out to five kilos or more, 10

14  and a half.  He was trying to get me with the same thing.  And

15  I just felt like it was way too much time.  I only was home a

16  couple months.  I didn't get a chance to do really too much of

17  anything.

18    So that's -- I just plead for my life because I feel like

19  I was put in a situation like this.  I feel like this is wrong.

20  I understand I'm doing wrong, and I deserve to be punished for

21  my wrongdoing, but I feel like I shouldn't get overly punished.

22  And I feel like this stuff -- all this is vindictive

23  prosecution.  That's what I feel, sir.  That's it.  I apologize

24  to the courts and that's it.

25    **THE COURT:**  Okay.  Thank you.

1      Applying the 3553(a) factors, the Defendant presents as 35

2 years old.  He accepted responsibility for distributing

3 narcotics but certainly contests the quantities that have been

4 attributed to him that were found by the jury.  He doesn't have

5 a high school diploma, but he did get his GED while in prison.

6 He's got no dependents.  Certainly he was raised with a father

7 who was a -- very much a substance abuser and, like his son, is

8 frequently in prison.

9      He stayed with his mother and his grandparents when his

10 father wasn't around, but it was an extremely unstable

11 household and one in which contained a great deal of financial

12 distress.

13      He has and continues to maintain a good relationship with

14 his father.  However, there are -- he has significant

15 substance, health, mental health issues that have been

16 exacerbated by his -- sorry, significant mental health issues

17 that were exacerbated by some childhood trauma and violence

18 that he witnessed.

19      He's got a life-long substance abuse history which also

20 contributed to poor decision-making.  He is in relatively good

21 health, physical health.  Of course because of the amount of

22 time that he's been incarcerated during his adult life he's

23 only been engaged in sporadic employment and has no assets.

24      What's quite disturbing is the behavior while he's been

25 incarcerated and during his incarcerations.  He has numerous

1  infractions for assaultive behavior and guilty violations.

2      In fact, he ended up stabbing a co-conspirator defendant

3  in this case almost blinding that co-conspirator who actually

4  testified at trial.  While the Defendant may assert that it had

5  nothing to do with the drug conspiracy, the underlying drug

6  conspiracy, I find that hard to believe.  But, nevertheless,

7  it's a demonstration of the significant mental health and anger

8  issues that the Defendant has.  How on earth can I expect an

9  individual to comply with the law when released or if released

10  when he can't comply with the law and not engage in violent

11  behavior while he's incarcerated.  It's very disturbing.  And

12  now it's very likely that Mr. Durbin has been permanently

13  maimed as a result of this behavior.

14      Of course the nature and circumstances of the offense are

15  serious.  He engaged in a conspiracy with others to distribute

16  large amounts of narcotics and cocaine base from Arizona to

17  Maryland.  It's a shame because the Defendant believed that

18  that was the only thing that he could do, and that's the only

19  way that he could make money is to continually engage and

20  distribute narcotics in Harford County, where of course because

21  of his previous convictions he was a target of their drug

22  interdiction.

23      There's nothing absolutely vindictive about this

24  prosecution.  Of course it is serious because much of the

25  violence that occurs in the state arises out of the narcotics

1   trade, and indeed we -- it's manifested itself in this case as

2   two drug dealers stab -- one of them stabbed or assaulted

3   another.

4       I do recognize the conditions of confinement and the Court

5   certainly appreciates that.  Since COVID there's been a

6   limitation on treatment and vocational services programs and

7   that has delayed the recovery of individuals like the

8   Defendant.  I think once he gets the treatment and training

9   that he needs he will be at a lower risk of reoffending.

10      There is a need for deterrence.  I think a message also

11  has to be sent to this Defendant and others like this Defendant

12  who believe that they can engage in violent criminal behavior

13  while incarcerated as a means of settling disputes is something

14  that's not going to be tolerated in the federal system and

15  shouldn't be tolerated in the state system.

16      The guidelines here is offense level 24, Criminal History

17  Category VI, the guideline range here is 100 months to 125

18  months, a supervised release range of between four and five

19  years, a fine range of between 20,000 and $5 million.

20      The sentence that is sufficient but not greater than

21  necessary to comply with the purposes set out in Title 18

22  U.S.C. § 3553(a) is 156 months.

23      I'm going to impose the residential drug treatment

24  program, mental health treatment, vocational training as well

25  anger management.

1    I'm going to put him on supervised release for a period of

2 five years.  And I would note that this sentence of 156 months

3 would be regardless of the Court's findings on the departures

4 and based exclusively on the 3553(a) factors and purposes

5 alone, but either way it is important.

6    In addition to the standard and mandatory conditions of

7 supervised release, there are additional conditions.  You must

8 not use or possess alcohol, you must participate in a

9 in-patient alcohol abuse program and follows the rules and

10 regulations of that program.  The probation officer will

11 supervise your participation in the program, provider,

12 location, modality, duration, intensity, et cetera.

13    You must not communicate or otherwise interact with any

14 known member of the Crips gang without first obtaining

15 permission of the probation officer.

16    You must participate in a substance abuse treatment

17 program and follow the rules and regulations of that program.

18 The probation officer will supervise your participation in the

19 program, provider, location, modality, duration, intensity, et

20 cetera.

21    You must provide the probation officer with access to any

22 requested financial information and authorize the release of

23 any financial information.  The probation officer may share

24 financial information with the U.S. Attorney's Office.

25    You must participate in a mental health treatment program

1  and follow the rules and regulations of that program.  The

2  probation officer, in consultation with the treatment provider,

3  will supervise your participation in the program, provider,

4  location, modality, location, duration, intensity, et cetera.

5      You must submit to substance abuse testing to determine if

6  you've used a prohibited substance.  You must participate in a

7  vocational services program and follow the rules and

8  regulations of that program.  Such program may include job

9  readiness training and skills development training.

10      I'm not going to impose a fine because the Defendant does

11  not have the ability to pay.  Restitution is not applicable.

12  Neither is forfeiture.  Is that correct, Mr. Romano?

13          **MR. ROMANO:**  That is correct, Your Honor.  In this

14  case it is not.

15          **THE COURT:**  There will be 100-dollar special

16  assessment imposed.

17      Mr. Mann, is there a recommendation regarding the Bureau

18  of Prisons recommendation?

19          **MR. MANN:**  Judge, my client would like to stay as

20  close to Baltimore as possible, preferably Pennsylvania.

21          **THE COURT:**  As close to Baltimore as possible,

22  preferably Pennsylvania.

23      Mr. Durbin [sic.], the sentence doesn't fall within the

24  guideline range but I believe it is appropriate in light of the

25  Court's findings under the 3553(a) factors and purposes.

1       There are no open counts to be dismissed, right?

2            **MR. ROMANO:**  No, Your Honor.

3            **THE COURT:**  All right.  Very well.  Certainly you've

4   got 14 days to file an appeal of your conviction and/or your

5   sentence.

6       The Defendant will be retained.  A judgment and commitment

7   order will be prepared.  A statement of reason will be prepared

8   and.  These records, along with the appropriate records of

9   sentencing, will be filed with the United States Sentencing

10  Commission as well as the United States Bureau of Prisons.

11      Mr. Romano, is there anything else we can productively

12  handle before we conclude?

13           **MR. ROMANO:**  No, Your Honor.  Thank you.

14           **THE COURT:**  Mr. Mann, anything else we can handle?

15           **MR. MANN:**  No, Your Honor.

16           **THE COURT:**  Thank you very much.

17           **THE CLERK:**  All rise.  This Honorable Court is now in

18  recess.

19      (Hearing concluded at 3:21 p.m.)

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4        I, Ronda J. Thomas, Registered Merit Reporter, Certified

 5   Realtime Reporter, in and for the United States District Court

 6   for the District of Maryland, do hereby certify, pursuant to 28

 7   U.S.C. § 753, that the foregoing is a true and correct

 8   transcript of the stenographically-reported proceedings held in

 9   the above-entitled matter and the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12                          Dated this 6th day of December 2022.

13

14

15                          _____

16                          Ronda J. Thomas, RMR, CRR
                            Federal Official Reporter
17

18

19

20

21

22

23

24

25
```

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA451**

Sheet 1 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)     Judgment Page 1 of 6

JSH

# United States District Court
## District of Maryland

UNITED STATES OF AMERICA

v.

**TERRELL DARNELL WALTON**

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed on or After November 1, 1987)

Case Number: GLR-1-20-CR-00210-004

Defendant's Attorney: Tyler L Mann, CJA
Assistant U.S. Attorney: Christopher J Romano

**THE DEFENDANT:**

☐ pleaded guilty to count(s) ___
☐ pleaded nolo contendere to count(s) _____, which was accepted by the court.
☒ was found guilty on count _1 of the Superseding Indictment_ after a plea of not guilty.

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 21 U.S.C. §846 | Conspiracy To Distribute and Possess With Intent To Distribute Controlled Substances | 05/30/2020 | 1 |

The defendant is adjudged guilty of the offenses listed above and sentenced as provided in pages 2 through __6__ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984 as modified by U.S. v. Booker, 543 U.S. 220 (2005).

☐ The defendant has been found not guilty on count(s) _____
☐ Counts ___ is/are dismissed on the motion of the United States.

**IT IS FURTHER ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

_____September 22, 2022_____
Date of Imposition of Judgment

_____9/23/2022_____
**George L. Russell III**                                    Date
**United States District Judge**

Name of Court Reporter: Ronda Thomas

**JA452**

Sheet 2 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                    Judgment Page 2 of 6

**DEFENDANT: Terrell Darnell Walton**                    CASE NUMBER: GLR-1-20-CR-00210-004

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of __**156 months as to Count 1**__ .

☒ The court makes the following recommendations to the Bureau of Prisons:
1. That the defendant be placed in a facility consistent with his security level that is as close as possible to: **Baltimore, Maryland preferably Pennsylvania**.
2. That the defendant participates in any substance abuse program for which he may be eligible including the RDAP.
3. That the defendant participates in any appropriate mental health evaluation and treatment program.
4. That the defendant participates in any appropriate anger management evaluation and treatment program.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ a.m./p.m. on _____.
    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender, at his/her own expense, to the institution designated by the Bureau of Prisons at the date and time specified in a written notice to be sent to the defendant by the United States Marshal. If the defendant does not receive such a written notice, defendant shall surrender to the United States Marshal:

    ☐ before 2pm on _____

**A defendant who fails to report either to the designated institution or to the United States Marshal as directed shall be subject to the penalties of Title 18 U.S.C. §3146. If convicted of an offense while on release, the defendant shall be subject to the penalties set forth in 18 U.S.C. §3147. For violation of a condition of release, the defendant shall be subject to the sanctions set forth in Title 18 U.S.C. §3148. Any bond or property posted may be forfeited and judgment entered against the defendant and the surety in the full amount of the bond.**

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By:_____
DEPUTY U.S. MARSHAL

Sheet 3 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                    Judgment Page 3 of 6

**DEFENDANT: Terrell Darnell Walton**             CASE NUMBER: GLR-1-20-CR-00210-004

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **5 years**.

**The defendant shall comply with all of the following conditions:**

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

## A. MANDATORY CONDITIONS

1) You must not commit another federal, state or local crime.
2) You must not unlawfully possess a controlled substance.
3) You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4) ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5) You must cooperate in the collection of DNA as directed by the probation officer.
6) ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7) ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page

## B. STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4) You must answer truthfully the questions asked by your probation officer.
5) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7) You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8) You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

Sheet 4 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                                    Judgment Page 4 of 6

**DEFENDANT: Terrell Darnell Walton**                                    CASE NUMBER: GLR-1-20-CR-00210-004

1) If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
2) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
3) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
4) If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
5) You must follow the instructions of the probation officer related to the conditions of supervision.

## C.    SUPERVISED RELEASE
## ADDITIONAL CONDITIONS

1. You must not use or possess alcohol.

2. You must participate in an inpatient alcohol abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

3. You must not communicate, or otherwise interact, with any known member of the Crips gang, without first obtaining the permission of the probation officer.

4. You must participate in a substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

5. You must provide the probation officer with access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the U.S. Attorney's Office.

6. You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

7. You must submit to substance abuse testing to determine if you have used a prohibited substance.

8. You must participate in a vocational services program and follow the rules and regulations of that program. Such a program may include job readiness training and skills development training.


**U.S. Probation Office Use Only**

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.


Defendant's Signature _____    Date _____

Sheet 5, Part A - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                                    Judgment Page 5 of 6

**DEFENDANT: Terrell Darnell Walton**                                    CASE NUMBER: GLR-1-20-CR-00210-004

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 5B.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $100.00 | Not Applicable | WAIVED | Not Applicable | Not Applicable |

☐  CVB Processing Fee $30.00

☐  The determination of restitution is deferred until _____.  An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | $.00 | |

**TOTALS**                  $ _____              $ ____$0.00____

☐  Restitution amount ordered pursuant to plea agreement  _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☐  the interest requirement is waived for the  ☐  fine  ☐  restitution

   ☐  the interest requirement for the  ☐  fine  ☐  restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Sheet 6 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                                                          Judgment Page 6 of 6

**DEFENDANT: Terrell Darnell Walton**                                           CASE NUMBER: GLR-1-20-CR-00210-004

# SCHEDULE OF PAYMENTS

Payment of the total fine and other criminal monetary penalties shall be due as follows:

A    ☒    In full immediately; or

B    ☐    $_____ immediately, balance due (in accordance with C, D, or E); or

C    ☐    Not later than _____; or

D    ☐    Installments to commence _____ day(s) after the date of this judgment.

E    ☐    In _____ (*e.g. equal weekly, monthly, quarterly*) installments of $_____ over a period of _____ year(s) to commence when
          the defendant is placed on supervised release.

The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

Unless the court expressly orders otherwise, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties
shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Bureau of
Prisons Inmate Financial Responsibility Program, are to be made to the Clerk of the Court.

☐    **NO RESTITUTION OR OTHER FINANCIAL PENALTY SHALL BE COLLECTED THROUGH THE INMATE
FINANCIAL RESPONSIBILITY PROGRAM.**

If the entire amount of criminal monetary penalties is not paid prior to the commencement of supervision, the balance shall be paid:

☐    in equal monthly installments during the term of supervision; or

☐    on a nominal payment schedule of $_____ per month during the term of supervision.

The U.S. probation officer may recommend a modification of the payment schedule depending on the defendant's financial
circumstances.

Special instructions regarding the payment of criminal monetary penalties:

☐    Joint and Several

| Case Number<br>Defendant and Co-Defendant<br>Names *(including defendant<br>number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐    The defendant shall pay the cost of prosecution.

☐    The defendant shall pay the following court cost(s):

☐    The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5)
fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution
and court costs.

**JA457**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| | : | |
| v. | : | **Case No.  GLR-20-210** |
| | : | |
| **TERRELL WALTON,** | : | |
| | : | |
| Defendant | : | |

### NOTICE OF APPEAL

Notice is hereby given that the above-named defendant, Terrell Walton hereby appeals to the United States Court of Appeals for the Fourth Circuit from the judgment and sentence imposed in this action as set forth in open court on September 22, 2022, as recorded in the judgment docketed on September 23, 2022.

Dated: September 30, 2022.

Respectfully submitted,

_____
/s/
TYLER MANN (#30028)
Law Offices of Mann & Risch
101 E. Chesapeake Ave.
Suite 403
Towson, MD 21286
Phone: (410) 929-5145
Email:  tyler@mannrisch.com

1

**JA458**

1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND
2                    NORTHERN DIVISION

3   UNITED STATES OF AMERICA,          )
                                       )
4            Plaintiff,                )
         vs.                           )
5                                      ) CRIMINAL NO.:
    CHE JARON DURBIN,                  ) 1:20-cr-00210-GLR-2
6                                      )
             Defendant.                )
7   _____)

8
                                Baltimore, Maryland
9                               December 19, 2022
                                9:30 a.m.
10
                     TRANSCRIPT OF PROCEEDINGS
11                       SENTENCING HEARING
         BEFORE THE HONORABLE GEORGE LEVI RUSSELL, III
12                      Courtroom 7A

13

14  For the Plaintiff:

15       Christopher J. Romano, Esquire
         Office of the United States Attorney
16       36 S. Charles Street, 4th Floor
         Baltimore, MD 21201
17

18

19  For the Defendant:

         Catherine Flynn, Esquire
20       Law Office of Catherine Flynn
         217 North Charles Street
21       2nd Floor
         Baltimore, MD 21201
22

23  Also Present:  Jessica Jackson, Probation Officer
                   Michael Pecukaitis, U.S. Postal Inspector
24

25       (Computer-aided transcription of stenotype notes)

*Patricia G. Mitchell, RMR, CRR  Federal Official Court Reporter*
*101 W. Lombard Street, Fourth Floor*
*Baltimore, MD 21201*

**JA459**

```
1                      P R O C E E D I N G S
2        (9:30 a.m.)
3            THE COURT:  You can have a seat everyone.  Good
4   morning.  Mr. Romano, why don't you call the case for me,
5   please.
6            MR. ROMANO:  Thank you, Your Honor.  Good morning.
7   This is the matter of the United States versus Che Jaron
8   Durbin.  Representing the United States is Christopher Romano.
9   Also present at counsel table is U.S. Postal Inspector Michael
10  Pecukaitis, and we're here for Mr. Durbin's sentencing on
11  Counts 1, 2 and 3 of the Indictment after he was found guilty
12  at trial.
13           THE COURT:  Very good.  Ms. Flynn, good morning to
14  you.
15           MS. FLYNN:  Good morning, Your Honor.  I'm Catherine
16  Flynn; I represent Mr. Durbin who is seated to my left.
17           THE COURT:  Mr. Durbin, good morning to you, sir.
18           THE DEFENDANT:  Good morning.  How are you doing?
19           THE COURT:  Pursuant to the court's masking policies,
20  everyone in the courtroom shall remain masked unless you're
21  engaged in a speaking role and have been fully vaccinated.  I
22  have been fully vaccinated, and I am engaged in a speaking
23  role, so as a result, I'm going to go ahead and remove my
24  mask.
25           We are here for the purposes of sentencing.  Mr.
```

3

1    Durbin was convicted on three counts of Conspiracy to

2    Distribute and Possess with Intent to Distribute Cocaine after

3    a jury trial.

4            Mr. Durbin, have you had the opportunity to view the

5    presentence report that was generated in this case?

6            THE DEFENDANT:  Yes.

7            THE COURT:  Mr. Durbin, if you could please sit up

8    and speak clearly into the microphone.  Have you had the

9    opportunity to speak with your attorney about the report?

10           THE DEFENDANT:  Briefly.

11           THE COURT:  I'm sorry?

12           THE DEFENDANT:  Yes, I spoke with her briefly about

13   it.

14           THE COURT:  Do you need more time to speak with her

15   about the report?

16           THE DEFENDANT:  I don't believe so.

17           THE COURT:  Ms. Flynn, have you had the opportunity

18   to review the report with your client?

19           MS. FLYNN:  Yes, Your Honor, and I believe I sent a

20   copy to Mr. Durbin.  Is that correct?

21           THE DEFENDANT:  Yes.

22           MS. FLYNN:  And we've had two or three visits since

23   then; is that correct?

24           THE DEFENDANT:  Yes.

25           MS. FLYNN:  All right.  I just wanted to clarify, we

1  have spoken several -- quite a few times since I sent it to you

2  because this sentencing actually originally was scheduled in

3  September, I believe.

4          THE COURT:  Right.

5          MS. FLYNN:  And we moved it to today's date because I

6  was on a jury.  So we've had several visits in between that

7  time; is that correct?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Just to confirm, Mr. Durbin, you don't

10 need any additional time to review the presentence report with

11 your attorney?  You're satisfied with your review of it as well

12 as your consultation with Ms. Flynn regarding the presentence

13 report; is that correct, sir?

14         THE DEFENDANT:  I just have a few, like,

15 misunderstandings on a couple of the points that I received.

16         THE COURT:  All right.  Let me ask you this.  I have

17 received sentencing memoranda from both the Government as well

18 as Ms. Flynn, and I did receive a self-represented defendant's

19 pro se supplement to the sentencing memoranda which you ended

20 up filing dated December 7, 2022, ECF No. 200.  Is that what

21 you're referring to?

22         THE DEFENDANT:  Yes.

23         THE COURT:  And within the confines of that document,

24 I note that you contest several issues which would include a

25 two-level obstruction of justice enhancement because you assert

```
1   that you did not obstruct justice by testifying falsely at
2   trial.  Is that correct, sir?
3              THE DEFENDANT:  Yes.
4              THE COURT:  And do you contest you were an
5   organizer/leader of the organization as well; is that correct?
6              THE DEFENDANT:  Yes, I contest that too.
7              THE COURT:  Okay.  Those two issues are the primary
8   issues regarding the sentencing guidelines; is that correct,
9   sir?
10             THE DEFENDANT:  Yes.
11             THE COURT:  And then, of course, you cite to a number
12  of factors related to your physical condition, your health
13  condition and other factors associated with the 3553(a) factors
14  in order to make an effort to have your sentence reduced; is
15  that correct, sir?
16             THE DEFENDANT:  Yes.
17             THE COURT:  In sum total, I've generalized the
18  contested issues as well as the arguments that you're seeking
19  to make as part of this sentencing; is that correct, sir?
20             THE DEFENDANT:  Yes.
21             THE COURT:  Ms. Flynn, I know that you've reviewed
22  his supplemental sentencing memoranda and I have reviewed yours
23  as well.  Are there any -- do you believe that the Court has
24  adequately summarized the defendant's contested issues related
25  to this case and the arguments he is making regarding his
```

```
1   sentence?
2           MS. FLYNN:  Yes, Your Honor.
3           THE COURT:  Very well.  Mr. Romano, I know you've
4   reviewed the sentencing memoranda as well.  Has the Court sort
5   of generally captured the arguments that the defendant has
6   made?
7           MR. ROMANO:  Your Honor, I believe that's
8   correct although there may be an issue with regard to drug
9   quantity because that does affect the base offense level.  I
10  addressed that in my sentencing memo, and I'll be happy to
11  speak at the appropriate time about that as well.
12          THE COURT:  Okay, very well.
13          MR. ROMANO:  Otherwise, yes, the Court fairly
14  summarized both Ms. Flynn's argument and the pro se arguments
15  that the defendant filed as well.  For the record, I did remove
16  my mask; I have been fully vaccinated and boosted.
17          THE COURT:  Thank you.  So I think the way we're
18  going to handle this is we're going to first start out with
19  the -- what the appropriate guidelines are in the case
20  according to the presentence report because those may be
21  contested.  Counts 1, 2 and 3 are grouped, and pursuant to
22  3D1.1, Group 1, conspiracy and possession with intent to
23  distribute cocaine, the base offense level is 30 due to the
24  amount and type of narcotics involved.  I believe the issues
25  were that he was charged with distribution of 5,000 grams of
```

1  cocaine as to Count 1 and then 500 grams of cocaine as to

2  Counts 2 and 3.

3          I'll certainly hear from the Government with regard

4  to the quantities indicated and to determine whether or not the

5  base offense level is appropriately 30.

6          MR. ROMANO:  Thank you, Your Honor.

7          THE COURT:  It's at least five kilograms of cocaine

8  associated with the defendant.

9          Then I'll hear from Ms. Flynn, and then we'll move to

10  each individual enhancement as well.

11          MR. ROMANO:  Your Honor, the Government's position is

12  that the base offense level with regard to Count 1 is at least

13  five kilograms of cocaine which would be a base offense level

14  of 30.  As the Court is familiar because you presided over the

15  trial, you heard testimony from a cooperating co-defendant,

16  Jameka Thompson, who testified that based on her multiple trips

17  between Tucson, Arizona and Harford County, Maryland, that she

18  transported upwards of 40 kilograms of cocaine.

19          Her testimony in large part was corroborated not just

20  by the quantity of drugs that were seized from her which was

21  over a kilo on the last stop, but as Your Honor will recall,

22  there were both airline records, hotel records, and rental car

23  records that showed a series of her trips from flying out from

24  Baltimore to Tucson and getting a rental car and driving back

25  where she indicated in her testimony that she was transporting

1   cocaine.  She used both her credit card as well as the

2   defendant's credit card to rent those rental cars.  We produced

3   those records which showed over 2,000 miles on each one of the

4   trips.  And clearly she was not out there just for the weather.

5   She was out there to transport cocaine back.

6        In addition to her testimony and her acknowledgment

7   at the time that she appeared before Your Honor and pled guilty

8   that she was involved in a conspiracy of over five kilograms,

9   Your Honor also heard the guilty plea of Mr. Durbin's source of

10  supply, Jack Anderson, who likewise accepted responsibility and

11  indicated that his role in the conspiracy was in excess of five

12  kilograms of cocaine.

13        Also as Your Honor will recall from the testimony --

14  and the postal inspector is here as well -- the U.S. Postal

15  Inspection Service seized $82,300 in currency, an amount that

16  the evidence showed was sufficient to pay for at least

17  four kilograms of cocaine.  All of that coupled with the one

18  kilogram of cocaine that was seized in 2019 from the

19  defendant's mother's residence, addressed to a company that the

20  defendant had formed and was the majority stockholder, TRU

21  Homes LLC, along with the excess of a kilogram that was seized

22  from Jameka Thompson in 2020, that there were at least five

23  kilograms of cocaine involved in the conspiracy.

24        Now the jury's verdict form indicated as to Count 1

25  that there was at least 500 grams or more of cocaine.  The

1    Court is not bound by that finding by the jury.  More than 25

2    years ago, as the Supreme Court pointed out in *United States v.*

3    *Watts*, a case that I cited in my sentencing memo, that even a

4    jury's verdict of acquittal -- and we don't have an acquittal

5    here; we have a finding by a jury of a drug quantity but we

6    don't have an acquittal.  But even a finding of acquittal, the

7    Supreme Court said does not prevent the sentencing court from

8    considering conduct that was involved in the charge as long as

9    the Court is satisfied by a preponderance of the evidence that

10   there was an amount in this case of five kilograms or more.

11          The Supreme Court in the *Watts* case relied upon the

12   statutory section of Title 18 §3661 which states that no

13   limitation shall be placed on the information concerning the

14   background, the character, or the conduct of the person

15   convicted of an offense for which the Court may receive and

16   consider for purposes of imposing the appropriate sentence; and

17   indeed that's echoed in the sentencing guidelines under §1B1.4

18   which says that the Court in determining the sentence to impose

19   within the guideline range or whether a departure is warranted,

20   that the Court may consider with that limitation any

21   information concerning the defendant's conduct unless otherwise

22   prohibited by law.  The Supreme Court has made clear that it's

23   not prohibited by law.

24          And indeed I'm not going to belabor the point

25   further, but I cited in my sentencing memo cases from the

1    Fourth Circuit, *U.S. v. Ibanaga* and *United States v. Hayes*, for

2    that very principle that the standard of proof here is by

3    preponderance of evidence in order for the Court to find that

4    the amount of cocaine involved in this conspiracy was five

5    kilograms or more.

6            Accordingly, I'm asking the Court to make a

7    determination that the base offense level would be a base

8    offense level of 30, reflecting at least five kilograms of

9    cocaine.

10           As far as Counts 2 and 3, he was only charged in

11   those counts with 500 grams or more, as Your Honor obviously

12   recalls at the time that both of those drugs were seized in

13   2019 and 2020.  In the one case it was a kilogram, and in the

14   2020 case when Jameka Thompson was arrested after the defendant

15   had gotten out from Tucson, had returned home, and she drove

16   back a couple days later, it was roughly 1.2 kilograms of

17   cocaine that were seized in connection with that.  And that

18   forms the basis for Counts 2 and 3.  But for Count 1, the

19   Government's position is that the overall arching conspiracy

20   reflected five kilograms or more which would be a base offense

21   level of 30.

22           So that's where we would start, and I'll address the

23   other issues once Ms. Flynn addresses this particular one.

24   Thank you, Your Honor.

25           THE COURT:  Thank you very much.  Ms. Flynn, I'll be

```
1    more than happy to hear from you.
2              MS. FLYNN:  Thank you, Your Honor.
3              I gather, Your Honor, I should identify for the
4    record that I have been fully vaccinated, and I've taken off my
5    mask for purposes of addressing the Court.
6              THE COURT:  Thank you.
7              MS. FLYNN:  Your Honor, we're asking the Court to
8    consider the base offense level to be 24 which I believe
9    accurately reflects the verdict from the jury.  Basically what
10   the Government is asking you to do is to ignore the fact that
11   the jury had the opportunity to convict Mr. Durbin of the
12   quantity that the Government was identifying and they chose not
13   to.  All of the evidence that was presented regarding the
14   quantity was speculative.  Let's start with Ms. Thompson's
15   testimony.
16             She speculated, she was estimating the quantity that
17   she believed she was responsible for.  She didn't identify that
18   "On every given trip this is how much I picked up, this is how
19   much money was involved."  She didn't testify with specificity
20   as to how she reached that number.
21             So the Government is asking Your Honor to basically
22   ignore the jury's verdict and go down that path of speculation
23   of what Mr. Durbin may or may not have been responsible for.
24   There was not any objective evidence, any tangible evidence of
25   the specific quantity here which I suspect is why the jury
```

1    rendered the verdict that they did.

2          So while I understand that the Court is allowed to

3    basically ignore the jury's verdict and their deliberation and

4    find by a preponderance of the evidence, in spite of the jury's

5    verdict, of certain quantity in this particular case, the

6    evidence that supports that argument is pure speculation.  So

7    the jury had the option of convicting him of more than five

8    kilograms; they chose not to.  They convicted him of possession

9    with intent to distribute 500 grams or more of cocaine, and I

10   believe that the proper designation of the base offense level

11   under those circumstances would be a 24.

12         So when the Government is arguing that you can take

13   into account Mr. Durbin's conduct, that was conduct that would

14   have been testified to by a cooperating co-conspirator who

15   received a significant benefit as a result of her testimony,

16   and the Government is also asking you to rely on a plea

17   agreement for a co-defendant who did not testify.  So we had no

18   opportunity to challenge the conclusions that were in the

19   statement of facts that he was asked to plead to.  So I don't

20   think it's appropriate for the Court to take into account

21   Mr. Anderson's plea agreement given the fact that there was no

22   opportunity to challenge that.

23         We did have an opportunity to challenge

24   Ms. Thompson's testimony and point out to the jury that she was

25   not a reliable witness, and I can only speculate that that's

1  why the jury reached the conclusion that they did.  While I

2  understand the Court is allowed to ignore the conclusion of the

3  jury, I don't believe under these circumstances that would be

4  appropriate.  In addition, obviously the Court did have an

5  opportunity to hear from Mr. Durbin, and the link between

6  Ms. Thompson's alleged activities and Mr. Durbin were basically

7  solely based on her testimony, and she received a significant

8  sentencing reduction as a result of that.

9        So it is our position that the proper base offense

10 level is a 24.

11       THE COURT:  Thank you.  Any reply from you,

12 Mr. Romano?

13       MR. ROMANO:  Just briefly, Your Honor.  We still have

14 the $82,300 which there was testimony from the Government's

15 witnesses, law enforcement officers, that that was back in that

16 time when that money was seized from the mailing by Mr. Durbin

17 to Jack Anderson out in Arizona, that that was basically the

18 going rate for four kilos of cocaine.  So it's not, with all

19 due respect to Ms. Flynn, it's not speculation.  She's

20 speculating as to why the jury returned the verdict that it

21 did.

22       But we're not asking the Court to speculate.  We're

23 asking the Court to look at the case in totality.  Also the

24 Court, just like we say to the jury, can rely on its own common

25 sense that Mr. Durbin, who flew out multiple times to Arizona,

1  and Ms. Thompson, who flew out to Arizona and then drove back,

2  wouldn't be driving back for an ounce, two ounces of cocaine.

3  That just defies credibility in terms of what was going on

4  here.

5       So we have her testimony.  In addition, we have the

6  multiple trips by her, as well as we have the airline records

7  and car rental records from Mr. Durbin going out there that

8  clearly show that there was an ongoing and a significant, a

9  significant effort to obtain cocaine to bring it back here to

10  Maryland.  So we have all that coupled with the money that I

11  think the Court can very well find by a preponderance of

12  evidence that it's not 500 grams.  I can speculate as to why

13  the jury came back with 500 grams because they saw one kilogram

14  and then they saw another kilogram.  They saw the one that was

15  concealed in that doll and then the other one.

16       So if I want to engage in the same type of

17  speculation as Ms. Flynn, the jury could very well have said,

18  okay, maybe they don't understand that for the conspiracy, it's

19  not just the drugs that were actually seized but what the

20  entire underlying conspiracy was involved in and what the

21  effort was.  But we don't need to speculate and we're not

22  asking the Court to speculate.

23       We're asking the Court to look at the evidence in

24  total, apply a preponderance of evidence, utilizing that

25  evidence as well as a finding by the Court with regard to just

```
 1   common sense that you don't make those 2,000-mile trips back
 2   multiple times.  We're not talking about one time, we're not
 3   talking about two times.  The records show multiple trips to
 4   establish that the object of this conspiracy was at least
 5   five kilograms.  Thank you, Your Honor.
 6            THE COURT:  Thank you very much.
 7            Pending before the Court is a contested issue
 8   regarding the amount and type of narcotics involved in a drug
 9   conspiracy subsequent to the defendant's conviction despite the
10   jury verdict that they did indeed check the box under 500 grams
11   or more of cocaine.  The Court is convinced by a preponderance
12   of the evidence that the appropriate offense level is base
13   offense level of 30 pursuant to 2D1.1(a)(5) and (c)(5).
14            The collective evidence put forth at trial
15   demonstrates that as a result of seizures, transportation
16   records, credit card receipts, co-conspirator testimony, as
17   well as cash seized, that the defendant was involved in, at the
18   very least, five kilograms of cocaine and a conspiracy to
19   manufacture, import or possess with intent to distribute
20   cocaine in that particular quantity.  As a result, I will go
21   ahead and find that the base offense level is 30.
22            It appears that the next contested issue is whether
23   or not the defendant was an organizer or leader.  Mr. Romano,
24   if you'd like, I certainly can hear from you on that, but I
25   think your sentencing memoranda outlines that as well, but I'll
```

```
 1    be more than happy to hear from you.

 2            MR. ROMANO:  Thank you, Your Honor, just briefly.

 3    The Government is requesting a four-level increase pursuant to

 4    §3B1.1(a) that the defendant was an organizer or leader.  The

 5    members of the conspiracy included, but weren't limited to, the

 6    defendant; Jack Anderson; Jameka Thompson; Terrell Walton, the

 7    co-defendant who went to trial; Gerrick Jackson, who the

 8    wiretap calls between Mr. Durbin and Mr. Jackson showed

 9    multiple, multiple contacts with Mr. Jackson ordering

10    quantities of cocaine and crack cocaine.  There were all these

11    references to scale and half time and all of that which weren't

12    for personal use.  They were for resale, given the amounts

13    requested, the frequency with the amounts requested.  So he was

14    clearly part and parcel of the conspiracy.  So there's five

15    people right there.

16            Then we have the other individuals that Mr. Durbin

17    was supplying, some of which was for personal use, some of

18    which was for resale.  So it's clear that he was an organizer

19    or leader.  He sent Jameka Thompson out there to Tucson to

20    obtain the cocaine and bring it back here so that it could be

21    resold.

22            In summary, the Government believes that the

23    defendant was, in fact, an organizer, a leader and a

24    resupplier, if you will, of the cocaine, and for those reasons,

25    the four-level increase is warranted.
```

1    THE COURT:  On top of that, he sent the package to

2    his mother's address.  I don't know whether or not she was

3    involved in the circumstance, but his mother's address was the

4    delivery destination for, I believe, the money.

5    MR. ROMANO:  Actually the mother's address was used

6    in two capacities.  One, the Court will recall he was hanging

7    outside waiting for the postal guy to show up, and when the

8    postal guy -- he actually almost ran to him to get that package

9    and bring it into mom's apartment there in Aberdeen; it was

10   addressed to TRU Homes, not to his mother.

11   THE COURT:  Right.

12   MR. ROMANO:  And, you know, I would hope that he

13   wouldn't intentionally make his mother part of the conspiracy,

14   but certainly he used that address to facilitate that.  And

15   then the money was actually mailed from him using, in this

16   case, his actual name and if you remember, the drugs when they

17   came out, Jack Anderson sent them in a fake name but about two

18   doors down from his house.  But when it came time for the

19   money, like a Jerry Maguire, "show me the money," they mailed

20   it to Jack Anderson, using Jack Anderson's real name and real

21   address.  Of course, notwithstanding both of those things had

22   gotten intercepted by the Postal Inspection Service so it never

23   made it to Jack Anderson.

24   But, yes, it just goes to show the lengths at which

25   he went to try and obtain the cocaine.  Once it got here, the

```
1   distribution levels through Terrell Walton and Gerrick Jackson
2   and others.  So I think there's ample, ample evidence to
3   support the four-level increase for the role in the offense.
4   Thank you.
5           THE COURT:  Thank you.  Ms. Flynn, I'll hear from you
6   if you'd like.
7           MS. FLYNN:  Your Honor, frankly, my argument is going
8   to dovetail with the anticipated Government's request for the
9   two-level increase for obstruction of justice because I'm
10  relying on Mr. Durbin's testimony in making my argument.
11          THE COURT:  Understood.
12          MS. FLYNN:  The two go hand in hand.
13          THE COURT:  And then I'll just give Mr. Romano a
14  brief opportunity to reply to both, and then I'll rule on
15  both.
16          MS. FLYNN:  All right.  Your Honor, we would object
17  to -- I'm jumping forward.  We would object to the four-level
18  enhancement for the role in the offense as well as the
19  two-level enhancement for the allegation of obstruction of
20  justice.  Your Honor heard obviously the entire trial.  You
21  heard Mr. Durbin's testimony.  He explained that he was not
22  involved in this conspiracy, that he was involved in selling
23  marijuana and that he was involved in the illegal sale of
24  vehicles, getting them from the Southwest, that the vehicles
25  were sold across the border; that when they raided his house,
```

1   there was documentation of false vehicle titles, all sorts of

2   documentation that indicated that there was this, I guess,

3   illegal sale of car activity.

4          He testified that that's what he was involved with;

5   that the activities of Jameka Thompson and Jack Anderson, while

6   Mr. Durbin had introduced them, he didn't have anything to do

7   with the ongoing activities that those people were involved

8   with and that his phone calls and the connections to these

9   other alleged co-conspirators, he indicated that he was selling

10  marijuana, not cocaine.  So he denies the allegations in this

11  case and he denies that his testimony was untruthful.

12          THE COURT:  Right, okay.

13          MS. FLYNN:  So I would object to both enhancements.

14          THE COURT:  Very good.  Mr. Romano, I'll hear from

15  you if you like.

16          MR. ROMANO:  Thank you, Your Honor.  Your Honor, the

17  Government is seeking under sentencing guideline §3C1.1 a

18  two-level enhancement for obstruction.  That section under

19  3C1.1 provides that if a defendant willfully obstructed,

20  impeded or attempted to obstruct or impede the administration

21  of justice with respect to an investigation, prosecution or

22  sentencing, then the Court may very well include a two-level

23  enhancement for obstruction.

24          While the Government understands the defendant has a

25  constitutional right to testify in his defense, he doesn't have

1  a constitutional right to "test-i-lie" and that's what he did
2  here.  He took the stand and said, "I'm not trafficking in
3  cocaine; I'm trafficking in marijuana."  No evidence of
4  marijuana, no evidence of marijuana being seized.  What came to
5  Mom's house wasn't marijuana; it was cocaine.  What Jameka
6  Thompson brought back -- and let's again look at that scenario
7  in May of 2020.

8          He flies out there, she flies out there.  We see them
9  both on the surveillance.  She's meeting with Jack Anderson.
10 He's picking her up at the airport and bringing her to Jack
11 Anderson.  She starts to leave in one vehicle, comes back,
12 meets again with Jack Anderson, obtains more cocaine and drives
13 back.  The defendant says, "Well, that was between Jack
14 Anderson and Jameka Thompson."  Jameka Thompson had no record
15 until --

16          THE COURT:  She had a job, she had a place.  She had
17 a family to support.

18          MR. ROMANO:  Right.  She got kicked off a post.

19          THE COURT:  She lost everything.

20          MR. ROMANO:  She did and the reason she did was -- if
21 you'll recall too she was even, after she was arrested and she
22 was in Harford County -- and this kind of goes towards the
23 sentencing issues that I'll touch on in a minute -- she's told
24 not to have contact with him.  She's already out, they released
25 her, and she's still calling him while he's locked up in the

1    Harford County Detention Center.  So she gets yanked back in

2    the detention center because she's in violation of her pretrial

3    conditions.  Even when she's in there, she's still trying to

4    call him.  Why?  Because, as she said, she loved him.

5                THE COURT:  There was this whole scheme to get

6    married.

7                MR. ROMANO:  Oh, yeah.  They were going to get

8    married.  For reasons we don't need to go into, that didn't

9    happen.  But the defendant used her.  He used her to facilitate

10    his drug business.  Whether he really had feelings for her or

11    not doesn't matter.  What he did do is he involved a woman who

12    had no prior criminal record to do his dirty work.

13                As Your Honor indicated, she lost everything.  She

14    had a master's degree.  In fact, Ms. Flynn was trying to

15    cross-examine her that she was the brains behind the outfit

16    here because she had the master's degree, and she was the one

17    with Jack Anderson that was doing all of this.  And the

18    defendant, "Oh, okay, yeah, I was selling some stolen cars."

19    But that's not the basis to say that his testimony doesn't

20    result in an obstruction enhancement.

21                Indeed, the Supreme Court in the *United States v.*

22    *Dunnigan* stated that the defendant can't contend in the

23    sentencing that because perjury interferes with the right to

24    testify, that we shouldn't apply that if the facts are such

25    that that testimony is, as I said, really "test-i-lie."

1          There's a case that's exactly on point that I cited

2    in my sentencing memorandum, *United States v. Perez*, where in

3    that case the obstruction of justice enhancement was affirmed,

4    affirmed for a defendant who falsely testified under oath that

5    he wasn't involved in cocaine trafficking.  That testimony

6    directly is contradicted by not only just a Government's

7    witness that the jury found credible, regardless of what we're

8    talking about in terms of drug quantity, but the jury obviously

9    found that testimony credible.  And the Court in *Perez* found,

10   as this Court should, that that false testimony concerned a

11   material matter, namely the guilt or innocence of the

12   defendant.  His false testimony that he wasn't involved in a

13   cocaine conspiracy or the money that he was sending to the

14   source of supply were not drug proceeds were absolutely

15   material to the guilt or innocence.

16          And it was done willfully.  It wasn't by accident.

17   It wasn't by mistake.  In fact, he got on the stand and said,

18   "I wouldn't get involved in cocaine this time because I already

19   got banged on that once, so I know what I was looking at there.

20   So that's why I was only selling marijuana."

21          Now did we see a single ounce, much less a single

22   gram of marijuana recovered from Jameka Thompson, from Mom's

23   house, from the package, from the searches that were done at

24   the defendant's house where we got the stolen car titles or

25   whatever they were?  No.  Now the fact that he may have been

1    involved in other criminal activity is hardly shocking or

2    surprising so if he's involved in a stolen car ring, fine.  So

3    what?  That wasn't why he was flying out to Arizona.  Jameka

4    Thompson wasn't driving stolen cars back and forth.  She was

5    driving cocaine back so it could be resold.

6            He clearly testified intentionally, willfully and

7    falsely as to material matters, and for those reasons, the

8    obstruction enhancement should apply as well.  Thank you.

9            THE COURT:  All right.  Pending before the Court are

10   two requests or two objections to the presentence report,

11   namely that the defendant was an organizer/leader pursuant to

12   3B1.1(a), as well as the defendant obstructed justice by

13   testifying falsely about his narcotics distribution activities,

14   namely that he was distributing marijuana and also engaged in

15   the transportation and distribution of stolen vehicles.

16           The Court does find by a preponderance of the

17   evidence the defendant was clearly an organizer/leader.  He

18   manipulated others within the criminal conspiracy.  The

19   evidence demonstrated that he was certainly in charge of the

20   location of where the narcotics would be distributed to.

21   Ms. Thompson testified credibly that she was directed by the

22   defendant.  Again, credit card records and other financial

23   documents indicate that he was an organizer/leader.

24           Further, the defendant's own testimony this Court

25   finds by a preponderance of the evidence was false.  There was

1  no indication, as pointed out by the Government, of the seizure

2  of any marijuana.  In fact, the circumstances regarding this

3  particular conspiracy and the evidence against the defendant

4  supports that he was indeed engaged in the cocaine distribution

5  activities.

6         So there's just no question based upon the evidence

7  as a whole -- and in fact, the jury disbelieved the

8  defendant -- that he was an organizer/leader, and of course he

9  testified falsely because the credible evidence in this case

10  pointed to him distributing cocaine and being involved in the

11  drug conspiracy.  As a result, both enhancements will end up

12  applying; that will raise his base offense level to 36.

13         I'll ask Ms. Flynn, those were the -- those were the

14  objections that were addressed by the defendant?  In other

15  words, he does not address or object to any term or condition

16  of supervised release, fine, et cetera, as indicated in the

17  presentence report; is that correct?

18         MS. FLYNN:  Yes, Your Honor.

19         THE COURT:  All right.  Looking at the defendant's

20  criminal history, he's accumulated a total of 12 criminal

21  history category points.  He was on probation at the time that

22  he committed the present criminal offense.  Among those

23  previous criminal convictions is a previous federal conviction

24  for cocaine base in which he received a reduced sentence of 20

25  months.  As a result, he has 14 criminal history category

1  points.  He is well within the Roman numeral VI category.  That

2  puts him -- with the grouping, it puts him at an offense level

3  36, criminal history category VI, with a guideline range of

4  between 324 and 405 months.

5          There is a minimum mandatory sentence that comes

6  along with these convictions on all three counts of five years;

7  a supervised release range as to Count 1 and 2 and 3 of between

8  four and five years; a fine range of between 40,000 and $5

9  million; and a special assessment of $300, $100 for each count

10 of conviction.

11         Mr. Romano, is that an accurate characterization of

12 the sentencing guideline range?

13         MR. ROMANO:  Yes, it is, Your Honor.

14         THE COURT:  Ms. Flynn, understanding and noting

15 Mr. Durbin's objections to the Court's finding, that is an

16 accurate characterization of the Court's finding of the

17 guideline range?

18         MS. FLYNN:  Yes, Your Honor.

19    **(Conference at the bench.)**

20    **(It is the policy of this court that every guilty plea and**

21 **sentencing proceeding include a bench conference concerning**

22 **whether the defendant is or is not cooperating.)**

23         THE COURT:  All right.  Mr. Romano, I'd be more than

24 happy to hear from you regarding sentencing.

25         MR. ROMANO:  Thank you, Your Honor.  As we all know,

1   the advisory guideline range is but one factor that the Court

2   is to consider in fashioning the appropriate sentence.

3   Title 18, § 3553(a) sets forth the factors that the courts are

4   to consider, including the nature and circumstances of the

5   offense, the history of the defendant, the need for the

6   sentence to be imposed to reflect the seriousness of the

7   offense, to promote respect for the law, and to provide just

8   punishment as well as to afford an adequate deterrent to the

9   defendant and, significantly here as well, to protect the

10  public from further crimes of the defendant.

11         The Court is familiar with the entire case and

12  indeed, as I mentioned before, Mr. Durbin not only involved

13  himself but involved Jameka Thompson, an individual who had no

14  prior criminal involvement and criminal history until her

15  unfortunate association with Mr. Durbin.

16         As the report reflects, Mr. Durbin has four prior

17  felony convictions.  The Court has touched upon one of those

18  which is a federal conviction for which he had initially

19  received 140 months, later reduced to 120 months.  There were

20  repeated violations of conditions of that supervised release

21  which resulted in an additional cumulative total of three

22  years' incarceration for those violations.

23         It's pretty clear that Mr. Durbin has shown and

24  remains undeterred when it comes to drug trafficking.  He has

25  no real credible argument that he's not a recidivist drug

1  dealer. And the Court needs to impose a sentence, if not to
2  deter Mr. Durbin from further criminal conduct, but at a
3  minimum to protect the public from Mr. Durbin's criminal
4  activities.

5  I'm reminded of a quote from Winston Churchill who
6  said: The most exhilarating feeling in the world is being shot
7  at and missed. Initially Mr. Durbin was shot at and hit when
8  he got that federal conviction, but it didn't deter him. He
9  was, in essence, shot at and missed when in 2019 that package
10  of cocaine was sent to his mother's house. It was seized; he
11  wasn't prosecuted for that. You would think that, giving
12  credit to his testimony on the witness stand, that he knew what
13  kind of sentence he could be facing given that he had
14  previously been convicted of cocaine. It didn't draw him up
15  short because he got that package in 2019. And even after that
16  when he knew that he was being looked at because they seized
17  those drugs, he continued. He continued to deal in cocaine.

18  "Well, I can't have it mailed to me because I see
19  what happened there, so plan B, send Jameka out to Tucson and
20  we'll just drive the drugs back. We'll just drive them back."
21  Money up to that point hadn't been a problem so, "I'll mail the
22  money out, but I'm not going to mail drugs back to me because
23  that had already been picked off." The only thing that did
24  when that first package in 2019 was seized, it didn't stop him;
25  it just changed up the MO. How is he going to get the drugs

1   back to Maryland, and how is he going to get the money back out

2   to Jack Anderson?  So it didn't stop him.

3           In every sense of the word, Che Durbin is a career

4   offender.  He has four prior felony drug convictions.  He has

5   now facing him a sentence for a fifth and what amounts to his

6   second federal drug conviction.  He hasn't been deterred.

7   Quite frankly, I don't know that there's anything that will

8   deter.  So we then have to look at how do we protect the

9   public?  How do we promote respect for the law?  Two important

10  considerations under Title 18, 3553(a).

11          In my sentencing memorandum, I asked the Court to

12  consider a sentence that's higher than what I'm actually going

13  to recommend now.  I will say this -- and as the Court knows

14  and I'm sure is going to hear from Ms. Flynn, perhaps members

15  in the courtroom and perhaps even Mr. Durbin himself, he did

16  sustain a serious injury.  There's no question about that.  At

17  the hands of his co-defendant, an extremely violent

18  individual.

19          THE COURT:  That's cost him -- Mr. Durbin's

20  recidivist behavior has cost him more than just time away from

21  his family and behind bars.  It's now costing him his eye.

22  That's another cost of this is that he's missing an eye because

23  he decided he didn't learn from the previous drug convictions

24  and wanted to continue to engage in this behavior.  He's ruined

25  Ms. Thompson's life.  He's now lost an eye and regardless of

1  what happens is going to be spending a significant amount of

2  time in the Bureau of Prisons.

3         MR. ROMANO:  Correct.  In that regard, it's -- I

4  don't want to have the Court take this the wrong way, but I

5  think the Court understands -- but for his activities, he

6  wouldn't have placed himself in the position at least the way

7  he lost his eye.

8         THE COURT:  Absolutely.

9         MR. ROMANO:  He could have lost his life, quite

10  frankly, the way he was operating out on the street.  But the

11  fact that he did sustain a serious injury at the hands of his

12  co-defendant, quite frankly, tempers my recommendation.  As I

13  indicated, initially I was going to recommend 325 months which

14  is about 27 and a half years.  But I do think a substantial

15  sentence needs to be imposed.  I'm going to ask the Court to

16  consider a sentence at least 20 years or 240 months.  That's

17  double what he got the last time.  Clearly the last time, even

18  coupled with the reduction from 140 down to 120 and then three

19  years on top of that that he got for the violation of

20  supervised release, didn't slow him down, didn't deter him.  So

21  the Court needs to consider all of that when it reflects on

22  what's the appropriate sentence that's sufficient but not

23  greater than necessary.

24         The guideline range, 325 to 400-some months, given

25  his personal circumstances, which I think the Court also needs

1    to take into consideration from the physical standpoint, I

2    think warrants a reduction in what the Government was seeking

3    and call it lenity, call it whatever, I believe that a sentence

4    of 240 months or 20 years is the appropriate sentence given his

5    prior multiple felony drug convictions, his repeated violations

6    of both state probation and federal supervised release, and the

7    fact that he continues and continues and continues to deal in

8    drugs which the Court knows not only ruined people's lives but,

9    in fact, can cost people their lives.

10            So for all those reasons, Your Honor, I would

11   respectfully ask the Court to consider a sentence of at least

12   20 years.  Thank you.

13            THE COURT:  Thank you very much.  Ms. Flynn, I'll be

14   more than happy to hear from you.

15            MS. FLYNN:  Thank you, Your Honor.  I know the Court

16   is well aware of my client's medical issues.  He had two --

17   well, three significant medical problems while he was

18   incarcerated.  First, he was diagnosed with COVID and that was

19   prior to getting vaccinated, and he now permanently suffers

20   from hypertension as a result of that.  He was diagnosed with

21   COVID on November 30, 2021.  He was locked up on May 12, 2020

22   in Harford County, so he's been continuously incarcerated since

23   that date.

24            THE COURT:  No objection to credit since May 12 of

25   2020?

```
 1            MR. ROMANO:  No, sir.

 2            THE COURT:  All right.

 3            MS. FLYNN:  Then on May 15, 2021, he tore his

 4   Achilles tendon while at CDF.  It's not just that he suffered

 5   this injury; it was the lack of proper medical care that

 6   exacerbated the problem.  I had to file two motions with the

 7   court to get the proper medical care for Mr. Durbin.  I had to

 8   file a motion in June asking for an MRI which had been

 9   recommended but the jail wasn't accommodating, and then a

10   further motion was filed in November for follow-up treatment.

11   So it's not just the injury, but it's the way somebody is

12   treated when they're at CDF.  And it's my understanding,

13   speaking to Dr. Berger who's the surgeon for the Achilles

14   tendon, that the delay in treatment, the delay in getting

15   proper medical care exacerbated the problem.

16            I'm not sure if the Court remembers this, but when we

17   were in trial, Mr. Durbin was coming in but he had a boot on.

18            THE COURT:  Right.

19            MS. FLYNN:  And it's my understanding that as a

20   result of that, an infection developed and that was probably in

21   February or March, and then he suffered from that infection for

22   months.

23            Ultimately what ended up happening, he was stabbed on

24   April 11, 2022, stabbed in the eye.  He indicates to me that

25   there was a delay in calling the ambulance, there was a delay
```

1  in getting to the hospital.  And he was at the hospital at MTC

2  for a while after he was released from the University of

3  Maryland, but it was torture trying to get the proper medical

4  treatment from outside eye experts.

5          What ended up happening is that Dr. Berger, who was

6  the doctor for his Achilles tendon, had to delay access to

7  handle what he needed to handle for Mr. Durbin because of the

8  eye surgery and the schedule there.  So he had to take a back

9  seat to the schedule of the eye surgeons.  I think there were

10 two surgeons who had to perform the surgery on Mr. Durbin.  And

11 that, I think, was in September; is that correct, sir?

12         THE DEFENDANT:  Yes.

13         MS. FLYNN:  So the injury was in April and he didn't

14 get surgery until September.  And then there were five

15 follow-up appointments, and Dr. Berger said to me, I can't do

16 anything until after all of that has been completed.  So the

17 infection had been festering for months.  What Dr. Berger

18 indicated is he's going to have to have another surgery because

19 of all these delays.

20         So ultimately I am going to be asking the Court to

21 recommend to the Bureau of Prisons that he be sent to -- I

22 think it's Butner, North Carolina?

23         THE COURT:  Butner, right.

24         MS. FLYNN:  Which it's my understanding they have

25 medical facilities.

33

1          THE COURT:  Absolutely.  It's probably the best

2     medical facility that the Bureau of Prisons has so

3     definitely --

4          MS. FLYNN:  So that is going to be a request because

5     there is ongoing treatment and intervention that's going to be

6     necessary.  Hopefully, there will come a point where whatever

7     intervention is necessary when it's over and they can get him

8     to the best place they can and that he get that and be

9     transferred to another facility.  I don't know that it's going

10    to be a chronic problem.  It's just that there are problems

11    that have to be addressed, and the delay because of his

12    incarceration have made things much, much worse than they would

13    have been for somebody who was not incarcerated at the time of

14    the injuries.

15          So while I understand the Government and the Court

16    have indicated but for his activities, he wouldn't have been

17    locked up where he got these injuries, that still doesn't mean

18    he should be entitled to subpar medical treatment.

19          THE COURT:  I 100 percent agree.  And as I'm certain

20    you're aware, and the Government is aware and the Marshal

21    Service and everyone, this circumstance related to COVID threw

22    everything completely upside down.

23          MS. FLYNN:  I know.

24          THE COURT:  And it got to a point where even after

25    the vaccine became available, there were some people that

1    weren't taking it, you were still getting it even though you

2    were vaccinated.  There was a high risk of contracting this

3    virus.  And that basically backed up not only the courts but

4    backed up the medical services provided to inmates, backed up

5    just general elective services that everyday folks were getting

6    before the pandemic.  But I agree with you and your point is

7    well taken that although the circumstances that gave rise to

8    him being incarcerated aren't necessarily on the government,

9    nevertheless the treatment after he is incarcerated, there is

10   some responsibility and accountability on the government's

11   part, so I hear you.

12           MS. FLYNN:  Thank you.  Before I finish, I know one

13   member that's in the audience of my client's family would like

14   to address the Court.

15           THE COURT:  Sure.  Who is that?

16           MS. FLYNN:  Ms. Tracy Durbin.

17           THE COURT:  Ms. Durbin, why don't you come forward.

18   You can come here through the double doors.  Ms. Flynn, if you

19   could direct her to the podium.  Ms. Durbin, if you have been

20   fully vaccinated, you may remove your mask when speaking.

21           MS. MURRAY:  I'm Tracy Murray.  I'm vaxxed and

22   boosted.

23           THE COURT:  Fantastic.  If you could, please state

24   and spell your full name for the record.

25           MS. MURRAY:  Tracy Murray, T-r-a-c-y M-u-r-r-a-y.

35

```
1              THE COURT:  All right, Ms. Murray, I'll be more than
2    happy to hear from you.
3              MS. FLYNN:  Before you start, I just want the Court
4    to have some context.  Mr. Durbin was very, very lucky to have
5    Ms. Murray as his advocate for his healthcare issues.
6              THE COURT:  Good.
7              MS. FLYNN:  I think but for Ms. Murray, we might
8    never have been able to get the proper care because she is in
9    the healthcare industry, and she was very, very aggressive in
10   her advocacy on behalf of Mr. Durbin to get the proper medical
11   care.  So I just want the Court to be aware of that.
12             THE COURT:  Ms. Murray, thank you very much for your
13   efforts.  You didn't have to do it.  You're in this business
14   but I appreciate your efforts.
15             MS. MURRAY:  I am Mr. Durbin's girlfriend.  I've been
16   his girlfriend for 14 years.  I am a registered nurse, I have
17   my bachelor's degree.  I just want to reiterate what Ms. Flynn
18   said about the medical treatment that he received.  First he
19   caught COVID.  Subsequently, now he has hypertension which he
20   did not have.  He lost his eye for them not calling 911 when he
21   needed; he sat there and bled out for over an hour which
22   subsequently caused him to be blind.
23             THE COURT:  It initially started when he was stabbed
24   in the eye by his co-defendant.
25             MS. FLYNN:  Yes, that is correct, while he was on the
```

1    telephone with me.  He sat there for over an hour waiting for

2    medical treatment.  He did not get medical treatment then.

3         The leg issue, it happened maybe in May.  Sent

4    letters, called, had to speak with Ms. Flynn in order to get

5    the proper treatment that he needed then.  Subsequently it got

6    infected.  He could also lose his leg at this point because he

7    has to have another surgery because of that.

8         As you said, if he weren't here, this probably would

9    have never happened, but that does not mean that he does not

10   deserve the treatment that he should have gotten.  He just

11   didn't deserve none of that.

12        THE COURT:  I understand.  I want to again thank you

13   for your strength and advocacy for Mr. Durbin, your dedication

14   to being a healer and coordinating efforts with Ms. Flynn, who

15   is one of our outstanding Criminal Justice Act panel attorneys,

16   to be able to do everything you can to advocate for him.  So

17   thank you.

18        MS. MURRAY:  No problem.  You're welcome.

19        MS. FLYNN:  Thank you, Your Honor.  Here in the

20   courtroom I just want to point out in addition to Ms. Murray

21   are her three daughters who Mr. Durbin helped raise, as well as

22   my client's father, cousin, and brother-in-law.

23        THE COURT:  Okay, thank you very much.  I'm sorry

24   you're here under these very difficult circumstances.

25        MS. FLYNN:  So he does have a lot of support in the

1　community.  One other thing, it is my recollection that after

2　my client was stabbed by Mr. Walton, I let Mr. Romano know that

3　that happened.  The jail didn't even let the Government know

4　that that had happened.  And Mr. Romano was in a position of

5　scrambling to try and backtrack and get the information.

6　　　　　I think by the time he was made aware of it -- he can

7　correct me if I am wrong -- whatever video there was was not

8　secured, and therefore Mr. Walton was not, in my opinion,

9　properly -- I don't know that the case was properly

10　investigated for purposes of prosecution.  I think there was

11　video, and it was not secured and stored.

12　　　　　THE COURT:  I believe it was also an issue of

13　Mr. Durbin not being cooperative as well.

14　　　　　MS. FLYNN:  I understand that.

15　　　　　THE COURT:  So Mr. Durbin knows who stabbed him, and

16　he chose not to assist in the investigation and prosecution of

17　a person who took his eye.

18　　　　　MS. FLYNN:  Your Honor, I understand that.

19　　　　　THE COURT:  So that's on him.

20　　　　　MS. FLYNN:  But it's also objectively the -- if

21　there's video and a crime occurs, I think it's incumbent upon

22　the law enforcement community to secure that video.

23　　　　　THE COURT:  Right.  And also Mr. Durbin testifying

24　and corroborating his co-defendant doing what he did goes a

25　long way to securing a conviction.

1          MS. FLYNN:  I understand.

2          THE COURT:  Understood.

3          MS. FLYNN:  Just factually speaking, I was surprised

4    when I contacted Mr. Romano and he was unaware of it.

5          THE COURT:  Sure.

6          MS. FLYNN:  Frankly, I don't know what all the rules

7    of this kind of process are, but Mr. Romano was certainly

8    advised very quickly when Ms. Thompson was trying to marry my

9    client.  He was the one who told me about that.  But

10   unfortunately, I was the one who had to inform him about the

11   injury.  I just want the Court to be aware that these things

12   can be complicated.

13         I'm asking Your Honor to consider a sentence of 15

14   years which is 180 months given the significant cost to

15   Mr. Durbin's health as a result of his incarceration.  My

16   understanding is Mr. Walton received 13 years, if I'm not

17   mistaken, and it is my understanding that part of that included

18   his conduct that -- as alleged in being the perpetrator against

19   Mr. Durbin.  So it's my understanding, while I wasn't present

20   for the entire sentencing, that the Court was taking into

21   account Mr. Walton's role in what happened to Mr. Durbin in

22   fashioning a sentence under the circumstances in his case.

23         I understand the verdicts and the counts were

24   different for Mr. Walton, and obviously I can't speak to his

25   criminal history.  But as far as Mr. Durbin is concerned, I'm

1  asking Your Honor to consider a sentence of 180 months under

2  all of the circumstances.

3         Now, Mr. Durbin, you have a right of allocation in

4  this case.  You can address the Court if there's something that

5  has not been addressed, or you can remain silent.  That's up to

6  you.  Is there something you would like to say?

7         THE DEFENDANT:  Yes.  First I want to say -- [noise

8  interruption.]

9         THE COURT:  You have to move away from the

10 microphone.  If you've been fully vaccinated, you can pull down

11 your mask, Mr. Durbin.

12        THE DEFENDANT:  Yeah.  First I want to apologize to

13 my family for the effect my decision-making made on them.  And

14 I want to send a special thank you to my fiancée, Tracy Murray,

15 for her encouragement and, you know, and just keeping me

16 positive throughout all this.  And I want to apologize to the

17 courts.

18        THE COURT:  All right.  I want to thank you very much

19 for that, Mr. Durbin.

20        Applying the 3553(a) factors, the defendant accepted

21 responsibility for his conduct.  He is 43 years old.  He does

22 have his GED.  He doesn't have any dependents, but his

23 girlfriend has children who she is raising.  Based upon the

24 presentence report, he had a normal childhood, no abuse or

25 neglect.  He is married and divorced.  In very poor -- I would

 1   say poor physical health, having suffered significant injuries
 2   as a result of altercations while incarcerated which included a
 3   stabbing, leaving him blind in one eye.
 4          I note that he has had extensive contact with the
 5   criminal justice system and indeed received a more lenient
 6   sentence as a result of his last federal drug conviction.
 7   Despite being released, he was not deterred from engaging in
 8   narcotics activity and indeed had another state court
 9   conviction for drug distribution.  And then we, of course,
10   we've got this large-scale conspiracy.
11          Without a doubt, Mr. Durbin is an experienced drug
12   dealer and who, despite being incarcerated for significant
13   periods of time, has not been deterred from engaging in this
14   kind of criminal conduct.  It's also a demonstration of a
15   failure to appreciate the real damage that drug dealers do in
16   our community and, quite frankly, not learning his lesson from
17   it.  And people are sick of it.
18          He was an organizer and a leader of a large-scale
19   drug conspiracy.  He knew what he was doing.  In the wake of
20   his behavior, he ruined the life of a person who didn't have
21   any criminal record, namely his paramour or girlfriend.
22          Of course, it's very serious.  Much of the violence
23   and death that occurs in this country arises out of the illegal
24   narcotic drug trade.  In addition to that, it's noteworthy that
25   despite testifying falsely that he was not engaged in cocaine

1    distribution, he nevertheless admitted to being engaged in

2    interstate or international automobile -- stolen automobile

3    trafficking and readily admitted on the stand, despite

4    admonishments from the Court about his right against

5    self-incrimination, to still nevertheless engaging in drug

6    distribution.  I find it absolutely remarkable.

7         And I certainly understand the circumstances giving

8    rise to his loss of an eye, and the lack of treatment or the

9    slow treatment should not have happened.  But nevertheless, the

10   perpetrator of this event wasn't brought to justice because

11   Mr. Durbin decided he wasn't going to snitch or cooperate

12   against somebody who ended up stabbing him in his eye.

13        I do think that there's a need to protect the public.

14   His prior criminal behavior is a clear demonstration that he is

15   incapable as an adult of conforming himself to the laws of

16   society.  He did receive a reduced sentence of 10 years before.

17   The advisory guideline range is between 324 and 405 months.

18   There's a minimum mandatory as to each one of those counts,

19   Counts 1 and 3.  Supervised release range between -- as to

20   Counts 1 and 3 of four to five years, a fine range between

21   40,000 and $5 million, and a special assessment in the amount

22   of $100 for each count of conviction for a total of $300.

23        I agree with the Government.  The sentence that is

24   sufficient, but not greater than necessary, to comply with the

25   purposes set out in 3553(a)(2) is 240 months.  I will tell you

1    before I heard argument in this case, I was seriously

2    considering going high into the guideline range, but I

3    certainly understand some leniency should be put in place given

4    the conditions of confinement that Mr. Durbin had to endure.

5         It will be 240 months for each count of conviction to

6    run concurrently, five years of supervised release to run

7    concurrently.  I note that I would have reached this sentence

8    regardless of how I fell on the guideline range based upon all

9    of the factors that I mentioned, including the fact that this

10   is the defendant's second federal criminal conviction and, I

11   believe, fourth or fifth distribution conviction.

12        I'm not going to impose a fine because he doesn't

13   have the ability to pay.  Restitution is not applicable.  There

14   is a forfeiture order here, the $82,300, the monies that were

15   seized.  Is there any objection to that?

16        MS. FLYNN:  No, Your Honor.

17        THE COURT:  Noted and granted.  There will be a

18   special assessment in the amount of $300 that will be imposed.

19   I am going to recommend a Bureau of Prisons facility in Butner.

20        The sentence doesn't fall within the guideline range.

21   In fact, it's well below the guideline range, but I think it's

22   nonetheless appropriate in light of the Court's findings on the

23   3553(a) factors and purposes.  There are no open counts to be

24   dismissed.

25        Mr. Durbin, you've got 14 days to file an appeal of

```
 1    your conviction and sentence in this matter.  The defendant
 2    will remain detained.  A Judgment and Commitment Order will be
 3    prepared, a Statement of Reasons will be prepared, and these
 4    records, along with the appropriate records of sentencing, will
 5    be filed with the United States Sentencing Commission as well
 6    as the United States Bureau of Prisons.
 7              Mr. Romano, is there anything else we can
 8    productively handle before we conclude?
 9              MR. ROMANO:  Your Honor, you may have discussed it
10    and I may have not heard it, but I think now don't we have to
11    go through all the conditions of supervised release?
12              THE COURT:  Right.  Well, Mr. Durbin indicated
13    earlier, and I can confirm now, that he reviewed the
14    presentence report.  Is that correct, Mr. Durbin?
15              THE DEFENDANT:  Yes.
16              THE COURT:  And you had the opportunity to read both
17    the mandatory and standard conditions of supervised release?
18              THE DEFENDANT:  Yes.
19              THE COURT:  I also note that there's no objection to
20    the special conditions of supervised release which I did not
21    mention.  In addition to the standard and mandatory conditions
22    of supervised release, I am going to impose special conditions
23    which would include, of course, paying the special assessment,
24    to submit to substance abuse testing to determine if you've
25    used a prohibited substance, or not attempt to obstruct or
```

1    tamper with testing methods.

2         You must participate in a substance abuse treatment

3    program and follow the rules and regulations of that program.

4    The probation officer will supervise your participation in the

5    program: provider, location, modality, duration, intensity, et

6    cetera.

7         Ms. Flynn, I can recommend a residential drug

8    treatment program for him.

9         MS. FLYNN:  Thank you, Your Honor.

10         THE COURT:  Is there any other particular program he

11    would like to engage in, vocational training or something?

12         MS. FLYNN:  No, Your Honor.

13         THE COURT:  All right.  Is there anything else,

14    Ms. Flynn?

15         MS. FLYNN:  No, Your Honor.  I will be filing the

16    notice of appeal.  I will not be in a position to handle that

17    matter for him.

18         THE COURT:  Right.

19         MS. FLYNN:  So I've already indicated that he should

20    either reach out to the public defender's office for the

21    appointment of an appellate attorney or seek other private

22    counsel for purposes of the appeal.

23         THE COURT:  That's right.  Mr. Durbin, it's going to

24    be really important.  Ms. Flynn is moving on, and so she will

25    not be available to represent you during the course of the

1  appeal.  So it's going to be really important for you to reach
2  out to the public defender's office as soon as possible.  I
3  don't know whether or not Ms. Murray will do that or you can
4  coordinate --
5           MS. FLYNN:  I'll facilitate it.
6           THE COURT:  Okay.  Ms. Flynn is going to facilitate
7  the contact, so she can assist in getting you another federal
8  public defender for the purpose of appealing your conviction.
9           THE DEFENDANT:  So do I put something in writing?
10          THE COURT:  She'll explain it to you.  She's one of
11 our outstanding panel attorneys, and so she will be able to
12 explain everything to you, and she will facilitate reaching out
13 to the public defender's office for the purpose of getting you
14 counsel.  And, by the way, everything is being recorded here so
15 there's a record of what I am saying so that you can be assured
16 that you will have appellate counsel to take care of your
17 appeal.  All right?
18          THE DEFENDANT:  All right.
19          THE COURT:  All right, thank you.
20          MS. FLYNN:  Thank you, Your Honor.
21          THE CLERK:  All rise.  This Court stands in recess.
22      (Proceedings concluded at 10:42 a.m.)
23
24
25

1    CERTIFICATE OF OFFICIAL REPORTER

2         I, Patricia G. Mitchell, Registered Merit Reporter,

3    Certified Realtime Reporter, in and for the United States

4    District Court for the District of Maryland, do hereby certify,

5    pursuant to 28 U.S.C. § 753, that the foregoing is a true and

6    correct transcript of the stenographically-reported proceedings

7    held in the above-entitled matter and the transcript page

8    format is in conformance with the regulations of the Judicial

9    Conference of the United States.

10         Dated this 11th day of March 2023.

11

12

13    _____
      Patricia G. Mitchell, RMR, CRR
14         Federal Official Reporter

15

16

17

18

19

20

21

22

23

24

25

Sheet 1 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)

Judgment Page 1 of 6

DSG

# United States District Court
## District of Maryland

UNITED STATES OF AMERICA

v.

**CHE JARON DURBIN**

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed on or After November 1, 1987)

Case Number: GLR-1-20-CR-00210-002

Defendant's Attorney: Catherine Flynn
Assistant U.S. Attorney: Christopher J Romano

**THE DEFENDANT:**

☐  pleaded guilty to count(s) ____
☐  pleaded nolo contendere to count(s) _____, which was accepted by the court.
☒  was found guilty on Count(s) 1s, 2s, 3s of the Superseding Indictment after a plea of not guilty.

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 21:846 | Conspiracy To Distribute and Possess With Intent To Distribute Controlled Substances | 05/31/2020 | 1s |
| 21:841(B)(1)(B); 18:2 | Possession With Intent To Distribute Cocaine; Aiding and Abetting | 05/31/2020 | 2s |
| 21:841(B)(1)(B); 18:2 | Possession With Intent To Distribute Cocaine; Aiding and Abetting | 05/31/2020 | 3s |

The defendant is adjudged guilty of the offenses listed above and sentenced as provided in pages 2 through ___6___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984 as modified by U.S. v. Booker, 543 U.S. 220 (2005).

☐  The defendant has been found not guilty on count(s) _____
☐  Count _____ is dismissed on the motion of the United States.

**IT IS FURTHER ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

December 19, 2022
Date of Imposition of Judgment

_George L. Russell III_                    12/20/2022    Date
George L. Russell III
United States District Judge

Name of Court Reporter:  Patricia Mitchell

Sheet 2 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                                      Judgment Page 2 of 6

**DEFENDANT: Che Jaron Durbin**                                        CASE NUMBER: GLR-1-20-CR-00210-002

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of **240 months as to Count 1s of the Superseding Indictment; 240 months as to Count 2s of the Superseding Indictment to run concurrent to Count 1s; 240 months as to Count 3s of the Superseding Indictment to run concurrent to Count 2s; for a Total Term of 240 months with credit for time served while in Federal Custody since May 12, 2020.**

☒ The court makes the following recommendations to the Bureau of Prisons:
   - That the defendant be designated to the <u>FCI</u> at <u>Butner</u> for service of his sentence.
   - That the defendant participates in any substance abuse program for which he may be eligible including the RDAP program.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____ a.m./p.m. on _____.
   ☐ as notified by the United States Marshal.

☐ The defendant shall surrender, at his/her own expense, to the institution designated by the Bureau of Prisons at the date and time specified in a written notice to be sent to the defendant by the United States Marshal. If the defendant does not receive such a written notice, defendant shall surrender to the United States Marshal:

   ☐ before 2pm on _____.

**A defendant who fails to report either to the designated institution or to the United States Marshal as directed shall be subject to the penalties of Title 18 U.S.C. §3146. If convicted of an offense while on release, the defendant shall be subject to the penalties set forth in 18 U.S.C. §3147. For violation of a condition of release, the defendant shall be subject to the sanctions set forth in Title 18 U.S.C. §3148. Any bond or property posted may be forfeited and judgment entered against the defendant and the surety in the full amount of the bond.**

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL


By:_____
DEPUTY U.S. MARSHAL

Sheet 3 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                                    Judgment Page 3 of 6

**DEFENDANT: Che Jaron Durbin**                                     CASE NUMBER: GLR-1-20-CR-00210-002

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **5 years as to Count 1s; 5 years as to Count 2s to run concurrent to Count 1s; 5 years as to Count 3s to run concurrent to Count 2s; for a Total Term of 5 years.**

**The defendant shall comply with all of the following conditions:**

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

## A.   MANDATORY CONDITIONS

1) You must not commit another federal, state or local crime.
2) You must not unlawfully possess a controlled substance.
3) You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4) ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5) You must cooperate in the collection of DNA as directed by the probation officer.
6) ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7) ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page

## B.   STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4) You must answer truthfully the questions asked by your probation officer.
5) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7) You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8) You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

Sheet 4 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                                                    Judgment Page 4 of 6

**DEFENDANT: Che Jaron Durbin**                                CASE NUMBER: GLR-1-20-CR-00210-002

1) If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
2) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
3) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
4) If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
5) You must follow the instructions of the probation officer related to the conditions of supervision.

## C.   SUPERVISED RELEASE
## ADDITIONAL CONDITIONS

You must participate in a substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

You must submit to substance abuse testing to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

**U.S. Probation Office Use Only**

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

Sheet 5, Part A - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)

Judgment Page 5 of 6

**DEFENDANT: Che Jaron Durbin**

CASE NUMBER: GLR-1-20-CR-00210-002

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 5B.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $300.00 | Not Applicable | Waived | Not Applicable | Not Applicable |

☐ CVB Processing Fee $30.00

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | $.00 | |

| | | | |
|---|---|---|---|
| **TOTALS** | $_____ | $    $0.00 | |

☐ Restitution amount ordered pursuant to plea agreement _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Sheet 6 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                                    Judgment Page 6 of 6

**DEFENDANT: Che Jaron Durbin**                                    CASE NUMBER: GLR-1-20-CR-00210-002

# SCHEDULE OF PAYMENTS

Payment of the total fine and other criminal monetary penalties shall be due as follows:

A  ☒  **Special Assessment to be paid in full immediately.**

B  ☐  $_____ immediately, balance due (in accordance with C, D, or E); or

C  ☐  Not later than _____; or

D  ☐  Installments to commence _____ day(s) after the date of this judgment.

E  ☐  In _____ (*e.g. equal weekly, monthly, quarterly*) installments of $_____ over a period of _____ year(s) to commence when
       the defendant is placed on supervised release.

The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

Unless the court expressly orders otherwise, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties
shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Bureau of
Prisons Inmate Financial Responsibility Program, are to be made to the Clerk of the Court.

☐  **NO RESTITUTION OR OTHER FINANCIAL PENALTY SHALL BE COLLECTED THROUGH THE INMATE
FINANCIAL RESPONSIBILITY PROGRAM.**

If the entire amount of criminal monetary penalties is not paid prior to the commencement of supervision, the balance shall be paid:

    ☐  in equal monthly installments during the term of supervision; or

    ☐  on a nominal payment schedule of $_____ per month during the term of supervision.

The U.S. probation officer may recommend a modification of the payment schedule depending on the defendant's financial
circumstances.

Special instructions regarding the payment of criminal monetary penalties:

☐  Joint and Several

| Case Number<br>Defendant and Co-Defendant<br>Names *(including defendant<br>number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☒  **The defendant shall forfeit the defendant's interest in the following property to the United States: See Order of Forfeiture
incorporated herein by reference.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5)
fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution
and court costs.

**JA510**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA          *
                                  *
vs.                               *        Criminal No.: GLR-20-0210
                                  *
                                  *
CHE DURBIN                        *

*     *     *     *     *     *     *     *     *     *     *     *     *

### <u>NOTICE OF APPEAL</u>

Notice is hereby given that the above-named defendant, Che Durbin hereby appeals to the United States Court of Appeals for the Fourth Circuit from the judgment and sentence imposed in this action as set forth in open court on December 19, 2022, as recorded in the judgment docketed on December 20, 2022. Undersigned counsel was privately retained for the proceedings in the District Court, the Defendant can no longer afford private counsel and requests the appointment of counsel to represent him. Undersigned counsel is not a member of the CJA panel and is not prepared to represent the Defendant for an appeal.

Dated: December 20, 2022.

Respectfully submitted,

_____/s/_____
CATHERINE FLYNN
217 North Charles Street
Second Floor
Baltimore, Maryland  21201
410-286-1440
Attorney for Defendant
cflynn@catflynnlaw.com

**JA511**